FILED

2005 MAY 12  PM 2: 33

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAMSUNG ELECTRONICS CO, LTD,                No    C-00-4524 VRW

     Plaintiff,

     v                                    ORDER

QUANTA COMPUTER, INC et al,

     Defendants.

_____/

Following the dismissal of various claims, this suit now focuses on United Stats Patent No 5,333,273, which discloses a "protected hot key function for microprocessor-based computer system." The invention is in the field of computer circuitry and, more particularly, keyboard-input processing for ISA-compatible personal computers. The court held a claim construction hearing on May 6, 2005, pursuant to <u>Markman v Westview Instruments, Inc</u>, 517 US 370 (1996). Based on the hearing, the parties' memoranda and the applicable Federal Circuit law, the court construes the claims of the patent as follows.

United States District Court

For the Northern District of California

I

The patent in suit has been the subject of considerable litigation, both in this court and in the Southern District of Texas before Magistrate Judge Johnson and Judge Rainey. Between the patent itself, the parties' memoranda, Judge Johnson's report and recommendation (the "Texas R&R," reproduced at Joint Statement (Doc #196) Ex 1) and Judge Rainey's claim construction order (the "Texas Order," also reproduced at Joint Statement (Doc #196) Ex 1), the invention has been exhaustively described. Accordingly, the barest outline will suffice here.

As the patent explains, activity on ISA-compatible computers typically proceeds via an "interrupt," which causes the computer's CPU to stop one activity and start another. Various interrupts (conventionally labeled in ISA-compatible computers as IRQ0, IRQ1, IRQ2 and so on) are associated with various functions. Conventionally, the "IRQ1" interrupt is associated with keyboard input; when the CPU receives an IRQ1 interrupt, it stops its activity to receive a "scan code" from the keyboard. This scan code signifies that a certain key has been depressed or released, and the CPU will then execute software instructions in response to the particular scan code. Such software instructions are specific to the software that a user has loaded onto the computer. For example, pressing the "A" key on the keyboard while running a word processing program will, typically, cause the letter "a" to appear in the active document. More exotically, particular keys or key combinations that call up a program or perform a certain function are often known as "hot keys." If two loaded programs are both designed to respond to the same hot key, the resulting conflict can

2

United States District Court

For the Northern District of California

1   cause the computer not to function in the way the user expects.

2          The patent is directed to a "protected hot key function"

3   whose behavior is not as readily altered or customized by user-

4   loaded software as conventional hot keys.  The invention describes

5   an "additional function key," which, when depressed on its own or

6   in combination with a conventional key or keys, causes a second

7   interrupt -- i e, an interrupt other than the IRQ1 interrupt

8   conventionally used in ISA-compatible computers.  Apparently, at

9   the time of the invention, little if any software existed that

10  would respond to this second interrupt, thus ensuring that computer

11  manufacturers could reliably assign predictable behaviors to hot

12  keys using the additional function key (or to the additional

13  function key on its own) without interference from user-loaded

14  software.

15

16                                II

17         The construction of patent claims is a question of law to

18  be determined by the court.  <u>Markman v Westview Instruments, Inc</u>,

19  517 US 370 (1996).  The goal of claim construction is "to interpret

20  what the patentee meant by a particular term or phrase in a claim."

21  <u>Renishaw PLC v Marposs SpA</u>, 158 F3d 1243, 1249 (Fed Cir 1998).  In

22  determining what a patentee meant by a term or phrase, the court

23  looks first to the claim itself.

24              The claims of the patent provide the concise
                formal definition of the invention.  They are
25              the numbered paragraphs which "particularly
                [point] out and distinctly [claim] the subject
26              matter which the applicant regards as his
                invention."  35 USC § 112.  It is to these
27              wordings that one must look to determine
                whether there has been infringement.  Courts
28              can neither broaden nor narrow the claims to

                                  3

> give the patentee something different than what
> he has set forth.  No matter how great the
> temptations of fairness or policy making,
> courts do not rework claims.  They only
> interpret them.

EI Du Pont de Nemours & Co v Phillips Petroleum Co, 849 F2d 1430, 1433 (Fed Cir 1988).

"The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." Renishaw, 158 F3d at 1248. "The words used in the claim are viewed through the viewing glass of a person skilled in the art." Brookhill-Wilk 1, LLC v Intuitive Surgical, Inc, 326 F3d 1215, 1220 (Fed Cir 2003) (citing Tegal Corp v Tokyo Electron Am, Inc, 257 F3d 1331, 1342 (Fed Cir 2001)). "Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning." York Prods, Inc v Central Tractor Farm & Family Ctr, 99 F3d 1568, 1572 (Fed Cir 1996).  The court may, if necessary, consult a variety of sources to determine the ordinary and customary meaning of a claim term, including the claim terms themselves, dictionaries, the written description, the drawings and the prosecution history, if in evidence. Brookhill-Wilk 1, 326 F3d at 1220.  "Such intrinsic evidence is the most significant source of legally operative meaning of disputed claim language." Vitronics Corp v Conceptronic, Inc, 90 F3d 1576, 1582 (Fed Cir 1996).  With respect to dictionary definitions, "[i]f more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." Texas Digital Systems, Inc v Telegenix, Inc, 308 F3d 1193, 1203 (Fed Cir 2002).

The court begins its construction of claim terms by consulting intrinsic evidence of the meaning of disputed claim terms, which includes the claims, the specification and the prosecution history (if in evidence).  Lacks Industries, Inc v McKechnie Vehicle Components USA, Inc, 322 F3d 1335, 1341 (Fed Cir 2003) (citation omitted).  "If upon examination of this intrinsic evidence the meaning of the claim language is sufficiently clear, resort to 'extrinsic' evidence, such as treatises and technical references, as well as expert testimony when appropriate, should not be necessary."  Digital Biometrics, Inc, v Identix, Inc, 149 F3d 1335, 1344 (Fed Cir 1998).  "[I]f after consideration of the intrinsic evidence, there remains doubt as to the exact meaning of the claim terms, consideration of extrinsic evidence may be necessary to determine the proper construction."  Id.

"[A] court may constrict the ordinary meaning of a claim term in * * * one of four ways[:]" (1) "if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim in either the specification or prosecution history;" (2) if the intrinsic evidence shows that the patentee distinguished the term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention; (3) "if the term chosen by the patentee so deprives the claim of clarity as to require resort to other intrinsic evidence for a definite meaning; and (4) "if the patentee phrased the claim in step- or means-plus-function format," then "a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto * * *."  CCS Fitness, Inc v Brunswick

United States District Court

For the Northern District of California

<u>Corp</u>, 288 F3d 1359, 1366-67 (Fed Cir 2002) (internal citations and quotation marks omitted).

Limitations from the specification, such as from the preferred embodiment, cannot be read into the claims absent an express intention to do so.  <u>Teleflex, Inc v Ficosa North Am Corp</u>, 299 F3d 1313, 1326 (Fed Cir 2002) ("The claims must be read in view of the specification, but limitations from the specification are not to be read into the claims.").  But "a construction that excludes a preferred embodiment 'is rarely, if ever, correct.'" <u>C R Bard, Inc v United States Surgical Corp</u>, 388 F3d 858, 865 (Fed Cir 2004) (citing <u>Vitronics</u>, 90 F3d at 1583).

With these legal principles in mind, the court now turns to the construction of the disputed claim language of the patent.

III

Independent claims 1 and 5 and several dependent claims are at issue.  For many terms, the parties have stipulated to constructions (either of their own accord or by adopting the Texas construction).  The court accepts those stipulations for purposes of this action.  The claims -- with disputed language underscored the first time it appears -- are rescribed below.  (The dependent claims about which there are no disputes are not rescribed.)

1.  A system for providing a built-in function in an <u>ISA-compatible</u> computer in response to activation of a selected combination of user activated keys, comprising:

a keyboard having a set of conventional alphanumeric and function keys and further having at least one <u>additional function key</u>;

6

a keyboard controller connected to said
keyboard to monitor said conventional keys
and said additional function key to detect
when at least one of said keys is
activated, said keyboard controller having
first and second interrupt signal lines
connected to said ISA-compatible computer,
said keyboard controller responsive to an
activation of at least one of said
conventional keys to activate a first
interrupt signal to said ISA-compatible
computer on said first interrupt signal
line, said keyboard controller responsive
to an activation of said additional
function key in combination with at least
one of said conventional alphanumeric keys
to generate a second interrupt signal to
said ISA-compatible computer on said
second interrupt signal line;

a first conventional interrupt handling routine
within said ISA-compatible computer
responsive to said first interrupt signal
from said keyboard controller to input
data scan codes from said keyboard; and

a second non-conventional interrupt handling
routine within said ISA-compatible
computer responsive to said second
interrupt signal from said keyboard
controller to input an identification of
said activated alphanumeric key and to
perform a predetermined function selected
by said identified alphanumeric key.

                            * * *

4. The system for providing a built-in function as
defined in claim 1, further comprising a central
processing unit that indexes a first memory location
pointer in response to said first interrupt signal,
said central processing unit further indexing a
second memory location pointer in response to said
second interrupt signal

5. A system for servicing keyboard interrupts in an
ISA-compatible computer, comprising:

a keyboard having a plurality of keys including
conventional alphanumeric keys,
conventional symbol keys, conventional
function keys and conventional cursor
control keys, said keyboard further
including at least one non-conventional

<u>function key</u>, said keyboard generating a
scan code in response to an activation of
at least one of said keys, said <u>scan code</u>
varying depending upon which of said keys
is activated; and

a keyboard controller <u>coupled</u> to said keyboard,
said keyboard controller further coupled
to said ISA-compatible computer by first
and second interrupt signal lines, said
keyboard controller generating a first
interrupt signal on said first interrupt
signal line upon receipt of a scan code
corresponding to one of said conventional
keys, said ISA-compatible computer
programmed to execute a program to input
said scan code in response to said first
interrupt signal, said keyboard controller
generating a second interrupt signal on
said second interrupt signal line <u>upon
receipt of a scan code corresponding to
said non-conventional function key</u>, said
ISA-compatible computer programmed to
execute at least one special routine upon
receipt of said second interrupt signal.

Patent at 13:36-14:48.

Thus, the terms to be construed are:

• "ISA-compatible computer" (claims 1 and 5)

• "additional function key" (claim 1) and "non-conventional
  function key" (claim 5), which the parties agree should
  be given the same construction

• "keyboard controller" (claims 1 and 5)

• "connected to" (claim 1)

• "second interrupt signal" (claims 1 and 5)

• "data scan code" (claim 1) and "scan code" (claim 5),
  which the parties agree should be given the same
  construction

• "indexes a first memory location pointer" (claim 4)

• "indexing a second memory location pointer" (claim 4)

• "coupled to" (claim 5)

• whether "upon receipt of a scan code corresponding to
  said non-conventional function key" (claim 5) means "upon
  receipt of a scan codes that is generated by the

8

United States District Court

For the Northern District of California

activation of a single non-conventional function key alone"

The court construes these terms in a sequence that reflects their logical interdependence.

"ISA-compatible computer" (claims 1 and 5)

The patent explains that "ISA" refers to "Industry Standard Architecture." Patent at 1:13-14. ISA "was developed by IBM Corporation for use in its AT-type computers that utilize an Intel 80x86 microprocessor." Id at 1:17-20. "The architecture of ISA-compatible computer systems is well known and [is not] described in detail" in the patent. Id at 3:48-50. The Texas R&R concluded that "an 'ISA-compatible computer' is a computer that can handle ISA standard defined interrupts." Texas R&R at 14. This was adopted by the Texas Order.

Defendants agree with the Texas construction. Defs Br (Doc #207) at 24. Plaintiff asks the court to "clarify" the Texas construction with the caveat that "[n]ot all ISA standard defined interrupts need to be used in an ISA-compatible computer." Pl Br (Doc #199) at 23. Plaintiff is anxious that under the Texas construction, defendants might "argu[e] to the jury that an ISA-compatible computer must actually use all of the ISA standard defined interrupts." Id.

The parties agree that the patent states that IRQ15 (which is used in the preferred embodiments of the patent as the "second interrupt signal") is not defined on a conventional ISA system. Id; Defs Br (Doc #207) at 24. Defendants quarrel with plaintiff's proposal on the ground that it "muddies the waters by leaving open the possibility that some of [the IRQs that are

9

United States District Court

For the Northern District of California

indispensible to a functioning ISA-compatible computer] might not be used." Id. That is, defendants contend that, with respect to defining interrupts, ISA compatibility has some room for flexibility, but a certain minimal set of interrupts must be used.

The Texas construction -- "a computer than can handle ISA standard defined interrupts" -- is sufficient, at least for the time being. Nothing in this language excludes the possibility that some interrupts might not be used in a given computer. Plaintiff is free to argue that point to the jury. It may be that the parties' true dispute is not over an ISA-compatible computer's ability to handle interrupts, but rather over what interrupts must be defined for a computer to be dubbed "ISA-compatible." If so, the parties may apply to the court for a further construction of "ISA-compatible computer," presenting relevant briefing and authorities when they do.

Accordingly, the court construes "ISA-compatible computer" as "a computer that can handle ISA standard defined interrupts."

"additional function key" (claim 1) and "non-conventional function key" (claim 5)

The parties list these terms as disputed, Joint Statement (Doc #196), but they do not appear to brief their dispute. Plaintiff seems to contend that "additional function key" is the "Fn" key, while defendants contend that it should mean "an extra function key." While the "Fn" key is disclosed as part of a preferred embodiment, see Patent fig 5, there is nothing to limit the claim to this preferred embodiment.

United States District Court

For the Northern District of California

1    The court essentially agrees with defendants that the

2 terms "additional function key" and "non-conventional function key"

3 can be construed according to their plain meaning.  Indeed, the

4 court concludes on the record before it that no construction is

5 needed at all.  Accordingly, the court declines to construe these

6 terms.

7

8 "data scan code" (claim 1) and "scan code" (claim 5)

9    The parties (and the Texas Order) agree that a "scan

10 code" (or "data scan code") is "a code number that the keyboard

11 generates or outputs whenever a key is depressed or released."

12 Plaintiff and defendants part company on whether "a row and a

13 column signal" -- the electrical signals generated from the grid of

14 wires that underlays the keys of the keyboard -- constitutes a scan

15 code.  Plaintiff argues that a row and column signal can constitute

16 a scan code; defendants argue that they cannot.

17    Throughout the patent, the discussion of "scan codes"

18 concentrates on how they are passed among different components of

19 the system.  See, e g, Patent at 4:25-27 ("The communication of

20 keyboard scan code information from the keyboard controller 128 to

21 the microprocessor 110 is illustrated pictorially in FIG 2.").

22 There is (almost) no discussion of how the scan codes are created,

23 and hence what forms they may take; the specification simply says

24 that "the keyboard generates a scan code."  Id at 4:18.  But the

25 specification makes clear why it is unnecessary to specify how scan

26 codes are created:

27            The keyboard 150 operates in a known
             conventional manner to repeatedly scan a
28           plurality of contact switches associated with

11

> the keys on the keyboard to determine if one or
> more contact switches is open or closed.  When
> an open contact switch is closed by depressing
> a key or a closed contact switch is opened by
> releasing a key, the keyboard 150 generates a
> scan code which is communicated to the keyboard
> controller 128 via the signal lines 152.

Id at 4:12-21.  In other words, the specification leaves "scan

code" undefined (and hence ambiguous) and instructs that "scan

code" is to be construed as it would be understood by one skilled

in the art.

> Elsewhere in the specification, the operation of the

keyboard is explained in more detail:

> When the keyboard microprocessor 250 detects an
> active row signal, it uses the row signal and
> the currently active column signal to uniquely
> identify which of the keys on the keyboard is
> depressed.  The key is identified with a scan
> code in a conventional manner.

Id at 7:51-55.  Plaintiff posits that "us[ing] the row signal and *

* * column signal to uniquely identify" the depressed key means

that a row and column signal is a scan code, because scan codes

identify keys.  But in the excerpt block-quoted above, "identify"

in the first sentence is best interpreted as "determine," while

"identified" in the second sentence means "identified to the

keyboard controller."  The two sentences would be redundant (or

inconsistent) if "identify" and "identified" had the same meaning.

Admittedly, this part of the specification is poorly drafted.  The

more revealing aspect of this excerpt is the suggestion that scan

codes are "conventional, i e, well known to those skilled in the

art.  Moreover, by using different words, the specification itself

suggests a distinction between "signals" and "scan codes."

> In light of the specification's intentional lack of a

12

1  definition of "scan code," it is appropriate for the court to look

2  to dictionary definitions.  Conventional dictionary definitions

3  make a distinction between "signals," which are physical phenomena,

4  and "codes," which are descriptions or identifiers.  In the

5  relevant senses, a "code" is a "symbol used to identify something

6  that lacks a specific name" and a "signal" is a "detectable

7  physical quantity or impulse (as a voltage, current, magnetic field

8  strength) by which messages or information can be transmitted."

9  Webster's Third New International Dictionary (Merriam-Webster,

10  Unabridged ed 1981) 437, 2115.

11          Two technical references cited by defendants are

12  particularly illuminating, and are consistent with the conventional

13  dictionary definitions.  First, the <u>Microsoft Press Computer</u>

14  <u>Dictionary</u> defines "scan code" as a "code number transmitted to an

15  IBM or compatible computer whenever a key is pressed or released."

16  Microsoft Press Computer Dictionary 306-07 (Microsoft, 1991),

17  reprinted in Dang Decl (Doc #209) Ex 6.  It is difficult to see how

18  a "signal" can be a "number."  Second, <u>How Computers Work</u> explains

19  that a "key's circuit carries a <u>signal</u> to the [keyboard]

20  microprocessor" which in turn "generates a number, called a <u>scan</u>

21  <u>code</u>".  Ron White, How Computers Work 112 (ZD Press, 1993)

22  (emphasis added), reprinted in Dang Decl (Doc #209) Ex 5.  This

23  reference can only be understood to exclude the possibility that a

24  row and column signal is a scan code.

25          Even resort to extrinsic evidence to construe "scan code"

26  confirms these dictionary meanings.  Defendants' expert makes the

27  point very clearly:

28          The microprocessor within the keyboard

13

United States District Court

For the Northern District of California

1   determines if a key is depressed by scanning
    the keyboard's matrix, which can be thought of
2   as a grid of circuits (row wires and column
    wires) underneath the keys.  Each key has an
3   electrical switch associated with it, with the
    electrical switch located at an intersection of
4   a row wire and a column wire.  The
    microprocessor scans each column of the
5   keyboard matrix, reading all the rows of a
    selected column to determine whether any of the
6   switches associated with any of the respective
    keys is pressed or released.  The row and
7   column signals on the row wires and column
    wires of the keyboard matrix only represent the
8   present electrical state of a given key as
    described above. * * * Row and column signals
9   are signals communicated between the keyboard
    microprocessor and keyboard matrix to enable
10  the microprocessor to monitor actuation and
    release of keys of the keyboard.  However, the
11  row and column signals are never provided from
    the keyboard microprocessor to the host
12  computer.  In fact, the keyboard microprocessor
    has to first convert or translate the pairing
13  of a row signal and a column signal into a scan
    code.  It is this scan code that is provided to
14  the host computer.

15  Buscaino Decl (Doc #208) ¶15 (emphasis in original).

16      This lends considerable credence to the specification's

17  apparent distinction between "signals" and "codes":  "Signals" are

18  raw electrical states (indicating, for example, an open or closed

19  circuit), while "codes" are translated or abstracted information

20  describing an electrical state.

21      Plaintiff's own expert describes the operation of a

22  keyboard in much the same way, also respecting the difference

23  between signals (the detection of which he refers to as "looking

24  for closed switches") and codes (which he refers to as "values"):

25      The process that the keyboard microprocessor is
    performing is to scan each column successively
26  looking for closed switches and reporting their
    value back to the CPU when one is found.
27  Because the keyboard microprocessor performs a
    scan of each column to find which key or keys
28  have been pressed, the values that correspond

14

to the pressed keys are called "scan codes."
Wedig Decl (Doc #201) ¶19.  In fact, plaintiff's expert even
describes scan codes as being "generated."  Id ("Once one or more
pressed keys have been detected and one or more scan codes
generated * * *.").  If the row and column signals are used to
detect a key press, it makes sense to speak of subsequently
"generating" a scan code only if the row and column signals are <u>not</u>
themselves scan codes.

Plaintiff strenuously suggests that two pieces of
extrinsic evidence -- manuals for the Phoenix 80286 Advanced Rom
Bios, see Wedig Supp Decl (Doc #215) Ex A -- show that row and
column signals can be scan codes.  One diagram depicts "keyboard
make/break scan codes" flowing to an "8042 keyboard controller"
which in turn issues a "make/break system scan code."  Id at 8-4.
Another diagram explains that "each time a key is pressed, the
keyboard hardware itself generates a keyboard make or break scan
code.  In and of themselves, keyboard scan codes are not
understandable to the system."  Id at 10-5.  While this may be
evidence that scan codes can take different forms, it is not
evidence that row and column signals are themselves scan codes.
This is not the only example of dispute among the parties about
whether scan codes are standardized and, if so, what standard
applies.  But that is all quite beside the point for purposes of
construing "scan code," because there is no basis in the claims for
limiting the term to one particular industry standard or another.
What is clear is that row and column signals are not scan codes.

Accordingly, the court adopts defendants' proposal (with
a grammatical correction) and construes "scan code" and "data scan

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1 code" as "a code number that the keyboard generates whenever a key
2 is depressed or released, said code number created by converting a
3 pairing of a row signal and a column signal in the keyboard
4 matrix."

5

6 "keyboard controller" (claims 1 and 5)

7        The parties largely agree on the construction of this
8 term:  The "keyboard controller" is "a component that activates
9 interrupt signals in response to receipt of data scan codes from
10 the keyboard and, upon request, transmits the data scan codes to
11 the computer."  The Texas Order further provides that the keyboard
12 controller is "distinct from the keyboard" and "the keyboard and
13 keyboard controller may be physically separate or housed together
14 in the same unit."  Texas Order at 4-5.  Plaintiff purports to
15 agree with the Texas Order, but suggests that "distinct from the
16 keyboard" should be omitted as superfluous and potentially
17 confusing in light of the (more accurate) "physically separate or
18 housed together" caveat.  Pl Br (Doc #199) at 8-9.  Defendants
19 protest that throughout the patent, the keyboard and the keyboard
20 controller are referred to as separate entities that are
21 "connected" or "coupled."  Def Br (Doc #207) at 13.  As such,
22 defendants contend, the reference to they keyboard controller being
23 "distinct from the keyboard" is the only way to give meaning to the
24 claim language.

25        The crux of the dispute flows from the parties' agreed
26 construction for "keyboard," which is "an input apparatus
27 containing internal circuitry to output or generate data scan
28 codes."  In light of the court's construction of "data scan code,"

16

United States District Court

For the Northern District of California

the parties' agreed-upon construction of "keyboard" implies that the process of "converting a pairing of a row signal and a column signal in the keyboard matrix" occurs within the functional unit of the keyboard.

There is no basis in the claim language for prohibiting the keyboard controller and the keyboard from being housed together. But by the same token, the patent is unambiguous in treating the keyboard and keyboard controller separately -- they are distinct in the schematics shown in the figures of the patent and they are distinct by the literal words of the claims. Moreover, the court's construction of "connected" (see below) would seem to require that the keyboard and the keyboard controller be electronically or functionally discrete components.

In this light, "distinct from the keyboard" is not superfluous; to the contrary, it dovetails with the court's construction of "scan code" and "connected to." Although the keyboard and keyboard controller are not (necessarily) _physically distinct_, they must be _electronically or functionally_ distinct. The court adopts the Texas construction in that respect. The parties are free to remind the jury that, as the Texas Order put it, "the keyboard and keyboard controller may be physically separate or housed together in the same unit." Nothing in the court's construction says otherwise.

A word is appropriate about the much-contested figure 7, which depicts a keyboard matrix connected to a microprocessor (250) with IRQ and data lines coming off it. The figure is difficult to decipher, for the specification states that the keyboard controller (220) is illustrated in figure 7, yet no such object appears in the

figure.  There is a later reference to figure 7 to the keyboard controller (130), but 130 does not appear on figure 7, and where it does appear (figures 1-4 and 6), 130 is an interrupt controller. Setting aside figure 7, however, the text of specification is consistent with the court's conclusion that the keyboard controller and the keyboard (including the keyboard microprocessor) can be closely physically connected but electronically or functionally distinct.  For example, the specification explains that "the keyboard controller 220 and the keyboard 210 [may be] combined as a single unit."  Patent at 7:33-34.  "Combined as a single unit" suggests physical integration, but the continuing reference to the keyboard controller and the keyboard as distinct entities suggests some electronic or functional distinction between them.

Accordingly, the court construes "keyboard controller" as "a component, electronically or functionally distinct from the keyboard, that activates interrupt signals in response to receipt of data scan codes from the keyboard and, upon request, transmits the data scan codes to the computer."

"connected to" (claim 1)

Plaintiff proposes to construe this seemingly simple term as "joined or linked together, including (1) two parts that have been physically joined or designed together (at least in part) through which electrical signals may flow, or (2) the contact between a device and one of its constituent components through which electrical signals may flow."  Defendants propose "join or fasten one thing to another usually by something intervening."

The court intuits that the dispute here arises from the

18

United States District Court

For the Northern District of California

1   technological progress of integrating multiple functions onto a

2   single microchip.  Plaintiff, unsurprisingly, would construe

3   "connected" as "broad enough to encompass the contact between a

4   device and one of its constituent parts."  Pl Br (Doc #199 at 15.

5   Defendants contend that this lacks support in the intrinsic record

6   or dictionary definitions.

7          By its plain meaning, "connected to" refers to the

8   "joining or fastening of one thing to another," just as defendants

9   propose.  But in the context of the patent, which relies heavily on

10  schematics to give content to "connected to" (see figs 1-4, 6-10),

11  the connections in question are not the nuts-and-bolts linkages of

12  mechanical engineering.  See <u>ACTV, Inc v Walt Disney Co</u>, 346 F3d

13  1082, 1088 (Fed Cir 2003) ("While certain terms may be at the

14  center of the claim construction debate, the context of the

15  surrounding words of the claim also must be considered in

16  determining the ordinary and customary meaning of those terms.").

17  There is little if anything in the patent about the physical size

18  or contiguity of the elements depicted in the figures or described

19  in the specification.  Plaintiff's proposed construction is a

20  (flawed) attempt at capturing both the unimportance of physical

21  integration and the importance of identifying electronically or

22  functionally discrete units.  A physically unified microchip with

23  two electronically distinct circuits that are "connected" within

24  the chip exemplifies one circuit "connected to" another.

25         The court is thus not entirely satisfied with either

26  proposed construction:  Plaintiff's construction ventures too far

27  from the plain meaning of the term to be construed; defendants'

28  proposal's use of "thing" is too tied to a realm of physically

United States District Court

For the Northern District of California

discrete objects.  The patent is about electronics and the figures represent functions; rather than simply "things," the claims describe "electronically or functionally discrete things."  The court therefore makes its own construction, on which it will entertain a motion to reconsider if necessary:  "Connected to" refers to "joining or fastening one electronically or functionally discrete thing to another."  With this language, the parties should be able to explain to the jury whether the products in suit do or do not meet the patent's claimed scope involving electronically or functionally discrete components.

<u>"coupled to" (claim 5)</u>

The court sees no reason to give this term a construction different from the construction given to "connected to," nor do the parties offer significantly different constructions for these two terms.  Accordingly, the court construes "coupled to" to refer to "joining or fastening one electronically or functionally discrete thing to another."

<u>"second interrupt signal" (claims 1 and 5)</u>

The parties agree that the "first interrupt signal" must be IRQ1, and so they agree that the "second interrupt signal" must <u>not</u> be IRQ1.  The parties dispute whether the second interrupt signal can be <u>any</u> other interrupt (as plaintiff contends), or whether it is limited to one of the ISA-standard interrupts (as defendants contend).  The question boils down to whether one skilled in the art would, in 1990 and in the context of a patent directed toward ISA-compatible computers, understand "interrupt" to

United States District Court

For the Northern District of California

1  encompass interrupts other than the ISA-standard IRQ interrupts.

2  Plaintiff's expert says yes.  Wedig Decl (Doc #201) ¶40

3  Defendants' expert says no.  Buscaino Decl (Doc #208) ¶38.

4          The dispute turns on whether the claims must be read

5  strictly in the context of ISA-compatible systems.  If so, it

6  appears that there is no significant disagreement that the claim

7  reads upon only IRQ interrupts other than IRQ1.  If the claim may

8  be interpreted beyond the context of ISA-compatible systems, then

9  there is no such limitation.  Defendants point out that the agreed-

10 upon construction of "first interrupt signal" flows from the fact

11 that ISA-compatible computers use IRQ1 as the standard interrupt

12 for keyboard input; why, defendants ask, should not the same

13 limitation be imposed on "second interrupt signal"?

14         Whether it was correct or not for the parties to

15 stipulate to the construction of "first interrupt signal" as they

16 did (apparently a decision made in light of the prosecution

17 history), the court sees no basis in the literal claim language to

18 limit "second interrupt signal" to ISA-standard interrupts.  If

19 anything, the choice of "interrupt" -- a generic, but well-

20 understood engineering term, see Wedig Decl (Doc #201) ¶40 --

21 rather than "IRQ" or "ISA-standard interrupt" evinces the

22 patentee's choice to eschew such a limitation in favor of a more

23 expansive claim.  Indeed, although IRQs are referenced throughout

24 the specification, the claims themselves eschew any reference to

25 IRQs.

26         It may well be that the independent requirement in the

27 claims that the invention function "in an ISA-compatible computer"

28 will tend to exclude non-ISA-standard interrupts.  But that is not

United States District Court

For the Northern District of California

a limitation introduced by "second interrupt signal," and so it would be improper to construe "second interrupt signal" more narrowly than its literal terms.  Accordingly, the court adopts plaintiff's proposed construction in this respect.

Plaintiff also seeks to elaborate on this construction by specifying that the interrupt "is generated when the non-conventional function key is depressed either alone or in conjunction with a conventional key."  This additional language, plaintiff asserts, is necessary to construe "second interrupt signal" in the context of claim 5.  The court rejects plaintiff's invitation to add this language to the construction, although the court returns to this issue shortly.  In this context, it is enough to say that "second interrupt signal" carries no germ of a requirement about how or when the signal is generated; other words in the claims carry that meaning.

Accordingly, the court construes "second interrupt signal" as "any interrupt, other than IRQ1."

**"upon receipt of a scan code corresponding to said non-conventional function key" (claim 5)**

As promised, the court now returns to the question whether claim 5 is limited to, or at least reads upon, generating the second interrupt signal "upon receipt of a scan code that is generated by the activation of a single non-conventional function key alone."  There is little to say on this subject; the literal terms of the claim are that the second interrupt signal is generated "upon receipt of a scan code corresponding to said non-conventional function key."  Receipt of that scan code alone is a

United States District Court

For the Northern District of California

1  sufficient condition for triggering the second interrupt signal.

2  The specification acknowledges that this is a possible (albeit

3  nonpreferred) embodiment.  Patent at 7:1-3 ("[T]he [non-

4  conventional] thirteenth function key Fn can be used to specify a

5  particular function in a manner similar to the [conventional]

6  function keys F1 through F12.").

7       By the same token, nothing in the claim language suggests

8  that receipt of that scan code alone is a necessary condition; it

9  may be that, in a proper embodiment, claim 5 could read on a

10  function key in combination with a conventional key.  The Texas

11  Order is consistent with this view.  See Texas Order at 11 ("While

12  the broad language of claim 5 does not expressly call for a second

13  interrupt signal in response to a scan code corresponding to the

14  non-conventional key with another key, neither does that language

15  foreclose the option of a scan code representing a combination of

16  keys.").

17       Whatever the case, the claim language is so clear that

18  the court need not look to the specification (or elsewhere) to

19  construe it.  Accordingly, being unable to improve on the literal

20  claim language, the court declines to construe the language

21  identified by defendants.

22

23  "indexes a first memory location pointer" (claim 4)

24       The parties agree that, in the activity of a CPU, "to

25  index" is "to select or access."  There is also no dispute over

26  what is indexed; the parties agree that the "memory location

27  pointer" is "an identifier that corresponds to the start of the

28  first conventional interrupt handling routine" of claim 1 (upon

United States District Court
For the Northern District of California

which claim 4 is dependent).  But the parties dispute <u>how</u> the
indexing is accomplished.  Plaintiff contends that there is no
limitation on the type of pointer.  Pl Br (Doc #199) at 23-24.
Defendants contend that the claim should be limited to indexing
performed through an interrupt vector, because ISA-compatible
computers perform indexing using interrupt vectors.  Defs Br (Doc
#207) at 23.

     The dispute appears to mirror the dispute over "second
interrupt signal"; there, as here, defendants assert that the
claims read only upon ISA-compatible computers and therefore claim
terms should be limited to their meaning in the ISA computing
environment.  The court is again unpersuaded.  If the patentee had
meant to limit the claim to particular methods of indexing, such a
limitation would appear in the literal terms of the claim language.
And indeed, as plaintiff points out, claims 6 and 7 refer to
"interrupt vectors."  Claim 4 does not.  Accordingly, it is not so
limited, and the court adopts plaintiff's proposed construction.

     Accordingly, the court construes "indexes a first memory
location pointer" as "selects or access an identifier that
corresponds to the start of the first conventional interrupt
handling routine."

"indexing a second memory location pointer" (claim 4)

     The construction of this phrase tracks the construction
of "indexes a first memory location," <u>mutatis mutandis</u>.
Accordingly, the court construes "indexing a second memory
location" as "selects or accesses an identifier that corresponds to
the start of the second non-conventional interrupt handling

1    routine."

2

3                              IV

4         Finally, with breathless accusations of sandbagging on

5    plaintiff's part, defendants move to strike portions of plaintiff's

6    reply brief, or in the alternative, to consider a supplemental

7    declaration from defendants in rebuttal.  Doc #219.  It is

8    undeniable that plaintiff devotes considerably greater attention to

9    the construction of "scan code" in its reply brief than in its

10   opening brief.  Compare Pl Br (Doc #199) at 22-23 (less than one

11   page of briefing on "scan code") with Pl Reply (Doc #213) at 11-14

12   (over three pages of briefing on "scan code").  But such is the

13   vice of three-step Markman briefing; a patentee who files an

14   opening brief may not be fully aware of the arguments that its

15   opponent will advance in its responsive brief.  In any event, the

16   court has found it unnecessary to refer to the material presented

17   in the reply brief (and, by extension, the rebuttal material

18   offered in defendants' supplemental declaration).  Accordingly,

19   defendants' motion (Doc #219) is DENIED as moot.

20

21        IT IS SO ORDERED.

22

23                              _____

24                              VAUGHN R WALKER

25                              United States District Chief Judge

26

27

28

United States District Court
for the
Northern District of California
May 12, 2005


\* \* CERTIFICATE OF SERVICE \* \*
Entry on Civil Docket




Case Number:3:00-cv-04524


Samsung Electronics

    vs

Quanta Computer

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Northern District of California.

That on May 12, 2005,  I SERVED and ENTERED on the civil docket a
true and correct copy(ies) of the attached, by placing said copy(ies) in
a postage paid envelope addressed to the person(s) listed below, by
depositing said envelope in the U.S. Mail; or by placing said copy(ies)
into an inter-office delivery receptacle located in the office of the Clerk.


        Mark Fowler, Esq.
        DLA Piper Rudnick Gray Cary US LLP
        2000 University Circle
        East Palo Alto, CA  94303-2248

        Terry D. Garnett, Esq.
        Alschuler Grossman Stein & Kahan LLP
        2049 Century Park, East
        39th Fl.
        Los Angeles, CA  90067-3213

        Vincent K. Yip, Esq.
        Alschuler Grossman Stein & Kahan LLP
        2049 Century Park, East
        39th Fl.
        Los Angeles, CA  90067-3213

        William L. Anthony, Esq.
        Orrick Herrington & Sutcliffe LLP
        1000 Marsh Road
        Menlo Park, CA  94025

        Kai Tseng, Esq.
        Orrick Herrington & Sutcliffe LLP

Richard W. Wieking, Clerk

BY: ___CORA DELFIN_____
   Deputy Clerk