United States Courts
Southern District of Texas
ENTERED

APR 2 3 2003

Michael N. Milby, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SAMSUNG ELECTRONICS CO., LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL NO. H-01-071 |
| | § | |
| INVENTEC CORPORATION and | § | |
| INVENTEC MANUFACTURING | § | |
| (NORTH AMERICA) CORPORATION, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| SAMSUNG ELECTRONICS CO., LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL NO. H-01-175 |
| | § | |
| ARIMA COMPUTER CORPORATION | § | |
| and ARIMA COMPUTER (TEXAS) | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |

## REPORT AND RECOMMENDATION ON CLAIM CONSTRUCTION

All parties agreed to a joint Markman hearing.[1]  The Markman hearing was held on November 12-15, 2002.[2]  The two patents remaining at issue in both cases are U.S. Patent No. 5,333,273 ("'273"), and U.S. Patent No. 5,588,054 ("'054").  The '273 patent is a continuation of Ser. No. 611,292.  Both patents ('273 and

---

[1]    For clarity, the court will, when it is necessary or desirable to distinguish between the two cases, refer to Civil Action No. H-01-71 as "Inventec" and Civil Action No. H-01-0175 as "Arima."

[2]    Inventec Docket Entry Nos. 100-107, Arima Docket Entry Nos. 130-135.

1

'054) are currently owned by Plaintiff and are being asserted in infringement actions against Defendants Arima and Inventec. The '273 patent relates to a protected hot key function for a microprocessor-based computer system, and the '054 patent relates to a power conservation system for a modem in a computer system.

The court has considered the hearing testimony, all relevant filings, the arguments of counsel, and the applicable law.[3]

## I.  Legal Principles for Claim Interpretation

In Markman v. Westview Instruments, Inc., the United States Supreme Court affirmed that the construction of patent claims is a matter of law exclusively for the court. 517 U.S. 370, 372 (1996). The court deciphers the meaning of the patent without reference to the accused device. Jurgens v. McKasy, 927 F.2d 1552, 1560 (Fed. Cir.), cert. denied, 502 U.S. 902 (1991). In order to fulfill this obligation, the court can rely on two types of evidence in addition to the claim language: intrinsic (e.g., patent specification and file history) and extrinsic (e.g., expert testimony). Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

According to modern claim construction principles, emphasis is placed on the words of the claims. See Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002); Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1341 (Fed. Cir. 2001); Karlin Tech.,

---

[3]    These cases were referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636 (b) (1) (A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and FED. R. CIV. P. 72. Inventec Docket Entry No. 66, Arima Docket Entry No. 42.

Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971 (Fed. Cir. 1999); Vitronics Corp., 90 F.3d at 1582.  The words used in the claims are given their ordinary meaning "in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history, if in evidence." Teleflex, Inc., 299 F.3d at 1324, 1325.  The ordinary meaning of a claim term, particularly a technical term, is determined from the perspective of a person of ordinary skill in the relevant art.  Id. at 1325; Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1340 (Fed. Cir. 2001).

The court should rely on intrinsic evidence to provide context and clarification, as well as to determine if the patentee intended to deviate from the ordinary meaning of the terms.  Teleflex, Inc., 299 F.3d at 1325, 1326; see also Bell Atl. Network Servs., Inc. 262 F.3d 1258, 1268 (Fed. Cir. 2001)(indicating that the heavy presumption in favor of the ordinary meaning of claim terms is overcome if the patentee acts as his own lexicographer or the words lack sufficient clarity to define the scope of the claim); Vitronics Corp., 90 F.3d at 1582-83 (stating that the history of the patent's prosecution may include specific representations regarding the scope of the invention and its relationship to prior art).  Statements affecting the scope of the invention may take the

form of an express disclaimer of a particular claim construction[4] or may offer interpretive assistance to the court in construing a claim. <u>Prima Tek II, L.L.C. v. Polypap, S.A.R.L.</u>, 318 F.3d 1143, 1149 (Fed. Cir. 2003). Because words often have multiple meanings, the objective and contemporaneous record found within the intrinsic evidence provides "the most reliable guide" to aid the court in determining which of the various meanings of the terms the inventor intended. <u>Tex. Digital Sys., Inc. v. Telegenix, Inc.</u>, 308 F.3d 1193, 1203 (Fed. Cir. 2002).

If the court finds no remaining ambiguity in the claim terms after reviewing the intrinsic evidence, the court need not consider any of the available extrinsic evidence. <u>Dow Chem. Co. v. Sumimoto Chem. Co., Ltd.</u>, 257 F.3d 1364, 1373 (Fed. Cir. 2001). Extrinsic evidence, including expert testimony, inventor testimony, and technical writings, is only relevant for the explication of any patent claims which remain unclear after thorough analysis of the intrinsic evidence. <u>Interactive Gift Exp., Inc.</u>, 256 F.3d at 1332; <u>Pitney Bowes, Inc. v. Hewlett-Packard Co.</u>, 182 F.3d 1298, 1308-09 (Fed. Cir. 1999); <u>Vitronics Corp.</u>, 90 F.3d at 1583, 1584. However, a court may consult extrinsic evidence for purposes of understanding the technology at issue. <u>Pitney Bowes, Inc.</u>, 182 F.3d

---

[4]    Arguments made to the patent office are considered, at this stage in a case, as an aid to claim construction. Prosecution history estoppel comes into play after claim construction, when deciding what equivalents the patentee relinquished via amendment.

4

at 1308, 1309. <u>See also</u> <u>Karlin Tech., Inc.</u>, 177 F.3d at 971; <u>Vitronics Corp.</u>, 90 F.3d at 1584.

## II.  Claim Construction of the '273 Patent Entitled "Protected Hot Key Function For Microprocessor-Based Computer System"

### A. <u>Background of the Patent</u>

The '273 patent involves technology for a protected hot key function in computers that are compatible with Industry Standard Architecture ("ISA"). ISA-compatibility refers to the architecture that IBM Corporation used for its computers and shared with the industry. According to the prosecution history of the patent, in the prior art, all interrupts were handled by the same interrupt handling routine. Usually present in ISA-compatible user systems are terminate and stay resident ("TSR") programs, which allow a user to access certain functions while another program is running. The TSR program generally runs in the background without interfering with the normal operation of the application program.

"Hot keys" may be utilized to call up the TSR programs temporarily. However, a potential problem with the use of hot keys is the fact that the hot keys of one TSR program may interfere or coincide with the hot keys of another TSR program. Also, if a hot key combination that is used for a TSR program coincides with an operational key function of an applications program, the TSR program may be activated when the user desired to perform a function of the application program, leading to user frustration

5

and error.  Because of the finite number of keys on the typical keyboard, it is not always possible to design around these issues. Therefore, a hot key function that cannot conflict with other programs' hot keys is desirable.

The inventors who applied for the '273 patent attempted to solve this problem by including an independent function key on the keyboard that had not been previously provided on conventional ISA-type computer systems.  Additionally, the interrupt handling routine utilized by this independent function key was not the same conventional interrupt handling routine used by the typical TSR program, a feature that ostensibly made this solution novel and unique.  Programs that utilized this new non-conventional interrupt handling routine would therefore be less likely to conflict with TSR programs.

B.  <u>Claims 1 and 5 of the '273 Patent</u>

The '273 patent abstract describes the invention as "an ISA-compatible computer system [that] includes an additional function key on its keyboard."[5]  Claims 1 and 5 are the only independent claims in the '273 patent.  Claim 1 reads:

> A system for providing a built-in function in an ISA-compatible computer in response to activation of a selected combination of user activated keys, comprising:
>
>> a keyboard having a set of conventional alphanumeric and function keys and further

---

[5]    Inventec Docket Entry No. 1, Ex. F, Arima Docket Entry No. 1, Ex. F. For the remainder of this section, the court does not repeat the record location of the patent when citing to its contents.

6

having at least one additional function key;

a keyboard controller connected to said keyboard to monitor said conventional keys and said additional function key to detect when at least one of said keys is activated, said keyboard controller having first and second interrupt signal lines connected to said ISA-compatible computer, said keyboard controller responsive to an activation of at least one of said conventional keys to activate a first interrupt signal to said ISA-compatible computer on said first interrupt signal line, said keyboard controller responsive to an activation of said additional function key in combination with at least one of said conventional alphanumeric keys to generate a second interrupt signal to said ISA-compatible computer on said second interrupt signal line;

a first conventional interrupt handling routine within said ISA-compatible computer responsive to said first interrupt signal from said keyboard controller to input data scan codes from said keyboard; and

a second non-conventional interrupt handling routine within said ISA-compatible computer responsive to said second interrupt signal from said keyboard controller to input an identification of said activated alphanumeric key and to perform a predetermined function selected by said identified alphanumeric key.[6]

Claim 5 reads:

A system for servicing keyboard interrupts in an ISA-compatible computer, comprising:

a keyboard having a plurality of keys including conventional alphanumeric keys, conventional symbol keys, conventional function keys and conventional cursor control keys, said keyboard further including at least one non-conventional function key, said keyboard

---

[6]     Col. 13, l. 36-col. 14, l. 7.

7

generating a scan code in response to an activation of at least one of said keys, said scan code varying depending upon which of said keys is activated; and

a keyboard controller coupled to said keyboard, said keyboard controller further coupled to said ISA-compatible computer by first and second interrupt signal lines, said keyboard controller generating a first interrupt signal on said first interrupt signal line upon receipt of a scan code corresponding to one of said conventional keys, said ISA-compatible computer programmed to execute a program to input said scan code in response to said first interrupt signal, said keyboard controller generating a second interrupt signal on said second interrupt signal line upon receipt of a scan code corresponding to said non-conventional function key, said ISA-compatible computer programmed to execute at least one special routine upon receipt of said second interrupt signal.[7]

Several terms in these claims are in dispute. The court addresses each term, noting the particular concerns raised by the parties in their multiple briefs and at the Markman hearing.[8]

---

[7]    Col. 14, ll. 23-48.

[8]

All parties agree that the following claim terms in the '273 patent have the following meanings, and the court adopts these constructions and representations: 1) "Conventional Alphanumeric Keys" are "keys that correspond to the letters of an alphabet, the decimal digits, and punctuation symbols;" 2) "Conventional Function Keys" are "keys identified as F1, F2...F11, and F12;" 3) "Additional Function Key" or "non-conventional function key" is the "Fn" key; 4) "First Interrupt Signal Line" is "a signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the first interrupt signal;" 5) "Second Interrupt Signal Line" is "a second, separate, signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the second interrupt signal;" 6) "Indexes or indexing" means "selects or accesses;" 7) "Conventional Symbol Keys" means "keys that correspond to conventional symbols, such as @, $, %, ^, &, *;" 8) "Conventional Cursor Control Keys" are "keys identified as the 'Home' key, the 'End' key, and the 'up, down, left and right arrow' keys;" 9) "Special Routine" is "a routine that is executed upon receipt of the second interrupt signal;" 10) "Interrupt Controller" is "a device coupled to the keyboard controller that generates one of a number of interrupt vectors depending on the interrupt signal received;" 11) "Interrupt

8

Unless otherwise noted, a term retains the same meaning throughout the patent.

## 1.  ISA-Compatible Computer

In the preamble (as well as several more times in Claim 1 and Claim 5), the patentee used the phrase "ISA-compatible computer," but left the term undefined, apparently because the patentee believed that "the architecture of ISA-compatible computer systems [was] well known."[9]  That assertion aside, the ordinary and customary meaning of this technical term has been hotly debated both in the opposing parties' briefs and during oral argument.

Plaintiff would like a very general definition of ISA-compatibility that would include any "microprocessor-based computer capable of running software that can be run on an IBM personal computer,"[10] but Defendants argue for more restrictive definitions.

---

Vector" "identifies a particular interrupt signal and also corresponds to an interrupt handling routine;" 12) "First Conventional Interrupt Handling Routine" is "a first interrupt handling routine that responds to the first interrupt signal from the keyboard controller by inputting data scan codes originating at the keyboard;" and 13) "Second Non-Conventional Interrupt Handling Routine" means a second interrupt handling routine, which, in response to the second interrupt signal inputs an identification of said activated alphanumeric key, and performs a predetermined function selected by the alphanumeric key.  No party will offer a construction for "identification of said activated alphanumeric key."  All parties agree to use plain meaning for "resides in read only memory."  <u>See</u> Inventec Docket Entry No. 89, Arima Docket Entry No. 119; Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002; Defendants' [Revised] Proposed Order dated Dec. 13, 2002.

[9]     Col. 3, ll. 48-50.

[10]    Arima Docket Entry No. 113, Inventec Docket Entry No. 81.

Both defendants focus on the system of interrupts the computer is capable of handling.[11]

"ISA-compatible" is a technical term of art used very generally in the field of computers in a wide variety of contexts. As noted earlier, it is a way to describe the architecture that IBM developed for its computers and then shared, allowing manufacturers to ensure greater compatibility and leading to more efficient and useful designs. Plaintiff focuses on the term "compatible" to bolster its assertion that ISA-compatibility is primarily related to software, and not hardware. Defendants point out that the term ISA-compatible is only discussed in the patent with respect to a system of interrupts and argue that the definition of ISA-compatible adopted by the court should reflect this focus. This is a situation in which the ordinary meaning of the word lacks "sufficient clarity to permit the scope of the claim to be ascertained from the words alone," and, as such, the specification may be used to assist in resolving this ambiguity. <u>Teleflex</u>, 299 F.3d at 1325.

In the specification of the patent, ISA is generally described as defining "an architectural environment for computers that

_____

[11]    Specifically, Defendant Arima argues for a definition stating that an "'ISA-compatible computer' is a computer supporting the [ISA] standard having an ISA bus, and which is capable of handling ISA standard defined interrupts." Arima Docket Entry No. 117. Defendant Inventec argues that "[a]n 'ISA-compatible computer' is a computer, which is capable of handling [ISA] standard defined interrupts." Inventec Docket Entry No. 86.

utilize an Intel 80x86 microprocessor."[12]  The description goes on to discuss the software that has been written for computer systems that are ISA-compatible, apparently to introduce the background of the need for the innovation that is described in the patent.  The utility of the invention is avoidance of certain hardware issues that lead to software problems.  This mere discussion in the specification of the different software programs available for IBM compatible computers does not serve either to define or to redefine the term "ISA-compatible."

In arguments to the United States Patent and Trademark Office ("PTO") for allowance, the '273 patent applicant stated, "In order to truly appreciate the novel and nonobvious distinction of the claimed invention over the prior art it is important to note that the claimed invention is in the ISA-compatible computer environment" and "[i]n the conventional ISA system, IRQ1 is the only interrupt which the controller can generate in response to a keystroke."[13]  Although these assertions do appear in the prosecution history, rather than the claims themselves, they are useful for determining how the patentee limited the term's definition in order to obtain allowance.  The inventor is not referring to a preferred embodiment with these statements, but to

---

[12]    Col. 1, ll. 19-20.

[13]    Inventec Docket Entry No. 88, Ex. O, Amendment, p. 5, USPTO 00499. From this point on, the court does not repeat the record location of the '273 patent prosecution history.  Also, it is noted that "IRQ" is an interrupt request line, hence "IRQ1" refers to interrupt request line 1.

11

the "claimed invention." "The terms in a claim . . . are not given their ordinary meaning to one of ordinary skill in the art when it appears from the patent and file history that the terms were used differently by the applicant." Southwall Techs., Inc. v. Cardinal IG Comp. 54 F.3d 1570, 1578 (Fed. Cir.), cert. denied, 516 U.S. 987 (1995).

After the patent examiner described ISA-compatible as "no more than a well known basic design choice,"[14] and the proposed claims had been rejected twice, the patentee amended the claim language to further clarify that the invention claimed the "two interrupt signals as being two separate physical entities"[15] within the ISA-compatible environment. This was to distinguish the claimed invention in the "extremely limiting"[16] ISA-compatible computer architecture that, by the patentee's own definition, previously provided only one interrupt. By focusing on the invention's ability to provide another interrupt signal without varying the most commonly used computer architecture at the time, the applicant sought to distinguish his claimed invention from the prior art referenced by the examiner. As such, the patentee continued to frame his invention solely within the ISA-compatible environment, more and more narrowly as required by the examiner.

_____

[14]    Final Action dated April 14, 1992, USPTO 00508.

[15]    Amendment in Response to Final Office Action, p. 4, USPTO 00548.

[16]    Amendment, p. 6, USPTO 00500.

12

Arguments made to the PTO during prosecution can limit the meaning of the terms for purposes of claim construction in subsequent litigation. "The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during prosecution of his patent." Springs Window Fashions, LP v. Novo Indus., 323 F.3d 989, 995 (Fed. Cir. 2003). The claimed invention must be described to the extent that the public can avoid infringement in order for patent laws to serve their purpose of promoting (and not hindering) invention. To adopt the broad definition that Plaintiff urges upon the court would be to ignore the assertions that the patentee himself made to the PTO in order to gain allowance for his claims. This the court cannot do.

On the opposite end of the spectrum, Defendant Arima invites the court to adopt a construction that would specify that an ISA-compatible computer must include an ISA bus as one of its components. However, the court finds no legal justification for carrying its claim construction to that level of specificity. Such a narrow definition is not required either by the claims themselves or the intrinsic evidence. Defendant Arima argues that, although no mention of the ISA bus is made in the claims, it is clear from the specification that the only portion of the ISA-compatible computer that the patent is concerned with is the system of interrupts. Therefore, following Defendant Arima's logic, the ISA

13

bus, as a main component of the commonly used system of interrupts described as a preferred embodiment in the specification, should be included in the definition. The court cannot give credence to this argument. Limitations to the claims should not be inferred from a preferred embodiment. See Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998).

Therefore, the court determines that an "ISA-compatible computer" is a computer that can handle ISA standard defined interrupts.

### 2. Keyboard, Keyboard Controller, and Data Scan Code

The meaning of the terms "keyboard," "keyboard controller," and "data scan code" are major points of contention among the parties. The context for the use of these terms is slightly different in Claim 1 than in Claim 5. The difference in the two claims may reflect, as has been suggested, the difference between desktop and laptop computers. However, the claims themselves do not make this distinction explicit. The court, therefore, does not extrapolate definitional nuances from that assumption or import additional limitations into the claims on that basis. Rather, the court focuses on the language of the claims in deciding the meanings of these terms.

With regard first to the term "keyboard," Plaintiff argues that it is "the combination of the keys, the keyboard matrix and the microprocessor circuitry used to decode signals from the

14

keyboard matrix."[17]    Defendants offer definitions that emphasize what the claims state that the keyboard does, rather than what components it includes.    Defendant Arima's construction is as follows: "A 'keyboard' is an input device that outputs a data scan code (Claim 1), or generates a data scan code (Claim 5) in response to an actuation of a key.[18]    Defendant Inventec's construction is substantially the same.[19]    At the <u>Markman</u> hearing, Plaintiff's counsel agreed that the keyboard outputs or generates a data scan code and suggested that the court could include that requirement in the definition.[20]    Plaintiff's main lobbying point is that the definition of keyboard should include microprocessor circuitry.

Relying on extrinsic evidence in the form of expert testimony, Plaintiff encourages the court to recognize that a keyboard cannot operate without microprocessor circuitry and that one of ordinary skill in the art at the time of the invention understood the necessity of microprocessor circuitry.    Also, as Plaintiff points out, the specification indicates that Figure 7 "is a partial block diagram of a keyboard in accordance with the present invention showing the control microprocessor and the keyboard matrix."[21]

---

[17]    Arima Docket Entry No. 113, Inventec Docket Entry No. 81.

[18]    Arima Docket Entry No. 117.

[19]    Inventec Docket Entry No. 86.

[20]    <u>Markman</u> hearing transcript, vol. 1, pp. 73, 79-80.

[21]    Col. 3, ll. 25-27.

15

Figure 7 indeed includes a microprocessor and a keyboard matrix as part of the diagram. The specification's more detailed description of Figure 7 states that "the keyboard controller 220 and the keyboard 210 are combined as a single unit" and that the "keyboard controller 220 is controlled by an internal keyboard microprocessor 250."[22] The specification continues:

> When the keyboard microprocessor 250 detects an active row signal, it uses the row signal and the currently active column signal to uniquely identify which of the keys on the keyboard 210 is depressed. The key is identified with a scan code in a conventional manner. . . . The keyboard microprocessor 250 in the keyboard controller 130 activates the IRQ1 signal line 154, and, when the system microprocessor 110 responds, communicates the scan codes to the system microprocessor . . . .[23]

Plaintiff argues that, because the claims dictate that the scan codes come from the keyboard and the preferred embodiment requires the keyboard microprocessor circuitry to output the scan codes, the microprocessor circuitry must be part of the keyboard.

The court encounters some difficulty with Plaintiff's definition. Primarily, it does not appear that the described embodiment referenced by Plaintiff is that which is claimed in either Claim 1 or Claim 5. The language of the specification indicates that the keyboard microprocessor is internal to the keyboard controller (not the keyboard) and that the keyboard and keyboard controller are combined in a single unit. The claims,

---

[22]    Col. 7, ll. 32-37.

[23]    Col. 7, ll. 51-62.

16

however, do not give life to this single-unit embodiment.  The claims employ the words "connected" and "coupled" to explain the relationship between the keyboard and the keyboard controller.  In addition to these words suggesting separate identities, the claims further explain distinct roles for the two components.  According to the claims, the keyboard provides the keyboard controller with the data scan codes, and the keyboard controller receives the scan codes and activates interrupt signals.  This language controls.  See Elekta Instrument S.A. v. O.U.R. Scientific. Int'l, Inc., 214 F.3d 1302, 1308 (Fed. Cir. 2000)(noting that unambiguous claim language controls over the written description).  The microprocessor, in the single-unit embodiment, performs both the scan code and the interrupt functions.  The claim language does not assign the microprocessor a role and, in fact, divides its duties between the keyboard and the keyboard controller.  Certainly, nothing in the claim language requires that the microprocessor or microprocessor circuitry be a part of the keyboard.

That said, Defendants agree with Plaintiff that the keyboard must contain "control logic" or "circuitry" in order to generate scan codes, but disagree that the court's construction should employ terms derived from the specification's description of the single-unit embodiment.  Defendant Arima quotes one of the prior art references as evidence of what was known to one skilled in the art at the time of the filing of the '273 patent.  The prior art

17

taught that a typical keyboard "contain[ed] circuitry for scanning an array of key switches, and generating scan codes corresponding to the pressing or releasing of the respective keys."[24] All parties agree, then, that the keyboard contains some type of control logic or circuitry to enable it to perform the task assigned to it by the claims. Beyond that, the court finds nothing in the claims or the intrinsic evidence that mandates a more specific explanation of how the keyboard generates a scan code.

Because the court finds the areas of agreement provide a sufficient definition for "keyboard," the court determines that a keyboard is an input apparatus containing internal circuitry to output or generate data scan codes.

The definition of "keyboard controller" flows from the above discussion. Plaintiff proposes that the court define it as "an electrical component that monitors and detects the activation of keys on the keyboard."[25] Focusing more particularly its relationship to the keyboard, Defendants define the keyboard controller as "a device that is connected to and separate from the keyboard to activate interrupt signals in response to 'Data Scan Codes' received from the 'Keyboard.'"[26]

---

[24] U.S. Patent No. 5,056,057.

[25] Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002.

[26] Defendants'[Revised] Proposed Order dated Dec. 13, 2002.

18

"Keyboard controller" is defined by the plain language of the claims.    In Claim 1, the keyboard controller must monitor the activation of keys on the keyboard, must respond to such activation by activating an interrupt signal, and must transmit the scan codes from the keyboard to the computer.    In Claim 5, the keyboard controller, at a minimum, must receive a scan code and must generate an interrupt signal.

As mentioned above, in the claims, the keyboard controller is either connected or coupled to the keyboard.    The plain meaning of the words "connected" and "coupled" dictate that the keyboard and the keyboard controller be separate entities.[27]    This understanding is consistent with the majority of the specification.[28]    In fact, only in the description of Figure 7 does the patentee explain a preferred embodiment in which the keyboard and the keyboard controller are combined in a single unit.[29]    The court hesitates to read patent claims in a manner that would disclaim a preferred embodiment.    Cf. Vitronics Corp., 90 F.3d at 1583-84.    However, the court cannot choose the patentee's words for him and rewrite the claims to include an embodiment so clearly excluded.    The court

---

[27]    Claim 5 also uses the word "coupled" to describe the relationship between the keyboard controller and the ISA-compatible computer.    Col. 14, ll. 34-35.    The keyboard controller and the ISA-compatible computer are also distinct components.

[28]    See, e.g., col. 4, ll. 6-7 ("The keyboard controller 128 is connected to a keyboard via a plurality of signal lines 152."); col. 8, ll. 67-68 ("A keyboard 432 is connected to the keyboard controller 430.").

[29]    Arguably, even this description suggests that the two components are distinct but are housed together.

19

finds the patentee's choice of words in Claims 1 and 5 to be highly persuasive evidence that the keyboard and keyboard controller are separate.  Cf. id. at 1583 (stating that it requires highly persuasive evidence to determine that a preferred embodiment falls outside of the scope of the patent claim); Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., 285 F.3d 1046, 1054 (Fed. Cir. 2002)(stating that, when a patentee discloses without claiming certain subject matter, he dedicates the unclaimed subject matter to the public).

Consistently throughout the specification and the claims, the patentee explains that the keyboard controller receives scan codes from the keyboard, generates interrupt signals, and, in most cases, transmits scan codes to the computer microprocessor.[30]  In Claim 1, the keyboard controller is "connected to said keyboard to monitor" the keys to detect when one is activated.[31]  The court understands this language, consistent with the remainder of the patent, to mean that the keyboard controller monitors the keys and detects activation via the keyboard.  Plaintiff's definition is inaccurate because it defines the keyboard controller only with respect to monitoring and detecting key activity.  Not only does Plaintiff's definition leave out significant duties assigned to the keyboard

---

[30]    See, e.g., col. 4, ll. 19-20, 28-29; col. 5, ll. 24-25; col. 6, ll. 38-42; col. 7, ll. 13-14; col. 8, l. 68-col. 9, l. 2; col. 12, ll. 9-11; col. 13, ll. 43-57, 60-61; col. 14, ll. 2-5, 33-48.

[31]    Col. 13, ll. 43-45.

20

controller (e.g., receiving scan codes and generating interrupt signals), but it reassigns the role of the keyboard (i.e., monitoring and detecting key activity) to the keyboard controller.

The court finds the best construction of the term "keyboard controller" to be: a component, separate from the keyboard, that activates interrupt signals in response to receipt of data scan codes from the keyboard and, upon request, transmits the data scan codes to the computer.

In the '273 patent, "data scan code" appears in Claim 1 and "scan code" appears in Claim 5. The parties agree that, for the purposes of this patent, these two terms are essentially the same and can be treated as if they are the same.[32] Plaintiff argues that these terms mean "a code that corresponds to a particular key or a particular key combination on the keyboard."[33] Defendants suggest that it is "a unique identifying code generated by the keyboard and produced in a conventional manner from column and row signals when a particular key of the keyboard is actuated."[34] Defendants add,

---

[32]    See Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002; Defendants' [Revised] Proposed Order dated Dec. 13, 2002.

[33]    Inventec Docket Entry No. 81. The court notes that Plaintiff dropped the words "or a particular key combination" in its proposed construction of this term. Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002. At the Markman hearing, Plaintiff conceded that the these words could be omitted. Markman hearing transcript, vol. 1, p. 104.

[34]    Defendants' [Revised] Proposed Order dated Dec. 13, 2002.

21

"Column and row signals are used to generate data scan codes, but are not themselves data scan codes."[35]

"In determining the ordinary meaning of a technical term, courts are free to consult scientific dictionaries and technical treatises at any time." Dow Chem. Co., 257 F. 3d at 1373.  The Microsoft Press Computer Dictionary states that a "scan code" is "a code number transmitted to an IBM or compatible computer whenever a key is pressed or released.  Each key on the keyboard has a unique scan code."[36]  This definition comports with the usage of the term in the claims.  Looking to the specification to determine whether the inventor has added to or altered the definition, the court finds nothing to indicate that the patentee assigned the term any meaning other than what is ordinary to one skilled in the art. The specification explains that the keyboard generates a scan code "[w]hen an open contact switch is closed by depressing a key or a closed contact switch is opened by releasing a key."[37]  Both the computer definition and the specification make it clear that a data scan code is generated each time a key is depressed or released.

---

[35]     Id.

[36]     Inventec Docket Entry No. 8, Ex. 25.

[37]     Col. 4, ll. 16-18.

04/23/2003 WED 17:41   [TX/RX NO 6642]

The parties agree that data scan codes are produced from row and column signals.[38]  The only real point of contention relates to Defendants' use of the words "in a conventional manner."  The written description does specify that the keyboard generates scan codes in a conventional manner,[39] but the claims do not.  The court agrees with Plaintiff that these words are an unnecessary addition to the definition.

A "data scan code" is a code number generated by the keyboard from row and column signals whenever a key is depressed or released.

### 3.  First and Second Interrupt Signals

Plaintiff defines "first interrupt signal" as "a signal activated by the keyboard controller in response to the activation of one of the conventional keys for interrupting the computer."[40] Defendants offer a more limited definition of "first interrupt signal," stating that it is "the ISA standard IRQ1 interrupt signal which is sent by the keyboard controller on the first interrupt signal line in response to activation of at least one conventional key."[41]

---

[38]    Plaintiff's expert testified that row and column signals are a form of scan codes.  Defendants disagree.  The court finds the debate on whether row and column signals are scan codes to be unimportant to the construction of the patent.

[39]    See col. 4, 11. 13-20.

[40]    Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002.

[41]    Defendants' [Revised] Proposed Order dated Dec. 13, 2002.

23

The term "first interrupt signal," as it is used in the claims, could carry a very broad meaning. Claim 1 states that the keyboard controller is responsive to "an activation of at least one of said conventional keys to activate a first interrupt signal."[42] Claim 5 states that the keyboard controller generates a first interrupt signal "upon receipt of a scan code corresponding to one of said conventional keys."[43] The plain language of the claims does not limit the first interrupt signal to any specific interrupt.

However, the patentee narrowed this definition both in the specification and in arguments for allowance. The specification reads:

> The interrupt controller 130 has a plurality of interrupt request lines IRQ0 through IRQ 15 that can be connected to devices that communicate with the microprocessor 110 on an interrupt basis. In the ISA-compatible computers, the interrupt signal from the keyboard controller 128 is communicated to the interrupt controller 130 via the IRQ1 signal line which has the second highest priority.[44]

Before the PTO, the patentee stated, "In the conventional ISA system, IRQ1 is the only interrupt which the controller can generate in response to a keystroke."[45] Together, these are words of manifest restriction.

---

[42]    Col. 13, ll. 49-51.

[43]    Col. 14, ll. 38-39.

[44]    Col. 4, ll. 31-38.

[45]    Amendment, p. 5, USPTO 00499.

24

The comment to the PTO alone was an unambiguous and clear statement of disavowal, as the patentee claimed his invention solely within the conventional ISA system and identified IRQ1 as the only interrupt within that system that could be generated by a single keystroke. Because the invention is described repeatedly as part of the ISA-compatible environment, this first interrupt signal must be IRQ1. According to the patent, the only interrupt innovation that the patent reveals or claims is a non-conventional second interrupt. To allow the definition urged by Plaintiff would be to allow the patentee to claim subject matter which he claimed, during the patent's prosecution, did not exist.

A "first interrupt signal" is the ISA standard IRQ1 interrupt signal which is activated by the keyboard controller in response to the activation of one of the conventional keys.

Plaintiff does not offer a definition of "second interrupt signal" alone, but defines these related phrases: 1) "'activation of said additional function key in combination with at least one of said conventional alphanumeric keys to generate a second interrupt signal' [from Claim 1] means a signal generated by the keyboard controller in response to the activation of the Fn key in combination with at least one of the conventional alphanumeric keys for interrupting the computer;" and 2) "'second interrupt signal on said second interrupt signal line upon receipt of a scan code corresponding to said non-conventional function key' [from Claim 5]

25

means a signal is generated by the keyboard controller upon receipt of a scan code corresponding to the non-conventional function key."[46]

Defendants define "second interrupt signal" as "one of the unassigned ISA standard IRQ interrupt signals (IRQ0-IRQ15)."[47] Defendants differentiate what occurs in Claim 1 from what occurs in Claim 5. In Claim 1, they assert, the second interrupt signal is generated by the keyboard controller in response to the activation of a combination of the additional function key and an alphanumeric key; whereas, in Claim 5, it is triggered by the activation of a non-conventional function key alone.

Two matters are particularly at issue here. First, the parties disagree whether the second interrupt signal must be an unused ISA standard IRQ interrupt signal. Second, the parties disagree whether Claim 5 teaches that the second interrupt signal is generated only when the non-conventional function key alone is depressed.

Regarding the first issue, the patentee did not restrict the identity of the second interrupt signal in the same way he did the first interrupt signal. In stark contrast to his words restricting the first interrupt signal to IRQ1, the patentee represented that "the claimed invention generates at least one non-conventional

---

[46]    Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002.

[47]    Defendants' [Revised] Proposed Order dated Dec. 13, 2002.

26

interrupt fundamentally different from the interrupt generated in the prior art."[48]   The only limitation imposed by the prosecution history is that the second interrupt signal not be IRQ1.   In the written description, the patentee specifically discusses the use of IRQ15 for the second interrupt signal, but does not exclude all other possibilities.

Within the ISA-compatible computer environment at that time, other interrupt signals in addition to IRQ were in use.   A non-maskable interrupt ("NMI") is specifically mentioned in the specification as an interrupt other than IRQ in use at the time. "Rather than communicating the NMI output to the microprocessor 410, in the present invention, the NMI output of the system controller is connected to the IRQ15 signal line 426 and is thus provided as the IRQ15 input of the I/O controller and interrupt multiplexer 424."[49]   Despite the Defendants' arguments to the contrary, the court does not find that this language, which presumably teaches away from the use of an NMI interrupt, excludes every ISA-compatible interrupt other than an IRQ interrupt.   The language simply is not clear enough to redefine the claims as such.

Therefore, the second interrupt signal can be any interrupt other than IRQ1 that was known at the time of the patent within the ISA-compatible computer environment.

---

[48]    Amendment, p. 7, USPTO 00501.

[49]    Col. 12, l. 65-col. 13, l. 4.

Turning to the second issue, the court notes that the parties agree that, in Claim 1, the second interrupt signal is generated in response to the activation of the additional function key in combination with at least one conventional alphanumeric key. The court adopts this construction. Unfortunately, the parties disagree on the scope of Claim 5. Claim 5, Plaintiff argues, is broader than Claim 1 in that it covers generating a second interrupt signal both when the non-conventional function key is depressed alone or when it is depressed together with a conventional key. Defendants contend it covers only the former.

Claim 5 states that the keyboard generates a scan code in response to the activation of at least one key and that the keyboard controller generates a second interrupt signal "upon receipt of a scan code corresponding to said non-conventional function key."[50] The "computer [is] programmed to execute at least one special routine upon receipt of said second interrupt signal."[51] The court finds little room in the claim language for the maneuvering Plaintiff attempts. Plaintiff's expert said nothing at the Markman hearing to convince the court that the claim deserved the broad reading backed by Plaintiff.

The language of Claim 5 is clearly distinguishable from that in Claim 1. In Claim 1, the patentee uses the words "activation of

---

[50]    Col. 14, ll. 44-45.

[51]    Col. 14, ll. 46-48.

28

said additional function key in combination with at least one of said conventional alphanumeric keys to generate a second interrupt signal."[52]  In Claim 5, the patentee claims only that the second interrupt is sent "upon receipt of a scan code corresponding to said non-conventional function key."[53]  The comparison of the language of the claims tells the court that the patentee knew what language to use to indicate that the second interrupt signal would be sent in response to the activation of a combination of keys and, yet, omitted that language.  Instead, Claim 5 speaks of a singular scan code that corresponds to the non-conventional function key. As previously discussed, the court determined that each time a key is depressed or released, a scan code is generated.  Therefore, when the non-conventional function key is depressed, the activation prompts the generation of a scan code, that is, a scan code that *corresponds* to the non-conventional function key.  Claim 5 makes no mention of depressing the non-conventional function key in combination with another key.

The court recognizes that Claim 5 allows for a scan code to be generated "in response to an activation of at least one of said keys."[54]  Although it does contemplate the option of depressing a key combination, this language does not go so far as to import into

---

[52]    Col. 13, ll. 53-56.

[53]    Col. 14, ll. 44-45.

[54]    Col. 14, ll. 29-30.

the claim a limitation addressing what happens when the non-conventional function key is depressed in combination with any conventional key. The claim simply does not explain such a situation.

Plaintiff argues that the specification teaches both depressing the non-conventional function key alone and depressing the non-conventional function key together with *any* conventional key.[55] Plaintiff argues that, because Claim 1 covers only the use of the non-conventional function key in combination with conventional alphanumeric keys, Defendants' interpretation of Claim 5 would deprive the patentee of the portion of his invention that deals with using the non-conventional function key in combination with other conventional keys. In Claim 5, the keyboard includes conventional symbol keys, conventional function keys, and conventional cursor control keys. The court agrees that its construction eliminates coverage for the use of the non-conventional function key in combination with any of the symbol keys, the other function keys, or the cursor control keys. However, it is the patentee, as author of his claims, who

---

[55]    See col. 2, ll. 17-19, 55-59; col. 7, ll. 1-19; col. 7, l. 65-col. 8, l. 46.  In particular, the specification states:

> Although the thirteenth function key Fn can be used *alone* to specify a particular function in a manner similar to the function keys F1 through F12, in the preferred embodiment described herein, the thirteenth function key Fn is activated in conjunction with one of the *alphanumeric* keys to specify one of a plurality of predetermined functions.

Col. 7, ll. 1-7.  Claim 1 covers the preferred embodiment mentioned here.

30

disclaimed these possible key combinations. <u>Cf.</u> <u>Johnson</u>, 285 F.3d at 1054.

As additional support for the court's construction, the description of what the computer does in response to the second interrupt signal indicates that the claim teaches only depressing the non-conventional function key by itself. Unlike other descriptions in the patent, Claim 5 teaches that the computer executes a special routine upon receipt of the second interrupt signal--without requesting or receiving a scan code or key identification from the keyboard controller. By way of contrast, in Claim 1, the first interrupt handling routine requires the input of a data scan code in response to the interrupt signal, and the second handling routine requires identification of the alphanumeric key before it performs the predetermined function. In the first part of Claim 5, the computer executes a program to input the scan code in response to the first interrupt signal. However, for the second interrupt signal, Claim 5 includes no similar limitation. When the computer receives the second interrupt signal, it executes "at least one special routine."[56] The plain language of Claim 5 teaches that the computer executes a special routine when the non-conventional function key alone is depressed. This is consistent with the court's reading of the other claim language.

---

[56] Although not clear from the words themselves, the "at least" language in this sentence may refer to differences among the various TSR and application programs.

For Claim 5, the second interrupt signal is generated when the non-conventional function key alone is depressed.

### 4. Program

The term "program" appears in Claim 5. "Program" in this context means a handling routine that causes the computer to receive keyboard scan codes from the keyboard controller. This is derived from the plain language of the claim.

### C. Other claims at issue

Claim 4 of the '273 patent reads:

> The system for providing a built-in function as defined in Claim 1, further comprising a central processing unit that indexes a first memory location pointer in response to said first interrupt signal, said central processing unit further indexing a second memory location pointer in response to said second interrupt signal.[57]

A "first memory location pointer" as used in Claim 4 is an identifier that corresponds to the start of the first conventional interrupt handling routine. Similarly, a "second memory location pointer" is an identifier that corresponds to the start of the second non-conventional interrupt handling routine. Nothing more or less can be imputed from the intrinsic or extrinsic evidence offered by the parties.

Claim 6 of the '273 patent reads:

> The system for servicing keyboard interrupts as defined in claim 5, further comprising an interrupt controller coupled to said keyboard controller, said

_____

[57]    Col. 14, ll. 16-21.

32

interrupt controller generating one of a plurality of interrupt vectors, said vector depending upon said interrupt signal.[58]

Claim 7 of the '273 patent reads as follows:

The system for servicing keyboard interrupts as defined in claim 6, further comprising a Central Processing Unit coupled to said interrupt controller, said Central Processing Unit indexing one of a plurality of memory locations, said memory location depending upon said interrupt vector.[59]

"Indexing one of a plurality of memory locations" in Claim 7 means to utilize an interrupt vector to access a memory location corresponding to the interrupt vector. This limitation comes from the claim itself, not the specification or other intrinsic evidence. Claim 7 is a dependent claim that incorporates the limitations of both independent Claim 5 as well as those of dependent Claim 6. Claim 6 and Claim 7 specifically mention interrupt vectors as dependent on the interrupt signals and state that the memory location depends on the interrupt vector. Plaintiff's proposed construction of the term, "selecting or accessing one of a plurality of memory locations that correspond to the program or special routine,"[60] would ignore the fact that the claim language itself does indeed require the use of the interrupt vector.

---

[58]    Col. 14, ll. 49-54.

[59]    Col. 14, ll. 55-60.

[60]    See Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002.

33

This concludes the construction of all of the necessary terms in the '273 patent.

III. **Claim Construction of the '054 Patent Entitled "Power Conservation System for a Modem in a Computer System"**

A. Background of the Patent

The technology involved in the '054 patent is, like the technology of the '273 patent, related to the field of computers. The '054 patent addresses problems with prior power conservation systems. Power conservation features are especially attractive in the area of laptop computers, because of the desire for a low weight and small size to increase portability. To conserve energy and, therefore, to allow designers of laptop computers to utilize smaller batteries in their designs, numerous different power conservation schemes have been implemented in the field. However, problems arise when the components that are not receiving power need to perform functions during certain contingencies, such as when a modem needs to answer an incoming call. The technology in this patent addresses the problem of missed calls to the modem while a computer is in a power conservation mode. The patent solves this problem by having an auxiliary power supply that provides power to the ring detect circuit so that at all times the modem is supplied with the necessary power and the ring detect circuit remains in an active state.

34

B.  Claim Construction

The '054 patent abstract describes the invention as "[a] power conservation system for a modem in a computer system."[61] The patent contains three independent claims (Claims 1, 15, and 19).  The court here quotes those three claims and one dependent claim (Claim 11), all of which are the subjects of the parties' debate on construction.  Claim 1 of the '054 patent reads:

> A power conservation system for a modem in a computer system having a primary power supply and an auxiliary power supply, comprising:
>
> a ring detect circuit coupled to a telephone ring signal line for generating a ring detect signal in response to detection of a ring signal on said telephone ring signal line, said ring detect circuit also being coupled to a power supply voltage for supplying power to said ring detect circuit during a normal mode of operation;
>
> a power management system having an input coupled to said ring detect circuit and an output coupled to the primary power supply, said power management system being responsive to said ring detect signal for switching the primary power supply from a first level corresponding to a power conservation mode of operation of the computer system to a second level corresponding to said normal mode of operation; and,
>
> wherein said auxiliary power supply is coupled to said ring detect circuit for supplying power to said ring detect circuit when the computer system is in said power conservation mode of operation, whereby said ring detect circuit is maintained in

---

[61]    Inventec Docket Entry No. 1, Ex. F, Arima Docket Entry No. 1, Ex. F. For the remainder of this memorandum, the court does not repeat the record location of the patent when citing to its contents.

35

an active state even during said power conservation
mode of operation of the computer system.[62]

Claim 11 reads, "The system as set forth in claim 1, wherein said
auxiliary power supply comprises a battery power source."[63]  Claim
15 reads:

A power conservation system for a modem in a
computer system having a primary power supply and an
auxiliary power supply, comprising:

ring detect means coupled to a telephone ring
signal line for generating a ring detect
signal in response to detection of a ring
signal on said telephone ring signal line,
said ring detect means also being coupled to a
power supply voltage to supply power to said
ring detect means during a normal mode of
operation;

power management means having an input coupled to
said ring detect means and an output coupled
to the primary power supply, said power
management means being responsive to said ring
detect signal for switching the primary power
supply from a first level corresponding to a
power conservation mode of operation of the
computer system to a second level
corresponding to said normal mode of
operation; and,

wherein said auxiliary power supply is coupled to
said ring detect means for supplying power to
said ring detect means when the computer
system is in said power conservation mode of
operation, whereby said ring detect circuit is
maintained in an active state even during said
power conservation mode of operation of the
computer system.[64]

---

[62]    Col. 4, ll. 19-42.

[63]    Col. 5, ll. 18-19.

[64]    Col. 5, ll. 30-53.

36

Claim 19 reads:

> A power conservation system for a modem in a computer system, comprising:
>
> > a primary power supply;
> >
> > an auxiliary power supply comprising a battery;
> >
> > a ring detect circuit coupled to a telephone ring signal line for generating a ring detect signal in response to detection of a ring signal on said telephone ring signal line; and
> >
> > a power management system having an input coupled to said ring detect circuit and an output coupled to the primary power supply, said power management system being responsive to said ring detect signal for switching the primary power supply from a first level corresponding to a power conservation mode of operation of the computer system to a second level corresponding to said normal mode of operation,
> >
> > said auxiliary power supply being coupled to said ring detect circuit for supplying power to said ring detect circuit when the computer system is in said power conservation mode of operation, whereby said ring detect circuit is maintained in an active state even during said power conservation mode of operation of the computer system.[65]

There are several critical claim terms in dispute.[66]

---

[65]    Col 6, ll. 20-52.

[66]    Happily, not all of them are in dispute. All parties agree that the following claim terms in the '054 patent have the following meanings, and the court adopts these constructions: 1) "Ring Detect Circuit" is "a circuit which detects a Ring Signal on the Ring Signal Line when an incoming call is received, and generates a Ring Detect Signal;" 2) "Telephone Ring Signal Line" is "a line that is a telephone line or is coupled to a telephone line; 3) "Ring Detect Signal" is "a signal for indicating when an incoming call is received;" 4) "Ring Signal" is "the signal present on a Telephone Ring Signal Line when an incoming

## 1.  Computer System

The debate begins with what a "computer system" is.  Plaintiff defines it as "an electronic apparatus that accepts, processes, stores, and outputs data according to programmed instructions."[67] Defendants prefer a more specific definition: "a complete, working system, including hardware (such as a CPU), memory, software (such as an operating system and application programs) and any connected peripherals (such as a modem, a hard disk drive, etc.)."[68]

The term is used in the preamble to each of the three independent claims in the patent (Claims 1, 15, and 19).  The specification gives the following explanation of the term:

> In general, the computer system includes a monitor 50, a main body 1, and a keyboard 2.  The main body 1 includes a central processing unit (CPU) 20, a memory 30, a video logic module 40, a timer 60, a direct memory access (DMA) and interrupt controller 70, an expansion slot (or port) 80, a modem 10 coupled to the expansion slot 80, storage

---

call is received;" 5) "Power Management System" is "circuitry that is responsive to an input from the 'Ring Detect Circuit' for switching the 'Primary Power Supply' between a level corresponding to the 'Normal Mode of Operation' and a level corresponding to the 'Power Conservation Mode of Operation;'" 6) "Maintained in an Active State" means "the 'Ring Detect Circuit' is in an active state in both the 'Normal Mode' and the 'Power Conservation Mode' of operation;" 7) "Expansion Port" is "a connector for a printed circuit card to which a peripheral component can be plugged in to achieve the connectivity between the component and the computer system;" 8) "Normal Mode of Operation of the Computer System" is "where the 'Primary Power Supply' provides power to most system components of the 'Computer System;'" 9) "Power Supply" is a device that can have different power modes and "has a source of power[] and provides power to electronic equipment such as computers and peripherals;" and 10) "Primary Power Supply" supplies power at one or more voltages and "is the main 'Power Supply' of a 'Computer System.'" <u>See</u> Inventec Docket Entry Nos. 81, 86; Arima Docket Entry No. 117; Defendants' [Revised] Proposed Order dated Dec. 13, 2002; Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002.

[67]    Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002.

[68]    Defendants' [Revised] Proposed Order dated Dec. 13, 2002.

> media 90 (e.g., a floppy disk drive and/or a hard disk
> drive and/or a CD-ROM drive), a power supply 110, an
> auxiliary power supply 120 (e.g., a secondary battery),
> and a power management system 100 for controlling the
> power supply 110 and the auxiliary power supply 120.[69]

The court does not take this statement to mean that all computer systems must contain all of the components identified by patentee or may not contain additional components. The court does understand that the patentee intended for the computer system to contain multiple, interconnected components.

The patentee's general description of a computer system and Defendants' definition are consistent with the common understanding of the word "system," i.e., multiple components working together to form a whole. See Webster's New World Dictionary (1988), 1359. Plaintiff's definition leaves out any explication of the word "system," but provides the ordinary meaning for the word "computer." The court finds that a combination of the definitions best covers the whole term.

A "computer system" is a group of components, including hardware and peripherals, that are connected to form an electronic apparatus that accepts, processes, stores, and outputs data according to programmed instructions.

## 2. Auxiliary Power Supply and Related Terms

The difference between "primary power supply" and "auxiliary power supply" is a large component of this dispute. As previously

---

[69]    Col. 1, ll. 27-38.

noted, the parties agree that the term "power supply" should be construed as "a device that has a source of power[] and provides power to electronic equipment such as computers and peripherals."[70] All parties also agree that such a "power supply" can have different modes of operation. With respect to the term "primary power supply," the parties agree that it supplies power at one or more voltages and is the main power supply of the computer system. Implicit in these definitions are the parties' agreements that a power supply is not the same as a power source and that a power supply can provide more than one voltage.

Although the parties obviously compromised to reach these constructions, they failed to reach an agreement on the definition of "auxiliary power supply." Plaintiff points the court to the claim language, holding that the term is defined fully by its required function. According to Plaintiff, "an auxiliary power supply" is "a power supply that supplies power to the ring detect circuit during a power conservation mode of operation."[71] Defendants focus more on the relationship between the auxiliary power supply and the primary power supply. Defendants assert that the auxiliary power supply must be "separate and distinct" from and have a different power source from the primary power supply.

---

[70]   Defendants' [Revised] Proposed Order dated Dec. 13, 2002.

[71]   Plaintiff's [Proposed] Claim Construction Order dated Dec. 16, 2002.

The court first examines the words of the claims. Claims 1, 15, and 19 all list a primary power supply and an auxiliary power supply as separate features. Common usage of the terms "primary" and "auxiliary" suggests distinctions in importance, sequence, and/or role. See Webster's New World Dictionary (1988), 94, 1069. All three independent claims require that the auxiliary power supply provide power to the ring detect circuit/means during power conservation mode. None of the independent claims identifies which power supply provides the "power supply voltage" to the ring detect circuit/means during a normal mode of operation. Only Claims 10, 12, and 21 specifically require the auxiliary power supply continuously to supply power to the ring detect circuit regardless of the mode of operation.

The prosecution history provides context and additional clarification on the wording of these claims. In the examiner's statement of reasons for allowing Claim 2, a claim which was later incorporated into Claim 1 by amendment, he explained:

> The ring detector of Noyes is powered by the signals received on the telephone lines, and is powered in this manner regardless of the power mode of the computer system. Providing the ring detect circuit of Noyes[72] with a separate power supply voltage to power the ring detect circuit during the normal mode of operation of the computer is not anticipated by the art of record and would be an unobvious modification of Noyes in view of the art of record.[73]

---

[72]    U.S. Patent No. 4,656,318 (issued April 7, 1987)("Noyes").

[73]    Inventec Docket Entry No. 83, Arima Docket Entry No. 116, Ex. 4, Office Action Summary, p. 6, SEC013875.

41

The examiner followed this statement with his reasons for allowing a battery, if that battery is the auxiliary power supply, to supply continuous power to the ring detect circuit:

> The auxiliary power source of Noyes comprises the telephone lines from which the ring detect circuit of Noyes derives power to operate. Thus, Noyes does not anticipate the auxiliary power supply comprising a battery power source, and this is also considered an unobvious modification of Noyes since the ring detect circuit of Noyes derives its power from the telephone lines and there is no reason to provide a battery power source to the circuit. Also note that while other art of record (such as Gross et al.) disclose ring detect circuits that are powered by battery power sources, such sources are not known in the art of record to be auxiliary power sources, but rather primary power sources which have different power modes (see Gross et al.).[74]

Noyes disclosed a way to power the modem without rapidly depleting a portable power supply, namely by drawing power through the telephone lines. The telephone lines continuously provided power to the ring detect circuit, even when the ring detect circuit was otherwise being supplied power; meaning that, in any power mode, the telephone lines were still providing the power to the ring detect circuit.

The examiner made two significant points distinguishing the '054 patent from Noyes. First, the examiner indicated that the invention was not obvious if some power supply other than the auxiliary power supply provided power to the ring detect circuit during normal mode. In the context of the '054 patent, the "other"

---

[74]    Id.

42

power supply was the primary power supply. Second, continuous power supply to the ring detect circuit by an auxiliary power supply, if the auxiliary power supply comprised a battery, was not anticipated by Noyes. In essence, the examiner suggested that the applicant revise original Claims 2 and 18, later known as 1 and 17, to provide a separate power supply voltage to power the ring detect circuit during the normal mode of operation. The claims which identified the auxiliary power supply as a battery did not need to be revised. In a response to an Office Action dated May 8, 1996, applicant adopted the changes that had been suggested by the examiner, remarking:

> Claims 1, 11 and 17 stand rejected under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent No. 4,656,318 to Noyes ("Noyes") and claim 15 stands rejected under 35 U.S.C. § 103 as being unpatentable over Noyes in view of the admitted prior art in Figure 2 ("Figure 2"). Independent claims 1 and 17 have been amended to include the limitations of dependent claims 2 and 18, respectively, which the Examiner has indicated contain allowable subject matter.[75]

Notably, the patentee did not challenge the examiner's assertions and interpretations. Instead, the patentee amended the claims as the examiner suggested in the Office Action in order to overcome the rejection. "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." Southwall Techs., Inc., 54 F.3d at 1576. The

---

[75]    Inventec Docket Entry No. 83, Arima Docket Entry No. 116, Ex. 2, Amendment, p. 7, SEC013886.

prosecution history, then, confirms that the primary power supply and the auxiliary power supply must be separate and distinct.

The court does not find, however, any support for Defendants' assertion that separate and distinct means that the primary and auxiliary power supplies have different power sources. The patent leaves open exactly how separate the two power supplies must be. As long as they are distinguishable such that it can be determined which is providing power to the ring detect circuit during each mode of operation, they are covered by the patent claims.

The court finds that the "auxiliary power supply" is a second, separate power supply that powers the ring detect circuit when the computer system is in a power conservation mode of operation.

The court finds the parties' definitions of "auxiliary power supply comprising a battery" to be substantially similar. All parties recognize that the term "comprising" is a term of art in patent law, which means that "the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 501 (Fed. Cir. 1997). Therefore, the claim would encompass any "auxiliary power supply" that was either composed entirely of a battery or that included a battery and other elements.

### 3. Other Terms

As agreed, the "normal mode of operation" of a computer is a mode in which the primary power supply provides power to most

44

system components of the computer system.  The "power conservation mode of operation" is when the computer system as a whole consumes less power than when it is in a normal mode of operation.  These meanings are derived from the plain language of the claims.

The parties do not agree as to whether the phrases "first level corresponding to a power conservation mode of operation" and "second level corresponding to the normal mode of operation" should be construed.  Plaintiff and Defendant Inventec seem to agree that these phrases need not be construed.  However, Defendant Arima contends that "[a] 'first level corresponding to a power conservation mode of operation' is a state of the primary power supply in which the supply voltage (or supply voltages) from the primary power supply to at least most components of the computer system, including the ring detect circuit, is cut off so that a minimum amount of power is supplied to the computer system.  A 'second level corresponding to the normal mode of operation' is a state in which the primary power supply provides a supply voltage (or supply voltages) to at least most components of the computer system.'"[76]

The court finds no justification in the claims, the specification, or the prosecution history to construe these phrases so narrowly.  The definitions outlined above for "normal mode of

_____

[76]    Defendants' [Revised] Proposed Order dated Dec. 13, 2002.

45

operation" and "power conservation mode of operation" provide sufficient guidance for the jury.

The parties are also in disagreement over whether the term "power conservation system for a modem" needs to be construed by the court. This phrase appears in the preamble of Claims 1, 15, and 19. Plaintiff and Defendant Arima do not offer a construction for this phrase, but Defendant Inventec suggests that itemizing the required elements of a power conservation system in one place would be helpful to a jury. Defendant Inventec proposes that "the court construe the preamble by listing the components defined in the claim elements that follow the preamble, as follows: A 'Power Conservation System: is made up of a 'Power Management System,' a 'Ring Detect Circuit,' a 'Primary Power Supply,' and an 'Auxiliary Power Supply.'"[77]

The preamble of a claim does not serve as an essential component of the claim unless the patentee uses it to recite essential structure or steps or to define the subject matter of the claimed invention. Eaton Corp. v. Rockwell Int'l Corp., 2003 WL 1562153, at *5 (Fed. Cir. Mar. 27, 2003). This is not the case here. Each of the three claims contain limitations that fully explain the particular "power conservation system for a modem" which they embody. Defendant Inventec does not argue that the preamble is a necessary component of the claims, only that

---

[77]    Inventec Docket Entry No. 86.

46

construction of the preamble will aid the jury. The court disagrees. The additional construction is superfluous and unnecessary.

The court finds no other terms which need construction. Should the parties believe that other terms in either patent need interpretation, the parties must include those terms and their proposed interpretations in timely filed objections to this Memorandum.

The Clerk shall send copies of this Report and Recommendation on Claim Construction to the respective parties who have ten (10) days from the receipt thereof to file written objections thereto pursuant to General Order 2002-13. Failure to file written objections within the period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas, 77208. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

SIGNED at Houston, Texas, this 23 day of April, 2003.

NANCY K. JOHNSON
UNITED STATES MAGISTRATE JUDGE