**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**



JUN 03 2004

Michael N. Milby, Clerk of Court

SAMSUNG ELECTRONICS COMPANY,    §
LTD.,                                               §
                                                        §
        **Plaintiff,**                             §
                                                        §
v.                                                     §        **CIVIL ACTION NO. H-01-0071**
                                                        §
INVENTEC CORPORATION and       §
INVENTECT MANUFACTURING        §
(NORTH AMERICA) CORPORATION,   §
                                                        §
        **Defendants.**                          §


## MEMORANDUM & ORDER

Before the Court is United States Magistrate Judge Nancy K. Johnson's Report and Recommendation on Claim Construction ("the Recommendation") signed on April 23, 2003 (Dkt. #114). The Recommendation sets forth Judge Johnson's suggested construction of the claims of United States Patent No. 5,333,273 ("the '273 patent") and United States Patent No. 5,588,054 ("the '054 patent").

The plaintiff, Samsung Electronics Co., Ltd. ("Samsung"), and the defendants, Inventec Corporation and Inventec Manufacturing (North America) Corporation (collectively "Inventec"), timely filed objections to the Recommendation on June 30, 2003. *See* Dkt. #120, 121. As all claims and counterclaims relating to the '054 patent have now been dismissed with prejudice per the parties' stipulation, *see* Dkt. #133, the objections to the Recommendation's construction of the claims of that patent are OVERRULED as moot.

The Court has considered Samsung's objections to the Recommendation's construction of the '273 patent terms "ISA-compatible computer," "keyboard," "keyboard controller," "data scan

140

code," "first interrupt signal," and "second interrupt signal" and Inventec's objections to the Recommendation's construction of the '273 patent terms "data scan code" and "second interrupt signal." After careful consideration of the Recommendation, the objections, the record, and the applicable law, the Court SUSTAINS in part and OVERRULES in part both Samsung's and Inventec's objections to the Recommendation's construction of the '273 patent claims as follows. With respect to the Recommendation's construction of the terms "ISA-compatible computer," "keyboard," and "first interrupt signal," the Court OVERRULES any objections as to those terms and ADOPTS the Recommendation's construction of those terms, as well as the terms to which there were no objections.[1]  With respect to the Recommendation's construction of the terms "keyboard controller," "data scan code," and "second interrupt signal," the Court SUSTAINS in part and OVERRULES in part both Samsung's and Inventec's objections as to those terms and REVERSES the Recommendation's construction, as explained below.[2]

## Discussion

### I.    "Keyboard Controller"

The Recommendation defines "keyboard controller" as "a component, separate from the keyboard, that activates interrupt signals in response to receipt of data scan codes from the keyboard and, upon request, transmits the data scan codes to the computer." Dkt. #114, p. 21.  Samsung

---

[1] There were no objections to the Recommendation's construction of the terms "program," "first memory location pointer," "second memory location pointer," and "indexing one of a plurality of memory locations." Accordingly, the Court adopts the Recommendation's construction of those terms.

[2] A district court that refers a case to a magistrate judge must review de novo any portions of the magistrate judge's proposed findings and recommendations on dispositive matters to which the parties have filed specific, written objections. *See* FED. R. CIV. P. 72(b). The district court may accept, reject, or modify, in whole or in part, those portions of the proposed findings and recommendations. *See id.*

2

objects to the Recommendation's construction because it excludes the preferred embodiment, Figure 7, from the scope of the patent claims. More specifically, Samsung objects to the Recommendation's suggestion that the keyboard controller must be physically separate from the keyboard. As Samsung notes, Figure 7 discloses a preferred embodiment in which the "keyboard controller and keyboard are combined as a single unit," labeled as "keyboard matrix." Col. 7, ll. 33-34.

The Federal Circuit has emphasized that "[a] claim interpretation that reads out a preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed. Cir. 2003) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). Indeed, the Federal Circuit has permitted a construction that excludes a preferred embodiment in only one instance–"where the patent applicant limited the full scope of the claim language to omit the preferred (and only disclosed) embodiment in order to overcome an examiner's rejection." *Id.*

Although the Recommendation expresses a reluctance to "read the patent claims in a manner that would disclaim a preferred embodiment," the Recommendation nevertheless finds that the claims were written in such a way that clearly excludes an embodiment in which the keyboard and keyboard controller are not separate. Dkt. #114, p. 19. The Recommendation refers, in particular, to the patentees' use of the words "connected" and "coupled" in the claims to describe the relationship between the keyboard and keyboard controller. Indeed, claim 1 discloses "a keyboard controller *connected to* said keyboard to monitor said conventional keys and said additional function key . . ." (emphasis added). Col. 13, ll. 43-45. Likewise, claim 5 provides for "a keyboard controller *coupled to* said keyboard, said keyboard controller further coupled to said ISA-compatible computer . . ." (emphasis added). Col. 14, ll. 33-35.

3

The Court agrees with the Recommendation that the claims explain distinct roles for the keyboard and keyboard controller. For example, in claim 1, the keyboard outputs data scan codes, while the keyboard controller generates or activates interrupt signals upon receipt of the scan codes. These distinct roles are underscored by the fact that the keyboard and keyboard controller are described as "connected" or "coupled" together. Such language suggests that the keyboard and keyboard controller are not one, singular functioning entity, but, rather, perform their own unique functions in a cooperative manner. That the keyboard and keyboard controller function separately, however, does not require that they be *physically* separate. *See Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 992 (Fed. Cir. 1999)(emphasizing that "the unmodified term 'coupled' generically describes a connection, and does not require a mechanical or physical coupling"). Indeed, two entities can be connected or coupled to one another even if they are housed within the same unit.

There has been no "persuasive evidentiary support" in this case that the '273 patentees amended their claims in such a way as to omit the preferred embodiment depicted in Figure 7 in order to overcome rejection. Specifically, nothing in the prosecution history indicates that the patentees intentionally disclaimed an embodiment where the keyboard and keyboard controller are joined or linked as a single unit. Accordingly, the Court believes it would be committing error if it were to construe the claims so as to require the keyboard controller to be physically separate from the keyboard. Moreover, as described above, the Court finds that the claim language does not mandate such a construction.

Accordingly, the Court defines "keyboard controller" as a component, distinct from the keyboard, that activates interrupt signals in response to receipt of data scan codes from the keyboard

and, upon request, transmits the data scan codes to the computer. The keyboard and keyboard controller may be physically separate or housed together in the same unit.

## II.     "Data Scan Code"

The Recommendation construes "data scan code" to mean "a code number generated by the keyboard from row and column signals whenever a key is depressed or released." Dkt. #114, p. 23. The Recommendation is silent as to whether row and column signals are data scan codes.[3] Both Samsung and Inventec agree that data scan codes are produced from row and column signals. However, they object to the Recommendation's failure to specify whether row and column signals themselves may be considered data scan codes. While Samsung insists that row and column signals constitute data scan codes, Inventec argues that data scan codes are separate and distinct from row and column signals. The Court, thus, will attempt to resolve this dispute.

First, the Court notes that nothing in the claims refers to row and column signals. Therefore, the Court turns to the patent specification. The specification states: "When the keyboard microprocessor detects an active row signal, it uses the row signal and the currently active column signal to uniquely identify which of the keys on the keyboard is depressed. The key is identified with a scan code in a conventional manner." Col. 7, ll. 51-55. As the Recommendation states, the Microsoft Press Computer Dictionary provides that a scan code is "a code number transmitted to an IBM or compatible computer whenever a key is pressed or released." It further states that "[e]ach key on the keyboard has a unique scan code." Dkt. #114, p. 22. That definition comports with the patent specification, which explains that a scan code is generated "[w]hen an open contact switch

---

[3] The Recommendation found "the debate on whether row and column signals are scan codes to be unimportant to the construction of the patent." *See* Recommendation, Dkt. #114, p. 23, n. 38.

06/03/2004 THU 15:21  [TX/RX NO 6076]  ☑006

is closed by depressing a key or a closed contact switch is opened by releasing a key." Col. 4, ll. 16-18.

As stated above, Samsung submits that the data scan code generated by the keyboard is equal to a set of one row signal and one column signal. By contrast, Inventec's expert, Dr. Mercer, suggests that a single set of row and column signals cannot provide adequate information to produce a scan code. Rather, Dr. Mercer insists, an individual scan code is generated from a sequence of row and column pairs–that sequence representing the change which occurs when a key is pressed or released.

From the specification and dictionary definition, it is clear that each key on the keyboard has a unique corresponding data scan code. Importantly, neither the specification, nor the dictionary explain that there is a scan code for each *operation* with respect to the key (i.e., one scan code for depressing the key, one scan code for releasing the key); rather, it is the key itself that has a unique data scan code. The specification also indicates that a particular row and column pairing (i.e, row signal, column signal) identifies a particular key being pressed ("the row signal and the currently active column signal . . . uniquely identify which of the keys on the keyboard is depressed"). That key is then identified with a certain scan code, which is sent by the keyboard to the keyboard controller. There is no indication in the patent that the row and column pairing, which corresponds to a certain key, is not the data scan code that is sent to the keyboard controller. Nor is there anything in the specification to support Dr. Mercer's conclusion that a scan code represents more than the row and column pairing corresponding to a particular key, specifically, a calculation representing the change from one pair of row and column signals to another. The Court is inclined to adopt the more straightforward construction that Samsung proposes.

Thus, the Court holds that "data scan code" means a code number that the keyboard generates or outputs whenever a key is depressed or released, which corresponds to a pairing of a row signal and a column signal.

## III.    "Second Interrupt Signal"

The Recommendation defines "second interrupt signal" as "any interrupt other than IRQ1 that was known at the time of the patent within the ISA-compatible computer environment." Dkt. #114, p. 27. The Recommendation further provides that "[f]or claim 5, the second interrupt signal is generated when the non-conventional function key alone is depressed." *Id.* at p. 32.

Both Samsung and Inventec object to the Recommendation's construction of "second interrupt signal." Samsung disputes the construction's requirement that a second interrupt signal be an interrupt known at the time of the patent. Samsung asks the Court to adopt its construction of "second interrupt signal" as any interrupt signal other than the first interrupt signal. Samsung further objects that the recommended construction is too narrow, in that it eliminates the possibility that, with respect to claim 5, a second interrupt signal may be generated when the non-conventional function key is depressed together with a conventional key.

Inventec objects to the recommended construction because, while it requires that the second interrupt signal be an interrupt known at the time of the patent, it fails to further require that the interrupt use the ISA-compatible architecture in a substantially unchanged way. In particular, Inventec requests that the Court construe "second interrupt signal" to include only unassigned ISA standard IRQ interrupt signals (IRQ1–IRQ15). Inventec alternatively requests that "second interrupt signal" be defined as any interrupt other than IRQ1 that was known at the time of the patent within the ISA-compatible computer environment, except the second interrupt signal cannot be a non-

maskable interrupt ("NMI") or an interrupt equivalent to NMI.

With respect to the first part of the Recommendation's construction of "second interrupt signal"–any interrupt other than IRQ1 that was known at the time of the patent within the ISA-compatible computer environment–the Court adopts that construction. Despite Samsung's objections, the Court agrees with the Recommendation that the construction must be limited to only those interrupts known at the time of the patent application. To be sure, the Court must determine the ordinary meaning of the term from the perspective of a person of ordinary skill in the relevant art *at the time* of the alleged invention and patent application. *See Ferguson Beauregard v. Mega Sys.*, 350 F.3d 1327, 1347 (Fed. Cir. 2003) (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). A person skilled in the art at the time of the '273 patent application could have only understood "second interrupt signal" to include those interrupts in the field at the time.

The Court similarly declines to adopt Inventec's view that the definition of second interrupt signal must be limited to IRQ interrupts or non-NMIs and non-NMI equivalents. Clearly, the plain language of the claims does not limit the second interrupt signal to any specific interrupts. Claim 1 provides for a keyboard controller having first and second interrupt signal lines connected to an ISA-compatible computer. Claim 1 further provides that in response to an activation of at least one conventional key, the keyboard controller activates a first interrupt signal, and the keyboard controller is "responsive to an activation of [the non-conventional] function key in combination with at least one of [the] conventional alphanumeric keys to generate a second interrupt signal to [the] ISA-compatible computer on said interrupt signal line." Col. 13, ll. 53-57. Similarly, claim 5 covers a keyboard controller coupled to the ISA-compatible computer by first and second interrupt signal

8

lines.  Claim 5 instructs that upon receipt of a scan code corresponding to one of the conventional keys, the keyboard controller generates a first interrupt signal, and the keyboard controller "generat[es] a second interrupt signal on said second interrupt signal line upon receipt of a scan code corresponding to [the] non-conventional function key, [the] ISA-compatible computer programmed to execute at least one special routine upon receipt of said second interrupt signal." Col. 14, ll. 42-48.  Thus, the only requirement which can be extracted from the claim language is that the second interrupt signal cannot be the same as the first interrupt signal (the IRQ1 interrupt signal).

Although the specification and prosecution history reveal the patentees' intent to narrow the definition of "first interrupt signal" to include only IRQ1, they contain no such limitations with respect to "second interrupt signal."  The specification gives IRQ15 as an example of a second interrupt signal ("a second interrupt different from the IRQ1 interrupt is activated (e.g., IRQ15)", Abstract); however, the specification does not mandate that the second interrupt signal be IRQ15.  The Court will not limit the definition of "second interrupt signal" in such a way as to encompass only what the patentee disclosed in the specification.  *See Rexnord Corp. v. The Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) (quoting *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1007, 1121 (Fed. Cir. 1985)) ("If structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims . . . it is the claims that measure the invention, as informed by the specification").  Likewise, while NMIs are mentioned in the specification,[4] the language does not clearly exclude the possibility that a non-IRQ

---

[4] "Rather than communicating the NMI output to the microprocessor 410, in the present invention, the NMI output of the system controller is connected to the IRQ15 signal line 426 and is thus provided as the IRQ15 input of the I/O controller and interrupt multiplexer 424." Col. 12, l. 65 – col. 13, l. 4.

9

interrupt may be used as a second interrupt signal. Had the patentees intended to limit "second interrupt signal" to IRQ interrupts only, or to non-NMIs (or non-NMI equivalents), the patentees could have easily done so by modifying the claim language to so specify. As such, the Court adopts the first part of the Recommendation's construction of "second interrupt signal."

The Court next turns to the Recommendation's finding that the second interrupt signal, as used in claim 5, is generated when the non-conventional function key alone is depressed. Samsung argues that the claim language does not support such a narrow construction. The Court agrees. Claim 5 claims a "keyboard having a plurality of keys including conventional alphanumeric keys, conventional symbol keys, conventional function keys, and conventional cursor keys . . . and at least one non-conventional function key . . ." Col. 14, ll. 24–28. That claim further allows for a scan code to be generated "in response to an activation of at least one of said keys." Col. 14, ll. 29-30. Claim 5 also claims a "keyboard controller generating a second interrupt signal on said second interrupt signal line upon receipt of a scan code corresponding to said non-conventional function key . . ." Col. 5, ll. 42-45.

The Recommendation concludes that the language of claim 5 does not explain a situation where the non-conventional function key is pressed in combination with any conventional key. True, claim 1 expressly provides that a second interrupt signal is generated in response to the activation of the non-conventional function key *with at least one* of the conventional alphanumeric keys, while claim 5 does not include similar language indicating that the second interrupt signal is generated by pressing the non-conventional function key with at least one of the conventional keys. Rather, claim 5 only explains that the keyboard controller generates the second interrupt signal upon receipt of a scan code corresponding to the non-conventional function key. Based upon this language variance,

10

the Recommendation concludes that the patentees intended for claim 5 not to cover the situation where the non-conventional function key is depressed with a conventional key, and only to describe the activation of the non-conventional function key alone.

The Court is of the opinion that the semantic differentiation between claim 1 and claim 5 with respect to the activation of the non-conventional function key, in and of itself, is not sufficient to so narrowly construe the term "second interrupt signal." While the broad language of claim 5 does not expressly call for a second interrupt signal in response to a scan code corresponding to the non-conventional function key with another key, neither does that language foreclose the option of a scan code corresponding to a combination of keys. The claim merely states that when the keyboard controller receives a scan code corresponding to the non-conventional function key, the keyboard controller generates a second interrupt signal. Notably, claim 5 provides that a scan code is generated "in response to an activation of at least one of said keys." Col. 14, ll. 29-30. In the Court's view, this language suggests the possibility that a second interrupt signal may be generated upon receipt of a scan code corresponding to more than one key, for example, a non-conventional function key pressed in combination with a conventional key. Such a conclusion is further supported by the claim language: "said ISA-compatible computer programmed to execute at least one special routine upon receipt of said second interrupt signal." Col. 14, ll. 45-48. If, as the Recommendation suggests, the second interrupt signal is generated only by depressing the non-conventional function key alone, presumably the ISA-compatible computer would only be able to execute *one* special routine corresponding to that key, not *at least one* special routine as the claim language provides.

Therefore, the Court defines "second interrupt signal" as any interrupt, other than IRQ1, known at the time of the patent within the ISA-compatible computer environment, which is

06/03/2004 THU 15:21  [TX/RX NO 6076]  @012

generated when the non-conventional function key is depressed either alone or in conjunction with a conventional key.

### Conclusion

For the foregoing reasons, the Court ADOPTS the Recommendation's construction of the '273 patent terms, "ISA-compatible computer," "keyboard," "first interrupt signal," "program," "first memory location pointer," "second memory location pointer," and "indexing one of a plurality of memory locations," and OVERRULES all objections to the construction of those terms. Objections to the terms "keyboard controller," "data scan code," and "second interrupt signal" are SUSTAINED in part and OVERRULED in part.

The Court holds that the term "keyboard controller," as used in the claims of the '273 patent, means a component, distinct from the keyboard, that activates interrupt signals in response to receipt of data scan codes from the keyboard and, upon request, transmits the data scan codes to the computer. The keyboard and keyboard controller may be physically separate or housed together in the same unit.

The Court further holds that the term "data scan code," as used in the claims of the '273 patent, means a code number that the keyboard generates or outputs whenever a key is depressed or released, which corresponds to a pairing of a row signal and a column signal.

Finally, the Court holds that the term "second interrupt signal," as used in the claims of the '273 patent, means any interrupt, other than IRQ1, known at the time of the patent within the ISA-compatible computer environment, which is generated when the non-conventional function key is depressed either alone or in conjunction with a conventional key.

Signed this 3rd day of June, 2004.

John D. Rainey
UNITED STATES DISTRICT JUDGE

12

06/03/2004 THU 15:21  [TX/RX NO 6076]  ☒013

# UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

**MICHAEL N. MILBY**
CLERK OF COURT
P.O BOX 61010
HOUSTON, TEXAS 77208

www.txs.uscourts.gov

06/03/04

To:     K Jun Kim (aty)

Re:     Notice of Entry of Order or Judgment

---

Enclosed Order or Judgment entered in:

case number:      4:01-cv-00071

instrument number:  140

If after three attempts this fax fails, then we will print this notice and mail it to you.  For questions, please call (713) 250-5768.

Number of pages including cover sheet:   13