MARK D. FOWLER, Bar No. 124235
mark.fowler@dlapiper.com
ELIZABETH DAY, Bar No. 177125
elizabeth.day@dlapiper.com
TIMOTHY LOHSE, Bar No. 177230
timothy.lohse@dlapiper.com
SAL LIM, Bar No. 211836
sal.lim@dlapiper.com
GREGORY J. LUNDELL, Bar No. 234941
greg.lundell@dlapiper.com
DLA PIPER US LLP
2000 University Avenue
East Palo Alto, CA 94303-2214
Tel: 650.833.2000
Fax: 650.833.2001

Attorneys for Defendant and Counter-Plaintiff
SAMSUNG ELECTRONICS CO., LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WISTRON CORPORATION, a Taiwan corporation,<br><br>                Plaintiff and Counter-Defendant,<br><br>        v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Republic of Korea corporation,<br><br>                Defendant and Counter-Plaintiff.<br><br>SAMSUNG ELECTRONICS CO., LTD.,<br><br>                Counterclaim-Plaintiff,<br><br>        v.<br><br>WISTRON CORPORATION, and WISTRON INFOCOMM (TEXAS) CORPORATION,<br><br>                Counterclaim-Defendants. | CASE NO.  C-07-4748 VRW<br><br>**SAMSUNG ELECTRONICS CO., LTD.'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Claim Construction Hearing:<br>Date:  August 7, 2008<br>Time:  2:30 p.m.<br>Dept:  6<br>Judge:  Hon. Vaughn R. Walker |

1

## TABLE OF CONTENTS

2
**Page**

3  I.     INTRODUCTION ............................................................................................... 1

4  II.    APPLICABLE RULES OF CLAIM CONSTRUCTION .................................... 1

   III.   U.S. PATENT NO. 5,333,273 (the "'273 patent") .............................................. 2

5         A.     The Prior Claim Construction Orders ....................................................... 2

6         B.     Technical Background. .............................................................................. 3

7         C.     Data Scan Code/Scan Code ....................................................................... 4

          D.     First Interrupt Signal ................................................................................. 6

8         E.     Second Interrupt Signal ............................................................................. 6

9         F.     Second Interrupt Signal Line ..................................................................... 7

10        G.     Non-Conventional Function Key/Additional Function Key ..................... 8

          H.     Combination .............................................................................................. 8

11        I.      Program ..................................................................................................... 9

12        J.      Special Routine ....................................................................................... 10

13        K.     1) Indexes or Indexing; 2) Indexes a First Memory Location Pointer;
                 3) Indexing a Second Memory Location; and 4) Indexing One of Plurality

14               of Memory Locations .............................................................................. 11

   IV.    U.S. PATENT NO. 5,625,275 (the "'275 patent") ............................................ 13

15        A.     Technical Background. ............................................................................ 13

16        B.     Block ....................................................................................................... 14

17        C.     Variable ................................................................................................... 16

          D.     First Inactive State .................................................................................. 17

18 V.     U.S. PATENT NO. 6,523,100 (the "'100 patent") ............................................ 18

19        A.     Technical Background. ............................................................................ 18

20        B.     Memory Controller Unit .......................................................................... 19

          C.     Configured To Receive ............................................................................ 20

21        D.     To Provide ............................................................................................... 21

22        E.     Indication Of Access Speed .................................................................... 21

          F.     Access Timing ......................................................................................... 23

23        G.     Commensurate (with) .............................................................................. 24

24 VI.    CONCLUSION ................................................................................................. 25

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**CASES**                                                                                                **Page**

3

*Phillips v. AWH Corporation,*
    415 F.3d 1303 (Fed. Cir. 2005) .......................................................................................... 1

4

*Signtech USA, Ltd. v. Vutek, Inc.,*
    174 F.3d 1352 (Fed. Cir. 1999) ........................................................................................ 17

5

6

*Teleflex, Inc. v. Ficosa North America Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002) ................................................................................. 12, 20

7

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................................... 12, 24, 25

8

9

*York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.,*
    99 F.3d 1568 (Fed. Cir. 1996) ......................................................................................... 12

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP

WEST\21418332.2

SAMSUNG ELECTRONICS CO., LTD.'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. C 07-04748 VRW

1    **I.    INTRODUCTION**

2         Three Samsung patents are at issue.  One of the three patents, the '273 patent, already has

3    been construed four times, twice by this Court and twice previously in the Southern District of

4    Texas.  As the Court's existing constructions are correct, and as Wistron identifies no valid reason

5    to modify them, Samsung requests the Court again adopt these constructions.

6         Wistron's notebook computers clearly infringe the '273 patent under the Court's existing

7    constructions.  As a result, Wistron identifies seven additional claim terms to construe.

8    Reflecting the fact that at least five of these terms have meanings well-understood in the art,

9    Samsung and the defendants in the prior litigation stipulated to the meaning of those terms, and

10    this Court subsequently adopted the constructions.  Because the prior agreed-upon constructions

11    are correct and well-supported by the intrinsic evidence, and because Wistron's litigation-driven

12    constructions are unsupported by the intrinsic evidence, Samsung requests the Court again adopt

13    the prior agreed-upon constructions in this case.

14         The second patent-in-suit, the '275 patent, has not been previously construed.  Samsung's

15    constructions of the two terms that require construction are rooted directly in the language of the

16    claims and the specification and therefore should be adopted.  Wistron identifies a third term for

17    construction, but the term requires no construction and, in any event, Wistron's proposed

18    construction lacks any support in the intrinsic evidence.

19         The '100 patent includes six disputed claim terms.  The primary issue is whether the Court

20    should add – as Wistron requests – an "each access" limitation to the construction of three

21    disputed claim terms.  Wistron's request must be denied as neither the claims nor the

22    specification purport to impose such an added requirement.

23    **II.    APPLICABLE RULES OF CLAIM CONSTRUCTION**

24         This case presents no unique or unusual legal issue concerning claim construction.  The

25    usual rules of claim construction, reviewed at length by the Federal Circuit in *Phillips v. AWH*

26    *Corporation*, 415 F.3d 1303 (Fed. Cir. 2005), apply.  In *Phillips*, the Federal Circuit confirmed

27    the primacy of the intrinsic evidence in claim construction, focusing in particular on the language

28    of the claims and the specification.  *Phillips*, 415 F.3d at 1312-1317.  Samsung's proposed

-1-

1  constructions are anchored in the intrinsic evidence.

2  **III.     U.S. PATENT NO. 5,333,273 (the "'273 patent")[1]**

3       **A.     The Prior Claim Construction Orders.**

4       On May 12, 2005, this Court issued a Claim Construction Order concerning the '273

5  patent in *Samsung Electronics Co., Ltd. v. Quanta Computer Inc. et. al.*, Civil Action No. C-00-

6  4524 VRW (the "Quanta Order").  Lim Decl., Ex. B.  Upon motion for reconsideration by

7  Quanta, the Court issued a second claim construction order on July 25, 2006 (the "Second Quanta

8  Order).  Lim Decl., Ex. C.  As noted by the Court in the Quanta Order, the '273 patent was

9  construed twice before in actions brought by Samsung against other infringers in the Southern

10 District of Texas.  Lim Decl., Ex. B, p. 2.

11      In the Quanta Order, the Court construes five of the twelve claim terms currently at issue.

12 The five claim terms are:  (1) data scan code/scan code; (2) second interrupt signal; (3) non-

13 conventional function key/additional function key; (4) indexes a first memory location pointer;

14 and (5) indexing a second memory location.  Samsung agrees with the Court's prior constructions

15 of these five claim terms; Wistron does not.  As explained below, the Court's prior constructions

16 are correct and, therefore, the Court should adopt them in this action.

17      Because it is clear Wistron's notebook computers infringe the '273 patent under the

18 Court's prior constructions, Wistron requests the construction of seven additional claim terms.

19 Tellingly, in the prior lawsuits, the parties either reached agreement on these claim terms or they

20 did not require construction.  For example, in the *Quanta* action, the parties stipulated to

21 constructions of the following five claim terms Wistron now disputes:  (1) second interrupt signal

22 line; (2) program; (3) special routine; (4) indexes/indexing; and (5) indexing one of plurality of

23 memory locations.  Lim Decl., Ex. D.  Because there is no genuine dispute as to the meaning of

24 these claim terms, and because the previously stipulated constructions are correct, Samsung

25 requests the Court adopt the previously agreed-upon constructions in this case.

26

27 [1] A copy of the '273 patent is attached as Exhibit A to the Declaration of Sal Lim ("Lim Decl.").

28

1       **B.**     **Technical Background.**[2]

2       The '273 patent pertains to the "hot key" functions of a computer, which permit a

3  computer user to quickly call up a desired software program by pressing a specified key or

4  combination of keys on the keyboard.  Identical hot keys sometimes are used by more than one

5  software program, with one program using a particular hot key for one purpose, and another using

6  the same hot key for another purpose.  As a result, sometimes a user types a hot key intended for

7  one program, but the hot key is instead detected and acted upon by another program performing a

8  different function.  For example, the same combination of keys might be used both to perform a

9  function in a word processing program, and as part of a hot key combination to adjust screen

10  brightness.  In such a case, the computer mistakenly may recognize a particular key combination

11  as the hot key to adjust screen brightness when the user instead intended to use the key

12  combination while typing in a word processing program.  This not only would result in an

13  incorrect response by the computer, it also could interfere with the word processing program.

14  '273 patent, col. 1:56-col. 2:1-9; Wedig Decl., ¶¶ 20-21.

15       The invention of the '273 patent is an improved system for preventing interference

16  between programs when hot keys are used.  One aspect of the invention is the use of a non-

17  conventional function key (the "Fn" key), which is now found on almost all notebook computers.

18  When this "Fn" key is pressed alone or in combination with a conventional key to form a hot key

19  combination, a special "second interrupt signal" is generated by the keyboard controller that is

20  different from the conventional keyboard interrupt known as IRQ1.  This special interrupt signal

21  activates a special "second non-conventional interrupt handling routine" that is entirely

22  independent of the interrupt handling routine that is used for the application programs.  The use of

23  the Fn key as part of a hot key combination, together with a keyboard controller that can

24  distinguish between a conventional key press and a hotkey combination, to generate a different

25  interrupt signal and a different interrupt handling routine, prevents the computer from confusing

26  _____

27  [2] Samsung's expert concerning the '273 patent, Dr. Wedig, provides a detailed overview (with graphics)
of the underlying technology in paragraphs 7-31 of the Declaration of Dr. Robert Wedig ("Wedig Decl."),
filed herewith.

28

1  hot key combinations with other uses of the keyboard keys.  '273 patent, col. 2:10-40, col. 6:35-

2  65, col. 7:20-22, col. 7:65-col. 8:41, col. 13:48-56, col. 14:37-45; Wedig Decl., ¶¶ 22-23.

3      **C.      Data Scan Code/Scan Code.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| A code number that the keyboard generates whenever a key is depressed or released, said code number created by converting a pairing of a row signal and a column signal in the keyboard matrix. | A code number that the keyboard generates whenever a key is depressed or released, said scan code number created by converting a pairing of a row signal and a column signal in the keyboard matrix.  <u>Each key on the keyboard has a unique scan code.</u>  (Emphasis added.) |

10      The term "data scan codes" appears in independent claim 1.  The term "scan code"

11  appears in independent claim 5.  '273 patent, col. 13:61, col. 14:29-31, 38-44.  The parties agree

12  the terms should share the same construction, although the parties' respective constructions differ.

13      Samsung's proposed construction of these terms is identical to the Court's prior

14  construction.  Lim Decl., Ex. B, pp. 15-16.  Wistron's proposed construction also is the same,

15  except Wistron adds the limitation "each key on the keyboard has a unique scan code."

16      Wistron cites columns 4 and 7 of the specification to support its proposed construction.

17  Joint Claim Construction Statement ("JCCS"), Ex. E, pp. 1-2.  Wistron focuses in particular on

18  the following language from column 7:

19      When the keyboard microprocessor 250 detects an active row signal, it
        uses the row signal and the currently active column signal to uniquely
20      identify which of the keys on the keyboard is depressed.  The key is
        identified with a scan code in a conventional manner.

21

22  '273 patent, col. 7:51-55.

23      The Court considered this language in the Quanta Order.  Lim Decl., Ex. B, p. 11.

24  Notably, the Court concluded the word "uniquely" does not refer to a scan code, but instead refers

25  to the use of row and column signals (which the Court concluded were not scan codes) in

26  determining which key has been pressed.  *Id.*  The above-quoted language then states the "key is

27  identified with a scan code," but does not purport to impose the "unique" limitation Wistron now

28  seeks.  Indeed, nowhere does the specification impose an "unique" scan code limitation.

-4-

Wistron has not articulated a substantive reason for its proposed additional limitation, and it is unclear what added meaning or requirement this additional language imposes. However, if this "unique" limitation is added to the construction, Wistron may attempt to later argue, as past defendants did, that the claimed "scan codes" are limited to "standard" forms of scan codes. However, the Court previously rejected this assertion:

> This is not the only example of dispute among the parties about whether scan codes are standardized and, if so, what standard applies. But that is all quite beside the point for purposes of construing scan code, because there is no basis in the claims for limiting the term to one particular industry standard or another.

Lim Decl., Ex. B, p. 15; see also Wedig Decl., ¶¶ 35-38, Ex. N.

Wistron also may attempt to later argue, if the "unique" limitation is added to the construction, that the word "unique" requires the scan code to remain in the same format as it is transmitted through the various components of the computer. This also would be incorrect, as a scan code appears in different forms as the code travels through the computer system. Wedig Decl., ¶¶ 39-41, Exs. O and P. While the Court was not required to reach this precise issue in the Quanta Order, the Court did note, in reviewing the same evidence now presented by Samsung, that "this may be evidence that scan codes can take different forms." Lim Decl., Ex. B, p. 15.

Wistron also cites the *Microsoft Press Computer Dictionary* definition of scan code, which includes the language requested by Wistron. JCCS, Ex. E, p. 1; Lim Decl., Ex. B, p. 13. However, this same definition was before the Court in the *Quanta* action, and the Court did not then conclude this additional language was required by the patent. Indeed, in order to impose such a requirement, the Court would be required to go beyond the intrinsic evidence to import a limitation into the claim based upon a single piece of extrinsic evidence. Because no intrinsic evidence requires such a narrowing limitation, there is no basis for the Court to modify its prior construction of this claim term.

///

///

///

**D.    First Interrupt Signal.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| IRQ1. | The ISA Standard IRQ1 interrupt signal. |

This term appears in claims 1, 4 and 5. '273 patent, col. 13:5-51, 59-60, col. 14:36-42.

Nowhere do the claims, specification or prosecution history require the IRQ1 signal be an "ISA standard IRQ1" signal, or even mention a "standard IRQ1" signal. On the other hand, Samsung's proposed construction is consistent with the teaching of the specification. *See, e.g.,* '273 patent, col. 4:31-38; Figs. 1-4 and 6-9.

Samsung's proposed construction also is consistent with the Court's prior construction of the claim term "second interrupt signal," namely "an interrupt other than IRQ1." Lim Decl., Ex. B, p. 22. In adopting this construction, the Court noted "[t]he dispute turns on whether the claims must be read strictly in the context of ISA-compatible systems." *Id.* at 21. The Court concluded, in the context of the second interrupt signal, the claims do not need to be so strictly read. *Id.* Samsung's construction also is consistent with the Court's prior conclusion that the claimed "scan codes" should not be limited to a single industry standard. *Id.* at 15. Indeed, Wistron's proposed construction also is at odds with the Second Quanta Order, which rejected defendant's attempt to impose an "ISA bus" limitation – another purported aspect of the ISA standard – on the claimed "ISA-compatible computer." Lim Decl., Ex. C pp. 4-5. Accordingly, consistent with its prior rulings, the Court should reject Wistron's attempt to impose a purported ISA "standard" requirement on this claim term.

**E.    Second Interrupt Signal.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Any interrupt other than IRQ1. | Any interrupt signal other than IRQ1 interrupt signal. |

This term appears in claims 1, 4 and 5. '273 patent, col. 13:55-56, col. 14:3, 42-49.

Samsung's proposed construction is identical to the Court's prior construction. Lim Decl., Ex. B, pp. 20-22. Wistron does not identify any alleged error in the Court's prior

-6-

1    construction, but adds the word "signal" after the word "interrupt." Wistron does not explain why

2    this change is required. As the Court's existing construction is correct and no reason exists for

3    changing the construction, the Court should adopt its prior construction for this case.

4    **F.      Second Interrupt Signal Line.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| A second, separate signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the second interrupt signal. | A second, <u>dedicated</u> separate signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the second interrupt signal. (Emphasis added.) |

10    This claim term appears in claims 1 and 5. '273 patent, col. 13:57, col. 14:35-36, 43-44.

11    Samsung's proposed construction was agreed upon by the parties in the *Quanta* action and

12    subsequently adopted by the Court. Lim Decl., Ex. D, p. 5, Ex. B, p. 6. Wistron's construction is

13    identical to this prior construction, with the significant exception that Wistron argues the signal

14    line must be a "dedicated" line. Wistron's construction is incorrect because no intrinsic evidence

15    requires the second interrupt signal line be "dedicated," and because one of ordinary skill in the

16    art understands the second interrupt signal line need not be "dedicated."

17    Nothing in the claims requires the second interrupt signal line be "dedicated." Indeed,

18    Wistron does not cite the claim language in support of its construction. JCCS, Ex. E, pp. 9-13.

19    Nor do the sections of the specification and prosecution history cited by Wistron purport to

20    require the second interrupt signal line be "dedicated." *Id.* In short, no intrinsic evidence

21    supports, much less requires, the imposition of this added limitation.

22    Wistron's proposed construction also is contrary to the understanding of one of ordinary

23    skill in the art. Such a person knows the second interrupt signal line does not need to be a

24    dedicated line because the second interrupt signal could be communicated on any of the unused

25    IRQ lines, the NMI line or the SMI line. Wedig Decl., ¶ 45. At the time of the patent, it was well

26    known the NMI and SMI lines could be used for multiple functions and, accordingly, did not

27    need to be dedicated to handling only the claimed second interrupt signal. *Id.* Accordingly,

28    Wistron's proposed narrowing construction should be rejected.

-7-

DLA PIPER US LLP    WEST\21418332.2    SAMSUNG ELECTRONICS CO., LTD.'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. C-07-4748 VRW

**G.      Non-Conventional Function Key/Additional Function Key.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Plain meaning (no construction is required). | An additional function key other than a conventional function key. |

"Non-conventional function key" appears in claim 5. "Additional function key" appears in claim 1. '273 patent, col. 13:42-45, 53-54, col. 14:28, 45. The parties agree these terms should share the same construction, but the parties' respective constructions differ.

In the *Quanta* action, the Court ruled "no construction is needed at all" for these claim terms. Lim Decl., Ex. B, pp. 10-11. Notably, Wistron's current construction is similar to the construction proposed by defendants in the *Quanta* action–"an extra function key." *Id.* The Court declined to adopt that construction as it did not improve upon the existing claim language. The Court should reach the same conclusion here, particularly as Wistron identifies no reason why these two terms require construction.

**H.      Combination.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Plain meaning (no construction is required). | Simultaneously. |

This claim term appears in claim 1. '273 patent, col. 13:38, 54.

This claim term does not require construction. The existing claim language is easily understood and cannot be improved upon. In any event, Wistron's proposed construction must be rejected because it is inconsistent with the intrinsic evidence.

Wistron's construction would require, in claim 1, that the additional function key be activated "simultaneously" with a conventional alphanumeric key. '273 patent, col. 13:36-37, 53-55. However, in describing an embodiment of the claimed invention, the specification states that the additional function key and the alphanumeric key are not activated simultaneously: "when the keyboard microprocessor 250 detects the activation of the thirteenth function key Fn, it *waits* for the activation of an alphanumeric key." '273 patent, col. 7:65-68 (emphasis added).

-8-

1    Similarly, Figure 8 of the specification illustrates the Fn key is activated before, not

2    "simultaneously" with, the second key of the key combination. '273 patent, Fig. 8. Thus,

3    Wistron's proposed construction directly contradicts the specification. Wistron's construction

4    also is at odds with the understanding of one of ordinary skill in the art, who knows it is virtually

5    impossible for a user to literally simultaneously depress two keys in a key combination. Wedig

6    Decl., ¶ 51. Accordingly, Wistron's proposed construction should be rejected.

7        **I.    Program.**

8

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| A handling routine that causes the computer to receive keyboard scan codes from the keyboard controller. | To perform a series of instructions to input the scan code. |

9

10

11

12        This claim term appears in claim 5. '273 patent, col. 14:40. Samsung's proposed

13    construction was agreed upon by the parties in the Quanta action and subsequently adopted by

14    this Court. Lim Decl., Ex. D, p. 6, Ex. B, p. 6.

15        Claim 5 recites that the keyboard controller receives a scan code. '273 patent, col. 14:36-

16    39. Claim 5 then recites the "ISA-compatible computer [is] programmed to execute a program to

17    input said scan code." *Id.* at col. 14:40-42. Samsung's proposed construction correctly reflects

18    the claimed function of the "program," namely inputting the scan codes from the keyboard

19    controller to the computer. Wistron's construction does not reflect this claimed  function.

20        Samsung's proposed construction also is consistent with the teaching of the specification.

21    Figures 2, 3 and 6 of the specification each illustrates the CPU of the computer receiving scan

22    codes from the keyboard controller. '273 patent, Figs. 2, 3 and 6. The text of the specification

23    explains that a handling routine performs this function: "As part of ***the keyboard interrupt service***

24    ***routine***, the microprocessor 110 is caused to enable the keyboard controller 128 . . . to

25    communicate the keyboard scan codes from the keyboard controller to the microprocessor 110."

26    '273 patent, col. 5:21-25 (emphasis added). As Samsung's proposed construction is consistent

27    with the intrinsic evidence, Samsung requests the Court adopt its proposed construction.

28

1

**J.      Special Routine.**

2

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| A routine that is executed upon receipt of the second interrupt signal. | A routine that is only executed upon receipt of the second interrupt signal and the scan code corresponding to one of the conventional keys.  (Emphasis added.) |

3

4

5

6

7        This claim term appears in claim 5.  '273 patent, col. 14:47.  Samsung's proposed

8    construction was agreed upon by the parties in the *Quanta* action and subsequently adopted by

9    this Court.  Lim Decl., Ex. D, p. 6, Ex. B, p. 6.

10       Wistron's proposed construction differs from Samsung's construction in two significant

11   ways.  First, it requires the special routine be executed "only" upon receipt of the second interrupt

12   signal.  Second, it requires the special routine be executed upon receipt of "the scan code

13   corresponding to one of the conventional keys."  Wistron is wrong on both counts.

14       Nothing in claim 5 requires the special routine be executed "only" upon receipt of the

15   second interrupt signal.  Indeed, the word "only" does not appear anywhere in the claim.  '273

16   patent, col. 14:45-48.  Similarly, while the specification and prosecution history describe an

17   embodiment in which the special routine is executed upon receipt of the second interrupt signal,

18   they never state, much less require, that the "only" situation in which the special routine may be

19   triggered is receipt of the second interrupt signal.  JCCS, Ex. E, pp. 24-27.

20       Nor does the extrinsic evidence require the special routine be executed "only" upon

21   receipt of the second interrupt signal.  On the contrary, one of ordinary skill in the art also would

22   have understood, for example, that the special routine could be either the NMI handler or the SMI

23   handler.  Wedig Decl., ¶ 50.  At the time of the patent, it was well known that the NMI handler

24   and the SMI handler could be executed as a result of inputs from peripheral devices, and not just

25   upon receipt of the second interrupt signal.  *Id.*  Thus, Wistron's narrowing "only" limitation is

26   neither required by the intrinsic evidence nor supported by extrinsic evidence.

27       Wistron's second assertion, that the special routine is executed upon receipt of the scan

28   code corresponding to "one of the conventional keys," is plainly incorrect.  The claim language

-10-

1    makes clear the special routine is executed upon receipt of the second interrupt signal, which is

2    generated upon receipt of a scan code corresponding to the "non-conventional function key," not

3    "one of the conventional keys":

4        said keyboard controller generating a second interrupt signal on said second
         interrupt signal line upon receipt of **a scan code corresponding to said non-**
5        **conventional function key**, said ISA-compatible computer programmed to
         execute at least one special routine upon receipt of said second interrupt signal.

6

7    '273 patent, col. 14:42-48 (emphasis added).

8        Wistron's proposed construction literally changes the claim by replacing the phrase "said

9    non-conventional function key" with the phrase "one of the conventional keys." Accordingly, not

10   only is Wistron's proposed construction unsupported by the claim language, it is inconsistent with

11   the claim language. Wistron's proposed construction must therefore be rejected.

12       **K.    1) Indexes or Indexing; 2) Indexes a First Memory Location Pointer;**
                 **3) Indexing a Second Memory Location; and 4) Indexing One of Plurality of**
13               **Memory Locations.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| 1) Selects or accesses. (Agreed construction previously adopted by the Court; see Lim Decl., Ex. D, p. 6.) | 1) To locate information in a table by adding an offset amount. |
| 2) Selects or accesses an identifier that corresponds to the start of the first conventional interrupt handling routine. (Identical to the Court's prior construction; see Lim Decl., Ex. B, p. 24.) | 2) Adds an offset amount to a first memory location pointer. |
| 3) Selects or accesses an identifier that corresponds to the start of the second non-conventional interrupt handling routine. (Identical to the Court's prior construction; see Lim Decl., Ex. B, pp. 24-25.) | 3) Adding an offset amount to a second memory location. |
| 4) To utilize an interrupt vector to access a memory location corresponding to an interrupt vector. (Agreed construction previously adopted by the Court; see Lim Decl., Ex. D, p. 6.) | 4) Adding an offset amount to one of a plurality of memory locations. |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-

1    These claim terms appear in dependent claims 4 and 7.  As summarized in the table above,

2    two of these claim terms were construed by the Court in the Quanta Order, while the

3    constructions of the other two terms were agreed upon by the parties in the *Quanta* action and

4    subsequently adopted by the Court.  The primary difference between the existing constructions

5    and Wistron's constructions is that Wistron's proposed constructions require that indexing be

6    accomplished by "adding an offset amount."  This limitation is neither supported nor required by

7    the intrinsic evidence.

8    Wistron cites a single passage of the specification, which mentions the use of "segment

9    and offset addresses," and erroneously concludes that indexing must be accomplished by adding

10   an offset.  JCCS, Ex. E, pp. 16-19.  However, Wistron's construction ignores the other portions of

11   the specification which provide that indexing is accomplished by multiplication, not addition:

12   The microprocessor 110 uses **the value of 77H as an index** and accesses
     location 1DCH **(i.e., 77H X 4)** in the RAM 120 to obtain a pointer to the Fn
13   service routine in the RAM 120.

14   '273 patent, col. 6:57-60 (emphasis added); *see also* Figs. 2, 3 and 6 (each of which also indicates

15   multiplication).

16   Wistron's reliance on the *Microsoft Computer Dictionary* definition also is misplaced.

17   Specifically, extrinsic evidence cannot be used to contradict the clear meaning provided in the

18   intrinsic record.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

19   Furthermore, limitations cannot be read into the claims from the specification absent an

20   express intention to do so.  *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325-

21   1326 (Fed. Cir. 2002) ("The claims must be read in view of the specification, but limitations from

22   the specification are not to be read into the claims"); *York Prods., Inc. v. Cent. Tractor Farm &*

23   *Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996).  Here, the claims (particularly claim 4) do not

24   require indexing be performed in a particular manner, and the specification does not purport to

25   require indexing be performed in a specified manner.  Therefore, Wistron's proposed

26   constructions should be rejected.

27   ///

28   ///

-12-

**IV.     U.S. PATENT NO. 5,625,275 (the "'275 patent")**

     **A.     Technical Background.[3]**

     The '275 patent relates to charging a battery in a portable computer.  A portable computer uses power drawn from a power outlet (*e.g.,* a wall socket) to both:  (1) power the operations of the computer; and (2)  supply power to a power supply within the portable computer which recharges the computer's battery.  '275 patent, col. 1:13-19.  In most prior art portable computers, only two levels of charging current are supplied by the power supply to the battery:  one level when the computer is off and a second lower level when the computer system is on.  *Id.* at col. 1:20-23.

     In such computers, in order to ensure there is sufficient available current to charge the battery when the computer also is drawing current to power its normal operations, the AC adapter must be designed to provide enough power to meet the demand for current when the computer is using maximum power and the battery requires charging.  Because the AC adapter is designed for this "worst case" situation – in which the computer is drawing current at a maximum level and the battery is receiving charging current at a pre-set level – the capacity of the AC adapter often is greater than necessary for typical operation, when the computer is not drawing the maximum current and the balance of power available from the AC adapter is therefore wasted.  *Id.* at col. 1:23-35.

     The invention of the '275 patent provides an improved power supply to efficiently charge the battery of a portable computer while the computer is operating so all of the power from the AC adapter is utilized.  The power supply includes an AC adapter which supplies input current for operating the computer system and for charging the battery.  *Id.* at col. 1:54-col. 2:4.  The power supply also includes three sensors (or, in some claims, three sensing circuits, a controller, or three "sensing" steps) for detecting:  (1) the level of input current supplied by the AC adapter; (2) the level of charging current supplied to the battery; and (3) the output voltage level of the

---

[3] A copy of the '275 patent is attached as Exhibit F to the Lim Declaration.  Samsung's expert concerning the '275 patent, Dr. Colwell, provides a detailed overview (with graphics) of the underlying technology at paragraphs 11-23 of the Declaration of Dr. Robert Colwell ("Colwell Decl."), filed herewith.

1  power supply. *Id.* at col. 2:5-11, col. 9:4-14 (claim 1), col. 10:1-8 (claim 7), col. 10:52-61 (claim

2  11), col. 11:34-39 (claim 15), col. 12:23-25 (claim 16, which claims a sensor to monitor the input

3  current supplied by the AC adapter).

4      In most embodiments, a controller is connected to each sensor and monitors the input

5  current level, the charging current level and the output voltage level. *Id.* at col. 2:11-13, col.

6  9:15-18 (claim 1), col. 10:62-67 (claim 11), col. 12:25-29 (claim 16). In claim 7, the controller

7  monitors input signals without the claim reciting sensors. *Id.* at col. 10:1-9. In method claim 15,

8  the claim recites a "comparing step" as to the input current level, the charging current level and

9  the output voltage level. *Id.* at col. 11:40-col. 12:1-3.

10      In the invention, when the computer draws less current, more current charging is made

11  available to the battery, thus efficiently using the available power output from the AC adapter. *Id.*

12  at col. 1:54-67, col. 8:39-49, col. 9:27-40, col. 10:8-29, col. 11:3-15, col. 12:6-16, 30-39.

13  Conversely, in certain embodiments, in order to prevent over voltage or damage to the AC

14  adapter, when the monitoring determines the current drawn by the computer exceeds a set

15  threshold, a regulator or controller blocks the charging current flow to the battery. *Id.* at col.

16  1:54-67, col. 9:27-40, col. 10:8-29.

17      **B.    Block.**

18
| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
19
| The transistor is biased off. | Stop the flow of charging current. |
20

21      The claim term "block" appears only in claim 1. '275 patent, col. 9:28. Claim 1 requires

22  the "controller generating said control signal to cause said control circuit to block charging

23  current flow when at least one of said input current level, said charging current level and said

24  output voltage level exceeds its respective maximum limit." '275 patent, col. 9:27-31.

25  Samsung's proposed construction of "block" is identical to the patent's teaching of blocking in

26  the context of the invention, *i.e.*, biasing the transistor off. Wistron's proposed construction of

27  "block" essentially is "stop," as the balance of Wistron's construction ("the flow of charging

28  current") simply paraphrases the claim language following "block" ("charging current flow").

1     Samsung's construction is supported by the claim language.  Dependent claim 5 teaches

2 the claimed "blocking" of charging current consists of biasing a transistor off:

3         5. The power supply of claim 1, wherein said charging current control circuit
          includes a transistor connected to said AC adapter and to said battery, wherein
4         said ***transistor is biased on and off*** in accordance with said control signal
          generated by said controller ***to control current flow*** between said AC adapter
5         and said battery.

6 '275 patent, col. 9:51-56 (emphasis added).

7         Dependent claim 8 includes the same teaching:

8         8.  The regulator of claim 7, wherein said charging current control circuit
          includes a transistor connected between said AC adapter and to said battery,
9         wherein said ***transistor is biased on and off*** in accordance with said output
          signal generated by said controller ***to control current flow*** between said AC
10        adapter and said battery.

11 '275 patent, col. 10:30-35 (emphasis added).

12        Therefore, at a minimum, the claim term " block" must encompass at least biasing the

13 transistor off.  It is unclear why Wistron disputes Samsung's construction, or whether Wistron

14 contends its construction, "stop," does not encompass biasing the transistor off.  However, if

15 Wistron contends blocking cannot consist of biasing the transistor off, then Wistron's

16 construction is necessarily incorrect because it would read claim 5 out of the patent.

17        The specification also supports Samsung's construction.  Specifically, the specification

18 explains what blocking is performed, namely that the transistor is biased off.  For example, the

19 "Summary Of The Invention" section of the specification states:

20        The charging current control circuit may include a transistor connected to
          the AC adapter and to the battery, wherein ***the transistor is biased on and***
21        ***off*** in accordance with the control signal generated by the controller to
          control current flow between the AC adapter and the battery.
22

23 '275 patent, col. 2:25-30 (emphasis added).  The patent later repeats this same teaching:

24        The charging current control circuit may include a transistor connected
          between the AC adapter and the battery, wherein ***the transistor is biased***
25        ***on and off*** in accordance with the output signal generated by the controller
          to control current flow between the AC adapter and the battery.
26

27 '275 patent, col. 2:50-54 (emphasis added).

28        The specification repeats this teaching four more times.  '275 patent, col. 5:2-3 ("the

-15-

1   regulator output is disables such that **the MOSFET 22 is biased off** by the driving circuit 21 and

2   no current flow from the adaptor 14 flows through MOSFET 22 to the battery") (emphasis

3   added); col. 7:14-17 (same); col. 7:36-40 ("the driving circuit 21 **subsequently biases the**

4   **MOSFET 22 off** to prevent current output by the AC adaptor from reaching the battery 12")

5   (emphasis added); col. 8:8-14, 22-30.

6          Biasing the transistor off is precisely how one of ordinary skill in the art understands

7   blocking in the context of this invention. Colwell Decl., ¶ 25. Indeed, the '275 patent does not

8   disclose any other blocking in the specification. *Id.*; Lim Decl., Ex. F.

9          Samsung's proposed construction also is consistent with a stated purpose of the invention,

10  providing over voltage and short circuit protection. '275 patent, col. 1:57-60. One of ordinary

11  skill in the art understands the '275 patent describes an analog controller capable of measuring the

12  threshold limits on a continuous basis. Colwell Decl., ¶ 20. Such a controller makes an on-going

13  determination of whether any measured level has risen above its threshold and whether the

14  controller should withhold charging current from the battery by biasing the transistor off. *Id.* The

15  specification's repeated use of a MOSFET transistor suggests the inventors contemplated a

16  control circuit capable of fast blocking of the charging current. Thus, construing "block" to mean

17  biasing the transistor off is consistent with the commonly understood implementation of the

18  claimed invention.

19      **C.    Variable.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Plain meaning (no construction is needed). | Adaptable. |

23          This term appears in independent claims 1 and 7. '275 patent, col. 9:33-36, col. 10:13, 23.

24          This term does not require construction because it is easily understood by persons of

25  ordinary skill in the art and by laypersons, and because Wistron's proposed construction does not

26  improve upon the existing claim language. In fact, Wistron's construction – to the extent it is

27  comprehensible – appears to change the meaning of the claims.

28          The inventors chose to use the word "variable" in the claims, just as they did in selecting

-16-

1   the title of the '275 patent.  In fact, in response to a PTO rejection, the inventors re-titled their

2   invention:  "Power Supply Which Provides A *Variable* Charging Current To A Battery In A

3   Portable Computer System."  Lim Decl., Ex. F, p. 1. (emphasis added).  The inventors' careful

4   language choice should be honored.  *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1358 (Fed.

5   Cir. 1999) (the Federal Circuit "emphasizes the importance of careful language choices in the

6   specification and, particularly, in the claims").

7           Moreover, Wistron's construction finds no support in the intrinsic record.  The word

8   "adaptable" does not appear in the claims, the specification or the prosecution history.  To the

9   contrary, the inventors chose the word "vary" and its derivatives to describe regulating the

10  charging current level when none of the threshold levels is exceeded.  Lim Decl., Exs., Ex. F, p.

11  10; Ex. G, p. 2.  Nothing suggests the inventors contemplated the invention as "adapting" the

12  charging current (whatever that might mean) as opposed to varying the level of charging current.

13          Wistron's construction also is not supported by the general purpose dictionary definition it

14  cites.  Specifically, the *Compact Oxford English Dictionary* defines "variable" as:  "1. not

15  consistent or having a fixed pattern; liable to vary.  2. able to be changed or adapted."  JCCS,

16  Exhibit F, p. 5.  Wistron does not explain why this general purpose dictionary definition should

17  be applied to the claims, or how the definitions relate to the teachings of the specification.  In any

18  event, as between the two definitions included in this dictionary, one of ordinary skill in the art

19  would understand the first definition, not the second definition (which Wistron only partially

20  adopts), is closer to the meaning of "variable" as used by the patent.  Colwell Decl., ¶ 28.

21          **D.      First Inactive State.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| The state in which the transistor is biased off. | The signal state that represents no charging current is flowing. |

25          This claim term appears only in claim 7.  '275 patent, col. 10:10.  Claim 7 recites a

26  "control signal having a first inactive state when any one of said first, second and third input

27  signals exceeds a first, second and third limit value."  *Id.* at col. 10:10-12.

28          It appears Samsung and Wistron agree the "first inactive state" of the control signal results

-17-

1   in the same condition as when the charging current is "blocked" in claim 1.  Wistron and

2   Samsung also rely upon the same intrinsic evidence to support of their respective constructions of

3   "block" and "first inactive state."  Accordingly, Samsung's proposed construction of "first

4   inactive state" is correct for the same reasons Samsung's construction of "block" is correct.

5          Wistron cites two general purpose dictionary definitions of "inactive."  JCCS, Ex. F, p.

6   10.  However, the dictionary definitions cited by Wistron are not descriptive of the "first inactive

7   state" recited in claim 7.  In particular, it is not the case a "first inactive state" is a state in which

8   the transistor, or any other component contemplated in the invention, is "[n]ot functioning or

9   operating, or out of use."  *Id.*  When the transistor regulating charging current flow is biased off,

10  it is by no means "not functioning."  To the contrary, it is functioning, and it is doing so exactly

11  as it was designed to function, *i.e.,* by blocking.  Indeed, the only time the transistor (or any other

12  component of the invention) is "not functioning" is when the computer is powered off or broken.

13  Thus, the extrinsic evidence cited by Wistron is contrary to the teaching of the '275 patent.

14  **V.     U.S. PATENT NO. 6,523,100 (the "'100 patent")**

15         **A.     Technical Background.**[4]

16         The '100 patent relates to a computer memory system.  A computer "memory" typically is

17  an integrated circuit device such as a dynamic random access memory chip (a "DRAM").  A

18  memory contains computer programs comprised of sets of instructions to be executed, and data to

19  be manipulated, by the computer's central processing unit (the "CPU," the "brains" of the

20  computer).  A "memory module" typically includes a plurality of individual memories and

21  associated logic for communicating with the computer system.  Some computers have more than

22  one memory module.  In some computers, the memory modules may be coupled to a "memory

23  controller," which interfaces with the memory modules and generates timing for the control

24  signals needed to access data in the memories.  '100 patent, col. 1:19-32; Wedig Decl., ¶ 19.

25         The '100 patent invention relates to a memory controller capable of working with memory

26  ───────────────────────

27  [4]  A copy of the '100 patent is attached as Exhibit H to the Lim Declaration.  A detailed overview (with graphics) of the underlying technology is provided at paragraphs 18-19 and 54-56 of the Wedig Declaration.

28

1  modules of different types or varying speeds. '100 patent, col. 2:37-col. 3:10 (February 18, 2003,

2  Certificate of Correction (the "Certificate")); Wedig Decl., ¶ 56.  Conventional memory

3  controllers could not work with memory modules of different speeds or types.  '100 patent, col.

4  2:23-33.  To work with memory modules of varying speeds, the memory controller of the

5  invention receives an indication of the speed of the memory module and provides appropriate

6  access timing commensurate with the received indication of access speed.  '100 patent, col. 2:37-

7  col. 3:10 (Certificate), col. 11:48-53 (claim 1), col. 12:17-24 (claim 4); Wedig Decl., ¶ 55.

8      **B.    Memory Controller Unit.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Chip circuitry, other than a memory access requestor, that provides the access timing. | A controller that receives an indication of access speed on each access. |

13      This term appears in each claim.  '100 patent, col. 11:45-col. 12:51.

14      Samsung's construction is consistent with the intrinsic evidence and explains the meaning

15  of the claim term.  Wistron's construction, on the other hand, incorrectly imports an "on each

16  access" limitation into the claims and otherwise provides no meaning to the term.  As the claims

17  include no "on each access" limitation, and as neither the specification nor the prosecution history

18  impose such a requirement, Wistron's re-working of the claims must be rejected.

19      An important distinction present in Samsung's construction but lacking in Wistron's

20  construction is that the memory controller unit ("MCU") is chip circuitry other than the "memory

21  access requestor."  The distinction between the MCU and the "memory access requestor" is

22  established by the intrinsic evidence.  During prosecution of the '100 patent, Samsung explained:

> That is, ***the memory controller*** according to the claimed aspect of the present invention receives the access speed information and, once the information is received, uses the same, during accessing of the memory, to adaptively ***control the access timing*** when fulfilling an ***access request from a memory access requestor, e.g., the CPU, an I/O device, etc., thus freeing the memory access requestor from being concerned with the access timing***.

27  Lim Decl., Ex. I, October 8, 2002, Amendment at p. 6 (emphasis added).

28      This statement makes clear the MCU is not the memory access requestor.  This conclusion

-19-

1    also is mandated by the specification and the claims.  For example, the specification identifies a

2    CPU, rather than the MCU, as generating the memory access request.  '100 patent, col. 2:37-col.

3    3:10 (Certificate).  Likewise, in claim 4, the CPU is the memory access requestor, not the MCU.

4    '100 patent, col. 12:17-18.  Thus, the intrinsic evidence establishes the MCU and the memory

5    access requestor are different.

6         Wistron's construction also should be rejected because it includes an "on each access"

7    limitation.  However, no claim includes such a limitation.  Nor do the specification or prosecution

8    history purport to require such a limitation, much less clearly express an intent to impose such a

9    requirement.  Wistron's construction must therefore be rejected.  *Teleflex*, 299 F.2d at 1313.

10        Moreover, once the "on each access" limitation is removed from Wistron's construction,

11   the construction provides no meaning to the claim term.  Independent claims 1 and 4 already

12   expressly state the MCU receives "an indication of access speed."  '100 patent, col. 11:47-48, col.

13   12:20-23.  Thus, there is no need to restate this in a claim construction.

14        **C.    Configured To Receive.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| Plain meaning, which is "designed to receive." | Set up to receive during each access. |

19        This term appears in claims 1, 3, 4, 6 and 7.  '100 patent, col. 11:45-col. 12:51.

20        Once again, Wistron's construction seeks to import an extraneous and incorrect "each

21   access" limitation into the claims.  For the same reasons discussed above concerning the

22   "memory controller unit," Wistron's attempt to re-write the claims in this way must be rejected.

23        Moreover, the phrase "configured to receive" is completely clear to one of skill in the art

24   and requires no additional explanation – it means designed to receive.  Wedig Decl., ¶ 67.  This

25   conclusion is supported by the claim language.  For example, dependent claim 7 recites that the

26   "***memory controller unit is configured to receive*** an indication of access speed of said at least

27   one memory module during an initialization of said memory system."  '100 patent, col. 12:44-46

28   (emphasis added).  It is clear from this claim language the MCU is designed to receive an

-20-

1    indication of access speed. The specification also indicates the MCU is designed to receive such

2    an indication. *Id.* at col. 2:37-3:10 (Certificate), col. 8:22-31, Fig. 3C, Fig. 4.

3         Samsung's position also is supported by contemporaneous dictionary definitions. For

4    example, the Third and Fourth Editions of the American Heritage Dictionary of the English

5    Language define "configure" as "to design, arrange, set up, or shape with a view to specific

6    applications or uses." Lim Decl., Exs. J. The Random House Dictionary of the English

7    Language defines "configure" as "to design or adapt to form a specific configuration or for some

8    specific purpose." Lim Decl. Ex., K. Consistent with these definitions – and as the claims

9    themselves make clear – the MCU is "designed" for the purpose of "receiving."

10        **D.    To Provide.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| Plain meaning (no construction is needed). | Supply during each access. |

14        This term appears in claims 1, 2, 4 and 5. '100 patent, col. 11:45-col. 12-51.

15        The words "to provide" are simple words easily understood by a person of ordinary skill

16   in the art, and there is no need to construe this term. Wedig Decl., ¶ 71. Indeed, Wistron's

17   construction once again consists entirely of an improper attempt to import an "each access"

18   limitation into the claims. For the reasons discussed above concerning "memory controller unit,"

19   Wistron's attempt to re-write the claims by importing this extraneous limitation must be rejected.

20        **E.    Indication Of Access Speed.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| Data that identifies the read/write speed of the memory module. | State of a signal line connecting between a memory unit (MU) and the memory control unit (MCU) that represents memory clock rate information. |

26        This term appears in claims 1, 2, 4, 5, 7 and 8. '100 patent, col. 11:45-col. 12:51.

27        Independent claims 1 and 4 provide the MCU is configured to receive "an indication of

28   access speed." *Id.* at col. 11:48-49, col. 12:21-22. The claims do not require the "indication" take

-21-

1   any particular form or be received from any particular source – only that there be "an indication."

2   *Id.* One of ordinary skill in the art understands the "indication" only must be a type of data

3   provided to the MCU indicating access speed, and that multiple types of data can provide such

4   information. Wedig Decl., ¶ 74. Wistron's construction is incorrect because it suggests that the

5   indication must be received directly from the memory unit, and that the indication must take the

6   form of a particular state of a signal on a particular signal line. However, as just established, no

7   such requirements exist in the claims.

8          Wistron's construction also is incorrect as it appears to be an attempt to improperly limit

9   the claims to one embodiment described in the specification. However, as just established, the

10  inventors claimed "an indication" of access speed, not just the one implementation of the claim

11  reflected in Wistron's construction.

12         As to the words "access speed," one of ordinary skill in the art recognizes that the "access

13  speed" of a memory module is the rate at which a memory item can be read from or written to the

14  memory module. For example, if one million bytes of data can be read or written to a memory

15  module every second, the access speed is "one megabyte/second." Wedig Dec., ¶ 75. This

16  common understanding among those skilled in the art is reflected in Samsung's construction:

17  "data that identifies the read/write speed of the memory module."

18         This conclusion is consistent with the specification. For example, in an embodiment

19  described in the specification, an AHCMATCH* signal "is output from the matched [memory

20  unit] to the MCU 14 . . . which indicates that DRAMs having a specified speed are installed" and

21  "is a status signal to the MCU 14 which indicates that the [memory unit] is adding one half of a

22  MEMCLK cycle to the memory access to accommodate the timing requirements of the DRAMs."

23  '100 patent, col. 8:22-31, Fig. 3c, Fig. 4. One of ordinary skill in the art understands that in this

24  embodiment, the AHCMATCH* signal is data that identifies the read/write speed of the memory

25  module. Wedig Decl., ¶ 73.

26  ///

27  ///

28  ///

**F.    Access Timing.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Timing of a signal used to control the read/write access of the memory module. | A period of time used to access memory. Access timing is different from access speed. |

This term appears in claims 1, 2, 4, 5, 7 and 8. '100 patent, col. 11:45-col. 12:51.

There is no dispute that "access timing" is different from "access speed." Indeed, the claims separately recite the two limitations and they each have different roles in the claims. Wistron's inclusion of that distinction in its construction is therefore unnecessary. Rather, the only germane difference between the parties' constructions is Samsung correctly identifies "access timing" as the "timing of a signal," whereas Wistron incorrectly identifies it as a "period of time" used to access memory.

Samsung's proposed construction is supported by the intrinsic evidence. Claims 1, 2, 4 and 5 each recite the MCU "provide[s]" "an appropriate access timing." '100 patent, col. 11:50-51, col. 12:7-9, 23-25, 34-37. The specification states "FIG. 4 shows in greater detail certain *signals* of the MCU control bus . . ." *Id.* at col. 3:32-33 (emphasis added). As indicated by Figure 4, the seven illustrative *signals* between "MEMCLOCK*" and "RFRSH*," including the "RAS*" signal, *are provided by the MCU. Id.* at Fig. 4 (note direction of arrows). The "RAS*" signal is a memory access signal. *Id.* at Fig. 4, col. 9:11-15, col. 7:43-48. The specification further states the "*function* of the various *signals* shown in FIG. 4 are better understood by also referring to the *timing diagrams* of FIGS. 5-12 which show a variety of *memory access* types." *Id.* at col. 6:53-56 (emphasis added). The timing diagrams in Figures 5-12 *show the timing of these access signals*. *Id.* at col. 3:3-12 (describing Figs. 5-12 as "show[ing] the signal timing" for different read and write operations); Wedig Decl., ¶ 79. The timing of these access signals is different depending upon the type of read or write operation or access speed of the memory module. *Id.;* compare also Figs. 5 and 7 (timing of "RAS*" access signal differs in the two different types of read operations). Accordingly, the specification establishes "access timing" is the timing of a signal, such as RAS*, used to control the read/write access of the memory module,

-23-

1    which is Samsung's construction.  *See also* Wedig Decl., ¶ 80.

2        Wistron's proposed construction, which seeks to equate "access timing" to "a period of

3    time used to access memory," finds no support in the intrinsic evidence.  Wistron instead cites to

4    three dictionary definitions of "access time."  However, the claim term is "access timing," not

5    "access time."  More important, as just explained, the access timing disclosed in the specification

6    pertains to the timing of the memory access signals and not to a period of time used to access

7    memory.  In this regard, extrinsic evidence cannot be used to contradict the clear meaning

8    provided in the intrinsic record.  *Vitronics*, 90 F.3d at 1584.

9        **G.    Commensurate (with).**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| To accommodate the timing requirements of the memory module. | Corresponding in size. |

14        This term appears in claims 1, 2, 4 and 5.  '100 patent, col. 11:45-col. 12:51.

15        Samsung's proposed construction is consistent with the intrinsic evidence as understood

16    by one of ordinary skill in the art.  The claims require access timing (the timing of a signal, such

17    as RAS*) provided by the MCU that is <u>commensurate with</u> the indication of access speed (data

18    that identifies the read/write speed of the memory module).  *Id.* at col. 11:50-52, col. 12:25-27.

19    Thus, the MCU must take into account, or accommodate, the access speed of the memory module

20    by generating only access signals having timing compatible with the access speed.  *Id.*  For

21    example, if a MCU receives an indication the memory modules can read and write data at a

22    maximum speed of 1 megabyte/second (the access speed), the memory module must be provided

23    access timing that results in generating control signals with access timing that reads or writes data

24    at a rate ***of at most*** 1 megabyte/second.  Wedig Decl., ¶ 84.  Attempting to read or write data at a

25    higher rate would cause the memory system to fail.  *Id.*  Thus, one of ordinary skill in the art

26    understands the claim language "an appropriate access timing commensurate with the received

27    indication of access speed" means using access timing that will operate correctly with the speed

28    of the memory module.  *Id.*  This is consistent with Samsung's construction.

-24-

1    Indeed, Samsung's construction is a near verbatim quote from the specification. The

2    specification provides: "AHCMATCH* is a status signal to the MCU 14 which indicates that the

3    MU is adding one half of a MEMCLK cycle to the memory access *to accommodate the timing*

4    *requirements of the DRAMs*." '100 patent, col. 8:26-31 (emphasis added). The Abstract

5    similarly recites a "memory access cycle *compatible with* the indicated access speed." Abstract

6    (Certificate) (emphasis added). Thus, the intrinsic evidence directly aligns with Samsung's

7    proposed construction.

8    Wistron's construction is improper because it attempts to impose a one-to-one

9    correspondence between the access timing and the access speed (*i.e.*, any given access speed can

10   have only one corresponding access timing). However, as established above, the claims impose

11   no such restriction, and the specification expressly provides the access timing only needs "to

12   accommodate" or be "compatible with" the access speed. Thus, as explained above, any access

13   timing is acceptable as long as it can operate with the access speed. For that reason, Wistron's

14   more restrictive construction is incorrect.

15   Wistron also cites the definition of "commensurate" in a general purpose dictionary.

16   JCCS at p. 20. However, a dictionary definition cannot be used to contradict clear meaning

17   provided in the intrinsic record. *Vitronics*, 90 F.3d at 1584.

18   **VI.    CONCLUSION**

19   For the above reasons, Samsung requests the Court adopt its proposed constructions.

20   Dated: June 9, 2008                    DLA PIPER US LLP

21

22                                         By  /s/ Mark Fowler
                                               Mark Fowler
23                                             M. Elizabeth Day
                                               Sal Lim
24                                             Attorneys for Defendant and Counterclaim Plaintiff
                                               SAMSUNG ELECTRONICS CO., LTD.
25

26

27

28

DLA PIPER US LLP    WEST\21418332.2    SAMSUNG ELECTRONICS CO., LTD.'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. C-07-4748 VRW