UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WISTRON CORPORATION, a Taiwan corporation,<br><br>　　　　Plaintiff and Counter-Defendant,<br><br>　v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Republic of Korea corporation,<br><br>　　　　Defendant and Counter-Plaintiff. | CASE NO.  C-07-4748 VRW<br><br>**DECLARATION OF ROBERT P. COLWELL, PH.D. IN SUPPORT OF SAMSUNG ELECTRONICS CO., LTD.'S OPENING CLAIM CONSTRUCTION BRIEF** |
| SAMSUNG ELECTRONICS CO., LTD.,<br><br>　　　　Counterclaim-Plaintiff,<br><br>　v.<br><br>WISTRON CORPORATION, and WISTRON INFOCOMM (TEXAS) CORPORATION,<br><br>　　　　Counterclaim-Defendants. | |

I, DR. ROBERT P. COLWELL, declare as follows:

1.　　I am a citizen of the United States and reside in Portland, Oregon. I have been retained by Samsung Electronics Co., Ltd. to provide it with technical advice in this action.

2.　　In this declaration, after describing my expertise and the materials I reviewed, I

-1-
DECLARATION OF ROBERT COLWELL ISO SAMSUNG'S OPENING CLAIM CONSTRUCTION BRIEF;
CASE NO. C-07-4748 VRW

will first describe some aspects of batteries, battery-operated systems, and their recharging circuits. Next, I will review technology pertinent to United States Patent No. 5,625,275 (the "'275 Patent"). Finally, I will identify various terms and phrases used in the claims of the '275 patent and provide an explanation of how one of ordinary skill in the art of electronic circuits, batteries, and recharging systems would have understood the various claim terms and phrases in these claims at the time of invention.

## I. EXPERTISE

3. My *curriculum vitae*, including a list of all my publications, is attached to this declaration as Exhibit A. I make this declaration in support of Samsung Electronics Co., Ltd.'s Opening Claim Construction Brief in this action. I make this declaration of my own personal knowledge, and if called as a witness, I could and would testify competently to the facts in this declaration.

4. I am an expert in the design, architecture and application of integrated circuits. My educational background includes a Bachelor's of Science in Electrical Engineering from the University of Pittsburgh, as well as a Masters Degree and a PhD. in Computer Engineering from Carnegie Mellon University. In addition to my formal education, I have direct experience using and designing electronic power supplies.

5. As Intel's Chief IA-32 Architect, I was responsible for the design of the Pentium Pro microprocessor, which went into production in November, 1995. This microprocessor was the first to require a switching power supply to be located directly adjacent to the microprocessor, so that wire inductance combined with very fast switching transients would not cause unacceptable erosion of internal noise margins. The Pentium Pro was also the first microprocessor to output a digital value that directed the local power supply to provide one of a set of possible supply output voltages.

6. Also while at Intel, I served as the Chief Technology officer for Intel's Connected Products Group. The products designed by this group included battery-operated products with lithium-ion rechargeable batteries. The products powered by lithium-ion batteries had to be recharged according to a strict current/voltage protocol. To accomplish that end, Intel's

recharging circuit included an embedded microcontroller to sense the necessary currents and voltages to keep the batteries in their safe regions. I personally tested that design and initiated the process by which Underwriter's Labs would certify its safety.

## II. MATERIALS REVIEWED

7. I have read the '275 Patent, issued April 29, 1997, naming Roy Tanikawa and Hien Le as inventors and entitled "Power Supply Which Provides A Variable Charging Current To A Battery In A Portable Computer System."

8. I have reviewed the prosecution history for the '275 patent.

9. I have reviewed the Parties' Joint Claim Construction Statement as it relates to the '275 patent.

## III. LEVEL OF SKILL IN THE ART

10. Based on my reading of the patent specification and claims, I believe that one of ordinary skill in the art at time of the invention of the '275 patent would have had a Bachelor of Science in Electrical Engineering and at least 2 years of work experience in the field of hardware design.

## IV. GENERAL TECHNICAL BACKGROUND PERTINENT TO THE '275 PATENT

11. In order to help provide a foundation sufficient to understand the technology of the '275 patent, I will first provide a high level discussion technology related to the '275 patent followed by a discussion of the invention of the '275 patent as it relates to recharging a notebook computer battery.

12. Electrical current is the flow of electrons through some medium. Electrons are the negatively charged particles that orbit the nucleus of atoms. Depending on the material, the outermost electrons of the material's atoms can be forcibly removed by an external voltage impressed on the material. An electrical current exists when a voltage forces electrons from their atoms. Metals such as copper are particularly good conductors of electrical current because the electrons in copper are loosely bound to their atoms, which allows the electrical current to easily flow.

13. When electrical current is made to flow in only one direction, as it does in flashlights, cell phones, laptops, and so on, it is called "direct current" ("DC"). The current available from a battery's discharge of its power is unidirectional, DC. Microelectronic circuits such as those in a notebook computer are designed to be operated on a DC supply. However, DC does not efficiently travel over long distances, for example, from power generation plants to standard wall outlets. Current that repeatedly changes direction, on the other hand, allows for the efficient transmission of power over large physical distances. This kind of current is known as alternating current ("AC"). Although many devices that use power to run a motor can work directly from AC, electronic devices like computers require AC be converted to DC.

14. AC adapters convert AC into DC. An AC adapter either plugs directly into the wall outlet or provides a cord that plugs into the wall outlet. That wall outlet connection energizes one side of a transformer embedded within the AC adapter. The transformer is comprised of two coils of wire wrapped around a ferrous frame. The wall current flows through one winding, generating a magnetic field around that winding. That magnetic field impinges the second coil, and as the field strength changes, the magnetic field induces an electrical current in the second coil. The ratio of the number of turns in the first coil to the number of turns in the second coil determines the voltage ratio: in the U.S., the voltage available in a wall outlet is 120 volts. If a device is designed to run on, for example, 12 volts, then for every winding on the second coil, there must be ten such windings on the first coil. AC adapters often include a pair of small components known as diodes that only conduct electricity in one direction; they receive the voltage from the coils and convert the AC into the DC needed by the system being powered.

15. As I previously discussed, batteries discharge their power during normal use (and to a much smaller extent also self-discharge in storage or when the device is fully powered off). Certain types of batteries, know as secondary batteries, are capable of being recharged. Notebook computers typically include rechargeable batteries that power the computer when conventional power sources such as wall outlets are not available. Notebook computers also typically include an AC adapter to power the computer system when the user has access to a conventional power source such as a wall outlet. The AC adapter converts the AC current from a power source such

as a wall outlet into DC current that is useful for powering the computer system and recharging the notebook's battery. The time it takes to fully recharge a battery is proportional to the amount of current available to recharge the battery as well as the degree to which the battery had been discharged prior to the start of recharging.

## V. TECHNICAL BACKGROUND PERTINENT TO THE '275 PATENT

16. Users expect notebook computers to remain useful while recharging. However, notebook computers require electrical current in order to operate their computer systems and notebook computers require additional electrical current to simultaneously recharge their batteries. The invention of the '275 patent addresses this problem.

17. The amount of electrical current required by a notebook computer system will vary. As different components within the computer system, for example, a DVD player or a spinning hard drive, are turned on or off the current requirements of the system increase and decrease accordingly.

18. The amount of electrical current required to recharge a battery can also vary. Battery manufacturers typically specify at least two relevant limits, one that sets the minimum current that will (eventually) recharge the battery, and another that sets the maximum current that can safely be allowed to flow into the battery during recharge. Within these two limits, the more current being supplied to the battery per unit time, the faster the battery will recharge. Since fast recharge is valued by many consumers, engineers work hard to (economically) approach the upper recharge limit.

19. Before the invention of the '275 patent, some notebook power supplies attempted to power the computer system and quickly charge the battery by supplying two levels of battery charging current: one level when the computer system is off and a second, lower level when the computer system is on. While the computer system was off, the battery could be charged with a high current because there was no danger of taking necessary current away from the computer system. While the system was functioning, the level of charging current applied to the battery would be limited to the minimum amount necessary to recharge the battery. In order to ensure the computer would simultaneously be supplied with its maximum necessary current and enough

current to charge the battery (albeit, slowly), the AC adapter would be designed to meet the maximum possible need for current for the computer's system and battery. This need for excess capacity resulted in physically large AC adapters with current capacity that was often unused (and thus wasted).

## IV. AN OVERVIEW OF THE INVENTION OF THE '275 PATENT

20. The '275 patent describes a safe and efficient way to use a conventional AC adapter (item 14 in Fig. 1) to provide current for running a notebook's computer system (item 16 in Fig. 1) while also recharging its battery (item 12 in Fig. 1) as fast as possible.



FIG. 1

21. One aspect of the invention of the '275 patent uses three sensors inside the notebook computer in conjunction with a controller (item 20 in Fig. 1) to make a variable charging current available to the battery. The controller uses the first sensor (item 42 in Fig. 1) to sense the level of input current into the notebook from the AC adapter. The controller uses the second sensor (item 36 in Fig. 1) to sense the level of the charging current applied to the battery (item 12 in Fig. 1). The controller uses the third sensor (item 32 in Fig. 1) to sense the level of voltage of the battery. The controller typically is an analog chip programmed with threshold limits for each sensed limit against which the controller compares the actual sensed limits on a

continuous basis. One of skill in the art would understand that the controller reacts to changes in the sensed levels on an on-going and continuous basis.

22. In another aspect of the invention, when current is flowing from the AC adapter into the notebook, the controller compares the levels sensed at the sensors with the pre-set thresholds and uses those values to calculate how much charging current can be made available to the battery. When the battery requires charging and the system also requires current, the controller supplies a variable amount of current to the battery in order to keep the sensed input current approximately at its set threshold. The controller described in the '275 patent controls a transistor (item 22 in Fig. 1) with pulse width modulation ("PWM") techniques in order to vary the charging current. When the PWM-controlled transistor is turned off (generally referred to as "biased off" by circuit designers), no current flows through the transistor. PWM techniques call for the transistor to be turned on and off in a repeating pattern in which the ratio of transistor-on to transistor-off is known as the PWM "duty cycle." When the transistor is on for, say, 80% of the cycle and off for 20%, we say that the duty cycle is 80%. As this duty cycle is increased or decreased, the charging current applied to the battery increases or decreases, respectively. Further, as the charging current is reduced, the input current will be reduced. Thus, when both the system and the battery are drawing current, the controller maintains the input current near its approximate maximum limit by varying charging current applied to the battery in response to system current fluxuations caused by, for example, the activation and de-activation of system components.

23. The invention of the '275 further describes the controller's ability to block the charging current if at least one of the three sensed limits exceeds its respective pre-set threshold. The invention's protection against overages allows the power system to use the AC adapter's maximum output to supply the computer system with its required current and to use the balance of remaining input current to safely charge the battery within its capacity.

## V. DISPUTED CLAIM TERMS

### A. "BLOCK"

24. I understand that "block" has a particular meaning as it is used in claim 1 of the

-7-

'275 patent. It is my opinion that the term "block," is used in claim 1 to describe the same conditions that are described throughout the '275 specification, that is, when at least one of the input current, the charging current, and the battery voltage exceeds its respective set threshold, the controller responds by turning off the PWM-controlled transistor. Specifically, the '275 patent describes the controller's turning off the transistor in response to an overage on at least one of the sensed levels at Cols. 2:25-30; 2:42-54; 4:65-5:5; 7:9-18; 7:36-40. Accordingly, I believe that the claim limitation "block" means "the transistor is biased off."

25. In my opinion, one of ordinary skill in the art would understand the use of a transistor as it is described in the specification of the '275 patent as the only practical way to implement the block limitation of claim 1. I see no other description in the '275 patent that suggests the inventors intended the block limitation to carry any meaning other than the transistor is biased off.

26. It is my understanding that the conditions in claim 1 that cause the control circuit to "block the charging current" are essentially the same as the conditions in claim 7 that result in the "control signal having a first inactive state." Accordingly, I believe that Samsung's proposal to construe "first inactive state" to mean "the state in which the transistor is biased off" is appropriate for the same reasons I have stated in connection with the term "block."

## VI. "VARIABLE"

27. The term "variable" is used in claims 1 and 7 to describe the charging current as the charging current is controlled to maintain the input current level at its approximate maximum. Although it appears the inventors intentionally chose the term variable, it does not appear that the inventors wished to use the term in an unusual manner. Likewise, one of ordinary skill in the art would not recognize the term "variable" as a term of art with a particularized meaning. Therefore, it is my opinion that one ordinary skill in the art would understand this term is used according to its ordinary meaning.

28. Along with the parties' joint claim construction statement, I have reviewed Wistron's citations to dictionaries in support of its proposed construction for the term "variable." I note that the primary definition for variable is "not consistent or having a fixed pattern; liable to

-8-

vary." It is my opinion that one of ordinary skill in the art would understand this definition to be closer to the ordinary meaning of the term variable than Wistron's proposed construction of "adaptable."

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed on this June 9, 2008, at Portland, Oregon.

Dated: June 9, 2008

*/s/ Robert Colwell*
ROBERT P. COLWELL

-9-
DECLARATION OF ROBERT COLWELL ISO SAMSUNG'S OPENING CLAIM CONSTRUCTION BRIEF;
CASE NO. C-07-4748 VRW