# EXHIBIT B

FILED

2005 MAY 12 PM 2:03

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
N. DIST. OF CA.

1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

SAMSUNG ELECTRONICS CO, LTD,                    No    C-00-4524 VRW

        Plaintiff,

        v                                              ORDER

QUANTA COMPUTER, INC et al,

        Defendants.

_____/

        Following the dismissal of various claims, this suit now focuses on United Stats Patent No 5,333,273, which discloses a "protected hot key function for microprocessor-based computer system." The invention is in the field of computer circuitry and, more particularly, keyboard-input processing for ISA-compatible personal computers. The court held a claim construction hearing on May 6, 2005, pursuant to Markman v Westview Instruments, Inc, 517 US 370 (1996). Based on the hearing, the parties' memoranda and the applicable Federal Circuit law, the court construes the claims of the patent as follows.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

I

The patent in suit has been the subject of considerable litigation, both in this court and in the Southern District of Texas before Magistrate Judge Johnson and Judge Rainey.  Between the patent itself, the parties' memoranda, Judge Johnson's report and recommendation (the "Texas R&R," reproduced at Joint Statement (Doc #196) Ex 1) and Judge Rainey's claim construction order (the "Texas Order," also reproduced at Joint Statement (Doc #196) Ex 1), the invention has been exhaustively described.  Accordingly, the barest outline will suffice here.

As the patent explains, activity on ISA-compatible computers typically proceeds via an "interrupt," which causes the computer's CPU to stop one activity and start another.  Various interrupts (conventionally labeled in ISA-compatible computers as IRQ0, IRQ1, IRQ2 and so on) are associated with various functions. Conventionally, the "IRQ1" interrupt is associated with keyboard input; when the CPU receives an IRQ1 interrupt, it stops its activity to receive a "scan code" from the keyboard.  This scan code signifies that a certain key has been depressed or released, and the CPU will then execute software instructions in response to the particular scan code.  Such software instructions are specific to the software that a user has loaded onto the computer.  For example, pressing the "A" key on the keyboard while running a word processing program will, typically, cause the letter "a" to appear in the active document.  More exotically, particular keys or key combinations that call up a program or perform a certain function are often known as "hot keys."  If two loaded programs are both designed to respond to the same hot key, the resulting conflict can

2

United States District Court
For the Northern District of California

1  cause the computer not to function in the way the user expects.

2          The patent is directed to a "protected hot key function"

3  whose behavior is not as readily altered or customized by user-

4  loaded software as conventional hot keys.  The invention describes

5  an "additional function key," which, when depressed on its own or

6  in combination with a conventional key or keys, causes a second

7  interrupt -- i e, an interrupt other than the IRQ1 interrupt

8  conventionally used in ISA-compatible computers.  Apparently, at

9  the time of the invention, little if any software existed that

10 would respond to this second interrupt, thus ensuring that computer

11 manufacturers could reliably assign predictable behaviors to hot

12 keys using the additional function key (or to the additional

13 function key on its own) without interference from user-loaded

14 software.

15

16                                  II

17         The construction of patent claims is a question of law to

18 be determined by the court.  Markman v Westview Instruments, Inc,

19 517 US 370 (1996).  The goal of claim construction is "to interpret

20 what the patentee meant by a particular term or phrase in a claim."

21 Renishaw PLC v Marposs SpA, 158 F3d 1243, 1249 (Fed Cir 1998).  In

22 determining what a patentee meant by a term or phrase, the court

23 looks first to the claim itself.

24         The claims of the patent provide the concise
           formal definition of the invention.  They are
25         the numbered paragraphs which "particularly
           [point] out and distinctly [claim] the subject
26         matter which the applicant regards as his
           invention."  35 USC § 112.  It is to these
27         wordings that one must look to determine
           whether there has been infringement.  Courts
28         can neither broaden nor narrow the claims to

                                  3

1    give the patentee something different than what
2    he has set forth.  No matter how great the
     temptations of fairness or policy making,
3    courts do not rework claims.  They only
     interpret them.

4    EI Du Pont de Nemours & Co v Phillips Petroleum Co, 849 F2d 1430,

5    1433 (Fed Cir 1988).

6        "The claims define the scope of the right to exclude; the

7    claim construction inquiry, therefore, begins and ends in all cases

8    with the actual words of the claim."  Renishaw, 158 F3d at 1248.

9    "The words used in the claim are viewed through the viewing glass

10   of a person skilled in the art."  Brookhill-Wilk 1, LLC v Intuitive

11   Surgical, Inc, 326 F3d 1215, 1220 (Fed Cir 2003) (citing Tegal Corp

12   v Tokyo Electron Am, Inc, 257 F3d 1331, 1342 (Fed Cir 2001)).

13   "Absent a special and particular definition created by the patent

14   applicant, terms in a claim are to be given their ordinary and

15   accustomed meaning."  York Prods, Inc v Central Tractor Farm &

16   Family Ctr, 99 F3d 1568, 1572 (Fed Cir 1996).  The court may, if

17   necessary, consult a variety of sources to determine the ordinary

18   and customary meaning of a claim term, including the claim terms

19   themselves, dictionaries, the written description, the drawings and

20   the prosecution history, if in evidence.  Brookhill-Wilk 1, 326 F3d

21   at 1220.  "Such intrinsic evidence is the most significant source

22   of legally operative meaning of disputed claim language."

23   Vitronics Corp v Conceptronic, Inc, 90 F3d 1576, 1582 (Fed Cir

24   1996).  With respect to dictionary definitions, "[i]f more than one

25   dictionary definition is consistent with the use of the words in

26   the intrinsic record, the claim terms may be construed to encompass

27   all such consistent meanings."  Texas Digital Systems, Inc v

28   Telegenix, Inc, 308 F3d 1193, 1203 (Fed Cir 2002).

                                4

United States District Court
For the Northern District of California

1    The court begins its construction of claim terms by
2    consulting intrinsic evidence of the meaning of disputed claim
3    terms, which includes the claims, the specification and the
4    prosecution history (if in evidence).  Lacks Industries, Inc v
5    McKechnie Vehicle Components USA, Inc, 322 F3d 1335, 1341 (Fed Cir
6    2003) (citation omitted).  "If upon examination of this intrinsic
7    evidence the meaning of the claim language is sufficiently clear,
8    resort to 'extrinsic' evidence, such as treatises and technical
9    references, as well as expert testimony when appropriate, should
10   not be necessary."  Digital Biometrics, Inc, v Identix, Inc, 149
11   F3d 1335, 1344 (Fed Cir 1998).  "[I]f after consideration of the
12   intrinsic evidence, there remains doubt as to the exact meaning of
13   the claim terms, consideration of extrinsic evidence may be
14   necessary to determine the proper construction."  Id.

15   "[A] court may constrict the ordinary meaning of a claim
16   term in * * * one of four ways[:]" (1) "if the patentee acted as
17   his own lexicographer and clearly set forth a definition of the
18   disputed claim in either the specification or prosecution history;"
19   (2) if the intrinsic evidence shows that the patentee distinguished
20   the term from prior art on the basis of a particular embodiment,
21   expressly disclaimed subject matter, or described a particular
22   embodiment as important to the invention; (3) "if the term chosen
23   by the patentee so deprives the claim of clarity as to require
24   resort to other intrinsic evidence for a definite meaning; and (4)
25   "if the patentee phrased the claim in step- or means-plus-function
26   format," then "a claim term will cover nothing more than the
27   corresponding structure or step disclosed in the specification, as
28   well as equivalents thereto * * *."  CCS Fitness, Inc v Brunswick

5

United States District Court
For the Northern District of California

1  _Corp_, 288 F3d 1359, 1366-67 (Fed Cir 2002) (internal citations and
2  quotation marks omitted).

3         Limitations from the specification, such as from the
4  preferred embodiment, cannot be read into the claims absent an
5  express intention to do so.  _Teleflex, Inc v Ficosa North Am Corp_,
6  299 F3d 1313, 1326 (Fed Cir 2002) ("The claims must be read in view
7  of the specification, but limitations from the specification are
8  not to be read into the claims.").  But "a construction that
9  excludes a preferred embodiment 'is rarely, if ever, correct.'"
10 _C R Bard, Inc v United States Surgical Corp_, 388 F3d 858, 865 (Fed
11 Cir 2004) (citing _Vitronics_, 90 F3d at 1583).

12        With these legal principles in mind, the court now turns
13 to the construction of the disputed claim language of the patent.

14

15                              III

16        Independent claims 1 and 5 and several dependent claims
17 are at issue.  For many terms, the parties have stipulated to
18 constructions (either of their own accord or by adopting the Texas
19 construction).  The court accepts those stipulations for purposes
20 of this action.  The claims -- with disputed language underscored
21 the first time it appears -- are rescribed below.  (The dependent
22 claims about which there are no disputes are not rescribed.)

23

24     1.  A system for providing a built-in function in an
25 _ISA-compatible_ computer in response to activation of a
   selected combination of user activated keys, comprising:

26        a keyboard having a set of conventional
27            alphanumeric and function keys and further
             having at least one _additional function_
28           _key_;

                              6

United States District Court

For the Northern District of California

a <u>keyboard controller</u> <u>connected</u> to said
   keyboard to monitor said conventional keys
   and said additional function key to detect
   when at least one of said keys is
   activated, said keyboard controller having
   first and second interrupt signal lines
   connected to said ISA-compatible computer,
   said keyboard controller responsive to an
   activation of at least one of said
   conventional keys to activate a first
   interrupt signal to said ISA-compatible
   computer on said first interrupt signal
   line, said keyboard controller responsive
   to an activation of said additional
   function key in combination with at least
   one of said conventional alphanumeric keys
   to generate a <u>second interrupt signal</u> to
   said ISA-compatible computer on said
   second interrupt signal line;

a first conventional interrupt handling routine
   within said ISA-compatible computer
   responsive to said first interrupt signal
   from said keyboard controller to input
   <u>data scan codes</u> from said keyboard; and

a second non-conventional interrupt handling
   routine within said ISA-compatible
   computer responsive to said second
   interrupt signal from said keyboard
   controller to input an identification of
   said activated alphanumeric key and to
   perform a predetermined function selected
   by said identified alphanumeric key.

                    * * *

4.   The system for providing a built-in function as
     defined in claim 1, further comprising a central
     processing unit that <u>indexes a first memory location
     pointer</u> in response to said first interrupt signal,
     said central processing unit further <u>indexing a
     second memory location pointer</u> in response to said
     second interrupt signal

5.   A system for servicing keyboard interrupts in an
     ISA-compatible computer, comprising:

a keyboard having a plurality of keys including
   conventional alphanumeric keys,
   conventional symbol keys, conventional
   function keys and conventional cursor
   control keys, said keyboard further
   including at least one <u>non-conventional</u>

                     7

*United States District Court*
For the Northern District of California

1
2
3

<u>function key</u>, said keyboard generating a scan code in response to an activation of at least one of said keys, said <u>scan code</u> varying depending upon which of said keys is activated; and

4
5
6
7
8
9
10
11
12
13

a keyboard controller <u>coupled</u> to said keyboard, said keyboard controller further coupled to said ISA-compatible computer by first and second interrupt signal lines, said keyboard controller generating a first interrupt signal on said first interrupt signal line upon receipt of a scan code corresponding to one of said conventional keys, said ISA-compatible computer programmed to execute a program to input said scan code in response to said first interrupt signal, said keyboard controller generating a second interrupt signal on said second interrupt signal line <u>upon receipt of a scan code corresponding to said non-conventional function key</u>, said ISA-compatible computer programmed to execute at least one special routine upon receipt of said second interrupt signal.

14    Patent at 13:36-14:48.

15        Thus, the terms to be construed are:

16    • "ISA-compatible computer" (claims 1 and 5)

17    • "additional function key" (claim 1) and "non-conventional
18      function key" (claim 5), which the parties agree should
      be given the same construction

19    • "keyboard controller" (claims 1 and 5)

20    • "connected to" (claim 1)

21    • "second interrupt signal" (claims 1 and 5)

22    • "data scan code" (claim 1) and "scan code" (claim 5),
23      which the parties agree should be given the same
      construction

24    • "indexes a first memory location pointer" (claim 4)

25    • "indexing a second memory location pointer" (claim 4)

26    • "coupled to" (claim 5)

27    • whether "upon receipt of a scan code corresponding to
28      said non-conventional function key" (claim 5) means "upon
      receipt of a scan codes that is generated by the

8

*United States District Court*
*For the Northern District of California*

1           activation of a single non-conventional function key
            alone"

2    The court construes these terms in a sequence that reflects their

3    logical interdependence.

4

5    "ISA-compatible computer" (claims 1 and 5)

6           The patent explains that "ISA" refers to "Industry

7    Standard Architecture."  Patent at 1:13-14.  ISA "was developed by

8    IBM Corporation for use in its AT-type computers that utilize an

9    Intel 80x86 microprocessor."  Id at 1:17-20.  "The architecture of

10   ISA-compatible computer systems is well known and [is not]

11   described in detail" in the patent.  Id at 3:48-50.  The Texas R&R

12   concluded that "an 'ISA-compatible computer' is a computer that can

13   handle ISA standard defined interrupts."  Texas R&R at 14.  This

14   was adopted by the Texas Order.

15          Defendants agree with the Texas construction.  Defs Br

16   (Doc #207) at 24.  Plaintiff asks the court to "clarify" the Texas

17   construction with the caveat that "[n]ot all ISA standard defined

18   interrupts need to be used in an ISA-compatible computer."  Pl Br

19   (Doc #199) at 23.  Plaintiff is anxious that under the Texas

20   construction, defendants might "argu[e] to the jury that an ISA-

21   compatible computer must actually use all of the ISA standard

22   defined interrupts."  Id.

23          The parties agree that the patent states that IRQ15

24   (which is used in the preferred embodiments of the patent as the

25   "second interrupt signal") is not defined on a conventional ISA

26   system.  Id; Defs Br (Doc #207) at 24.  Defendants quarrel with

27   plaintiff's proposal on the ground that it "muddies the waters by

28   leaving open the possibility that some of [the IRQs that are

                                    9

indispensible to a functioning ISA-compatible computer] might not be used." Id. That is, defendants contend that, with respect to defining interrupts, ISA compatibility has some room for flexibility, but a certain minimal set of interrupts must be used.

The Texas construction -- "a computer than can handle ISA standard defined interrupts" -- is sufficient, at least for the time being. Nothing in this language excludes the possibility that some interrupts might not be used in a given computer. Plaintiff is free to argue that point to the jury. It may be that the parties' true dispute is not over an ISA-compatible computer's <u>ability to handle</u> interrupts, but rather over what interrupts <u>must be defined</u> for a computer to be dubbed "ISA-compatible." If so, the parties may apply to the court for a further construction of "ISA-compatible computer," presenting relevant briefing and authorities when they do.

Accordingly, the court construes "ISA-compatible computer" as "a computer that can handle ISA standard defined interrupts."

<u>"additional function key" (claim 1) and "non-conventional function key" (claim 5)</u>

The parties list these terms as disputed, Joint Statement (Doc #196), but they do not appear to brief their dispute. Plaintiff seems to contend that "additional function key" is the "Fn" key, while defendants contend that it should mean "an extra function key." While the "Fn" key is disclosed as part of a preferred embodiment, see Patent fig 5, there is nothing to limit the claim to this preferred embodiment.

10

United States District Court

For the Northern District of California

1    The court essentially agrees with defendants that the

2    terms "additional function key" and "non-conventional function key"

3    can be construed according to their plain meaning.  Indeed, the

4    court concludes on the record before it that no construction is

5    needed at all.  Accordingly, the court declines to construe these

6    terms.

7

8    "data scan code" (claim 1) and "scan code" (claim 5)

9        The parties (and the Texas Order) agree that a "scan

10   code" (or "data scan code") is "a code number that the keyboard

11   generates or outputs whenever a key is depressed or released."

12   Plaintiff and defendants part company on whether "a row and a

13   column signal" -- the electrical signals generated from the grid of

14   wires that underlays the keys of the keyboard -- constitutes a scan

15   code.  Plaintiff argues that a row and column signal can constitute

16   a scan code; defendants argue that they cannot.

17       Throughout the patent, the discussion of "scan codes"

18   concentrates on how they are passed among different components of

19   the system.  See, e g, Patent at 4:25-27 ("The communication of

20   keyboard scan code information from the keyboard controller 128 to

21   the microprocessor 110 is illustrated pictorially in FIG 2.").

22   There is (almost) no discussion of how the scan codes are created,

23   and hence what forms they may take; the specification simply says

24   that "the keyboard generates a scan code."  Id at 4:18.  But the

25   specification makes clear why it is unnecessary to specify how scan

26   codes are created:

27           The keyboard 150 operates in a known
            conventional manner to repeatedly scan a
28           plurality of contact switches associated with

11

United States District Court

For the Northern District of California

1

2

3

4

> the keys on the keyboard to determine if one or
> more contact switches is open or closed.  When
> an open contact switch is closed by depressing
> a key or a closed contact switch is opened by
> releasing a key, the keyboard 150 generates a
> scan code which is communicated to the keyboard
> controller 128 via the signal lines 152.

5  Id at 4:12-21.  In other words, the specification leaves "scan

6  code" undefined (and hence ambiguous) and instructs that "scan

7  code" is to be construed as it would be understood by one skilled

8  in the art.

9       Elsewhere in the specification, the operation of the

10  keyboard is explained in more detail:

11

12

13

14

> When the keyboard microprocessor 250 detects an
> active row signal, it uses the row signal and
> the currently active column signal to uniquely
> identify which of the keys on the keyboard is
> depressed.  The key is identified with a scan
> code in a conventional manner.

15  Id at 7:51-55.  Plaintiff posits that "us[ing] the row signal and *

16  * * column signal to uniquely identify" the depressed key means

17  that a row and column signal is a scan code, because scan codes

18  identify keys.  But in the excerpt block-quoted above, "identify"

19  in the first sentence is best interpreted as "determine," while

20  "identified" in the second sentence means "identified to the

21  keyboard controller."  The two sentences would be redundant (or

22  inconsistent) if "identify" and "identified" had the same meaning.

23  Admittedly, this part of the specification is poorly drafted.  The

24  more revealing aspect of this excerpt is the suggestion that scan

25  codes are "conventional, i e, well known to those skilled in the

26  art.  Moreover, by using different words, the specification itself

27  suggests a distinction between "signals" and "scan codes."

28       In light of the specification's intentional lack of a

12

United States District Court
For the Northern District of California

1  definition of "scan code," it is appropriate for the court to look
2  to dictionary definitions.  Conventional dictionary definitions
3  make a distinction between "signals," which are physical phenomena,
4  and "codes," which are descriptions or identifiers.  In the
5  relevant senses, a "code" is a "symbol used to identify something
6  that lacks a specific name" and a "signal" is a "detectable
7  physical quantity or impulse (as a voltage, current, magnetic field
8  strength) by which messages or information can be transmitted."
9  Webster's Third New International Dictionary (Merriam-Webster,
10  Unabridged ed 1981) 437, 2115.

11       Two technical references cited by defendants are
12  particularly illuminating, and are consistent with the conventional
13  dictionary definitions.  First, the Microsoft Press Computer
14  Dictionary defines "scan code" as a "code number transmitted to an
15  IBM or compatible computer whenever a key is pressed or released."
16  Microsoft Press Computer Dictionary 306-07 (Microsoft, 1991),
17  reprinted in Dang Decl (Doc #209) Ex 6.  It is difficult to see how
18  a "signal" can be a "number."  Second, How Computers Work explains
19  that a "key's circuit carries a signal to the [keyboard]
20  microprocessor" which in turn "generates a number, called a scan
21  code".  Ron White, How Computers Work 112 (ZD Press, 1993)
22  (emphasis added), reprinted in Dang Decl (Doc #209) Ex 5.  This
23  reference can only be understood to exclude the possibility that a
24  row and column signal is a scan code.

25       Even resort to extrinsic evidence to construe "scan code"
26  confirms these dictionary meanings.  Defendants' expert makes the
27  point very clearly:

28       The microprocessor within the keyboard

13

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14

> determines if a key is depressed by scanning
> the keyboard's matrix, which can be thought of
> as a grid of circuits (row wires and column
> wires) underneath the keys. Each key has an
> electrical switch associated with it, with the
> electrical switch located at an intersection of
> a row wire and a column wire. The
> microprocessor scans each column of the
> keyboard matrix, reading all the rows of a
> selected column to determine whether any of the
> switches associated with any of the respective
> keys is pressed or released. The row and
> column signals on the row wires and column
> wires of the keyboard matrix only represent the
> present electrical state of a given key as
> described above. * * * Row and column signals
> are signals communicated between the keyboard
> microprocessor and keyboard matrix to enable
> the microprocessor to monitor actuation and
> release of keys of the keyboard. However, the
> row and column signals are never provided from
> the keyboard microprocessor to the host
> computer. In fact, the keyboard microprocessor
> has to first convert or translate the pairing
> of a row signal and a column signal into a scan
> code. It is this scan code that is provided to
> the host computer.

15    Buscaino Decl (Doc #208) ¶15 (emphasis in original).

16         This lends considerable credence to the specification's

17    apparent distinction between "signals" and "codes": "Signals" are

18    raw electrical states (indicating, for example, an open or closed

19    circuit), while "codes" are translated or abstracted information

20    describing an electrical state.

21         Plaintiff's own expert describes the operation of a

22    keyboard in much the same way, also respecting the difference

23    between signals (the detection of which he refers to as "looking

24    for closed switches") and codes (which he refers to as "values"):

25
26
27
28

> The process that the keyboard microprocessor is
> performing is to scan each column successively
> looking for closed switches and reporting their
> value back to the CPU when one is found.
> Because the keyboard microprocessor performs a
> scan of each column to find which key or keys
> have been pressed, the values that correspond

14

United States District Court

For the Northern District of California

1    to the pressed keys are called "scan codes."

2   Wedig Decl (Doc #201) ¶19.  In fact, plaintiff's expert even

3   describes scan codes as being "generated."  Id ("Once one or more

4   pressed keys have been detected and one or more scan codes

5   generated * * *.").  If the row and column signals are used to

6   detect a key press, it makes sense to speak of subsequently

7   "generating" a scan code only if the row and column signals are not

8   themselves scan codes.

9        Plaintiff strenuously suggests that two pieces of

10  extrinsic evidence -- manuals for the Phoenix 80286 Advanced Rom

11  Bios, see Wedig Supp Decl (Doc #215) Ex A -- show that row and

12  column signals can be scan codes.  One diagram depicts "keyboard

13  make/break scan codes" flowing to an "8042 keyboard controller"

14  which in turn issues a "make/break system scan code."  Id at 8-4.

15  Another diagram explains that "each time a key is pressed, the

16  keyboard hardware itself generates a keyboard make or break scan

17  code.  In and of themselves, keyboard scan codes are not

18  understandable to the system."  Id at 10-5.  While this may be

19  evidence that scan codes can take different forms, it is not

20  evidence that row and column signals are themselves scan codes.

21  This is not the only example of dispute among the parties about

22  whether scan codes are standardized and, if so, what standard

23  applies.  But that is all quite beside the point for purposes of

24  construing "scan code," because there is no basis in the claims for

25  limiting the term to one particular industry standard or another.

26  What is clear is that row and column signals are not scan codes.

27       Accordingly, the court adopts defendants' proposal (with

28  a grammatical correction) and construes "scan code" and "data scan

15

1  code" as "a code number that the keyboard generates whenever a key

2  is depressed or released, said code number created by converting a

3  pairing of a row signal and a column signal in the keyboard

4  matrix."

5

6  "keyboard controller" (claims 1 and 5)

7         The parties largely agree on the construction of this

8  term:  The "keyboard controller" is "a component that activates

9  interrupt signals in response to receipt of data scan codes from

10 the keyboard and, upon request, transmits the data scan codes to

11 the computer."  The Texas Order further provides that the keyboard

12 controller is "distinct from the keyboard" and "the keyboard and

13 keyboard controller may be physically separate or housed together

14 in the same unit."  Texas Order at 4-5.  Plaintiff purports to

15 agree with the Texas Order, but suggests that "distinct from the

16 keyboard" should be omitted as superfluous and potentially

17 confusing in light of the (more accurate) "physically separate or

18 housed together" caveat.  Pl Br (Doc #199) at 8-9.  Defendants

19 protest that throughout the patent, the keyboard and the keyboard

20 controller are referred to as separate entities that are

21 "connected" or "coupled."  Def Br (Doc #207) at 13.  As such,

22 defendants contend, the reference to they keyboard controller being

23 "distinct from the keyboard" is the only way to give meaning to the

24 claim language.

25        The crux of the dispute flows from the parties' agreed

26 construction for "keyboard," which is "an input apparatus

27 containing internal circuitry to output or generate data scan

28 codes."  In light of the court's construction of "data scan code,"

United States District Court
For the Northern District of California

16

United States District Court
For the Northern District of California

the parties' agreed-upon construction of "keyboard" implies that
the process of "converting a pairing of a row signal and a column
signal in the keyboard matrix" occurs within the functional unit of
the keyboard.

There is no basis in the claim language for prohibiting
the keyboard controller and the keyboard from being housed
together.  But by the same token, the patent is unambiguous in
treating the keyboard and keyboard controller separately -- they
are distinct in the schematics shown in the figures of the patent
and they are distinct by the literal words of the claims.
Moreover, the court's construction of "connected" (see below) would
seem to require that the keyboard and the keyboard controller be
electronically or functionally discrete components.

In this light, "distinct from the keyboard" is not
superfluous; to the contrary, it dovetails with the court's
construction of "scan code" and "connected to."  Although the
keyboard and keyboard controller are not (necessarily) <u>physically</u>
distinct, they must be <u>electronically or functionally</u> distinct.
The court adopts the Texas construction in that respect.  The
parties are free to remind the jury that, as the Texas Order put
it, "the keyboard and keyboard controller may be physically
separate or housed together in the same unit."  Nothing in the
court's construction says otherwise.

A word is appropriate about the much-contested figure 7,
which depicts a keyboard matrix connected to a microprocessor (250)
with IRQ and data lines coming off it.  The figure is difficult to
decipher, for the specification states that the keyboard controller
(220) is illustrated in figure 7, yet no such object appears in the

17

1  figure.  There is a later reference to figure 7 to the keyboard

2  controller (130), but 130 does not appear on figure 7, and where it

3  does appear (figures 1-4 and 6), 130 is an interrupt controller.

4  Setting aside figure 7, however, the text of specification is

5  consistent with the court's conclusion that the keyboard controller

6  and the keyboard (including the keyboard microprocessor) can be

7  closely physically connected but electronically or functionally

8  distinct.  For example, the specification explains that "the

9  keyboard controller 220 and the keyboard 210 [may be] combined as a

10  single unit."  Patent at 7:33-34.  "Combined as a single unit"

11  suggests physical integration, but the continuing reference to the

12  keyboard controller and the keyboard as distinct entities suggests

13  some electronic or functional distinction between them.

14          Accordingly, the court construes "keyboard controller" as

15  "a component, electronically or functionally distinct from the

16  keyboard, that activates interrupt signals in response to receipt

17  of data scan codes from the keyboard and, upon request, transmits

18  the data scan codes to the computer."

19

20  "connected to" (claim 1)

21          Plaintiff proposes to construe this seemingly simple term

22  as "joined or linked together, including (1) two parts that have

23  been physically joined or designed together (at least in part)

24  through which electrical signals may flow, or (2) the contact

25  between a device and one of its constituent components through

26  which electrical signals may flow."  Defendants propose "join or

27  fasten one thing to another usually by something intervening."

28          The court intuits that the dispute here arises from the

18

United States District Court
For the Northern District of California

1  technological progress of integrating multiple functions onto a

2  single microchip.  Plaintiff, unsurprisingly, would construe

3  "connected" as "broad enough to encompass the contact between a

4  device and one of its constituent parts."  Pl Br (Doc #199 at 15.

5  Defendants contend that this lacks support in the intrinsic record

6  or dictionary definitions.

7        By its plain meaning, "connected to" refers to the

8  "joining or fastening of one thing to another," just as defendants

9  propose.  But in the context of the patent, which relies heavily on

10  schematics to give content to "connected to" (see figs 1-4, 6-10),

11  the connections in question are not the nuts-and-bolts linkages of

12  mechanical engineering.  See ACTV, Inc v Walt Disney Co, 346 F3d

13  1082, 1088 (Fed Cir 2003) ("While certain terms may be at the

14  center of the claim construction debate, the context of the

15  surrounding words of the claim also must be considered in

16  determining the ordinary and customary meaning of those terms.").

17  There is little if anything in the patent about the physical size

18  or contiguity of the elements depicted in the figures or described

19  in the specification.  Plaintiff's proposed construction is a

20  (flawed) attempt at capturing both the unimportance of physical

21  integration and the importance of identifying electronically or

22  functionally discrete units.  A physically unified microchip with

23  two electronically distinct circuits that are "connected" within

24  the chip exemplifies one circuit "connected to" another.

25        The court is thus not entirely satisfied with either

26  proposed construction:  Plaintiff's construction ventures too far

27  from the plain meaning of the term to be construed; defendants'

28  proposal's use of "thing" is too tied to a realm of physically

19

1  discrete objects.  The patent is about electronics and the figures

2  represent functions; rather than simply "things," the claims

3  describe "electronically or functionally discrete things."  The

4  court therefore makes its own construction, on which it will

5  entertain a motion to reconsider if necessary:  "Connected to"

6  refers to "joining or fastening one electronically or functionally

7  discrete thing to another."  With this language, the parties should

8  be able to explain to the jury whether the products in suit do or

9  do not meet the patent's claimed scope involving electronically or

10 functionally discrete components.

11

12 "coupled to" (claim 5)

13         The court sees no reason to give this term a construction

14 different from the construction given to "connected to," nor do the

15 parties offer significantly different constructions for these two

16 terms.  Accordingly, the court construes "coupled to" to refer to

17 "joining or fastening one electronically or functionally discrete

18 thing to another."

19

20 "second interrupt signal" (claims 1 and 5)

21         The parties agree that the "first interrupt signal" must

22 be IRQ1, and so they agree that the "second interrupt signal" must

23 not be IRQ1.  The parties dispute whether the second interrupt

24 signal can be any other interrupt (as plaintiff contends), or

25 whether it is limited to one of the ISA-standard interrupts (as

26 defendants contend).  The question boils down to whether one

27 skilled in the art would, in 1990 and in the context of a patent

28 directed toward ISA-compatible computers, understand "interrupt" to

20

United States District Court
For the Northern District of California

1  encompass interrupts other than the ISA-standard IRQ interrupts.

2  Plaintiff's expert says yes.  Wedig Decl (Doc #201) ¶40

3  Defendants' expert says no.  Buscaino Decl (Doc #208) ¶38.

4          The dispute turns on whether the claims must be read

5  strictly in the context of ISA-compatible systems.  If so, it

6  appears that there is no significant disagreement that the claim

7  reads upon only IRQ interrupts other than IRQ1.  If the claim may

8  be interpreted beyond the context of ISA-compatible systems, then

9  there is no such limitation.  Defendants point out that the agreed-

10 upon construction of "first interrupt signal" flows from the fact

11 that ISA-compatible computers use IRQ1 as the standard interrupt

12 for keyboard input; why, defendants ask, should not the same

13 limitation be imposed on "second interrupt signal"?

14         Whether it was correct or not for the parties to

15 stipulate to the construction of "first interrupt signal" as they

16 did (apparently a decision made in light of the prosecution

17 history), the court sees no basis in the literal claim language to

18 limit "second interrupt signal" to ISA-standard interrupts.  If

19 anything, the choice of "interrupt" -- a generic, but well-

20 understood engineering term, see Wedig Decl (Doc #201) ¶40 --

21 rather than "IRQ" or "ISA-standard interrupt" evinces the

22 patentee's choice to eschew such a limitation in favor of a more

23 expansive claim.  Indeed, although IRQs are referenced throughout

24 the specification, the claims themselves eschew any reference to

25 IRQs.

26         It may well be that the independent requirement in the

27 claims that the invention function "in an ISA-compatible computer"

28 will tend to exclude non-ISA-standard interrupts.  But that is not

21

United States District Court

For the Northern District of California

1   a limitation introduced by "second interrupt signal," and so it

2   would be improper to construe "second interrupt signal" more

3   narrowly than its literal terms.  Accordingly, the court adopts

4   plaintiff's proposed construction in this respect.

5          Plaintiff also seeks to elaborate on this construction by

6   specifying that the interrupt "is generated when the non-

7   conventional function key is depressed either alone or in

8   conjunction with a conventional key."  This additional language,

9   plaintiff asserts, is necessary to construe "second interrupt

10  signal" in the context of claim 5.  The court rejects plaintiff's

11  invitation to add this language to the construction, although the

12  court returns to this issue shortly.  In this context, it is enough

13  to say that "second interrupt signal" carries no germ of a

14  requirement about how or when the signal is generated; other words

15  in the claims carry that meaning.

16         Accordingly, the court construes "second interrupt

17  signal" as "any interrupt, other than IRQ1."

18

19  "upon receipt of a scan code corresponding to said non-conventional
    function key" (claim 5)

20

21         As promised, the court now returns to the question

22  whether claim 5 is limited to, or at least reads upon, generating

23  the second interrupt signal "upon receipt of a scan code that is

24  generated by the activation of a single non-conventional function

25  key alone."  There is little to say on this subject; the literal

26  terms of the claim are that the second interrupt signal is

27  generated "upon receipt of a scan code corresponding to said non-

28  conventional function key."  Receipt of that scan code alone is a

22

1   sufficient condition for triggering the second interrupt signal.

2   The specification acknowledges that this is a possible (albeit

3   nonpreferred) embodiment.  Patent at 7:1-3 ("[T]he [non-

4   conventional] thirteenth function key Fn can be used to specify a

5   particular function in a manner similar to the [conventional]

6   function keys F1 through F12.").

7           By the same token, nothing in the claim language suggests

8   that receipt of that scan code alone is a necessary condition; it

9   may be that, in a proper embodiment, claim 5 could read on a

10  function key in combination with a conventional key.  The Texas

11  Order is consistent with this view.  See Texas Order at 11 ("While

12  the broad language of claim 5 does not expressly call for a second

13  interrupt signal in response to a scan code corresponding to the

14  non-conventional key with another key, neither does that language

15  foreclose the option of a scan code representing a combination of

16  keys.").

17          Whatever the case, the claim language is so clear that

18  the court need not look to the specification (or elsewhere) to

19  construe it.  Accordingly, being unable to improve on the literal

20  claim language, the court declines to construe the language

21  identified by defendants.

22

23  "indexes a first memory location pointer" (claim 4)

24          The parties agree that, in the activity of a CPU, "to

25  index" is "to select or access."  There is also no dispute over

26  what is indexed; the parties agree that the "memory location

27  pointer" is "an identifier that corresponds to the start of the

28  first conventional interrupt handling routine" of claim 1 (upon

23

United States District Court

For the Northern District of California

1    which claim 4 is dependent).  But the parties dispute <u>how</u> the

2    indexing is accomplished.  Plaintiff contends that there is no

3    limitation on the type of pointer.  Pl Br (Doc #199) at 23-24.

4    Defendants contend that the claim should be limited to indexing

5    performed through an interrupt vector, because ISA-compatible

6    computers perform indexing using interrupt vectors.  Defs Br (Doc

7    #207) at 23.

8              The dispute appears to mirror the dispute over "second

9    interrupt signal"; there, as here, defendants assert that the

10   claims read only upon ISA-compatible computers and therefore claim

11   terms should be limited to their meaning in the ISA computing

12   environment.  The court is again unpersuaded.  If the patentee had

13   meant to limit the claim to particular methods of indexing, such a

14   limitation would appear in the literal terms of the claim language.

15   And indeed, as plaintiff points out, claims 6 and 7 refer to

16   "interrupt vectors."  Claim 4 does not.  Accordingly, it is not so

17   limited, and the court adopts plaintiff's proposed construction.

18             Accordingly, the court construes "indexes a first memory

19   location pointer" as "selects or access an identifier that

20   corresponds to the start of the first conventional interrupt

21   handling routine."

22

23   <u>"indexing a second memory location pointer" (claim 4)</u>

24             The construction of this phrase tracks the construction

25   of "indexes a first memory location," <u>mutatis mutandis</u>.

26   Accordingly, the court construes "indexing a second memory

27   location" as "selects or accesses an identifier that corresponds to

28   the start of the second non-conventional interrupt handling

24

1  routine."

2

3                              IV

4        Finally, with breathless accusations of sandbagging on

5  plaintiff's part, defendants move to strike portions of plaintiff's

6  reply brief, or in the alternative, to consider a supplemental

7  declaration from defendants in rebuttal.  Doc #219.  It is

8  undeniable that plaintiff devotes considerably greater attention to

9  the construction of "scan code" in its reply brief than in its

10 opening brief.  Compare Pl Br (Doc #199) at 22-23 (less than one

11 page of briefing on "scan code") with Pl Reply (Doc #213) at 11-14

12 (over three pages of briefing on "scan code").  But such is the

13 vice of three-step Markman briefing; a patentee who files an

14 opening brief may not be fully aware of the arguments that its

15 opponent will advance in its responsive brief.  In any event, the

16 court has found it unnecessary to refer to the material presented

17 in the reply brief (and, by extension, the rebuttal material

18 offered in defendants' supplemental declaration).  Accordingly,

19 defendants' motion (Doc #219) is DENIED as moot.

20

21        IT IS SO ORDERED.

22

23                              _____

24                              VAUGHN R WALKER

25                              United States District Chief Judge

26

27

28

                              25

cgd

United States District Court
for the
Northern District of California
May 12, 2005

\* \* CERTIFICATE OF SERVICE \* \*
Entry on Civil Docket

Case Number:3:00-cv-04524

Samsung Electronics

    vs

Quanta Computer

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on May 12, 2005,  I SERVED and ENTERED on the civil docket a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) listed below, by depositing said envelope in the U.S. Mail; or by placing said copy(ies) into an inter-office delivery receptacle located in the office of the Clerk.

        Mark Fowler, Esq.
        DLA Piper Rudnick Gray Cary US LLP
        2000 University Circle
        East Palo Alto, CA  94303-2248

        Terry D. Garnett, Esq.
        Alschuler Grossman Stein & Kahan LLP
        2049 Century Park, East
        39th Fl.
        Los Angeles, CA  90067-3213

        Vincent K. Yip, Esq.
        Alschuler Grossman Stein & Kahan LLP
        2049 Century Park, East
        39th Fl.
        Los Angeles, CA  90067-3213

        William L. Anthony, Esq.
        Orrick Herrington & Sutcliffe LLP
        1000 Marsh Road
        Menlo Park, CA  94025

        Kai Tseng, Esq.
        Orrick Herrington & Sutcliffe LLP

1000 Marsh Road
Menlo Park, CA  94025

Richard W. Wieking, Clerk

BY: ___CORA DELFIN_____
    Deputy Clerk