MICHAEL J. BETTINGER (STATE BAR NO. 122196)
michael.bettinger@klgates.com
TIMOTHY P. WALKER, PHD (STATE BAR NO. 105001)
timothy.walker@klgates.com
HAROLD H. DAVIS, JR. (STATE BAR NO. 235552)
harold.davis@klgates.com
**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
55 Second Street, Suite 1700
San Francisco, California 94105-3493
Telephone: 415.882.8200
Facsimile: 415.882.8220

Attorneys for Plaintiff and Counter-claim Defendants
WISTRON CORPORATION and
WISTRON INFOCOMM (TEXAS)
CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WISTRON CORPORATION,<br>　a Taiwan corporation,<br><br>　　　　　　Plaintiff and Counter-Defendant,<br><br>　vs.<br><br>SAMSUNG ELECTRONICS CO., LTD.,<br>　a Republic of Korea corporation,<br><br>　　　Defendant and Counter-Plaintiff | Case No. C 07-04748 VRW<br><br>**WISTRON CORPORATION AND WISTRON INFOCOMM'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| SAMSUNG ELECTRONICS CO., LTD.,<br><br>　　　　　Counterclaim-Plaintiff<br>　vs.<br><br>WISTRON CORPORATION, and<br>WISTRON INFOCOMM (TEXAS)<br>CORPORATION<br>　　　　Counterclaim-Defendants | |

# Table of Contents

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   EFFECT OF PRIOR CLAIM CONSTRUCTION RULINGS ....................................... 2

III.  PROPOSED CLAIM CONSTRUCTIONS................................................................ 2

A.    The '273 Patent.............................................................................................. 2

    1.  data scan code / scan code ..................................................................... 3
    2.  first interrupt signal................................................................................ 5
    3.  second interrupt signal .......................................................................... 6
    4.  second interrupt signal line .................................................................... 6
    5.  indexes / indexing; indexes a first memory location pointer; indexing a second   memory location; indexing one of plurality of memory locations ...................... 9
    6.  program        ........................................................................................ 11
    7.  special routine ...................................................................................... 11
    8.  combination .......................................................................................... 13
    9.  combination       ................................................................................... 14

B.    The '275 Patent............................................................................................ 14

    1.  block           ........................................................................................ 15
    2.  variable         ...................................................................................... 16
    3.  first inactive state ................................................................................ 17

C.    The '100 Patent............................................................................................ 17

    1.  memory controller unit ......................................................................... 18
    2.  configured to receive............................................................................ 19
    3.  to provide       .................................................................................... 19
    4.  indication of access speed .................................................................... 19
    5.  access timing ....................................................................................... 20
    6.  commensurate ...................................................................................... 21

IV.   Conclusion...................................................................................................... 22

# Table of Authorities

**Page**

## Federal Cases

*Alloc, Inc. v. Int'l Trade Comm'n,*
342 F.3d 1361 (Fed. Cir. 2003) ........................................................................................1

*Athletic Alternatives Inc. v. Prince Mfg., Inc.,*
73 F.3d 1573 (Fed. Cir. 1996) ..........................................................................12, 18, 19

*CAE Sceenplates Inc. v. Heinrich Fiedler GmbH,*
224 F.3d 1308 (Fed. Cir. 2000) ......................................................................................12

*Curtiss-Wright Flow Control Corp., v. Velan, Inc.,*
438 F.3d 1374 (Fed. Cir. 2006) ......................................................................................13

*Decisioning.com, Inc. v. Federated Dep't Stores, Inc.,*
No. 2007-1278, slip op. at 13 (Fed. Cir. May 7, 2008) ....................................................2

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
452 F.3d 1312 (Fed. Cir. 2006) ........................................................................................1

*Inpro II Licensing S.A.R.L. v. T-Mobile USA, Inc.,*
450 F.3d 1350 (Fed. Cir. 2006) ........................................................................................1

*Netword, LLC v. Centraal Corp.,*
242 F.3d 1347 (Fed. Cir. 2001) ...................................................................................1, 2

*On Demand Mach. Corp. v. Ingram Indus., Inc.,*
442 F.3d 1331 (Fed. Cir. 2006) ........................................................................................1

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech., Ltd.,*
521 F.3d 1521 (Fed. Cir. 2008) ........................................................................................5

*Nystrom v. Trex Co., Inc.,*
424 F.3d 1136 (Fed. Cir. 2005) ......................................................................................13

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) ..............................................................................*passim*

*SRI Int'l v. Matsushita Elec. Corp.,*
775 F.2d 1107 (Fed. Cir. 1985) ........................................................................................5

*Wang Labs., Inc. v. Am. Online, Inc.,*
197 F.3d 1377 (Fed. Cir. 1999) ..............................................................................1, 12, 18, 19

## I. INTRODUCTION

Plaintiff Wistron Corporation and Wistron Infocomm (Texas) Corporation (collectively, "Wistron") submit this brief in support of their proposed claim constructions. Defendant Samsung Electronics Co., Ltd. ("Samsung") proposes claim constructions that are results-oriented and blindly apply previous positions taken by parties other than Wistron. Wistron seeks selected clarification of certain terms previously construed by this Court and the construction of a few additional terms to better inform the jury about the issues and Wistron's specific defenses in this case. The purpose of claim construction is not just to define the plain meaning of individual terms, Samsung's myopic focus, but also to precisely instruct the jury on the proper *scope* of the patent claims. Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005).[1] See, e.g., O2 Micro Int'l Ltd. v. Beyond Innovation Tech., Ltd., 521 F.3d 1521, 1361 (Fed. Cir. 2008) ("[C]laim construction requires the court to determine what claim scope is appropriate *in the context of the patents-in-suit*.") (emphasis added).

Since Phillips, numerous Federal Circuit cases have emphasized that the scope of the invention disclosed in the specification is paramount.[2] Samsung, not surprisingly, cites none of them. Indeed, because computer and software patents often include broad claim terms, recent decisions

---

[1] The Federal Circuit has emphasized that "[i]n general, the scope and outer boundary of claims is set by the patentee's description of his invention." On Demand Machine Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1338 (Fed. Cir. 2006).

[2] See, e.g., Honeywell Int'l, Inc. v. ITT Indus., Inc., 452 F.3d 1312, 1319 (Fed. Cir. 2006) (construing "fuel injection system component" as meaning only fuel filters - "[a]s we determined above, the written description provides only a fuel filter that is made with polymer housing and electrically conductive fibers interlaced therein. No other fuel injection system component with the claimed limitations is disclosed or suggested. Where, as here, the written description clearly identifies what his invention is, an expression by a patentee during prosecution that he intends his claims to cover more than what his specification discloses is entitled to little weight."); Netword, LLC v. Centraal Corp., 242 F.3d 1347, 1352 (Fed. Cir. 2001) (rejecting patentee's "argument that the district court improperly limited the scope of claim 1 by importing the caching and pulling functions from the specification misperceives the role of 'claim construction' in infringement analysis. The role is neither to limit nor to broaden the claims, but to define, as a matter of law, the invention that has been patented. The claims are always construed in light of the specification, of which they are a part"); Inpro II Licensing S.A.R.L. v. T-Mobile USA, Inc., 450 F.3d 1350, 1356 (Fed. Cir. 2006); OnDemand, 442 F.3d at 1340 (Fed. Cir. 2006) (construing "customers" to mean retail customers, because "the claims cannot be of broader scope than the invention that is set forth in the specification"); Alloc, Inc. v. Int'l Trade Comm'n, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[W]here the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims."); Wang Labs., Inc. v. Am. Online, Inc., 197 F.3d 1377, 1382-83 (Fed. Cir. 1999) (limiting the broad claim term "frame" to a frame consisting of text characters, and specifically not encompassing a bit-map protocol).

---

have restricted broad and open-ended computer-related claim terms to the scope ascribed to them in the specification.  See, e.g., Decisioning.com, Inc. v. Federated Dep't Stores, Inc., No. 2007-1278, slip op. at 13 (Fed. Cir. May 7, 2008); Netword, 242 F.3d at 1352.

Wistron respectfully submits that its proposed claim constructions properly establish the scope of Samsung's claims in light of the invention actually described and claimed by Samsung.

## II.    EFFECT OF PRIOR CLAIM CONSTRUCTION RULINGS

In its opening claim construction brief, Samsung criticizes Wistron for offering constructions somewhat different from those adopted in prior Markman rulings and party agreements relating to Samsung's '273 patent.[3]  These prior rulings and prior party agreements, which occurred prior to the Phillips decision, are not preclusive against Plaintiffs, who, unlike Samsung, are having their first opportunity to be heard on these issues.[4]  Additionally, Samsung itself argued in the prior litigation against the claim constructions for several of the terms previously construed.

Most importantly, in making these criticisms, Samsung fails to acknowledge that Defendants agree with the substance of the prior claim constructions: any changes are intended only to clarify those constructions in ways that were not previously addressed by the parties in the previous litigation.  Of course, the prior rulings do not preclude Wistron from raising new issues not before the prior courts.  The Court is entitled and in fact obligated to conduct its own claim construction proceeding, and should not hesitate to improve upon the constructions offered by previous courts before which Counterclaim-Defendants did not have the opportunity to be heard.

## III.    PROPOSED CLAIM CONSTRUCTIONS

### A.    The '273 Patent[5]

---

[3] Ex. 1 (5/12/05 Claim Construction Order), and Ex. 2 (6/23/04 Claim Construction Order).  All "Ex." references in this brief will refer to exhibits attached to Declaration of Harold H. Davis in Support of Wistron's Responsive Claim Construction Brief ("Davis Decl.").

[4] Samsung's argument that prior Defendants have come to agreement over terms that are disputed in this litigation is of no moment as Wistron was not involved in any such agreement and disagrees with the constructions agreed upon in the prior case.

[5] Because the Court now has several copies of the patents-in-suit, Wistron's references to the patents-in suit, the '273, '275, and '100 patent refer to those patents attached respectively as Exhibits A, B, and C to the Joint Claim Construction Statement (Dkt. #43).

---

U.S. Patent No. 5,333,273 (the "'273 patent") is a computer architecture patent directed to generating a "second interrupt" on a "second interrupt signal line" in response to a user depressing a non-conventional function key on a keyboard attached to an ISA-compatible computer, where the second interrupt causes the computer to execute a "special routine." Declaration of Tony Clark in Support of Wistron's Responsive Claim Construction Brief ("Clark Decl.") ¶¶16-35. The goal is to avoid interference between the "special routine" and other programs that are executed in response to a "first interrupt" generated when a user presses a conventional key. Id. at ¶30.

Samsung's expert has admitted that the invention has to do with "computer architecture," which is how the various functional components of a computer are connected together. Ex. 4 (Declaration of Dr. Robert Wedig in Support of Samsung's Opening Claim Construction Brief ("Wedig Dep.") at 51:14 – 52:1; 76:4 – 77:13). As Samsung's own expert admitted, prior art ISA-compatible computers already provided a plurality of interrupt signals on a plurality of interrupt signal lines. Id. (at 89:5-90:9; 134:24-135:10). Accordingly, the novelty of the invention is not the idea of a "second interrupt signal" on a "second interrupt signal line," but instead is limited by the architectural design used to generate and transmit the second interrupt signal. Id. (at 67:16 – 68:3; 85:3-16).

## 1.     data scan code / scan code

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| A code number that the keyboard generates whenever a key is depressed or released, said scan code number created by converting a pairing of a row signal and a column signal in the keyboard matrix. Each key on the keyboard has a unique scan code. | a code number that the keyboard generates whenever a key is depressed or released, said code number created by converting a pairing of a row signal and a column signal in the keyboard matrix. |

The difference between the constructions proposed by Wistron and Samsung for "data scan code" and "scan code" is Wistron's proposed second sentence: "Each key on the keyboard has a unique scan code." This is simply the second sentence from the definition of "scan code" found in the standard dictionary, Microsoft Press Computer Dictionary (Ex. 3), a dictionary this Court characterized as "particularly illuminating" in its previous construction of "scan code." Ex. 1 at 13. At least one prior Court (Judge Rainey) concurred with Wistron proposed definition, in part, due to Samsung's own argument that a scan code corresponds to a particular key. Ex. 2 at 6 ("From the specification and dictionary definition, it is clear that each key on the keyboard has a unique

corresponding data scan code."; "it is the key itself that has a <u>unique</u> data scan code").

Despite Samsung's lawyers' argument in its brief, Samsung's own expert, Dr. Wedig, agrees with Wistron's construction. Samsung's expert has repeatedly admitted that no two keys can have the same scan code. Ex. 4 (Wedig Dep. at 122:25-124:6). In his declaration, Samsung's expert even goes so far as to characterize scan codes as "unique" to each key. Dkt. #59 at ¶¶ 38 ("The scan codes … are numbers which <u>uniquely identify individual keys on the keyboard</u>. … I agree with Mr. Norton that a <u>key on the keyboard has a scan code that uniquely identifies the key</u>…")(emphasis added) and at ¶35 ("The scan code … <u>always</u> corresponds to a key…."). Samsung should not be allowed to advance a position that it contradicted by its own proffered expert.[6]

The requirement that each key on the keyboard have a unique scan code is common sense and needed in this case. If scan code were not unique to a particular key, the computer could not distinguish keys based on scan code. Clark Decl. ¶¶36-7. Intrinsic evidence supports Wistron's construction. '273 Patent at 4:12-21; 7:51-55; Fig. 8 and 8:35-46 (showing and describing that only scan code uniquely associated with alphanumeric key is used to determine special routine); 14:33-38 (noting that scan codes correspond to particular alphanumeric key or to non-conventional function key).

"Scan code" must be construed in context of the claims, and all of the claims here require that the claimed architecture must be in an "ISA-compatible" system. Indeed, the applicants stressed that it was the ISA environment which was the critical limitation of the invention over prior art. Ex. 8 (at SEC-W 00000158: "to truly appreciate the novel and non-obvious distinction of the claimed invention over the prior art, it is important to understand that the claimed invention is in the ISA-compatible computer environment"; and at SEC-W 000000159: "the conventional ISA-compatible computer architecture is extremely limiting"). In the ISA context, each key on the keyboard has a unique scan code. *Id.* and Clark Decl. at ¶¶36-7.

---

[6] Dr. Wedig has previously testified that the inclusion of Microsoft's Dictionary definition of scan code, including the phrase "Each key on the keyboard has a unique scan code," is correct. Ex. 5 (Wedig 9/11/02 Dep. at 64:20 – 65:19). Moreover, Dr. Wedig offered a declaration in the previous Texas litigation where he again admitted that scan codes were unique to each key. Ex. 6 (Wedig 10/11/02 Decl. ¶51) (the "converted value [of row and column scan] is another form of the scan code since it <u>also uniquely identifies which key</u> or key combination has been pressed); Ex. 7 (Wedig 2/25/05 Decl. ¶43) (same).

1    Samsung asserts that the "Court considered this language in the Quanta Order" and

2    "concluded that the word 'uniquely' does not refer to a scan code, but instead refers to the use of row

3    and column signals…."  The Court made no such conclusion, and Samsung's citation is in error.[7]

4    The Court dealt solely with the issue of whether row and column signals were scan codes themselves.

5    Ex. 1 at 11:12-16.  Samsung also notes that the Court had the *Microsoft Press Computer Dictionary*

6    definition when it made its prior construction.  It is clear from the record in the prior litigation,

7    however, that the issue of whether this second sentence of the definition should be included was not

8    raised by either party, because they were instead litigating solely over the issue of whether row and

9    column signals could constitute scan codes.  Indeed, Samsung offers no legitimate reason why the

10   Court should use only a portion of the dictionary definition for its construction, but exclude the other

11   sentence which further clarifies what one of ordinary skill in the art understood "scan code" to mean

12   in an ISA-compatible environment.

13    Samsung further speculates as to Wistron's substantive arguments should the court accept

14   Wistron's proposed claim construction.  Such a results-oriented argument has long been rejected by

15   the Federal Circuit.  Supra at I.; see also e.g. SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1118

16   (Fed. Cir. 1985).  The Court must determine the correct construction of a term in the context of the

17   patent, not on what it thinks the parties may or may not argue to the Court or jury some time later.

18    **2.     first interrupt signal**

19
| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| The ISA standard IRQ1 interrupt signal | IRQ1 |

20    Wistron's proposed construction adds specificity to Samsung's proposed construction to

21   eliminate the possibility of absurd results.  Under Samsung's proposed construction, any signal

22   arbitrarily named "IRQ1" would be a "first interrupt signal."  Wistron proposes a common sense

23   clarification:  that the first interrupt signal be the IRQ1 signal defined by the ISA standard.  Clark

24   Decl. ¶38.

25

26   ───────────────────

27   [7] The Court explained that the word "identify" (not "uniquely" as erroneously claimed by Samsung) should be interpreted to mean "determine" in rejecting Samsung's argument that a scan code was a row and column signal. Ex. 1 at 12:15-27.  The Court did not consider whether each key had a unique scan code.  Id.
28   Samsung's position is surprising in that it was the party who argued to this Court that row and column signals "uniquely identify" a scan code.

1    Samsung's expert conceded that the first interrupt signal cannot be an arbitrary signal called

2    IRQ1. Ex. 4 (Wedig Dep. at 126:10-14).  Indeed, Samsung's expert relied upon the "ISA-compatible

3    computer" context of the claims to imply what Wistron asks be made explicit:  the first interrupt

4    signal is the ISA standard IRQ1 interrupt signal.  Id. (Wedig Dep. at 126:14-127:6).

5    Samsung argues that Wistron's construction imposes a limitation of "ISA Standard" and that

6    such a limitation is similar to an "ISA bus" limitation previously sought by another Defendant.

7    Samsung is incorrect on both points.  First, it is the claim itself that adds the ISA-compatible

8    limitation, thus Wistron's proposed construction properly identifies that the first interrupt signal

9    referred to in the claims is the ISA IRQ1, not just any randomly named computer interrupt that also is

10   named IRQ1.  Second, Wistron's construction is a clarification that is technically correct and is

11   supported by the specification.

**3.      second interrupt signal**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| Any interrupt signal other than IRQ1 interrupt signal | any interrupt other than IRQ1 |

14   Wistron's proposed construction adds specificity to the construction of "second interrupt

15   signal" to emphasize that the "second interrupt *signal*" is a "signal".  Samsung's proposed

16   construction uses the bare word "interrupt," which the jury may confuse with the computer process

17   called an "interrupt."  The difference between an "interrupt" and an "interrupt signal" is analogous to

18   the difference between a "stop" and a "stop light" or a "stop sign." Clark Decl. ¶39.  Samsung's

19   expert conceded that the "second interrupt signal" is, of course, a signal. Ex. 4 (Wedig Dep. 128:15-

20   16), thus there is no reasonable dispute that Wistron's construction is correct.

**4.      second interrupt signal line**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| A second, dedicated separate signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the second interrupt signal | a second, separate signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the second interrupt signal. |

25   Wistron's proposed construction requires that the second interrupt signal line be "dedicated"

26   to the second interrupt signal.  Samsung erroneously asserts that "no intrinsic evidence supports,

27   much less requires" that the second interrupt signal line be dedicated.  To the contrary, the '273

28   patent specifically teaches choosing a dedicated "second interrupt signal line," i.e., the typically

1  unused IRQ15 signal line: "The IRQ15 signal line is *typically not used* on conventional ISA

2  compatible computer systems and is thus *available for use with the thirteenth function key Fn*." '273

3  patent at 6:42-45 (emphasis added). Indeed, the '273 patent also discusses that IRQs are generally

4  dedicated lines for particular uses. '273 patent at 4:30-33. For example, IRQ1 is dedicated solely for

5  keyboard use. Id. at 4:33-37 ("In the ISA-compatible computers, the interrupt signal from the

6  keyboard controller 128 is communicated to the interrupt controller 130 via the IRQ1 signal line…");

7  5:51-52 ("the keyboard interrupt request signal (IRQ1)").

8     The patent clearly explains that a dedicated second interrupt signal line is used so that IRQ1

9  does not have to be modified. Id. at 7:20-22 ("Since the IRQ15 interrupt signal line 222 is activated

10  rather than IRQ1 signal line 154, the conventional keyboard service routine is not activated. Thus,

11  the conventional keyboard service routine does not have to be modified to accommodate the

12  thirteenth function key Fn").

13     In fact, the applicant for the '273 patent specifically amended their claims in response to an

14  examiner's rejection to add the limitation that the second interrupt signal is carried on a separate,

15  physical signal line and that the patent does not deal with a situation where there are multiple signals

16  on a non-dedicated line. Ex. 8 (WIS 0111309) ("it appears that Claims 1 and 5 may not be

17  sufficiently clear in defining the two interrupt signals *as being two separate physical entities on two*

18  *separate signal lines to distinguish the generation of multiple interrupts on the same signal line*")

19  (emphasis added).

20     At deposition, Samsung's expert explained that prior art computers already had multiple

21  interrupt signals on separate interrupt signal lines (e.g., IRQ15 signal on an IRQ15 signal line) and

22  that each separate interrupt line was a separate, physical line. Ex. 4 (Wedig Dep. at 89:5-90:9 and

23  134:24-135:10). Samsung's expert explained that the novelty of the invention was the way the

24  "second interrupt" (e.g., IRQ15) is used. Id. (Wedig Dep. at 83:24-85:16.) Samsung's expert said,

25  "In fact, the entire purpose, the main reason for the invention is to use something other than IRQ1 to

26  provide hot keys." Id. (Wedig Dep. at 137:24-138:1.)

27     Indeed, the problem to be solved by the invention is interference between programs using the

28  same interrupt signal and interrupt signal line (e.g., IRQ1). '273 patent at 2:32-42, 5:32-6:15. The

---

1    invention addressed that problem by using an existing but typically **unused** second interrupt signal

2    **line** (IRQ15) to send an interrupt signal to start programs that were supposed to be immune from such

3    interference:

> The computer system 200 illustrated in FIG. 4 is similar to the conventional ISA compatible
> computer system 100 illustrated in FIG. 1; however, an improved keyboard controller 220 is
> responsive to scan codes generated by the activation of the thirteenth function key Fn on the
> keyboard 210 to generate an interrupt request signal IRQ15 on an interrupt request signal line
> 222 to the interrupt controller 130. The *IRQ15 signal line is typically **not used*** on
> conventional ISA compatible computer systems and is thus *available for use with the
> thirteenth function key Fn*.

8    '273 patent at 6:35-45; see also at 4:38-43 ("The interrupt controller 130 receives the IRQ1 interrupt

9    signal along with interrupt signals from other devices, such as peripheral device controllers on the

10   ISA bus 140, and generates an interrupt to the microprocessor 110 via ***dedicated*** signal lines that

11   form part of the processor bus 114") (emphasis added).  In fact, the only two embodiments disclosed

12   in the patent show only the dedicated physical line, namely IRQ15, used for the second interrupt

13   signal line.

14          A dedicated signal line is necessary to accomplish the goal of the invention:  no interference

15   with other programs using that interrupt signal.  Clark Decl. ¶¶40-1. Using a shared signal line for the

16   second interrupt simply invites interference from the other signals on the line.  Id.

17          Samsung argues that at the time of the patent, "it is well known the NMI and SMI lines could

18   be used for multiple functions and, accordingly, did not need to be dedicated…."  This argument is

19   contrary to the patent itself.

20          Even though the second embodiment discusses using NMI, it does so only in the context of

21   mapping the NMI to a dedicated IRQ line, i.e. IRQ15.  '273 Patent at 12:21-13:27 ("*** The

22   microprocessor 410 executes the interrupt service routine ***dedicated*** to handling IRQ15, reads the

23   scan code data stored in the system controller 420 and executes the function associated with the scan

24   code.  Thus, as discussed above with respect to the first embodiment, the handling of the IRQ15

25   function is ***entirely independent*** of the conventional keyboard handling via IRQ1 and ***cannot be***

26   ***compromised*** by conventional TSR programs or the like.") (emphasis added).  If one of ordinary skill

27   in the art understood that that the second interrupt signal line "does not need to be a dedicated line" as

28   posited by Samsung, then there would have been no need whatsoever for the inventors to specify in

---

the second embodiment of the patent that the NMI be mapped to a dedicated signal line. Indeed, to do so would be nonsensical.

Samsung's argument that at the time of the invention "SMI line[] could be used for multiple functions" contradicts the very position it took at trial in the previous litigation that SMI had not even been invented at the time of the '273 patent.

Not only does the intrinsic evidence support Wistron's position as discussed above ('273 Patent at 6:35-45 and 4:38-43), the prosecution history also reveals that the patent uniquely defined the second interrupt signal line as a dedicated, unused line that was being devoted for use by the keyboard controller. See Ex. 8 (WIS 0111309: "the presently claimed invention provides the advantage that TSRs that may adversely affect the operation of the routines linked to the conventional interrupt signal *do not affect* the routines linked to the non-conventional interrupt signal."; and at SEC 0111310: "the present application which *uniquely define* an ISA-compatible computer system having a first conventional interrupt signal line from the keyboard controller to the computer and a *second non-conventional interrupt signal line* from the keyboard controller to the computer.") (emphasis added).

5.    **indexes / indexing; indexes a first memory location pointer; indexing a second memory location; indexing one of plurality of memory locations**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| (1) To locate information in a table by adding an offset amount; (2) adds an offset amount to a first memory location pointer; (3) adding an offset amount to a second memory location; (4) adding an offset amount to one of a plurality of memory locations | selects or accesses |

Wistron's proposal for construing the claim phrases that include "indexes" or "indexing" more precisely defines the terms in conjunction with the scope of the claims. Samsung's proposal, "selects or accesses" is too broad because to those of skill in the art, "indexes" or "indexing" means a particular way of selecting or accessing a memory location: by adding an offset amount to a base memory location. Clark Decl. ¶42

Wistron's proposal is supported by the patent specification and by standard dictionaries that represent what one of ordinary skill in the art would understand the term "index" to mean in the context of the patent. Ex. 3 ("index" – "In programming and information processing, to locate

1  information stored in a table by adding an offset amount, called the index, to the base address of the

2  table."). "[D]ictionaries and treatises can be useful in claim construction." Phillips v. AWH Corp.,

3  415 F.3d 1303.

4    Moreover, the patent explicitly discloses adding offset amounts to a base memory location:

5    The microprocessor 110 utilizes *the interrupt vector* received from the interrupt controller 130
   *as an index to* an interrupt vector table that *begins at location* OH in its RAM 120. (Although

6    the 80386SX microprocessor utilizes *segment and offset addresses in the format xxxx:yyyy,* the
   addresses will be discussed herein as absolute addresses in bytes from the lowest address in

7    memory.)

8  '273 patent at 5:1-8 (emphasis added).  In this quote, the value of the interrupt vector is the "index"

9  or offset amount that is added to the "begin[ning] location" or base memory location in the RAM

10  (random access memory). See Clark Decl. ¶43.  The parenthetical explains that the ISA-compatible

11  80386SX microprocessor utilizes "segment and offset addresses in the format xxxx.yyyy," meaning

12  the "yyyy" is the "index" to the base "xxxx." Id.  Samsung's expert admits as much.  (Wedig Dep. at

13  143:17-144:10.)

14    The parenthetical also explains that, to simplify subsequent discussion, the patent will, as an

15  abbreviation, discuss addresses "as absolute addresses in bytes from the lowest address in memory."

16  In plain English, this just means that in discussing examples of memory locations, the patent assumes

17  the "base address" is zero (lowest address in memory), so the offset equals the absolute address.

18  Clark Decl. ¶43.  Similarly, Samsung's expert admits that the offset itself can be zero, which would

19  make the base address equal to the absolute address.  Ex. 4 (Wedig Dep. at 158:1-3).

20    Samsung's proposed construction distorts the patent's disclosure in various ways.  First,

21  Samsung and its expert point out that the "offset" is not simply the value of the interrupt vector but

22  instead is 4 times the value of the interrupt vector.  Ex. 4 (Wedig Dep. 142:2-16).  In other words,

23  Samsung argues that Wistron's proposal calls for "adding" an offset amount, whereas the

24  specification talks about "multiplication."  Samsung Op. Br. [Dkt. #56] at 12.  This purported

25  distinction makes no difference to the concept of "indexing" as an offset amount; it just means the

26  value of this particular "index"/offset amount is determined by multiplying the value of the interrupt

27  vector by 4.

28

6.    **program**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| To perform a series of instructions to input the scan code | a handling routine that causes the computer to receive keyboard scan codes from the keyboard controller. |

Wistron's proposed construction of "program" is appropriately specific as it is described in the patent's specification. Clark Decl. ¶44. Samsung does not and cannot dispute that a computer program performs a series of instructions. Ex. 3 (Definition of "program"). Instead, Samsung's proposed construction imports the limitation that the program is a "handling routine." Samsung offers no intrinsic support for calling the "program" a "handling routine." Instead, it cites a portion of the patent calling the program a "keyboard interrupt service routine." Samsung Op. Br. [Dkt. #56] at 9:22-24.

Though using different words, both definitions share the concept (based on the claim language) that the purpose of the program is to input scan code from the keyboard controller to the computer. Samsung asserts in its brief, "Wistron's construction does not reflect this claimed function." Samsung Op. Br. [Dkt. #56] at 9:19. But Wistron's construction does say the program is to "input the scan code," and to the extent the additional details of the "claimed function" are already claimed, it is redundant to include those details in the definition of "program."

7.    **special routine**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| A routine that is only executed upon receipt of the second interrupt signal and the scan code corresponding to one of the conventional keys | a routine that is executed upon receipt of the second interrupt signal. |

In claim 5, the "special routine" is executed by the computer upon receiving the "second interrupt signal." '273 patent at 14:45-48. Since the point of the invention is using a second interrupt signal to avoid interference between programs (supra at 2-3), what makes the "special routine" special is that the "special routine" is triggered only by the second interrupt signal. That limitation ensures that the "special routine" will not encounter interference with programs triggered by the conventional first interrupt signal. Clark Decl. ¶¶45-46. Samsung's own expert testified at deposition that the "special routine" is different from the "program" that responds to the first interrupt signal (IRQ1). Ex. 4 (Wedig Dep. at 168:23-169:16.).

Samsung's proposed construction would permit the "special routine" to be triggered by the

conventional first interrupt signal so long as a second interrupt signal was received at some point. This would mean the **same routine** could be **both** the "program to input said scan code in response to said **first** interrupt signal" and the "special routine" executed in response to the "**second** interrupt signal". This is contrary to the claim language, which, by using different language to describe the "program" and the "special routine," raises a presumption that the "program" and the "special routine" are distinct. <u>CAE Sceenplates Inc. v. Heinrich Fiedler GmbH</u>, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings").

Because it is broad enough to include programs called by the first interrupt signal, Samsung's proposed construction is also contrary to the inventive concept of the patent: using a second interrupt signal to call "special routines" that are not subject to interference through the first interrupt signal. It is also contrary to the testimony of Samsung's own expert, who said the "special routine" is not triggered by IRQ1. Ex. 4 (Wedig Dep. at 168:23-169:16).

Wistron's construction also requires that the "special routine" only be triggered by receipt of a scan code for an alphanumeric key. This requirement is consistent with the only embodiment taught by the patent, where the Fn key is activated, the keyboard microprocessor waits for the subsequent activation of an alphanumeric key, and then the scan code of the conventional alphanumeric key is used to determine which Fn service routine to execute. '273 patent at 7:65 – 8:8; 8:41-43; 12:21-32. Consequently, it is proper for this Court to construe the term "special routine" in the context of what is described in the patent and the invention described to the public by the patentee. <u>See</u> <u>Athletic Alternatives Inc. v. Prince Mfg., Inc.</u>, 73 F.3d 1573, 1581 (Fed. Cir. 1996) ("Where there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, we consider the notice function of the claim to be *best served* by adopting the narrower meaning."); <u>Wang Labs. Inc. v. Am. Online Inc.</u>, 197 F.3d 1377, 1382-83 (Fed. Cir. 1999) (limiting claim term to only enabled embodiment by finding that even though claim term could be interpreted outside of patent context to include a broader claimed system, because the broader system was not described in the specification, the term had to be limited to a narrower system).

Samsung argues that the word "only" does not appear in the claim. Wistron's proposed construction is appropriate because the specification describes "special routine" in the embodiments as only executed upon receipt of *both* the second interrupt signal *and* the scan code corresponding to one of the conventional keys. Furthermore, repeated statements in the written description refer only to the scan code corresponding to one of the conventional keys being used to identify what "Fn service routine" should be run. '273 Patent at 7:5-19; 7:65 – 8:8 8:41-43; 12:21-32. Thus, it is appropriate to include "only" as part of the construction for "special routine." See e.g. Nystrom v. Trex Co., Inc., 424 F.3d 1136, 1144-1145 (Fed. Cir. 2005) (limiting term "board" to objects made of wood, even though claim did not specify "wood"); Curtiss-Wright Flow Control Corp., v. Velan, Inc., 438 F.3d 1374, 1379 (Fed. Cir. 2006) (limiting term "adjustable" to mean "adjustable on the fly").

Samsung also argues that the claim mentions "a scan code corresponding to the 'non-conventional function key' not 'one of the conventional keys'." Samsung Op. Br. at 11. However, the claim does not state that the "special routine" is executed upon receipt of only such a scan code. Instead, the claim merely states that the special routine is not executed until a second interrupt signal is received. The only special routine enabled by the specification is not executed until it receives both the second interrupt signal (that corresponds to the "non-conventional function key") and the scan code corresponding to one of the conventional keys.

**8.     combination**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| Simultaneously | plain meaning (no construction is needed). |

Claim 1 of the '273 patent refers to activation of the "additional function key *in combination* with at least one of said conventional alphanumeric keys". '273 patent at 13:53-55. Wistron contends this language is too ambiguous to leave undefined because under Samsung's proposed "plain meaning", the term "combination" could refer to any sequence of multiple key strokes that includes the additional function key. Samsung's expert admitted this is too broad. Ex. 4 (Wedig Dep. at 171:13-17) (testifying that if the Fn key is pressed and released and an alphanumeric key is then pressed and released, this is not "in combination.").

Samsung's expert also implicitly agreed with Wistron's construction when he admitted that if the Fn key is pressed and held down while an alphanumeric key is pressed, that is "in combination."

1    Ex. 4 (Wedig Dep. at 171:18-21).  In other words, Samsung's expert admits that in order to have keys

2    pressed "in combination", the keys have to be, at some point in time (however brief), depressed at the

3    same time.  This scenario would be included within the scope of Wistron's proposed construction,

4    "simultaneously".  Thus, Wistron's construction properly complies with the understanding of one of

5    ordinary skill in the art.  Clark Decl. ¶47.

6          The specification is not at odds with Wistron's proposed construction as argued by Samsung

7    because the "waiting" stated in the specification implies that both the Fn key and a conventional key

8    have to be depressed at the same time for some period of time, however brief that time might be.

9    Samsung fails to cite the entire relevant portion of the specification.  '273 patent at 7:65-68 and 8:9-

10   46 (stating that the Fn key and the alphanumeric key must be "active" at the same time).

11         **9.     non-conventional function key [additional function key]**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| An additional function key other than a conventional function key | plain meaning (no construction is needed) |

14         The terms "non-conventional function key" and "additional function key" should be construed

15   to eliminate any possibility of confusion that such keys are not conventional function keys.  There is

16   no substantive dispute that the terms refer to a function key "other than a conventional function key,"

17   as Wistron proposes.  Clark Decl. ¶48.

18   **B.     The '275 Patent**

19         U.S. Patent No. 5,625,275 (the "'275 patent") describes a power supply for a portable

20   computer that makes maximum use of the available AC power supply's current to charge the battery.

21   Clark Decl. ¶49; '275 patent at Abstract.  The '275 patent's claims require that so long as the battery

22   requires charging, the claimed power supply will direct approximately all available current from the

23   AC power supply to the battery except for current actually being used by the portable computer.  Id.

24   In order to accomplish this process, the patent describes three sensors to measure three parameters

25   (input current, charging current, and output voltage), and when any of these sensors detects a value

26   that exceeds a set maximum limit, the power supply is to stop charging the battery.  '275 Patent at

27   1:54-2:33.  As described by the patent:

28         The present invention provides a power supply for a rechargeable battery that adjusts the
           battery charging current depending upon the current drawn by the portable computer system at
           any given time. The power supply includes a regulator controller which monitors the output

1

2

3

4

> current and output voltage of the battery to provide over voltage and short circuit protection.
> The controller further monitors the level of input current being drawn by the computer system.
> When the computer draws less current, the battery charging current is increased accordingly,
> thus efficiently using all of the available power output from the AC adapter. Conversely, when
> the current drawn by the computer system is above a threshold value at which battery charging
> is not feasible, the regulator does not direct any charging current to the battery.

5

'275 patent at 1:54-68.

6

   **1.     block**

7

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| stop the flow of charging current | the transistor is biased off |

8

9

The '275 patent claims a power supply having three sensors measuring:  (1) input current

from the AC adapter; (2) charging current supplied to the battery; and (3) the battery output voltage.

10

<u>Supra</u> and '275 patent at 9:4-14; Clark Decl. ¶51.  There is a maximum level associated with each of

11

these three measured parameters.  <u>Id.</u>  The claim requires that when any of the three measured

12

parameters exceeds its maximum level, the control circuit should "block charging current flow".

13

'275 patent at 9:27-31.

14

The specification is unambiguous that when any of the three measured parameters exceeds its

15

maximum, "no current" flows to the battery.  '273 patent at 4:4-6 ("When either of these control

16

signals is above a predetermined threshold value, the regulator output is disabled so that ***no charging***

17

***current is supplied*** to the battery."); at 4:15-18 ("[I]f the current drawn by the computer system is

18

above the threshold value, the regulator output is disabled and ***no charging current*** is directed to the

19

battery 12.").  This construction is also consistent with providing over voltage and short circuit

20

protection to the circuit, since reducing the current to zero by any means would provide such

21

protection.  <u>Id.</u> at 1:57-60; Clark Decl. ¶¶52-55.

22

The applicants also agreed with Wistron's construction in a response to an office action:

23

"When the battery is charged and the maximum battery voltage is reached, *the charging current to*

24

*the battery is halted*."  Ex. 11 (WIS 0111945) (emphasis added).

25

Samsung's construction is incorrect because it attempts to import a structural limitation into a

26

verb.  The verb "block" should be defined as a function, not the structure that accomplishes that

27

function.

28

1

**2.     variable**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| Adaptable | Plain meaning (no construction is needed) |

According to claim 1, so long as none of the three measured parameters is exceeding its maximum, the power supply's control circuit is to provide charging current at a "variable" level such that the input current level is maintained at approximately its maximum level.  '273 patent at 9:32-40. In other words, as clearly explained by the applicants during prosecution, when the battery needs charging, the total input current drawn from the AC adapter is kept at approximately its maximum:

> The claims further clarify that the input current from the AC adapter is monitored and that the charging current to the battery is varied to control the charging current so that the input current is maintained at its predetermined maximum level until the battery is substantially charged….

Ex. 11 (WIS 0111946).  If none of the three measured parameters is at its maximum, that means the battery needs charging (because the battery output voltage is less than its maximum).  Clark Decl. ¶56.  To the extent the computer is using less than the maximum available input current, the remaining available input current is used to charge the battery.  As the computer uses less current, more charging current is sent to the battery, and vice-versa, always maintaining the total input current at approximately its maximum.[8]

Wistron proposes that "variable" be construed as "adaptable," to avoid confusion over variances in charging current not attributable to the intended operation of the claimed power supply. Clark Decl. ¶57.  Samsung's expert conceded that the "variable" charging current does not refer to random fluctuations or to such things as turning the computer on and off.  Ex. 10 (Colwell Dep. at 66:17-22).  Instead, the invention varies the charging current to adapt to the needs of the computer system while taking full advantage of the available input current.  Clark Decl. ¶58.  The maximum input current available is a constant associated with the AC adapter being used.  Id.   The current needs of the portable computer have priority over battery charging and will vary depending on how

---

[8] Ex. 11 (WIS 0111945) ("As the current requirements of the computer system increase, the amount of charging current provided to the battery is decreased to keep the input current at or below the maximum input current.  As the current requirements of the computer system decrease, the amount of the charging current provided to the battery is increased to keep the input current approximately equal to the maximum input current so that the maximum available current from the AC adapter is fully utilized until the battery is fully charged.")

1  the computer is being used. Id.

2       The "variable" charging current should be construed consistently with the operation of the

3  claimed power supply.  To meet the "variable" charging current limitation, the current must vary to

4  adapt to the needs of the computer system while maintaining the total input current at approximately

5  its maximum.  Clark Decl. ¶59-60.

6       **3.**       **first inactive state**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| The signal state that represents no charging current is flowing | the state in which the transistor is biased off |

9       The issues raised by this term are similar to those raised with respect to "block."  The "first

10  inactive state" is a state of a signal that controls the charging current.  The "first inactive state" of the

11  control signal is the state used when one of the three measured parameters exceeds its maximum

12  level.  '275 patent at 10:8-12.  As explained above, the patent is unambiguous that when any one of

13  the measured parameters exceeds its maximum, "no current" flows to the battery.  '275 patent at 4:4-

14  6 and 4:15-18.  Samsung's expert agrees.  Dkt. #57 (Colwell Decl. ¶22:10-11).  Accordingly,

15  Wistron's proposed construction is correct.  Clark Decl. ¶61.

16       Samsung's proposed construction is overly narrow in limiting the construction to a particular

17  embodiment described in the specification.  While biasing a transistor "off" may be one way to stop

18  the flow of charging current through the transistor, it is not the only way to stop charging current, and

19  the specification is clear that "no current" is the required condition when any of the three maxima is

20  exceeded.  See supra.

21  **C.**    **The '100 Patent**

22       U.S. Patent No. 6,523,100 (the "'100 patent") is directed to a memory system that adapts its

23  access timing to the access speed of the particular memory unit being accessed.  Clark Decl. ¶¶62-67.

24  The perceived problem addressed by the '100 patent is multiple units of the same memory type,

25  where the access speed varies among the units.  Id.; Dkt. #59 (Wedig Decl. ¶55).  The purpose of the

26  invention is to access the memory as quickly as possible without exceeding the access speed of the

27  memory unit being accessed.  Id.  To do that, each time the memory is accessed, the memory unit

28  having the sought information provides the memory controller an indication of its access speed; the

memory controller in turn provides access timing that is commensurate with that access speed.  Id.

### 1.    memory controller unit

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| A controller that receives an indication of access speed on each access | chip circuitry, other than a memory access requestor, that provides the access timing |

The "memory controller unit" of the claims is "configured to receive an indication of access speed." '100 patent at 11:48-49 and 12:21-23. Wistron's proposed construction of "memory controller unit" is supported by the specification's preferred embodiment and by the claim language. In the preferred embodiment, on each access, the individual memory unit having the sought information sends the memory controller an indication of access speed (e.g., STATMATCH* or AHCMATCH*) and the controller, in turn, adjusts its access timing to be commensurate with that memory unit's access speed. '100 patent at 8:13-32.; Clark Decl. ¶69.

Moreover, the only embodiment of the patent teaches what is called a "state machine" that participates in each access of the memory for dynamically providing appropriate timing information based on the type of memory accessed. '100 patent at 4:9-63.

Samsung's proposed construction would allow the patent to be read to cover a system where the indication of access speed is provided on *some other* schedule than during each access, however, during each access is the novel aspect of the system in the '100 patent. Clark Decl. ¶¶68, 70-1.

For that reason, the claims must be interpreted to have the memory controller unit receive an indication of access speed on each memory access. See Athletic Alternatives Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1581; Wang Labs. Inc. v. Am. Online Inc., 197 F.3d 1377, 1382-83.

But the file history confirms what one of ordinary skill would understand in reading the patent, namely that the memory controller unit functions dynamically and adaptively during each access. Ex. 13 (WIS 0111798) ("As also discussed by the applicants, the system according to *the present invention advantageously allows the memory controller to adapt to different* types and/or *speeds* of memory devices while freeing the CPU from having to account for the differences *when accessing the memory device*.") (emphasis added); Clark Decl. ¶71.

Wistron opposes Samsung's construction that the memory controller unit not be a memory access requestor on the grounds that it is not supported by the claim language. To the extent that Samsung relies on the file history, it should be noted that to avoid prior art, the applicant for the '100

patent amended the claims to exclude both a CPU and a memory access requestor from "memory controller unit." Ex. 13.

### 2. configured to receive

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| Set up to receive during each access | plain meaning, which is "designed to receive" |

The memory controller unit of the claims is "configured to receive an indication of access speed". '100 patent at 11:48-49. As discussed in connection with "memory controller unit," the requirement that the indication of access speed be received on each access is supported by the only disclosed embodiment. '100 patent at 8:13-32; Clark Decl. ¶73. Because no other schedule is enabled, that schedule should be incorporated into the claims. See Athletic Alternatives Inc., 73 F.3d 1573, 1581; Wang Labs. Inc., 197 F.3d 1377, 1382-83.

### 3. to provide

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| Supply during each access | plain meaning (no construction is needed) |

In the claims, the memory controller unit is also configured "to provide, during access," an appropriate access timing. '100 patent at 11:48-50. One of ordinary skill would understand "to provide" to mean "supply during each access because the memory controller unit is also configured "to provide, during access," an appropriate access timing. Clark Decl. ¶74. The claim language states this explicitly. '100 patent at 11:50-51 ("to provide, during access of said at least one memory module"). This is also consistent with the embodiment description at 8:13-32. Samsung's expert conceded that the claim language requires this, no matter what the definitions are. Ex. 4 (Wedig Dep. 179:1-18).

### 4. indication of access speed

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| State of a signal line connecting between a memory unit (MU) and the memory control unit (MCU) that represents memory clock rate information. | data that identifies the read/write speed of the memory module |

According to claim 1, the memory controller unit is "configured to receive an indication of access speed of said at least one memory module". '100 patent at 11:48-50. Wistron's proposed construction is supported by the specification. The preferred embodiments teach a signal line carrying a signal representing an indication of access speed (e.g., STATMATCH* or AHCMATCH*) that connects the memory unit to the memory controller. See e.g. '100 patent at Figure 4 and at 8:23-

1    29 ("[T]he assertion of AHCMATCH* being caused by the generation of MATCHED* and also a

2    MU jumper or switch which indicates that DRAMs having a specified speed are installed.

3    AHCMATCH* *is a status signal* to the MCU 14 which indicates that the MU is adding one half of a

4    MEMCLK cycle to the memory access to accommodate the timing requirements of the DRAMs.")

5    (emphasis added); Clark Decl. ¶77.

6         Samsung's proposed construction improperly changes this "status signal" to a broad and

7    vague "data", which could be something other than what is described and enabled by the patent,

8    namely a status signal.  Clark Decl. ¶¶75-6.  Samsung's proposed construction is also overly broad

9    because it would allow the "data" representing the access speed to be sent to the memory controller

10   unit indirectly.  During prosecution, the patentee was forced to disclaim the CPU as the "memory

11   controller unit" to avoid prior art.  Ex. 13 (WIS  111797-98).   It would be contrary to that disclaimer

12   to allow the memory controller unit to receive the indication of access speed indirectly, e.g., through

13   the CPU.  Id.

14       **5.    access timing**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| A period of time used to access memory. Access timing is different from access speed | timing of a signal used to control the read/write access of the memory module |

17        In claim 1, the memory controller unit provides "access timing".  '100 patent at 11:48-51.

18   Although the patent does not clearly define "access timing", dictionaries make clear that "timing"

19   refers to a period or length of time:

20       • Encyclopedia of Computer Science, 1993, page 5:  "access time" – "the elapsed time
21       between the initiation of a request for data and receipt for the first bit or byte of that data."

22       • Webster's New World Dictionary of Computer Terms, 1983, page 2: "access time" – "the
         length of time required to store or retrieve data between main memory and an external storage
23       device"

24       • The Encyclopedia of Microcomputer Terminology, 1984: "access time" – "Also called write
25       time, read time, and waiting time.  The interval between the time information is requested and
         it is received (read time).  Also refers to the interval between sending information to storage
26       (memory) and the time storage is completed (write time).  Also, the time required by the
         central processing unit to transmit or receive a byte or block of information to or from
27       memory.  Access time is often used as a means of rating computer and storage peripheral
         (tapes and disks) performance, much as cars may be rated by horsepower."

28       •Compact Oxford English Dictionary, Online Edition (askoxford.com): "timing" – a particular

1    time when something happens.

2    Ex. 12.  As is repeatedly noted in both technical and lay dictionaries, "access timing" is simply the

3    period of time used to access memory.  Because the patent does not clearly define "access timing",

4    these dictionaries should guide the court in its construction.  Phillips v. AWH Corp., 415 F.3d 1303.

5        Moreover, Samsung's expert agreed that "timing" could be defined in terms of periods of

6    time. Ex. 4 (Wedig Dep. at 196:18-197:5).  Samsung's expert also agreed that access timing is

7    different from access speed.  Id. (Wedig Dep. at 195:12-13).  Samsung's proposed construction

8    unhelpfully defines "timing" as "timing", thus Wistron's construction should be accepted.  Clark

9    Decl. ¶78.

10       **6.    commensurate**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| Corresponding in size | to accommodate the timing requirements of the memory module |

13       The claims require that the access timing provided by the memory controller unit be

14   "commensurate" with the indication of access speed.  '100 patent at 11:51-53.  The purpose of the

15   invention is to access a set of memory modules having varying access speeds as fast as possible by

16   providing access timing that is "commensurate" with the indication of access speed.  Clark Decl. ¶79.

17   In other words, memory modules having slower access speed are accessed with slower access timing;

18   memory modules having faster access speed are accessed with faster access timing.  Id.  This is

19   apparent from the preferred embodiment, where the state of the signals STATMATCH* and

20   ACHMATCH* prompts the memory controller unit to access the memory using faster or slower

21   access timing.  '100 patent at 8:13-32.

22       Samsung's proposed construction is too broad.  Clark Decl. ¶80.  Samsung's expert admitted

23   that Samsung's proposed construction would be met if the memory controller applied a single, slow

24   access timing to all of the memory modules.  Ex. 4 (Wedig Dep. at 200:13-201:11).  This is

25   contrary to the goal of the invention, adapting the access timing to the memory unit's access speed.  Ex. 4

26   (Wedig Dep. at 201:17-19) ("I mean, I believe it is -- it is a goal to be able to adapt to the -- the

27   memory units based on the indication that you get back of the access speed."); Clark Decl. ¶80.

28       Further, Samsung's proposed construction is contrary to the common understanding of the

     term commensurate of "corresponding in size or degree."  See Ex. 12 (American Heritage Dictionary

of the English Language, Fourth Edition (2000)). Instead, Samsung would have commensurate mean "to accommodate", a definition not supported by <u>any</u> intrinsic or extrinsic evidence whatsoever.  As explained above, Wistron's extrinsic evidence is consistent with what is described in the patent specification.  Consequently, the Court must reject Samsung's proposed construction.

### IV.    CONCLUSION

For the foregoing reasons, Wistron and Wistron Infocomm respectfully request the Court adopt its proposed constructions.

Dated:  June 23, 2008                                      Respectfully submitted,

                                                                         K&L GATES  LLP


                                                                         /s/ Tim Walker /s/
                                                                         _____
                                                                         Michael J. Bettinger
                                                                         Timothy P. Walker
                                                                         Harold H. Davis, Jr.
                                                                         55 Second St., Suite 1700
                                                                         San Francisco, CA 94105
                                                                         (415) 882.8200
                                                                         (415) 882.8220 (fax)
                                                                         mike.bettinger@klgates.com
                                                                         timothy.walker@klgates.com
                                                                         harold.davis@klgates.com

                                                                         Attorneys for Plaintiff and Counter-Defendant
                                                                         WISTRON CORPORATION and Counter-
                                                                         Defendant WISTRON INFOCOMM (TEXAS)
                                                                         CORPORATION