MICHAEL J. BETTINGER (STATE BAR NO. 122196)
michael.bettinger@klgates.com
TIMOTHY P. WALKER, PhD (STATE BAR NO. 105001)
timothy.walker@klgates.com
HAROLD H. DAVIS, JR. (STATE BAR NO. 235552)
harold.davis@klgates.com
**KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP**
55 Second Street, Suite 1700
San Francisco, California 94105-3493
Telephone: 415.882.8200
Facsimile: 415.882.8220

Attorneys for Plaintiff and Counter-claim Defendants
WISTRON CORPORATION and
WISTRON INFOCOMM (TEXAS)
CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WISTRON CORPORATION,<br>   a Taiwan corporation,<br><br>                    Plaintiff and Counter-Defendant,<br><br>   vs.<br><br>SAMSUNG ELECTRONICS CO., LTD.,<br>   a Republic of Korea corporation,<br><br>         Defendant and Counter-Plaintiff | Case No. C 07-04748 VRW<br><br>**DECLARATION OF TONY L. CLARK IN SUPPORT OF WISTRON CORPORATION AND WISTRON INFOCOMM'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| SAMSUNG ELECTRONICS CO., LTD.,<br><br>                    Counterclaim-Plaintiff<br>   vs.<br><br>WISTRON CORPORATION,  and<br>WISTRON INFOCOMM (TEXAS)<br>CORPORATION<br>                    Counterclaim-Defendants | |

**CLARK DECLARATION ISO WISTRON CLAIM CONSTRUCTION**

I, Tony Clark, declare and state as follows:

**I.      Professional Experience and Educational Background**

1.      I have been retained by Plaintiffs and Counterclaim-defendants Wistron Corporation and Wistron Infocomm to provide expert consulting services and testimony in this action.

2.      Attached hereto as Exhibit A is a true and correct copy of my current curriculum vitae.

3.      I earned a Bachelor of Science, Electrical Engineering degree at Cornell University in 1986, with a concentration in computer organization and design, digital signal processing, and lasers and optical electronics.

4.      After earning my undergraduate degree, I then earned a Masters of Electrical Engineering, also from Cornell University in 1987, with a concentration in computer networks, telecommunications networks, and control theory.

5.      I have significant work and lab experience in computer architecture, computer design, communication network design, and network performance and congestion.  Very early in my career, I designed (using "A Hardware Programming Language" ("AHPL")) and built a central processing unit out of transistor-transistor logic ("TTL") small scale integrated chips, including the ALU (arithmetic logic unit), instruction registers, data registers, and intra-processor bus.   My early career experience also included the design of an Integrated Services Digital Network (ISDN) external ringer, which was a mixed analog and digital circuits design, comprising for example capacitors, transformers, operational amplifiers, transistors, a central processing unit, and assembly code.

6.      From 1987 through the middle of 1993, my focus was on telecommunications networking and on layer 2 data networking, as a member of the technical staff and later as a technical director at Telcordia (Formerly Bell Communications Research).  More recently I have focused on local area data networking and IP networking.  My specific experience includes:

• Leading the research, architecture, requirements, and standards activities for Telcordia Technologies (formerly Bellcore) regarding frame relay protocol control plane and data transport plane congestion management and frame routing.  Highlights included the development of traffic simulation models to assess and characterize interoffice frame relay link performance in ISDN networks; the definition of a framework architecture for control plane congestion management in frame relay networks; and the specification of procedures outlining the use of forward and backwards explicit congestion notification for traffic management in frame relay networks;

• Leading the architecture, development of requirements, and the specification of the Bellcore Switched Multimegabit Data Service (SMDS) Inter Switching System Interface (ISSI) Routing

Protocol, which is based on OSPF and is a precursor to today's routing switch designs that separate control plane and forwarding functions;

• Leading the design of the Bellcore ISSI network layer protocol, which is modeled after the Internet Protocol (IP);

• Directing the Data Protocol Architecture group at Bellcore;

• Directing the OpenBay Alliance Program, which, among other things, developed the OpenBay RS routing software;

• As founder and CEO of Villa Montage Systems, Inc., developing a next generation broadband access platform, enabling service providers to rapidly deliver content-rich services over xDSL and MMDS fixed wireless last mile networks. Developed the architecture for an innovative content delivery and digital rights management system, which centrally manages and controls access to cached, high resolution (e.g., DVD quality) video at the customer's premises. By locally caching the video, the video can be streamed from the cache over an in-home network at very high speeds; while completely bypassing any congestion on the Internet or broadband access network. The architecture includes an innovative token passing media access control layer that facilitates the implementation of access classes and a fairer allocation of shared MMDS bandwidth.

    7.    At various times during my career, I enhanced my hands-on experience through the building of at least a dozen different types of computers. These computers range from ISA-compatible computers such as an IBM AT architecture, and include IBM XT architecture and more modern 486, Pentium, and Centrino systems.

    8.    Throughout my education and experience, I have developed an intimate knowledge in the design, construction and operation of electronic circuitry. I also have been involved in the design, development, and analysis of a wide array of electronic devices.

**II.    Materials Reviewed for this Declaration**

    9.    As part of my role in this case, among other documents, I have read and understood each of the following:

• U.S. Patent No. 5,333,273 (the "'273 Patent") and its file history;
• U.S. Patent No. 5,625,275 (the "'275 patent") and its file history;
• U.S. Patent No. 6,523,100 (the "'100 Patent") and its file history;
• Samsung's Opening Claim Construction Brief;
• Declaration of Dr. Robert Wedig in Support of Samsung's Opening Claim Construction Brief ("Wedig CC Decl.") and attached exhibits;
• May 19, 2008 Deposition Transcript of Dr. Robert Wedig;
• Declaration of Dr. Robert Colwell in Support of Samsung's Opening Claim Construction Brief ("Colwell CC Decl.") and attached exhibits;
• May 20, 2008 Deposition Transcript of Dr. Robert Colwell;
• The Joint Claim Construction Statement and Exhibits filed by the parties in this action;
• Wistron's proposed construction for select terms of the patents identified above;
• Samsung's proposed construction for select terms of the patents identified above;

• W. Rosch, THE WINN ROSCH HARDWARE BIBLE, (1989)
• K. Hwang and F. Briggs, COMPUTER ARCHITECTURE AND PARALLEL PROCESSING (1984)
• The website: http://en.wikipedia.org/wiki/Industry_Standard_Architecture (as of May 30, 2008)
• The PC Guide, http://www.pcguide.com/ref/mbsys/buses/types/olderISA-c.html (April 17, 2001)
• Webster's II New College Dictionary (1995);
• Microsoft Computer Dictionary (3d ed. 1997) for the terms "scan code", "index", and "program";
• Cambridge Advanced Learner's Dictionary for the term "combination"
• Merriam-Webster Online dictionary for the terms "block", and "inactive"
• American Heritage Dictionary of the English Language, Fourth Edition (2000) for the terms "block", "inactive", "configure", "provide", "speed", and commensurate;
• Compact Oxford English Dictionary, Online Edition (askoxford.com) for the terms "variable", "configure", "provide", and "timing";
• Mobile Intel® 945 Express Chipset Family, Datasheet, July 2007;
• Nanya 200 pin Unbuffered DDR2 SO-DIMM datasheet Rev 1.2, 08/2007;
• Samsung High-Performance SDRAM for Main Memory;
• Encyclopedia of Computer Science (1993) for the term "access time";
• Webster's New World Dictionary of Computer Terms (1983) for the term "access time";
• The Encyclopedia of Microcomputer Terminology (1984) for the term "access time"

10.    I am informed and believe that all of these documents have been produced to Samsung in this litigation.

**III.    One of Ordinary Skill in the Art**

11.    In his Declaration in support of Samsung's Opening Claim Construction brief, Dr. Wedig testified that a person of ordinary skill in the art at the time of the invention for the '273 and '100 patents "would have had a Bachelors of Science in Electrical Engineering or Computer Science and at least 2 years of work experience in the field of computer architecture or computer hardware and software design."  (at ¶ 6).  For the purposes of this declaration only, I will accept that definition, and when I use the term "person of ordinary skill in the art" (or similar term) it will be with Dr. Wedig's previous identification of such a person in mind.

12.    In Dr. Colwell's Declaration in Support of Samsung's Claim Construction, Dr. Colwell testified that a person of ordinary skill in the art at the time of the invention of the '275 patent "would have had a Bachelors of Science in Electrical Engineering and at least 2 years of work experience in the field of hardware design."  (at ¶ 10).  For the purposes of this declaration only, I will accept that definition, and when I use the term "person of ordinary skill in the art" (or similar term) in relation to the '275 patent, it will be with Dr. Colwell's previous identification of such a person in mind.

**IV.    Claim Construction Opinions**

13.     Based on my review of the proposed terms for construction, I understand that the parties have proposed twenty-one (21) terms for construction for three patents-in-suit including: twelve (12) terms for the '273 patent; three (3) terms for the '275 patent; and six (6) terms for the '100 patent.

14.     I am informed and understand that the principle tools for understanding the terms in a patent claim are the patent's specification and claims.  Thus, in defining the terms used in the claims of the '273, '275, and '100 patents, I have examined the claims of those patents and their specifications.

15.     In my opinion, the definitions proposed by Wistron are consistent with how one of ordinary skill in the art would have understood the claim terms, in light of the specification and file history, at the time the application was filed.  I agree with the bases and reasons for those definitions as set out below and incorporated into Wistron's Responsive Claim Construction Brief.

A.     **U.S. Patent No. 5,333,273 (the "'273 patent")**

16.     The '273 patent relates to computer architecture.  Computer architecture is "a system concept integrating hardware, software, algorithms, and languages to perform large computations" and, at its most basic and highest level of abstraction, specifies the interconnections among three major subsystems:  "the main memory, the central processing unit (CPU), and the input-output (I/O) subsystem."  K. Hwang and F. Briggs, COMPUTER ARCHITECTURE AND PARALLEL PROCESSING (1984), p. 2, 8.

17.     The very top layer of computer architecture abstraction is analogous to a satellite photograph of the entire earth, where only the major continents and oceans may be visible.  By narrowing the focus and successively increasing the magnification of the satellite camera, next levels of detail of the earth are revealed, e.g., countries, cities, streets, individual buildings, etc.  However, for a driver needing directions from location "A" to location "B," a top level satellite photo of the earth offers almost no clues for a route between the two locations.  The country and city views may provide further help, but it is only at the street level of detail that the driver will generally discover enough information to successfully map a route.  Such is the case for computer architecture.

18.     Each of the aforementioned major subsystems in turn has its own architecture, which

occurs at a lower level of abstraction and offers greater implementation detail.  At the lowest level (i.e., the street level), a developer of compatible computer hardware and software is provided with microchip pin level and / or connector level specifications, including names, commands, required voltage levels, and timing diagrams for each subsystem – all the necessary information that is needed to ensure a successful implementation.  The personal computer is one type of computer architecture; the minicomputer and the mainframe are examples of other types of computer architecture.

19.    The system in the '273 Patent is a particular personal computer architecture called Industry Standard Architecture (ISA).  In such a computer, the controller for the I/O subsystem is generally implemented on the main system board (also known as the motherboard), while the I/O devices are typically implemented on peripheral boards (also known a cards).  The ISA bus is the I/O subsystem architecture in an ISA-compatible computer.  I/O devices covered by the ISA specification include hard disks, floppy disks, keyboards, monitors, mice, printers, scanners, microphones, and speakers.

20.    The ISA specification is attributed to International Business Machines (IBM) and coincided with the launch of the Advanced Technology (AT) personal computer by IBM in 1984 – the successor to the IBM PC and IBM XT.[1]  ISA is a system architecture which includes specifications for components such as the CPU, I/O subsystem, the keyboard, and the keyboard interface.  More specifically, for example, ISA system architecture specifies the functions associated with the keyboard and how the keyboard is connected with the ISA system.  Further, ISA specifies how input-output devices are attached to the motherboard in an IBM AT personal computer (PC) system.

21.    In general, I/O devices communicate a request for attention to the CPU through an "interrupt" process.  The first step of the interrupt process is that an interrupt signal corresponding to the requesting I/O device is generated and transmitted on a physical interrupt signal line.  The

---

[1] The group of IBM competitors, comprised of  AST Research, Compaq Computer, Epson, Hewlett-Packard, NEC, Olivetti, Tandy, WYSE, and Zenith Data Systems, who came together in 1988 to create the Extended Industry Standard Architecture bus to compete with IBM's Micro Channel Architecture retroactively renamed the IBM AT bus to be "ISA" to avoid infringing IBM's trademark on its PC/AT computer.  Source: http://en.wikipedia.org/wiki/Industry_Standard_Architecture, May 30, 2008.

interrupt signal lines for the various I/O devices typically go to an interrupt controller.  The interrupt controller prioritizes the interrupts and interrupts the CPU by transmitting its own interrupt signal to the CPU.  The interrupt controller also sets an interrupt vector corresponding to the requesting I/O device.  The CPU reads the interrupt vector which directs the CPU to the appropriate service routine that corresponds to the interrupt signal being acted upon.

22.    To avoid conflicts in an ISA-compatible computer, it is generally recommended that two or more I/O devices do not share the same interrupt signal line.[2]  Further, certain interrupt signal lines have fixed assignments to certain I/O devices.  For example, IRQ0 and IRQ1 are respectively dedicated to the system timer and the keyboard in an ISA-compatible computer. Further, IRQ2 is the cascade input for the second Interrupt Controller chip.

23.    In the ISA specification, IRQ0 through IRQ15 are called maskable interrupts, meaning that the processor may complete what it is working on before responding to the interrupt.  The ISA interface specification also defines a nonmaskable interrupt (NMI) signal line, which is used to communicate error conditions that require the CPU's immediate attention.

24.    Key elements specified by the ISA bus architecture include the following:  an XT (8 bits data) interface; an AT (16 bits data) interface; 24 address bits / address lines; and 15 interrupt signal lines.  W. Rosch, THE WINN ROSCH HARDWARE BIBLE, (1989), Table 9.4.  In an ISA-compatible system, two 8259 Interrupt Controller chips are cascaded to provide the 15 interrupt signal lines on the motherboard.  Id. at p. 191-93.

25.    The ISA bus interface specification defines everything that is needed for an I/O device to correctly communicate with the motherboard in an ISA-compatible (i.e., IBM AT compatible) PC including the following: the number and names of the signal lines; the voltage levels on the signal lines; clock requirements; the protocol defining the format and semantics of the commands governing allowed transactions over the interface (including the interrupt procedures); and the preferred connector and / or pin definitions.

26.    From the perspective of a developer of computer hardware and software, the ISA bus

---

[2] The PC Guide, http://www.pcguide.com/ref/mbsys/buses/types/olderISA-c.html, April 17, 2001.

interface is but one of many interfaces that are of importance in an ISA-compatible (i.e., IBM AT-compatible) computer.  A second notable interface that is present in all ISA-compatible computers and is relevant to the '273 Patent is the Keyboard Interface.  The Keyboard Interface makes it possible for a keyboard from manufacturer "A" to talk to a PC system from manufacturer "B."  As long as the keyboard and personal computer system adhere to the Keyboard Interface specification, proper communications between the keyboard and personal computer are possible.

27.    The keyboard and keyboard controller are distinct components as defined by the ISA specification. The Keyboard Interface is a communications channel between the keyboard and keyboard controller over which commands and data are exchanged.

28.    IBM introduced two major new keyboard models coincident with the AT, or ISA computer.  The AT Keyboard was introduced with the original AT system and the Advanced Keyboard (also called the Enhanced Keyboard) was introduced with the upgraded AT system. THE WINN ROSCH HARDWARE BIBLE, p. 241.  Both keyboards are incompatible with the original 83-keys PC/XT Keyboard.   The difference between the two AT keyboards is the number of keys and the layout of the keys.  Like all other keyboards, the AT Keyboards' main functions are to detect when keys are depressed by a user and to send this information to the keyboard controller.  These functions are performed by the keyboard microprocessor (which is not the keyboard controller) within both AT Keyboard variations.

29.    The keyboard microprocessor of an ISA-compatible computer detects keystrokes and generates a scan code, which uniquely identifies the key that was depressed, to the keyboard controller.  Table 12.1 of THE WINN ROSCH HARDWARE BIBLE (p. 250-53) lists the scan codes for both AT Keyboards.  A scan code is sent serially over the cable connecting the keyboard to the PC chassis through the keyboard I/O port on the chassis.  Five separate physical wires comprise the keyboard cable, and four of the wires respectively carry the following:  keyboard clock; keyboard data (e.g., scan codes); electrical ground; and 5 volts electrical supply.  Id. at 254.  Additionally, both AT Keyboards are programmable, having their own sets of commands which can be relayed to the keyboards through the AT motherboard.  Id. at 241.  The specific signaling protocols and wiring conventions that ensure interoperability between an ISA compliant keyboard and an ISA-compatible

1    computer system define the ISA Keyboard Interface.

2         30.    The '273 patent is directed to creating a new computer architecture in order to solve

3    what was a limited problem of conflicting terminate-and-stay-resident ("TSR") programs.  The patent

4    calls for generating a "second interrupt" on a "second interrupt signal line" in response to a user

5    depressing a non-conventional function key on a keyboard attached to an ISA-compatible computer,

6    where the second interrupt causes the computer to execute a "special routine".  The goal is to avoid

7    interference between the "special routine" and other programs that are executed in response to a "first

8    interrupt" generated when a user presses a conventional key.

9         31.    At the time of the invention, one of ordinary skill in the art would have understood

10   that the system in Figure 1 of the '273 patent is an architectural depiction of an ISA-compatible

11   computer and would have recognized "ISA Bus (140)" in Figure 1 of the '273 patent as the ISA Bus

12   Interface and interface "152" in Figure 1 of the '273 patent respectively as the ISA Bus Interface and

13   as the ISA Keyboard Interface.  Further, one of ordinary skill in the art would have understood that

14   the system in Figure 4 of the '273 patent is an architectural depiction of an ISA-compatible computer

15   with the addition of the non-standard "Fn" key.

16        32.    One of ordinary skill in the art would understand that independent Claim 1 and

17   independent Claim 5 of the '273 patent both claim a system that explicitly has two distinct interfaces:

18   (1) the interface between the interrupt controller on the motherboard and ISA-compatible I/O devices

19   (i.e., the ISA Bus Interface) and (2) the interface between the keyboard controller and the keyboard

20   (i.e., the Keyboard Interface).

21        33.    With respect to the ISA Bus Interface, which governs communication between the

22   keyboard controller and the interrupt controller on the PC motherboard, Claim 1 discloses the ISA

23   Bus Interface by stating the following:

24        • "a system for providing a built-in function in an ISA-compatible computer" (13:36-37);

25        • "said keyboard controller having first and second interrupt signal lines connected to said ISA-
26        compatible computer" (13:46-48);

27        • "said keyboard controller…activate[s] a first interrupt signal to said ISA compatible computer"
          (13:48-52);

28        • "said keyboard controller…generate[s] a second interrupt signal to said ISA-compatible computer on
          said second interrupt line" (13:52-57);

• "said ISA-compatible computer responsive to said first interrupt signal from said keyboard controller" (13:59-60); and

• "said ISA-compatible computer responsive to said second interrupt signal from said keyboard controller" (14:2-4).

Regarding the interface between the keyboard controller and the interrupt controller on the PC motherboard, Claim 5 discloses the ISA Bus Interface by stating the following:

• "[a] system for servicing keyboard interrupts in an ISA-compatible computer" (14:22-23);

• "said keyboard controller further coupled to said ISA-compatible computer first and second interrupt signal lines" (14:33-36);

• "said keyboard controller generating a first interrupt signal on said first interrupt signal line" (14:36-38);

• "said ISA-compatible computer programmed to execute a program…in response to said first interrupt signal" (14:39-42);

• "said keyboard controller generating a second interrupt signal on said second interrupt signal line" (14:42-44); and

• "said ISA-compatible computer programmed to execute at least one special routine upon receipt of said second interrupt signal" (14:45-48).

34.    Regarding the ISA Keyboard Interface, which exists between the keyboard and the keyboard controller of an ISA-compatible computer, the following language in Claim 1 discloses the ISA Keyboard Interface:

• "a system for providing a built-in function in an ISA-compatible computer" (col. 13, lines 36-37);

• "a keyboard having a set of conventional alphanumeric keys" (col. 13, line 40);

• "a keyboard controller connected to said keyboard" (col. 13, line 43); and "said keyboard controller to input data scan codes from said keyboard" (col. 13, lines 60-61)

With respect to Claim 5 and the ISA Keyboard Interface, Claim 5 discloses the ISA Keyboard Interface in stating the following:

• "[a] system for servicing keyboard interrupts in an ISA-compatible computer" (col. 14, lines 22-23);

• "a keyboard having a plurality of keys including conventional alphanumeric keys…" (col. 14, lines 24-25);

• "said keyboard generating a scan code in response to the activation of at least one of said keys…" (col. 14, lines 28-30); and

• "a keyboard controller coupled to said keyboard" (col. 14, line 33) all confirm the existence of the

ISA Keyboard Interface.

35.    Further, one of ordinary skill in the art would have understood that independent Claim 1 and independent Claim 5 of the '273 patent do not claim the systems in Figure 7, Figure 8, Figure 9, and Figure 10 of the '273 patent as the systems depicted therein do not include the ISA Keyboard Interface.

**1.    data scan code / scan code**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| A code number that the keyboard generates whenever a key is depressed or released, said scan code number created by converting a pairing of a row signal and a column signal in the keyboard matrix. Each key on the keyboard has a unique scan code. | a code number that the keyboard generates whenever a key is depressed or released, said code number created by converting a paring of a row signal and a column signal in the keyboard matrix. |

36.    I understand that the difference between the two proposed constructions is that Wistron's proposed construction includes the sentence that "Each key on the keyboard has a unique scan code."  All of the claims require that scan code be construed in the context of an "ISA-compatible" system.  One of ordinary skill would understand that each key on the keyboard in an ISA-compatible computer has a unique scan code.  For example, if two keys had the same scan code (if a scan code was not unique to a particular key), the computer could not distinguish which key had been depressed based on scan code.

37.    Moreover, as discussed above, "ISA" was a well understood and defined specification by one of ordinary skill in the art.  The ISA standard had two programmable AT keyboards that differed only by the number of keys and the layout of the keys.  In order for one of ordinary skill in the art to understand and appropriately use these two keyboards in an ISA environment, the term "scan code" had a fixed meaning.  As evidenced by Microsoft Computer Dictionary (3d ed. 1997), one of ordinary skill in the art would have necessarily understood that each key on the keyboard has a unique scan code.  If this were not the case, then the two programmable AT keyboards defined by the ISA standard would not be interoperable, which is contrary to how one of ordinary skill in the art would have understand the ISA standard.

**2.    first interrupt signal**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |

| The ISA standard IRQ1 interrupt signal | IRQ1 |

38.    Again, all of the claims require that the interrupts be construed in the context of an "ISA-compatible" system.  Thus, defining the "first interrupt signal" as an arbitrary "IRQ1" is insufficient.  The term would have been understood by one of ordinary skill in the art to be the IRQ1 interrupt signal as defined by the ISA standard.

**3.    second interrupt signal**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| Any interrupt signal other than IRQ1 interrupt signal | any interrupt other than IRQ1 |

39.    Samsung's proposed construction of this term in error because it fails to note that the "second interrupt *signal*" is a "signal".  Samsung's proposed construction uses the bare word "interrupt," which may be confused with the computer process called an "interrupt."  The difference between an "interrupt" and an "interrupt signal" is analogous to the difference between a "stop" and a "stop light" or a "stop sign."

**4.    second interrupt signal line**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| A second, dedicated separate signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the second interrupt signal | a second, separate signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the second interrupt signal. |

40.    I understand that the primary difference between the parties' proposed constructions is whether the second interrupt signal line is dedicated or not.  The '273 patent is directed to the problem of eliminating interference between programs using the same interrupt signal and interrupt signal line (e.g., IRQ1).  The invention attempts to solve this problem by using an existing but typically unused second interrupt signal line (IRQ15) to send an interrupt signal to start programs that were supposed to be immune from such interference.

41.    One of ordinary skill in the art would understand that a dedicated signal line is necessary to accomplish the goal of the invention:  no interference with other programs using that interrupt signal.  Using a shared signal line for the second interrupt would simply invite interference from the other signals on the line and frustrate the entire purpose of the invention.    New programs might simply use the same interrupt.

**5.    indexes / indexing; indexes a first memory location pointer; indexing a second memory location; indexing one of plurality of memory locations**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| Indexes/indexing:  To locate information in a table by adding an offset amount<br><br>indexes a first memory location pointer: adds an offset amount to a first memory location pointer<br><br>indexing a second memory location: adding an offset amount to a second memory location<br><br>indexing one of plurality of memory locations: adding an offset amount to one of a plurality of memory locations | selects or accesses |

42.    Samsung's proposal, "selects or accesses" is too broad.  To those of skill in the art, "indexes" or "indexing" means a particular way of selecting or accessing a memory location:  by adding an offset amount to a base memory location.

43.    The patent explicitly discloses adding offset amounts to a base memory location:

> The microprocessor 110 utilizes *the interrupt vector* received from the interrupt controller 130 *as an index to* an interrupt vector table that *begins at location* OH in its RAM 120. (Although the 80386SX microprocessor utilizes *segment and offset addresses in the format xxxx:yyyy*, the addresses will be discussed herein as absolute addresses in bytes from the lowest address in memory.

'273 patent at col.5:1-8 (emphasis added).  In this quote, the value of the interrupt vector is the "index" or offset amount that is added to the "begin[ning] location" or base memory location in the RAM (random access memory).  The parenthetical explains that the ISA-compatible 80386SX microprocessor utilizes "segment and offset addresses in the format xxxx.yyyy," meaning the "yyyy" is the "index" to the base "xxxx."  I understand this quote to say that the patent will use absolute addresses as a simplified notation even though a real computer system would use offset amounts.  This is equivalent to having a base address equal to 0000 and the absolute address equal to the offset amount.

**6.    program**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| To perform a series of instructions to input the scan code | a handling routine that causes the computer to receive keyboard scan codes from the keyboard controller. |

1    44.    One of ordinary skill in the art would understand that a program executes a series of

2    instructions.  The claim language makes clear that the "program" executes a series of instructions to

3    input the scan code.

**7.    special routine**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| A routine that is only executed upon receipt of the second interrupt signal and the scan code corresponding to one of the conventional keys | a routine that is executed upon receipt of the second interrupt signal. |

45.    I understand that one of the differences in the parties' constructions is whether the

special routine is triggered <u>only</u> by the second interrupt signal. One of ordinary skill in the art would

understand that since the point of the invention is using a second interrupt signal to avoid interference

between programs, what makes the "special routine" special is that the "special routine" is triggered

only by the second interrupt signal.  This limitation ensures that the "special routine" will not

encounter interference with programs triggered by the conventional first interrupt signal.  Samsung's

definition could refer to a program that could be executed in response to the first interrupt signal.

46.    I understand that another difference between the parties proposed constructions is that

Wistron's construction requires the scan code of the conventional key to be inputted in order to

identify the routine that corresponds to the particular hotkey operation to be executed.  One of

ordinary skill in the art would understand Wistron's position to be more accurate especially in light of

the specification's embodiment description at 7:12-19.

**8.    combination**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| Simultaneously | plain meaning (no construction is needed). |

47.    One of ordinary skill in the art would understand that claim one's requirement that the

additional function key and a conventional alphanumeric key be depressed "in combination" means

that the keys would have to be depressed at the same time to trigger the hotkey operation.

**9.    non-conventional function key [additional function key]**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| An additional function key other than a conventional function key | plain meaning (no construction is needed) |

48.    One of ordinary skill in the art would understand that the terms "additional function key" or "non-conventional function key," in the context of an ISA-compatible system would mean an additional function key other than a conventional function key defined by the ISA specification on the two standard AT keyboards.

**B.    U.S. Patent No. 5,625,275 (the "'275 patent")**

49.    The '275 patent is directed to a power supply for a portable computer that makes maximum use of the available AC power supply's current to charge the battery.  In plain English, the patent's claims require that so long as the battery requires charging, the claimed power supply will direct approximately all available current from the AC power supply to the battery except for current actually being used by the portable computer.

**1.    block**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| stop the flow of charging current | the transistor is biased off |

50.    I understand that the difference between the parties' proposed constructions is whether "block" should be construed according the structure that is used, or whether it should be construed in accordance with the goal of the action in the claim.

51.    One of ordinary skill in the art would understand that the '275 patent discusses a power supply having three sensors measuring:  (1) input current from the AC adapter; (2) charging current supplied to the battery; and (3) the battery output voltage.  There is a maximum level associated with each of these three measured parameters.

52.    The patent requires that when any of the three measured parameters exceeds its maximum level, the control circuit should "block charging current flow."  The patent is unambiguous that when any of the three measured parameters exceeds its maximum, "no current" flows to the battery. '273 patent at 1:57-60.

53.    The patent also explicitly describes how, when any of the three measured parameters is exceeded, the charging current stops.  '273 patent at 4: 4-6 ("When either of these control signals is above a predetermined threshold value, the regulator output is disabled so that *no charging current is supplied* to the battery."); 4:15-18 ("[I]f the current drawn by the computer system is above the

threshold value, the regulator output is disabled and **_no charging current_** is directed to the battery 12.").

54.     The applicants agreed with Wistron's construction in a response to an office action: "When the battery is charged and the maximum battery voltage is reached, _the charging current to the battery is halted_." Ex. 11 (WIS 0111945) (emphasis added).

55.     Wistron's construction is also consistent with the goals of the patent in providing over-voltage and short circuit protection to the circuit, since reducing the current to zero by any means would provide such protection.  273 patent at 1:57-60.

**2.     variable**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| Adaptable | plain meaning (no construction is needed) |

56.     One of ordinary skill in the art would understand that the intent of the invention is to _proactively_ maximize the amount of charging current that is being delivered to the battery provided that none of the monitored parameters exceed their respective threshold.  According to claim 1, so long as none of the three measured parameters is exceeding its maximum, the power supply's control circuit is to provide charging current at a "variable" level such that the input current level is maintained at approximately its maximum level.  '275 patent at 9:32-40.  If none of the three measured parameters is at its maximum, that means the battery needs charging (because the battery output voltage is less than its maximum).  Thus, any definition of variable that does not preclude random charging current is inconsistent with the objective of the '275 patent.

57.     Wistron's proposed construction avoids confusion over variances in charging current not attributable to operation of the claimed power supply.

58.     The invention varies the charging current to adapt to the needs of the computer system while taking full advantage of the available input current.  The maximum input current available is a constant associated with the AC adapter being used.  The current needs of the portable computer have priority over battery charging and will vary depending on how the computer is being used.

59.     The idea behind the invention is that when the battery needs charging, the total input current drawn from the AC adapter is kept at approximately its maximum.  To the extent the computer is using less than the maximum available input current, the remaining available input

1    current is used to charge the battery.  As the computer uses less current, more charging current is sent

2    to the battery, and vice-versa, always maintaining the total input current at approximately its

3    maximum.

4        60.    The "variable" charging current should be construed consistently with the operation of

5    the claimed power supply.  To meet the "variable" charging current limitation, the current must vary

6    to adapt to the needs of the computer system while maintaining the total input current at

7    approximately its maximum.

8        **3.    first inactive state**

9 / 10

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| The signal state that represents no charging current is flowing | the state in which the transistor is biased off |

11    61.    It is my understanding that the conditions in the patent that cause the control circuit to

12    "block" are basically the same as the conditions that result in a "first inactive state" of a signal.  Thus,

13    one of ordinary skill in the art would understand "first inactive state" to mean "the signal state that

14    represents no charging current is flowing" for the same reasons I have stated above in connection

15    with the term "block."

16    **C.    U.S. Patent No. 6,523,100 (the "'100 patent")**

17    62.    As discussed previously, computer architecture specifies the interconnections among

18    the memory system, the central processing unit (CPU), and the input-output (I/O) system.  A general

19    design goal of the memory system is to close the performance gap, or speed gap that exists between

20    the CPU and memory.  In general, the CPU is orders of magnitudes faster than memory.

21    63.    From the perspective of access time hierarchy, the smallest and fastest memories are at

22    the top and the largest and slowest memories are at the bottom.  An example fast memory is CPU

23    local memory (e.g., internal registers and caches) and an example slow memory is an external tape

24    drive storage system.  Main memory, comprised of random access memory (RAM) modules, resides

25    in the middle of the access time hierarchy.

26    64.    A memory controller, also known as a memory control unit (MCU) or memory

27    controller unit, may be placed between the CPU and the memory to free the CPU to work on other

28    tasks during the many processor cycles that the CPU would otherwise have to typically wait for a

response from the memory.  The system described in the '100 patent pertains to a computer's main memory and to a specific performance optimization made possible by the MCU.

65.    The '100 patent discusses a memory system that adapts its access timing to the access speed of the particular memory unit being accessed.  The perceived problem addressed by the '100 patent pertains to multiple units of the same memory type (i.e., at the same level of the access time memory hierarchy), where the access speed may vary among the units.  The purpose of the invention is to access the memory as quickly as possible without exceeding the access speed of the memory unit being accessed.  To do that, each time the memory is accessed, the memory unit having the sought information provides to the memory controller an indication of its access speed; the memory controller in turn provides access timing that is commensurate with that access speed.

66.    One of ordinary skill of the art would understand that the patent is not about determining access speed during the initialization of a computer, as this was a well known and practiced technique at the time of the invention.  Instead, the patent is directed at dynamically determining memory access speed and timing during each access.

67.    My opinion is further supported by the applicant's statements to the United States Patent and Trademark office during prosecution of the patent.  In response to an office action, the applicant explicitly recognized that the patent taught dynamically adapting to different speeds of memory during access:

> "As also discussed by the applicants, the system according to ***the present invention advantageously allows the memory controller to adapt to different*** types and/or ***speeds*** of memory devices while freeing the CPU from having to account for the differences ***when accessing the memory device***."

(Attached as Ex. 13 to Davis Declaration in Support of Wistron's Responsive Claim Construction Brief) (Prosecution History WIS 0111798) (emphasis added)).

## 1.    memory controller unit

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| A controller that receives an indication of access speed on each access | chip circuitry, other than a memory access requestor, that provides the access timing |

68.    One of ordinary skill in the art would not understand the term "memory controller unit" as proposed by Samsung to be simply "chip circuitry."  Instead, the one of ordinary skill would understand that the "memory controller unit" of the claims is "a controller that receives an indication

of access speed."

69.     Wistron's proposed construction of "memory controller unit" is supported by the specification's preferred embodiment and by the claim language itself.  For example, the preferred embodiment can adapt on each access to the addressed memory unit's particular timing requirements. This works as follows: upon an address match, the memory controller returns an indication of access speed (e.g., STATMATCH* or AHCMATCH*) and the memory controller, in turn, adjusts its access timing to be commensurate with that memory unit's access speed.  '100 patent at 8:13-32.

70.     Samsung's proposed construction would allow the patent to be read to cover a system where the indication of access speed is provided on some other schedule than during each access, however, during each access is the novel aspect of the system in the '100 patent.

71.     Instead, the file history confirms what one of ordinary skill would understand in reading the patent, namely that the memory controller unit functions dynamically and adaptively during each access:

> • "These associated logic and/or the memory control unit must be made to work with the particular type and speed of the memory device, and thus cannot ***adaptively*** accommodate memories of varying types and/or access speed." Ex. 13 to Davis Declaration (WIS 0111797);

> • "the memory controller according to the claimed aspect of the present invention receives the access speed information and, once the information is received, *uses the same, during accessing of the memory, to **adaptively** control the access timing when fulfilling an access request from a memory access requestor* …." Ex. 13 to Davis Declaration (WIS 0111814);

> • "Indeed, as also discussed above, by teaching that the requestor itself adapts to different speeds of memories, Pawlowski teaches away from the ***adaptive operation*** of the memory controller." Ex. 13 to Davis Declaration (WIS 0111815-6).

72.     To avoid prior art, the applicant for the '100 patent amended the claims to exclude CPU's from "memory controller unit."

### 2.     configured to receive

| Wistron's Proposed Construction | Samsung's Proposed Construction |
| --- | --- |
| Set up to receive during each access | plain meaning, which is "designed to receive" |

73.     Because the patent discusses a particular memory controller unit, one of ordinary skill would understand that "configured to receive" only in the context of the claims and, thus, would appreciate that the patent actually requires the memory controller unit to be "configured" (i.e. "set up") to receive an indication of access speed during each access.  As discussed in connection with

"memory controller unit," the requirement that the indication of access speed be received on each access is supported by the only disclosed embodiment discussed in the patent. '100 patent at 8:13-32.

**3.    to provide**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| Supply during each access | plain meaning (no construction is needed) |

74.    One of ordinary skill would understand "to provide" to mean "supply during each access because the memory controller unit is also configured "to provide, during access," an appropriate access timing. The claim language states this explicitly. '100 patent at 11:50-51 ("to provide, during access of said at least one memory module"). This is also consistent with the embodiment description at 8:13-32.

**4.    indication of access speed**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| State of a signal line connecting between a memory unit (MU) and the memory control unit (MCU) that represents memory clock rate information. | data that identifies the read/write speed of the memory module |

75.    I understand that the major difference between the parties' constructions is that Samsung's proposed definition is broadly characterized as "data" relating to a memory's "read/write speed" whereas Wistron's proposed construction accurately observes that an "indication" is really a signal line state that represents memory clock rate information, as delivered on the line connecting an MU to the MCU.

76.    Samsung's proposed construction is incorrect because it would allow the "data" representing the access speed to be sent to the memory controller unit indirectly, such as through the CPU. During prosecution of the patent, however, the applicant explicitly disclaimed the CPU as the "memory controller unit" to avoid prior art. Ex. 13 (WIS 111797-98).

77.    Wistron's proposed construction is also supported by the patent's specification. The preferred embodiments of the patent teach a signal line carrying a signal representing an indication of access speed (e.g., STATMATCH* or AHCMATCH*) that connects the memory unit to the memory controller. E.g., Figure 4 and at 8:23-29 ("[T]he assertion of AHCMATCH* being caused by the generation of MATCHED* and also a MU jumper or switch which indicates that DRAMs having a specified speed are installed. AHCMATCH* is a status signal to the MCU 14 which indicates that the

1  MU is adding one half of a MEMCLK cycle to the memory access to accommodate the timing

2  requirements of the DRAMs.").

3      **5.      access timing**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| A period of time used to access memory. Access timing is different from access speed | timing of a signal used to control the read/write access of the memory module |

78.    One of ordinary skill in the art would understand that access timing and access speed

have different meanings and that "timing" refers to a period or length of time as opposed to the

read/write speed of a memory module.  Samsung's proposed construction is not helpful in that it

defines timing as "timing."  Upon reviewing the patent, however, one of ordinary skill would

understand that "access timing" is the period of time used to access memory.

      **6.      commensurate**

| Wistron's Proposed Construction | Samsung's Proposed Construction |
|---|---|
| Corresponding in size | to accommodate the timing requirements of the memory module |

79.    As explained earlier in this declaration, the purpose of the '100 patent is to access a set

of memory modules having varying access speeds as fast as possible by providing access timing that

is "commensurate" with the indication of access speed.  In other words, memory modules having

slower access speed are accessed with slower access timing; memory modules having faster access

speed are accessed with faster access timing.  The patent's description of the preferred embodiment

makes this point clear: the state of the signals STATMATCH* and ACHMATCH* prompts the

memory controller unit to access the memory using faster or slower access timing.  '100 patent at

8:13-32.

80.    Samsung's proposed construction is incorrect because it is contrary to the purpose of

the patent which is for a memory controller unit to dynamically adapt access timing based on

memory module access speed.   Samsung's proposed construction, contrary to what one of ordinary

skill in the art would understand, would encompass a system that applied a single access timing to all

of the memory modules regardless of their access speed, and thus not dynamically adapting the

access timing as described in the patent.

1    I declare under penalty of perjury under the laws of the United States that the foregoing is true
2    and correct.

3

4    Executed this **23** day of June, 2008, at San Francisco, California.

5

6    _____

7    Tony Clark

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLARK DECLARATION ISO WISTRON CLAIM CONSTRUCTION.**