EXHIBIT 6



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

OCT 1 5 2002

Michael N. Milby, Clerk

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD.,<br><br>        Plaintiff,<br><br><br>    v.<br><br><br>ARIMA COMPUTER CORPORATION,<br>and ARIMA COMPUTER (TEXAS)<br>CORPORATION,<br><br>        Defendants | CASE NO.  H 01 0175<br>JURY DEMANDED<br><br><br>DECLARATION OF DR. ROBERT G.<br>WEDIG IN SUPPORT OF PLAINTIFF<br>SAMSUNG ELECTRONICS CO., LTD.'S<br>PROPOSED CLAIM CONSTRUCTION |

-1-



I, DR. ROBERT G. WEDIG, declare as follows:

1.     I am a citizen of the United States and reside at 1516 Cormorant Ct., Sunnyvale, CA 94087. I am the owner of Wedig Consulting, in Cupertino, California. Wedig Consulting is an independent consulting firm specializing in analysis of computer hardware and software design issues. I received a Bachelors of Electrical Engineering degree from the University of Dayton in 1977. I received a Master of Science degree in electrical engineering from the University of Southern California in 1979. I received a Ph.D. in electrical engineering from Stanford University in 1982. From 1977 through 1979, I worked as a processor design engineer at Hughes Aircraft Company in Fullerton, California. In this capacity, I designed computer systems that included connections to computer keyboards and required power usage considerations. From 1979 through June 1982, I was a Research Assistant, Instructor, and Teaching Assistant in the Computer Systems Laboratory at Stanford University. During this time, I took classes and did research on computer systems which connect to input devices such as keyboards. From 1982 through December 1985, I was an Assistant Professor of Electrical and Computer Engineering at Carnegie-Mellon University where I taught courses in computer architecture and VLSI design that included interfacing techniques to a variety of input/output devices including keyboards and power usage in circuits. Since January 1986, I have worked as an independent consultant, doing business as Wedig Consulting. My *curriculum vitae,* including a list of all my publications, is attached as Exhibit A. I make this declaration in support of Plaintiff Samsung Electronics Co., Ltd.'s proposed claim construction in this action. I make this declaration of my own personal knowledge, and if called as a witness, I could and would testify competently to the facts in this declaration.

-2-

2.      In this declaration, after describing my expertise and the materials I reviewed, I will first describe some aspects of computer operation that will assist in understanding the invention described in the patents in suit.  Next, I will review computer technology pertinent to United States Patent No. 5,333,273.  I will then review claims 1 and 5-7 of U.S. Patent No. 5,333,273 and identify various terms and phrases used in the claims and provide an explanation of how one of ordinary skill in the art of computers, computer systems and architecture would have understood the various claim terms and phrases in these claims at the time of invention.  I will then review computer technology that is pertinent to United States Patent No. 5,588,054.  Finally, I will review and provide an understanding of how one of ordinary skill in the art would interpret specific terms and phrases that appear in claims 1 and 11 of U.S. Patent No. 5,588,054 at the time of invention.

## I.      EXPERTISE AND MATERIALS REVIEWED

3.      I am an expert in computers, computer systems and computer architecture that involve microcomputers, namely computers and systems that employ microprocessors as the central processing unit.  I am also an expert in power distribution and power conservation.  I understand that the field of invention of U.S. Patent 5,333,273 is concerned with the field of microprocessor-based computer systems, and more particularly, computer systems based on the Industry Standard Architecture (ISA) utilizing the Intel 80x86 microprocessors and their equivalents.  (US Patent 5,333,273, col. 1 ll. 11-16).  In particular, the invention relates to an improved system for implementing a computer keyboard. In addition to having taught courses on computer design which included connecting to computer keyboards, I have designed computer systems and digital computer logic that connects to keyboards.  I also understand that the field of invention of U.S. Patent 4,488,054 relates generally to modems and, more particularly, to a

power conservation system in a computer system. (US Patent 4,488,054 patent, col. 1 ll. 7-9). I have taught courses in computer and circuit design that have included design of computer circuits used in power conservation.

4.     I have been retained by Plaintiff Samsung Electronics Co., Ltd. to provide it with technical advice in this action. I have read United States Patent No. 5,333,273, issued July 26, 1994, naming Charles F. Raasch and Michael K. Goodman as inventors and entitled "Protected Hot Key Function for Microprocessor-Based Computer System." I will refer to that patent in this declaration as the "'273 Patent." I have also reviewed the United States patent application Serial No. 939,583, filed September 3, 1992, the application from which the '273 Patent issued, and the prosecution history of that application before the United States Patent and Trademark Office. I have also reviewed United States patent application Serial No. 611,292, filed November 9, 1990, and the history of the prosecution of that application by the United States Patent and Trademark Office. I have also reviewed the United States patents and the other publications identified on the first page of the '273 Patent as "References Cited". I understand those patents and publications to be the patents and publications that the United States Patent and Trademark Office considered during the prosecution of the applications. I have also reviewed the definitions of certain terms as found in the general and technical dictionaries and other books cited by the parties. I have reviewed the definitions for the terms defined by Samsung Electronics and defendants Quanta Computer, Inc. and Compal Electronics, Inc. in Exhibits B-3, C-3 and D-3, respectively, to the Joint Claim Construction Statement, dated June 6, 2002, which was filed in the action pending in the United States District Court for the Northern District of California, Case No. C00-4524VRW. I have also reviewed the letter sent from John W. Schlicher to Terry D. Garnett, William L. Anthony and Ned Isokawa on August 2, 2002 revising

-4-

some of Samsung's claim constructions for the '273 patent. I have also reviewed the letter sent from Matthew J. Hult to John W. Schlicher on August 30, 2002 modifying some of Compal's claim constructions for the '273 patent. I have also reviewed the letter sent from Sang N. Dang to John W. Schlicher on August 30, 2002 modifying some of Quanta's claim constructions for the '273 patent. I have also reviewed the letter sent from Keith A. Rutherford to Alan Albright on August 30, 2002 modifying Inventec's claim constructions for the '273 patent. I have also reviewed the letter sent from Dan C. Hu to Alan Albright on September 3, 2002 modifying Arima's claim constructions for the '273 patent. I have also reviewed the letter sent from John W. Schlicher to Terry D. Garnett, William L. Anthony and Ned Isokawa on August 30, 2002 revising some of Samsung's claim constructions for the '273 patent. I have also reviewed the letter sent from Alan Albright to Lee Kaplan, Trang Q. Tran, Philip T. Burns and Keith Rutherford on August 30, 2002 revising some of Samsung's claim constructions for the '273 patent. I have also reviewed the definitions for the terms defined by defendant Twinhead Corporation in Exhibit C1 to the Joint Claim Construction Statement, which was filed in the action pending in the United States District Court for the Northern District of California, Case No. C01-2424VRW. I have also reviewed the Samsung October 9, 2002 Claim Construction Charts. I have also reviewed the Inventec October 9, 2002 Claim Construction Charts. I have also reviewed the Arima October 10, 2002 Claim Construction Charts. I also attended the deposition of Dr. George Ligler held on September 18-19, 2002. I also attended the deposition of Dr. Raymond Mercer held on September 24-25, 2002.

5.    I have also read United States Patent No. 5,588,054, issued December 24, 1996, naming Seongkee Shin and Sangho Lee as inventors and entitled "Power Conservation System for a Modem in a Computer System." I will refer to that patent in this declaration as the

"'054 Patent."  I have also reviewed the United States patent application Serial No. 425,530,

filed April 20, 1995, the application from which the '054 Patent issued, and the prosecution

history of that application before the United States Patent and Trademark Office.  I have also

reviewed the United States patents and other publications identified on the first page of the

'054 Patent as "References Cited".   I understand those patent and publications to be the patents

and publications that the United States Patent and Trademark Office considered during the

prosecution of the applications.  I have also reviewed the definitions of certain terms as found in

the general and technical dictionaries and other books cited by the parties.  I have reviewed the

definitions for the terms defined by Samsung Electronics and defendants Quanta and Compal in

Exhibits B-1, C-1 and D-1, respectively, to the Joint Claim Construction Statement, dated June 6,

2002.  I have also reviewed the letter sent from John W. Schlicher to Terry D. Garnett, William

L. Anthony and Ned Isokawa on August 2, 2002 revising some of Samsung's claim

constructions for the '054 patent.  I have also reviewed the letter sent from Matthew J. Hult to

John W. Schlicher on August 30, 2002 modifying some of Compal's claim constructions for the

'054 patent.  I have also reviewed the letter sent from Sang N. Dang to John W. Schlicher on

August 30, 2002 modifying some of Quanta's claim constructions for the '054 patent.  I have

also reviewed the letter sent from Keith A. Rutherford to Alan Albright on August 30, 2002

modifying Inventec's claim constructions for the '054 patent.  I have also reviewed the letter sent

from Dan C. Hu to Alan Albright on September 3, 2002 modifying Arima's claim constructions

for the '054 patent.  I have also reviewed the letter sent from John W. Schlicher to Terry D.

Garnett, William L. Anthony and Ned Isokawa on August 30, 2002 revising some of Samsung's

claim constructions for the '054 patent.  I have also reviewed the letter sent from Alan Albright

to Lee Kaplan, Trang Q. Tran, Philip T. Burns and Keith Rutherford on August 30, 2002 revising

-6-

some of Samsung's claim constructions for the '054 patent. I have also reviewed the definitions for the terms defined by defendant Twinhead in Exhibit C2 to the Joint Claim Construction Statement. I have also reviewed the Samsung October 9, 2002 Claim Construction Charts. I have also reviewed the Inventec October 9, 2002 Claim Construction Charts. I have also reviewed the Arima October 10, 2002 Claim Construction Charts. I also attended the deposition of Dr. George Ligler held on September 18-19, 2002. I also attended the deposition of Dr. Raymond Mercer held on September 24-25, 2002.

6.      Based on my reading of the patent specifications and claims, I believe that one of ordinary skill in the art at time of the invention of the '273 and '054 patents would have had a Bachelors of Science in Electrical Engineering or Computer Science and at least 2 years of work experience in the field of computer hardware and software design.

## II.    TECHNICAL BACKGROUND PERTINENT TO THE '054 AND '273 PATENTS

7.      In order to help provide a technical background sufficient to understand the technology of the '054 and '273 patents, I will first provide a high level discussion of the basic operation of a computer by illustrating a computer system as three basic interacting components: a central processing unit, a memory and an input/output system. I will then explain how a computer program is performed in a computer system to execute computer programs. I will next explain how the keyboard works, how the computer determines that a key has been pressed and which key was pressed. Finally, I will describe how power is provided in the computer system and how power conservation in a computer system works.

8.      Although the intricacies of computers are vast, it becomes easier to gain an understanding of computers by conceptualizing them at a high level and then working down to more detailed levels of complexity as required to understand specific aspects of their design.

One such high level view is shown in Exhibit B to this declaration.  Exhibit B illustrates that a computer can be thought of as being composed of a central processing unit  ("CPU"), a memory, and an input/output or "I/O" unit.  These three basic components are connected together by a common set of wires called a "bus."  The CPU is in charge of the entire computer system and it controls and directs its operation.  The memory contains computer programs composed of sets of instructions for the CPU to execute and computer data for the CPU to manipulate.  The I/O unit allows the CPU to communicate with the Input/Output devices, such as the keyboard, printer and computer monitor.  The instructions and data that are transferred between the CPU and the memory are transferred via a "processor bus."

9.    A computer operates by executing computer programs made up of a large number of computer instructions.  In particular, the CPU reads the program's instructions from the memory and performs the commands specified by the instructions.  The CPU does this sequentially by requesting one instruction at a time from a specific location in the memory.  These requests are made over the bus.  The memory locates the instruction at the specified location and returns it back over the bus to the CPU.  The CPU then examines the instruction and performs the desired operation.  After completing the instruction, the CPU will then read the next instruction in memory and start to execute it.  The CPU continues this process until all the instructions in the program have been executed.

10.    The memory holds all the instructions that the CPU uses to perform its functions.  These instructions are arranged together in groups that perform a particular task called a "program" or "routine."  Whereas a program is a complete task to be performed, a routine may be a part of a complete task.  Multiple routines may make up a program.  A word processor or an email reading program are examples of programs executed by a CPU.

-8-

11.     Exhibit C shows an exemplary illustration of a seven instruction program residing in memory that deducts the amount of checks written from a checking account and notifies the user if the checking account balance goes below zero.  The CPU reads each instruction from this program sequentially, one after the other starting at the first instruction, unless the CPU performs an instruction that commands it to change the order of reading.  For example, in Exhibit C, the first instruction commands the CPU to read the current checking account balance from memory.  The CPU does this and then sequentially reads the next instruction that says to determine if there are any more checks to be processed.  If there are checks, the CPU continues to read and execute the third instruction.  If there are no more checks to process, the CPU then redirects its attention to start reading instructions starting at instruction 7.  Instruction 7 indicates that the program has completed so the computer can begin to work on another program.

12.     Although it may seem as though a computer can execute many programs simultaneously, it can only actually execute one instruction at a time.  Therefore, if the user is downloading a file from the Internet while at the same time editing a file using a word processing program, the computer must have a means for quickly jumping back and forth between the two different programs.  Because the program doing the downloading is not aware of the text editing program and vice versa, "interrupts" are used to allow one program to interrupt or temporarily halt the execution of another program.  An interrupt is a digital signal input to the CPU that instructs the CPU to stop reading instructions from one program and to start reading instructions from another program.  An interrupt is generated due to an event such as the receipt of data by a modem, a key being typed at the keyboard, or possibly the failure of a component of the computer system.

13.     As illustrated in Exhibit D, when the CPU receives an interrupt, it immediately

halts what it is doing and immediately starts executing a special program designed to respond to the interrupting condition called an interrupt routine. In the example shown in Exhibit D, the checking account balancing program is interrupted after it executes the third instruction. In this case, the user has typed a key on the keyboard. The CPU then begins to execute the interrupt routine by reading the data code for the key that was typed and saving it in a queue of typed keys for later. It then returns control back to the checking account program. Once the checking account program resumes execution, it continues on as though nothing has happened and it does not realize that it has ever been interrupted. At some later time, a program will examine the queue of typed keys and begin to process them. Each time a key is pressed, an interrupt is generated causing an interrupt routine to be executed. This happens at such great speed that the user is never aware that interrupts are occurring and that one program is being delayed because an interrupt routine is periodically taking small increments of the CPU's time.

14.    Further interaction that affects the behavior of a computer comes from the Input/Output (I/O) system. There are many types of I/O devices. For example, the keyboard controller provides communication with the computer's keyboard. The keyboard I/O is germane to the litigation at hand, so details of its operation will now be presented in more depth.

15.    In addition to the actual, plastic housing and the plastic keys, a computer keyboard is comprised of a keyboard matrix and microprocessor circuitry such as that shown in Exhibit E which is Figure 7 of the '273 patent. In order to determine exactly which key has been pressed, the keyboard microprocessor circuitry sends signals to the keyboard matrix and then receives back a response dependent on which key, if any, has been depressed.

16.    The keyboard matrix is composed of a matrix of switches such as that shown in Exhibit F. There is one electrical switch per key such that when a key is depressed, the switch is

-10-

connected and when the key is released the switch is disconnected. Exhibit F illustrates that one

wire per row and column is connected to a keyboard microprocessor to perform the detection

process. The keyboard microprocessor sets the column lines and then reads back the row lines.

17.     The process for detecting a key is to scan each column line and determine if a key

in a selected column has been pressed by reading out the row lines. Exhibit G illustrates how

this process works. In this example, a key at row 1, column 1 is being pressed. In step 1, the

microprocessor sets the column 0 wire to logic "1" and all other column wires to logic "0." The

keyboard microprocessor then reads the row wires. When there is no connection between the

active column line and a row line, the row line will read out as a "0." In step 1, none of the keys

in column 0 are pressed; therefore all the row lines remain at logic "0." When the keyboard

microprocessor reads the row lines and sees that they are all at logic "0", it determines that no

keys are being pressed in this column and then proceeds to the next step.

18.     In step 2, the microprocessor changes the values of the column wires such that

only column 1 has a logic "1" value and all the other columns have a logic "0" value. Then, the

keyboard microprocessor again reads out the row lines and detects that the value associated with

row 1 is found to be set to logic "1." The keyboard microprocessor now determines that the

switch at row 1, column 1 is closed, indicating that a user is pressing the key associated with this

switch. The keyboard microprocessor then sends a code to the CPU to indicate that a key has

been pressed. After it has done this, it will continue to scan the keyboard by performing step 3,

which sets the column 2 line to "1" and all other lines to "0." It then reads the row lines to see

that no switches in column 2 are pressed. In step 4, the keyboard microprocessor then performs

the same function on column 3 and also sees that no switches are pressed. The keyboard

microprocessor then repeats the process starting again at column 0 looking for the user to release

the current key and press a new key.

19.　The process that the keyboard microprocessor is performing is to scan each column successively looking for closed switches and reporting their value back to the CPU when one is found. Because the keyboard microprocessor performs a scan of each column to find which key or keys have been pressed, the values that correspond to the pressed keys are called "scan codes." Once one or more pressed keys have been detected and one or more scan codes generated, the keyboard microprocessor will then activate an interrupt line to notify the CPU that a key has been pressed. The CPU will then execute an interrupt routine, which will request the scan codes. The scan codes are transferred to the CPU, which places them in a queue of recently typed characters that are eventually passed on to the application program.

20.　As computers run faster, pass data more quickly and process more instructions per second, more power is required and more heat is generated. To try and reduce heat, to allow laptop computer batteries to last longer and to address the desire to reduce power usage in the home and workplace, modern computers have the ability to reduce the power usage of certain parts of the computer system not in use. To do this, the computer employs specialized digital logic called the "power management system" (PMS) that can reduce the computer system's power usage when commanded to do so. The PMS can control the power generating circuits to selectively enable or disable various components as needed in the computer system.

21.　If the computer system goes idle, has no user interaction and does not have a user program to run, the PMS can reduce the power to all the components of the computer system except those absolutely necessary to keep the computer system running. Then, if an external event occurs which requires the computer's attention, the PMS can turn the components back on and the normal mode of operation can be resumed.

-12-

22. One such external event that may require the computer to come back to full operation is a telephone ring signal connected to the modem of the computer. A modem is a digital component that translates the signals, voltages and timings of a telephone line into the digital signals used in a computer system. A modem can be used to allow communication over a telephone network between two computers, between a computer and the Internet and between two fax machines. A computer modem can detect when the telephone line is producing a ring signal. The modem will then generate an output called a "ring indicator" (RI) when it detects the telephone ring signal. If the ring indicator is connected to the PMS, the PMS can use the ring indicator to determine when it is time to reactivate or "wake up" the components in the computer system that have been put into a low power state and bring them back to a normal mode of operation.

## III.    BACKGROUND PERTINENT TO THE '273 PATENT

23. As previously discussed, when a user presses a key on the keyboard, the keyboard microprocessor detects it and interrupts the main computer to indicate that a key has been pressed. A problem that the computer must face is to determine which one of the multiple running programs should be notified of the key press so the key can be correctly handled. Normally this is easily decided by passing the data code associated with the pressed key or key combination to the program that the user is currently using. However, modern computer systems allow the user to send keyboard commands to programs that may not be active at the time of the command. For example, on an IBM computer system, if the user types a TAB key while holding down the ALT key, the operating system, the controlling program for the computer, will produce a window offering the user to switch to another active program. This key combination is sent to the operating system program even though the user is interacting with another program.

-13-

24.    A single key or a multiple key combination that substitutes for a more complex set of keystrokes or mouse commands is called a "hot key." Some hot keys are used in multiple programs, with one program using it for one purpose, and another using it for another purpose. It sometimes can occur that a user may type a hot key intended for one program, but it is erroneously detected and acted on by another program that recognizes the same hot key but performs a different function upon detecting it.

25.    The inventors of the '273 patent recognized that such a situation was possible and developed an innovative solution to the problem. Their invention involved adding a key to the standard IBM PC keyboard that would be used only by new programs that want to use a hot key combination. This key is now commonly found on many modern personal computer systems and it is usually labeled as "Fn." The Fn key operates such that when it is pressed along with a conventional key on the keyboard, a unique interrupt is generated different from the interrupt normally used to indicate a key has been pressed. This interrupt is sent to the computer system. This unique interrupt causes the computer to start to execute a unique interrupt handling routine to deal with the hot key. This interrupt handling routine will examine which conventional key was pressed along with the Fn key and perform the function associated with the selected hot key.

26.    This invention works with all existing programs and any new programs without interference. All new programs that are aware of the Fn key plus conventional key hot key combination can use it without interfering with programs previously written to use older hot key combinations. The interrupt generated by the combination of the Fn key and a conventional key is different from the normal key press interrupt, so it will not be detected by older programs. Programs designed before the development of the Fn key will therefore not know that the new key combination was pressed, so new programs that use the Fn key cannot interfere with older

-14-

programs.

## IV.    AN OVERVIEW OF CLAIM 1 OF THE '273 PATENT

27.    Claim 1 covers a system that provides additional functionality in an ISA-compatible computer.  This functionality is provided when certain key combinations are pressed.  Although I understand the language of the claim itself determines the bounds of invention, I will use Exhibit H, Figure 6 from the '273 patent, to illustrate the basic principals of claim 1.  This exhibit illustrates but one way to implement the invention described in claim 1 and it is not meant to limit the interpretation of claim 1 to be only what is shown in this exhibit.

28.    Element 1 of claim 1 describes a keyboard having alphanumeric and function keys.  In addition, this keyboard has the previously discussed additional function key "Fn."

29.    Claim 1 also claims a keyboard controller connected to the keyboard that monitors when a key is pressed.  Claim 1 discloses that the keyboard controller provides two interrupt signal lines that connect to the ISA-compatible computer.  Exhibit I highlights in this exemplary illustration the keyboard controller and two interrupt lines labeled IRQ1 and IRQ15 provided from the keyboard controller.   The claim does not limit the interrupts to be exactly the specific interrupt signal lines shown in Exhibit I.  A personal computer system has many interrupt signal lines used for a variety of purposes.  One of ordinary skill in the art would understand that any two interrupt signal lines produced by the keyboard controller would satisfy the two interrupt line requirement of claim 1.

30.    In claim 1, the keyboard controller must be responsive to any of the conventional keys to activate a first interrupt signal to the ISA-compatible computer on the first interrupt signal line.  In addition, the keyboard controller must be responsive to an activation of the additional function key along with one of the conventional alphanumeric keys to generate a

-15-

second interrupt signal to the ISA-compatible computer on the second interrupt signal line.

31.     Due to the activation of the first interrupt signal, claim 1 specifies that a conventional interrupt handling routine be executed to read the scan code from the keyboard. Exhibit J highlights the keyboard interrupt service routine executed by the CPU and the transfer of the scan code to the CPU that, in this embodiment, comes from the keyboard controller. Finally, Exhibit K illustrates the final element of claim 1.  Due to the activation of the second interrupt signal, claim 1 specifies that a second non-conventional interrupt handling routine is to be executed to identify which activated alphanumeric key was pressed along with the additional function key and to then perform a predetermined function based on the identified alphanumeric function key.  In Exhibit K, the second interrupt line is IRQ15.  However, claim 1 does not specify the interrupt line to use and one of ordinary skill in the art would know that it is not required that IRQ15 be used as the second interrupt line.

32.     There are a number of terms and phrases at issue that need to be defined in more detail to come to a thorough understanding of claim 1.  These terms and phrases are:

> (1) ISA-compatible computer
>
> (2) Keyboard
>
> (3) Keyboard controller
>
> (4) First interrupt signal
>
> (5) Activation of said additional function key in combination with at least one of said conventional alphanumeric keys to generate a second interrupt signal
>
> (6) First conventional interrupt handling routine
>
> (6) Data scan code
>
> (7) Second non-conventional interrupt handling routine

-16-

33.    Each of these terms and phrases is discussed in light of the preamble and individual claim elements of claim 1.

## V.    ISA-COMPATIBLE COMPUTER

34.    The term "ISA-compatible computer" is used in the preamble of claim 1 to specify the type of computer in which the present invention is to reside. It is therefore relevant to determine what one of ordinary skill in the art would understand to be an ISA-compatible computer.

35.    The phrase "ISA" is defined in the specification and commonly understood by one of ordinary skill in the art to mean "Industry Standard Architecture." ('273 patent, Col. 1 ll. 17-22). The architecture of a computer system is understood to be the view of the computer system as seen by the software. This view includes everything that the software can detect but nothing that the software cannot detect. For example, the software can recognize the particular instructions the computer uses to operate, the size and configuration of the memory, the number and type of interrupts, the different input/output devices connected to the computer and how to communicate with them. The software is not aware of the particular circuits used to implement the computer, how the circuits are laid out on the circuit boards, or the type of packaging used to hold them in the computer system. Only characteristics of a computer that can be detected by the software are considered part of the computer architecture. Two computers that have the same architecture can run the same software.

36.    Software development is very time intensive and prone to error. Also, users want to preserve their investment in the software programs they have purchased. Therefore, programmers and users alike desire that software written for one computer can be used on other manufacturers' computers and on later models of the same computer. When two computers have

-17-

the same architecture, the software written for one will have the same view of the computer system when run on the other. Therefore, for two computers with the same architecture, the software can be interchanged.

37.     The Industry Standard Architecture is understood by one of ordinary skill in the art to be the architecture of the IBM PC. The ISA architecture, developed by IBM, is the most widely used personal computer system available today. There has been a wealth of software written for it and many people know how to use it. It is very desirable for a manufacturer to design a computer system that slavishly follows the ISA computer architecture so it can take advantage of all the wealth of software that has previously been written for the IBM PC, and so that users will buy a computer with which they are already familiar. An ISA computer is a computer that can run any of the wide range of software that can run on an IBM personal computer. Each manufacturer's ISA computer may have a different detailed circuit design from an IBM personal computer. However, each time the software requests data or performs some interaction, all ISA computers will react identically to the way an IBM personal computer would respond.

38.     An external bus is a computer bus that has a standard connector that allows additional circuit cards to add functionality to the computer system. The IBM personal computer had such an external bus built into the computer to allow customers and other companies to design circuit cards that could interface with the computer and add additional capabilities to the computer system. This IBM external bus came to be called the ISA bus. To remain competitive in the 1980s and 1990s, companies designing a computer implementing the Industry Standard Architecture included the ISA bus so that external circuit boards that could be added to an IBM personal computer could also be added to their computer. However, this was for competitive

-18-

reasons and was not dictated by the need for the software to run correctly.

39.    Software cannot tell and cannot see what bus is being used to transfer the

instructions and data between the various components. A specific bus design is not required

since the software would not be able to tell the difference. In this regard, it is not necessary to

implement the ISA bus in a computer that is ISA-compatible. In fact, many computers today that

run all IBM personal computer software do not have an ISA bus.

40.    The IEEE dictionary defines compatibility as it relates to computer systems as:

> Pertaining to a computer system or system component that is
> capable of handling data and programs intended for use with some
> other system or component. (*IEEE Standard Dictionary of
> Electrical and Electronics Terms*, p. 185 (6[th] ed. 1996)).

Furthermore, the Merriam-Webster's Collegiate Dictionary defines compatibility as it

relates to computer systems as:

> Designed to work with another device or system without
> modification; esp. being a computer designed to operate in the
> same manner and use the same software as another computer.
> (*Merriam-Webster's Collegiate Dictionary*, p. 234 (10[th] ed. 1993)).

The term "compatible" as it relates to computers means that a program run on one computer

must also be able to run exactly the same for all possible inputs, producing the identical outputs,

on another computer. To the software, the two computers must appear identical. With an

understanding of the definition of architecture, compatible computers have the same architecture.

An ISA-compatible computer means that it is a computer of any design that can run the same

software as an ISA computer.

41.    As this relates to the '273 patent, there is nothing about the invention in claim 1,

or any claim, that requires the use of the ISA bus. One of ordinary skill in the art knows that it is

possible to practice each of the claims of the '273 patent without using the ISA bus. There must,

of course, be one or more buses to move data around the computer system, but the term "ISA-compatible" does not dictate that this bus must be the ISA bus. Indeed, there are several other components listed in the specification (e.g. the math coprocessor and the DMA controller) that are also not needed to practice claim 1, or any other claim of the '273 patent.

42.     When the specification discusses ISA-compatibility, it does not mention anything about the ISA bus. However, it does say that it "defines an architectural environment" and that "an extensive quantity of software has been written to operate on ISA-compatible computer systems:"

> "The Industry Standard Architecture (ISA) was developed by IBM Corporation for use in its AT-type computers and defines an architectural environment for computers that utilize an Intel 80x86 microprocessor, such as the Intel 80286, the Intel 80386, the Intel 80386SX, and the like. A large number of computer systems have been developed that are ISA compatible, and an extensive quantity of software has been written to operate on ISA-compatible computer systems." ('273 patent, col. 1 ll. 17-25).

Therefore, one of ordinary skill in the art, based on reading the claims, the specification and file history of the '273 patent, the *IEEE Standard Dictionary of Electrical and Electronics Terms* and the *Merriam-Webster's Collegiate Dictionary* would understand that an ISA-compatible computer is a micro-processor based computer that is capable of running software that can be run on an IBM personal computer. An ISA-compatible computer is not required to implement the ISA bus because the ISA bus has no bearing on the claim elements.

43.     The preamble of the claim 1 of the '273 patent is as follows:

> "1. A system for providing a built-in function in an ISA-compatible computer in response to activation of a selected combination of user activated keys, comprising:" ('273 patent, col. 13 ll. 36-39).

Given the understanding of the term "ISA-compatible," this preamble describes a system

-20-

for providing a function of a computer that can run IBM personal computer software. This function operates in response to the activation of a selected combination of user activated keys.

## VI.    KEYBOARD

44.    The first claim element of claim 1 of the '273 patent reads as follows:

> "a keyboard having a set of conventional alphanumeric and
> function keys and further having at least one additional function
> key;" ('273 patent, col. 13 ll. 40-42).

The first element of claim 1 calls for a keyboard having conventional alphabetic keys, function keys and at least one additional function key. In addition to this combination of keys, one of ordinary skill in the art would understand that a keyboard also requires a matrix of row and column wires to allow the detection of a key press. Without such wires, key activation could never be detected and sent to the computer system. Furthermore, one of ordinary skill in the art would understand that a keyboard includes microprocessor circuitry that decodes the signals from the keyboard matrix and determines which key was pressed. Again, without such circuitry, the key activation could never be detected and transmitted to the computer system. Figure 7 of the '273 patent supports this understanding in the depiction of a partial block diagram of a keyboard showing the keyboard matrix and the microprocessor circuitry. ('273 patent, Col. 3 ll. 25-27). Therefore, to one of ordinary kill in the art, a keyboard is the combination of keys, keyboard matrix and microprocessor circuitry for decoding signals from the keyboard matrix.


## VII.   KEYBOARD CONTROLLER, FIRST INTERRUPT SIGNAL, ACTIVATION OF SAID ADDITIONAL FUNCTION KEY IN COMBINATION WITH AT LEAST ONE OF SAID CONVENTIONAL ALPHANUMERIC KEYS TO GENERATE A SECOND INTERRUPT SIGNAL

45.    The second element of claim 1 reads as follows:

> a keyboard controller connected to said keyboard to monitor said
> conventional keys and said additional function key to detect when
> at least one of said keys is activated, said keyboard controller
> having first and second interrupt signal lines connected to said
> ISA-compatible computer; said keyboard controller responsive to
> an activation of at least one of said conventional keys to activate a
> first interrupt signal to said ISA-compatible computer on said first
> interrupt signal line, said keyboard controller responsive to an
> activation of said additional function key in combination with at
> least one of said conventional alphanumeric keys to generate a
> second interrupt signal to said ISA-compatible computer on said
> second interrupt signal line; ('273 patent, col. 13 ll. 43-57).

The function of the keyboard controller is clearly stated in the claim: "to monitor said
conventional keys and said additional function key to detect when at least one of said keys is
activated." This is the normal function of keyboard controllers and this function is supported by
the specification. ('273 patent, col. 2: 49-68; col. 4 ll. 6-11, 24-38; col. 6 ll.35-68; col. 7 l. 32 –
col. 8 l. 46; col. 8 l. 65 – col. 9 l. 21; col. 10 l. 39 – col. 11 l. 24; Figures 1-3: 128; Figure 4:220;
Figure 6:220; Figure 7; Figure 8; Figures 9-10:430). Therefore, the keyboard controller is
defined by one of ordinary skill in the art to be an electrical component that monitors and detects
the activation of keys on the keyboard. As recited in the claim element, the keyboard controller
also performs the function of generating a first and a second interrupt signal to the ISA-
compatible computer when certain key combinations are pressed.

46.    Claim 1 does not specify that the keyboard controller must be separate from and
receive scan codes from the keyboard. In support of this, the specification discusses one
embodiment in which the keyboard microprocessor and the keyboard controller are combined in
a single unit for computer systems such as laptop computers. ('273 patent, col. 7 ll. 35-37, 58-
63). In this embodiment, when the combined unit detects that a key has been pressed, it
generates the scan code and sends the scan code to the host computer directly. In this situation,

-22-

one might consider that the keyboard controller described in this embodiment does not receive scan codes from the keyboard since the keyboard controller and the keyboard microprocessor are combined in the same unit. Therefore, since the claim does not specify that the keyboard controller needs to receive scan codes from the keyboard, and at least one embodiment of the keyboard controller in the specification does not support this interpretation, one of ordinary skill in the art would understand that the keyboard controller is not required to be separate from the keyboard and it is not required to receive scan codes from the keyboard.

47.     The second claim element of claim 1 also defines a first interrupt signal. One of ordinary skill in the art would understand that a signal is a small quantity of information that can be transmitted from one point to another in many ways. For example, a signal may be transmitted on a wire shared by other signals or it can be transmitted on a wire by itself. It could also be transmitted through the air as in the case of a radio signal. Therefore, the first interrupt signal is a signal devoid of the medium for carrying the signal. As described in the claim and supported in the specification, the first interrupt signal is a signal activated by the keyboard controller in response to the activation of one of the conventional keys for interrupting the computer. ('273 patent, col. 2 ll. 51-55; col. 4 ll. 24-49; col. 7 ll. 51-64; col. 8 ll. 9-23; col. 8 l. 65 – col. 9 l. 2; col. 12 ll. 9-20; col. 13 ll. 14-28). The specification shows the use of the IRQ1 signal as one example of an interrupt signal that can be used to act as the first interrupt signal, but the claim does not specify using this specific signal. Furthermore, one of ordinary skill in the art would understand that there is no language in the claim or in the specification that requires that the first interrupt signal line needs to be dedicated to the purpose of transmitting the first interrupt signal. Claim 1 and the specification would allow the line to be shared for other purposes, such as carrying other interrupt signals at other times.

-23-

48.    The second claim element indicates the conditions for generating the second

interrupt signal when it says:

> "activation of said additional function key in combination with at
> least one of said conventional alphanumeric keys to generate a
> second interrupt signal." ('273 patent, col. 13 ll. 53-56).

One of ordinary skill in the art would understand that this means that the second interrupt signal

is generated by the keyboard controller in response to the activation of the Fn key in combination

with at least one of the conventional alphanumeric keys for interrupting the computer.  There is

no restriction placed in the claim element on what signal may be used to provide the second

interrupt signal.  In one embodiment, the signal IRQ15 is used as one example, but one of

ordinary skill in the art would not be so restricted to use only that signal or any other IRQ signal.

The second interrupt signal can be any interrupt signal, which can be generated as described in

the claim element.  One of ordinary skill in the art would understand that other such interrupts

that could be used as the second interrupt signal include IRQ2-IRQ14, SMI, SCI and NMI.

49.    The second claim element of claim 1 indicates that the additional function key

must be pressed "in combination with at least one of said conventional alphanumeric keys."  This

does not imply, and one of ordinary skill in the art would not understand, that this means that

there must be some ordered sequence of pressing the additional function key and one or more

conventional alphanumeric keys.  The claim does not require that the Fn key must be pressed

first and a conventional alphanumeric key must be pressed second or a conventional

alphanumeric key must be pressed first and the Fn key must be pressed second.  The

specification teaches that the Fn key should be pressed "in conjunction" with at least one of the

alphanumeric keys.  ('273 patent, col. 7 ll. 1-7).  One of ordinary skill in the art would not

understand this to imply any type of ordered sequence.

-24-

## VIII.  FIRST CONVENTIONAL INTERRUPT HANDLING ROUTINE, DATA SCAN CODE

50.      The third element of claim 1 reads as follows:

> a first conventional interrupt handling routine within said ISA-compatible computer responsive to said first interrupt signal from said keyboard controller to input data scan codes from said keyboard; and ('273 patent, col. 13 l. 58-61).

One of ordinary skill in the art would understand that this claim element specifies that when the ISA-compatible computer receives the first interrupt signal, it must stop executing the program that it was working on and start to execute the first conventional interrupt handling routine.  Furthermore, the claim indicates and the specification describes that the first conventional interrupt handling routine is a first interrupt handling routine that responds to the first interrupt signal from the keyboard controller by inputting data scan codes originating at the keyboard.  ('273 patent, col. 2 ll. 59-63; col. 5 ll. 10-31; Figures 2, 3 and 6).

51.      Each time a key or combination of keys is pressed on an ISA-compatible computer keyboard, a value, called a scan code, is generated.  One of ordinary skill in the art would understand from the specification that a data scan code is a code that corresponds to a particular key or a particular key combination on the keyboard.  ('273 patent, col. 2 ll. 59-63; col. 4 ll. 12-30; col. 5 ll. 21-31, 55-65; col. 6 ll. 30-45; col. 7 ll. 12-19; col. 7 l. 51 – col. 8 l. 46; col. 12 ll. 9-20; col. 13 ll. 14-17; Figures 2-3, 6-9).  The scan code appears in different forms as the code travels though the computer system but it always corresponds to a key or key combination. When a keyboard row and column matrix is scanned and the keyboard microprocessor determines that one or more keys are pressed, the value of the row lines and column lines uniquely identify which key or key combination was pressed.  The information of the row and column lines identifying the pressed key or keys is used to generate a scan code.  Before the scan

-25-

code is read by the first interrupt routine, the value obtained from the row and column scan may be converted into another value that is commonly understood by software programs. This converted value is another form of the scan code since it also uniquely identifies which key or key combination has been pressed.

52.     One scan code is generated when a key is pressed and a different scan code is generated when the key is released. ('273 patent, col. 4 ll. 21-24). Since a scan code is generated when a key is pressed and released, it is inaccurate to define a data scan code to mean the encoded data produced and output by the keyboard when the keyboard scans column and row signals generated upon depression of a key on the keyboard. This would be inaccurate since scan codes are also generated when keys are released.

53.     A data scan code is a code that corresponds to a key or key combination on the keyboard. A data scan code can be considered encoded in that there is a code associated with the key or key combinations. Defined this way, a data scan code is "encoded data" as both phrases are simply saying that the data scan code is a type of code. However, if one defines encoded data to mean exclusively some type of special value beyond any code that represents a pressed key or key combination, then one of ordinary skill in the art would not understand a scan code to be limited to encoded data. Furthermore, one of ordinary skill in the art would understand that the conventional manner for detecting key presses is to activate row or column lines and then to examine the resulting column or row lines to see if there is a change in one or more signals.

## IX.    SECOND NON-CONVENTIONAL INTERRUPT HANDLING ROUTINE

54.     The final element of claim 1 of the '273 patent reads as follows:

> a second non-conventional interrupt handling routine within said
> ISA-compatible computer responsive to said second interrupt
> signal from said keyboard controller to input an identification of

-26-

said activated alphanumeric key and to perform a predetermined
function selected by said identified alphanumeric key. ('273 patent,
col. 14 ll. 1-7).

When the ISA-compatible computer receives the second interrupt signal, it then must

stop executing instructions from the routine it was working on and start executing instructions

from the second non-conventional interrupt handling routine.  One of ordinary skill in the art

would understand that the second non-conventional interrupt handling routine is a second

interrupt handling routine, which, in response to the "second interrupt signal" inputs an

"identification of said activated alphanumeric key," and performs a predetermined function

selected by the "alphanumeric key. ('273 patent, col. 2 ll. 15 – 42, 59 – 68; col. 6 l. 35 – col. 7 l.

19; col. 7 l. 65 – col. 8; line 46; col. 12 l. 21 – col. 13 l. 22; Figures 2, 3 and 6).  Furthermore, the

final claim element does not specify that the second interrupt signal must be an ISA-defined

interrupt signal and one of ordinary skill in the art would understand that the second interrupt

signal is not so limited.

55.    It is important to note that the function of the second non-conventional interrupt

handling routine stated in the claim is not the same as that performed by the first conventional

interrupt handling routine.  Whereas the function of the first interrupt handling routine is to

"input data scan codes from said keyboard," the function of the second non-conventional

interrupt handling routine is to "input an identification of said activated alphanumeric key and to

perform a predetermined function selected by said identified alphanumeric key." This difference

in wording makes it clear to one of ordinary skill in the art that the claim does not require one to

read a scan code in the second non-conventional interrupt handling routine.  The second non-

conventional interrupt handling routine simply needs to input an identification of which activated

alphanumeric key was pressed concurrently along with the additional function key.  The

-27-

"identification of said activated alphanumeric key" needs only be an identifier that corresponds to an activated alphanumeric key; the claim element does not require the identification to be a scan code.

## X.    FIRST MEMORY LOCATION POINTER, SECOND MEMORY LOCATION POINTER

56.    Claim 4 of the '273 patent reads as follows:

> The system for providing a built-in function as defined in claim 1, further comprising a central processing unit that indexes a first memory location pointer in response to said first interrupt signal, said central processing unit further indexing a second memory location pointer in response to said second interrupt signal. ('273 patent, col. 14 ll. 16 – 21).

Claim 4 teaches that the system described in claim 1 has a central processing unit that, upon receiving the first interrupt signal, indexes a first memory location pointer. To one of ordinary skill in the art, a memory location pointer is a value that indicates the location of a specific memory item such as data or a routine. A memory location pointer may reside in memory or it may reside in a temporary location outside the memory such as in the CPU. In claim 4, the first memory location pointer is an identifier that corresponds to the start of the first conventional interrupt handling routine. The claim does not specify the location of the first memory location. It only specifies that the CPU must index a first memory location pointer. To one of ordinary skill in the art, indexing the first memory location pointer, as it is used in the claim, means to locate the first memory location pointer. The means for locating the first memory pointer is not specified in the claim.

57.    An exemplary embodiment in the specification describes one way of indexing the first memory location pointer. Exhibit L illustrates that when the CPU receives an interrupt indicating that a conventional key has been pressed, the CPU will then access a memory pointer

-28-

that indicates where the interrupt service routine is located. ('273 patent, col. 5 ll. 1-16). However, this illustration is one example of how to index to the first memory location pointer and one of ordinary skill in the art would not limit the claim to covering only this method of indexing. For example, the first memory location pointer may be a fixed location in memory or a temporary storage location in the CPU. One of ordinary skill in the art would understand that indexing or locating the first memory location pointer in a fixed location or a temporary storage in the CPU would also be covered by the claim element.

58.     Like the first memory location pointer, the second memory location pointer is an identifier that corresponds to the start of the second non-conventional interrupt handling routine. Exhibit M illustrates one embodiment that shows that when the CPU receives a second interrupt signal, it will then access a memory pointer that indicates where the Fn interrupt service routine is located. ('273 patent, col. 6 ll. 52-60). The claim does not say how the indexing or accessing is to be carried out. In particular, it specifically does not indicate that it is necessary to utilize an interrupt vector to perform the indexing. Although such a vector is utilized in one embodiment, there is no such limitation called for in the claim and limiting the claim interpretation to require the use of an interrupt vector would be incorrect. For example, an interrupt vector does not need to be used at all. The second memory location pointer may be a fixed location in memory or a temporary storage location in the CPU. One of ordinary skill in the art would understand that indexing or locating the second memory location pointer in a fixed location or a temporary storage in the CPU would also be covered by the claim element.

## XI.     PROGRAM, SECOND INTERRUPT SIGNAL ON SAID SECOND INTERRUPT SIGNAL LINE UPON RECEIPT OF A SCAN CODE CORRESPONDING TO SAID NON-CONVENTIONAL KEY

59.     Claim 5 reads as follows:

A system for servicing keyboard interrupts in an ISA-compatible computer, comprising:

a keyboard having a plurality of keys including conventional alphanumeric keys, conventional symbol keys, conventional function keys and conventional cursor control keys, said keyboard further including at least one non-conventional function key, said keyboard generating a scan code in response to an activation of at least one of said keys, said scan code varying depending upon which of said keys is activated; and

a keyboard controller coupled to said keyboard, said keyboard controller further coupled to said ISA-compatible computer by first and second interrupt signal lines, said keyboard controller generating a first interrupt signal on said first interrupt signal line upon receipt of a scan code corresponding to one of said conventional keys, said ISA-compatible computer programmed to execute a program to input said scan code in response to said first interrupt signal, said keyboard controller generating a second interrupt signal on said second interrupt signal line upon receipt of a scan code corresponding to said non-conventional function key, said ISA-compatible computer programmed to execute at least one special routine upon receipt of said second interrupt signal. ('273 patent, col. 14 ll. 22-48).

Portions of claim 5 are the same as claim 1 and to the extent that the same terms are used in the same way, I understand that it should be interpreted the same way. One difference is that a program is executed in response to the first interrupt signal, whereas in claim 1 a first conventional interrupt handling routine is executed in response to the first interrupt signal. To one of ordinary skill in the art, the word "program" can generally be substituted for the word "routine" without modifying the meaning of the sentence. Therefore, to help clarify the precise meaning of program in context, it is necessary to see what limitations are placed on the term in the claim. The claim specifies that the program in the second claim element of claim 5 is "to input said scan code in response to said first interrupt signal." ('273 patent, col. 14 ll. 40-42). Therefore, to one of ordinary skill in the art, the word "program" in the second element of claim

-30-

5 should be interpreted to mean a handling routine that causes the computer to receive keyboard scan codes from the keyboard controller. ('273 patent, col. 2 ll. 59-63; col. 5 ll. 10-31; col. 7 ll. 51-64; Figures 2,3 and 6).

60.    The second claim element of claim 5 also specifies that the keyboard controller must generate a second interrupt signal upon receipt of a scan code corresponding to the non-conventional function key. Claim 1 does not require receipt of such a scan code. It does however require the keyboard controller to recognize the activation of the additional function key in combination with a conventional alphanumeric key. Claim 5 requires only the receipt of the scan code corresponding to the non-conventional function key. Therefore, one of ordinary skill in the art would interpret "second interrupt signal on said second interrupt signal line upon receipt of a scan code corresponding to said non-conventional function key" to mean a signal generated by the keyboard controller upon receipt of a scan code corresponding to the non-conventional function key.

61.    Claim 5 does not say that the second interrupt signal can only be generated by the keyboard controller when the keyboard controller receives the scan code corresponding to the non-conventional function key alone. It also does not require that as soon as the keyboard controller receives the scan code for the non-conventional function key, it must issue the second interrupt signal without waiting for an additional key to be pressed. The specification teaches that the invention is pressing the non-conventional function key along with a conventional key. ('273 patent, col. 2 ll.17-21, 55-59; col. 7 l. 65 – col. 8 l. 46; Figure 8). The specification also teaches that the preferred embodiment is to use the non-conventional function key along with a conventional key. Therefore, it is not the preferred embodiment to respond to the activation of the non-conventional function key alone and to immediately issue the second interrupt signal

-31-

without waiting for an additional key to be pressed.

62.    One of ordinary skill in the art understands that the F1-F12 function keys operate

by generating a first interrupt signal when a function key, F1-F12, is pressed alone.  The

specification makes clear that it is not the preferred embodiment to respond to the non-

conventional function key alone in a manner similar to the function keys F1 – F12.  ('273 patent,

col. 7 ll. 1-19).

## XII.    INTERRUPT VECTOR

63.    Claim 6 of the '273 patent reads as follows:

> The system for servicing keyboard interrupts as defined in claim 5,
> further comprising an interrupt controller coupled to said keyboard
> controller, said interrupt controller generating one of plurality of
> interrupt vectors, said vector depending upon said interrupt signal.
> ('273 patent, col. 14 ll. 49-54).

Claim 6 further claims an interrupt controller, a standard device in an ISA-compatible

computer.  The interrupt controller is "an electrical component that generates interrupt vectors

corresponding to the interrupt signals."  Exhibit N shows an exemplary interrupt controller (130)

accepting two interrupt signal lines from the keyboard controller and outputting a single interrupt

line labeled INT to the CPU along with the interrupt vector (INT. VECTOR).  The interrupt

vector is an identifier that identifies a particular interrupt signal and also corresponds to an

interrupt handling routine. The interrupt vector is generated by looking at all active interrupt

lines and determining which is of highest priority and therefore which interrupt handling routine

the CPU should next execute.

64.    When one or more interrupt signal lines go active, the interrupt controller

activates the INT line to inform the CPU that an interrupt is requested.  Once the CPU recognizes

the interrupt request, it interrupts the program it is working on and requests the interrupt

controller to send it an interrupt vector to tell it which interrupt needs servicing. The interrupt

controller then decides which pending interrupt signal is of highest priority and sends the

interrupt vector of the highest priority interrupt to the CPU. The interrupt vector is then read by

the CPU and used to locate the memory pointer of the interrupt handling routine to execute.

('273 patent, col. 4 l. 24 – col. 5 l. 31).

## XIII.  INDEXING ONE OF A PLURALITY OF MEMORY LOCATIONS

65.   Claim 7 of the '273 patent reads as follows:

> The system for servicing keyboard interrupts as defined in claim 6,
> further comprising a Central Processing Unit coupled to said
> interrupt controller, said Central Processing Unit indexing one of a
> plurality of memory locations, said memory location depending
> upon said interrupt vector. ('273 patent, col. 14 ll. 55-60).

Claim 7 is based on claim 6 and covers the process of locating the start of the interrupt

handling routine. Exhibit O illustrates that in the exemplary embodiment, the CPU uses the

interrupt vector to access a pointer to the start of the interrupt routine. Once the CPU receives

the interrupt vector from the interrupt controller, it uses it to index a memory location that

corresponds to the start of the interrupt handling routine. Each different interrupt vector accesses

a unique memory pointer. Therefore, one of ordinary skill in the art would understand that

"indexing one of plurality of memory locations" means to select or access one of a plurality of

memory locations that correspond to the program or the special routine. ('273 patent, Col. 5 ll. 1-

16; Col. 6 ll. 50-60).

## XIV.  BACKGROUND PERTINENT TO THE '054 PATENT

66.   The '054 patent teaches a power conservation system for a modem in a computer

system whereby the ring detect circuit remains active even during a power conservation mode of

operation of the computer system. ('054 patent, abstract). The specification teaches that previous

-33-

to the '054 patent, the same power that was used to power the circuitry of the computer's modem was also used to power the ring detect circuitry. ('054 patent, col. 1 l. 61 – col. 2 l. 1). The ring detect circuitry is that circuitry that detects that the phone line connected to the modem has an active ring signal. (054 patent, col. 2 ll. 45 – 50). Therefore, when the computer was in a power conservation mode and power was removed from the modem, there also was no power to the ring detection circuitry. ('054 patent, col. 2 ll. 2 – 7). This caused the problem that an incoming call could not be recognized or received and thus there was no way to know that the computer should be powered back on to receive the call. The '054 patent teaches connecting an auxiliary power supply to the ring detection circuitry to allow it to stay powered when the circuitry for the modem and the rest of the computer is in a power conservation mode of operation.

67.    Exhibit P, Figure 2 of the '054 patent, illustrates the prior art to the '054 patent. A power supply (Vcc) supplies power to a ring detect circuit. One of ordinary skill in the art would understand that the notation Vcc is simply a constant voltage applied at the point where the notation is shown. Two input telephone lines (G) are connected to a photocoupler (11). The output of the photocoupler (11) is connected to the ring indicator (RI). The photocoupler continuously monitors the telephone line waiting for a ring signal. When there is no ring signal, the ring indicator (RI) remains in a deactivated state. When a ring signal is detected, the ring indicator activates and notifies the computer system that a call is being received.

68.    In the prior art, as discussed in the specification, if the voltage to the modem is removed, the power supply (Vcc) will no longer supply power to the ring detect circuit. Thereafter, regardless of whether the phone is ringing or not, the voltage at the ring indicator will be inactive thus not accurately indicating whether a phone line has a signal or not.

69.    Korean Utility Unexamined Application Publication Nos. 94-8840 and 94-8841

-34-

endeavor to solve this problem.  These applications disclose an integrated, stand alone

fax/modem that has a built-in computer and power controller utilizing a mechanical or electronic

switch that responds to a detection signal produced by a ring signal on the telephone line.  ('054

patent, col. 2 ll. 16-21). This signal is powered by the modem power supply, which is different

and independent from the main computer's power supply. Therefore, the modem is always on

and ready to communicate.  However, because the modem requires its own computer to perform

the power control operations, this computer must remain powered, increasing power

management overhead and power consumption. ('054 patent, col. 2 ll. 29-36).

70.      Exhibit Q, Figure 3 of the '054 patent, provides one embodiment illustrating the

invention of the '054 patent.  The telephone lines (G) and their connection to the photocoupler

are unchanged from the prior art.  The '054 patent specification describes that connected to the

photocoupler (133) is an Auxiliary Power Supply (120).  A voltage (Vcc) is connected to the

photocoupler through a leakage current protection device (LCP), which can be, for example, a

diode.  ('054 patent, col. 3 ll. 17-39).

71.      Connected to the photocoupler at the bottom of Exhibit Q is a power management

system (PMS) (100) that receives the same indication that the telephone line has a ring signal as

is reflected in the line RI.  Upon detecting the ring signal, the PMS activates its output which is

connected through an "OR" logic gate (150) to a power supply (110).  ('054 patent, col. 3 l. 65 –

col. 4 l. 11).  The other input of the OR gate is a manual power switch that can be activated by a

user.  The OR gate provides an active or high output when either one or both of its inputs are

active or high.

## XV.    AN OVERVIEW OF CLAIM 1 OF THE '054 PATENT

72.      Claim 1 of the '054 patent covers a power conservation system for a modem in a

-35-

computer system having a primary and an auxiliary power supply. ('054 patent, col. 4 ll. 19 –

21). The power conservation system includes a ring detect circuit that is coupled to a telephone

ring signal line that detects the ring signal. ('054 patent, col. 4 ll. 22 – 25). The ring detect

circuit is also coupled to a power supply voltage that supplies the power to the ring detect circuit

in a normal mode of operation. ('054 patent, col. 4 ll. 25 – 27). The claim also calls for a power

management system that has 'an input coupled to the ring detect circuit and an output coupled to

a primary power supply. ('054 patent, col. 4 ll. 28-30). The power management system

responds to the ring detect signal to cause the primary power supply to switch its operation from

a power conservation mode of operation to a normal mode of operation. ('054 patent, col. 4 ll.

30 – 35). The auxiliary power supply is coupled to the ring detect circuit and it provides the

power to the ring detect circuit when the computer system is in the power conservation mode of

operation. ('054 patent, col. 4 ll. 36 – 42).

73.    I understand that the language of a claim is to be interpreted in light of the

specification, file history and cited prior art. With this in mind, the following terms and phrases

are defined:

>    (1) Computer System
>
>    (2) Power Supply
>
>    (3) Primary power supply
>
>    (4) Auxiliary power supply
>
>    (5) Power supply voltage
>
>    (6) Power conservation mode of operation
>
>    (8) Normal mode of operation
>
>    (9) Said auxiliary power supply is coupled to said ring detect circuit for supplying

power to said ring detect circuit when the computer system is in said power conservation mode of operation.

74.     Each of these terms is defined in the context of the associated claim elements that contain the terms.

## XVI.   COMPUTER SYSTEM

75.     The preamble of the claim 1 of the '054 patent is as follows:

> "1. A power conservation system for a modem in a computer
> system having a primary power supply and an auxiliary power
> supply, comprising:" ('054 patent, col. 4 ll. 19 – 21).

The preamble describes a power conservation system in a computer system. One of ordinary skill in the art would understand that a computer system is an electronic apparatus that accepts, processes, stores, and outputs data according to programmed instructions. The term computer system is very general. It can be used to describe any electronic apparatus that has a central processing unit. The term does not imply the use of any specific peripherals such as modems, a printer, a hard disk or a tape drive. A computer system would still have the ability to perform computation without peripherals. Furthermore, the term "computer system" does not imply included software. Clearly, an operational computer system requires that there be some type of software to direct the operation of the computer. However, one of ordinary skill in the art would understand that a computer system would still have the ability to compute if there were no software. As understood by one of ordinary skill in the art, the term "computer system" does not imply a complete, working computer, including all hardware, memory, software such as an operating system and applications and connected peripherals. It only implies an electronic system that has the ability to compute.

## XVII.  POWER SUPPLY, POWER SUPPLY VOLTAGE

76.    The first claim element of claim 1 of the '054 patent reads as follows:

> a ring detect circuit coupled to a telephone ring signal line for
> generating a ring detect signal in response to detection of a ring
> signal on said telephone ring signal line, said ring detect circuit
> also being coupled to a power supply voltage for supplying power
> to said ring detect circuit during a normal mode of operation;
> ('054 patent, col. 4 ll. 22-27).

The first claim element of claim 1 calls for a ring detect circuit that takes as input a

telephone ring signal line, detects when the telephone line has a ring signal and then generates a

ring detect signal when the telephone ring signal is detected.  The claim furthermore requires that

the ring detect circuit be powered by a power supply voltage during a normal mode of operation.

A power supply is a circuit designed to provide electric current at a predetermined voltage for

supplying power to devices or circuits.  The claim does not indicate what power supply supplies

the power supply voltage and it would be improper to assume that the power supply voltage is

generated from the primary power supply.  The specification does not describe this and the claim

does not require it.  Furthermore, Exhibit Q, Figure 3 of the '054 patent, shows an embodiment

containing a power supply (110) that is connected to and has the necessary characteristics of the

primary power supply of claim 1.  ('054 patent, col. 3 ll. 51-58; col. 4 ll. 3-12).  The power

supply (110) of this figure shows no connection to the ring detect circuit which requires the

power supply voltage even though the entire circuit is shown.  A connection to provide the

power supply voltage for the ring detect circuit could have been easily shown.  Therefore, the

power supply voltage is defined by one of ordinary skill in the art to be a voltage that is supplied

by a power supply.

-38-

## XVIII. PRIMARY POWER SUPPLY, POWER CONSERVATION MODE OF OPERATION, NORMAL MODE OF OPERATION

77.      The second claim element of claim 1 of the '054 patent reads as follows:

> a power management system having an input coupled to said ring
> detect circuit and an output coupled to the primary power supply,
> said power management system being responsive to said ring
> detect signal for switching the primary power supply from a first
> level corresponding to a power conservation mode of operation of
> the computer system to a second level corresponding to said
> normal mode of operation; and, ('054 patent, col. 4 ll. 28-25)

78.      As described in the specification and understood by one of ordinary skill in the

art, the claim language "power conservation mode of operation" means a state in which the

computer system as a whole consumes less power than in the normal mode. ('054 patent, col. 3

ll. 51-58) This is the mode in which a minimum amount of power is supplied to the computer

system. The patent specification does not describe this mode as completely cutting off the power

to the computer system; it simply describes the power to be reduced to a minimum level. To one

of ordinary skill in the art, interpreting this claim to require that power to the computer system be

completely eliminated during the power conservation mode of operation would be incorrect since

power may still be applied to power critical systems that may be needed to bring the computer

back to the normal mode of operation. For example, the PMS must be powered during the

conservation mode of operation in order for it to be able to operate to determine when to bring

the primary power back to the normal mode of operation.

79.      The specification also does not explicitly define what is a normal mode of

operation. However, it is known that at least the modem must be active during the normal mode

of operation. ('054 patent, col. 3 ll. 39-44) Any further understanding of what constitutes a

normal mode of operation must come from a general knowledge of computer systems as

understood by one of ordinary skill in the art.

80.    One of ordinary skill in the art knows that modern computer systems have many built-in mechanisms to perform power conservation.  Even with the computer in full use with the keyboard and mouse and other peripherals in constant use, it is possible that certain unused input/output devices may get turned off, or power may be reduced if they have not been accessed for a while.  For example, a computer disk drive has an independent microprocessor that controls its use.  This microprocessor can detect if there has not been any requests of the disk drive in a given period of time.  If no disk requests have been made in a programmed amount of time, the disk drive microprocessor may stop the disk from spinning and shut down portions of the disk drive control circuitry. This can happen even when the user is actively using the computer system.  The same thing can and does happen with even higher regularity with a computer Compact Disk (CD) drive.  In the situation where the hard disk or the CD drive is partially shut down, the primary power supply will not be supplying power to these devices even though the computer system is in full use.  Therefore, one of ordinary skill in the art would not define a normal mode of operation to be when the primary power supply supplies the power to all the components in the computer system.  It is more accurate to define a normal mode of operation of the computer system to be where the primary power supply provides power to most components of the computer system.  This definition covers the common situation where the computer is fully operational yet some components may have independently been turned off.

81.    Since a normal mode of operation does not necessarily power all the components at one instant, when the primary power supply operates in normal mode, it may not be powering all the components at once.  Therefore, one of ordinary skill in the art would define the primary power supply to be a power supply that supplies most system components with power during a

-40-

normal mode of operation and has a lower (power saving) level during a power conservation mode.

82.    Electrical power drives all the electronic circuitry in the computer and provides the means for passing information from one digital block to another. Power is provided to a computer via an electrical cord plugged into a wall outlet and sometimes from a battery when wall power is not available. A wall outlet or battery acts as a "power source." However, to operate quickly and efficiently, a computer must have very specific, conditioned power provided at a specific voltage that does not change as the power demands on the system change. Therefore, the unregulated power provided by the power sources in a variety of voltages must first pass through circuits that regulate the power to produce a set of voltages that have the necessary characteristics required by the computer to operate correctly. For each voltage required by a computer, there is separate circuit called a "power supply" that generates the necessary voltage.

83.    A power supply, as it was ordinarily and customarily understood in the electronics field in 1994 and today is a circuit designed to provide electric current at a predetermined voltage for supplying power to devices or circuits. The power source of the notebook computer provides the power to drive multiple power supplies in a notebook computer system. A notebook computer has many power supplies which supply power, generally at different voltages, for different purposes. A notebook computer has a +5 volt power supply to provide +5 volt power to all devices requiring +5 volts during normal operation. It also has a +3.3 volt power supply for components requiring +3.3 volt power in normal operation. A notebook will also have a +12 volt power supply for interface devices and other devices that require +12 volt power. A notebook computer may also have a +2.5 volt power supply to provide voltages for certain other

-41-

circuits.

84.    One power supply in a computer system is distinguished from another power

supply by the difference in voltage generated or the control of when the power supply is active.

Since two power supplies have different characteristics, there must be some difference in their

design and therefore some unique circuits that make them different. If one considers a "power

supply" to consist only of the circuits that are unique to that power supply, then each power

supply is obviously completely separate. However, every power supply must receive power

from a power source or possibly other power supplies so that it can convert it into the voltage

necessary for its purpose. There may be multiple sources of power in the computer system (i.e.

wall plug and battery). As the power source is sent to the various power supplies, there may be

intermediate circuits for distributing the power to the various power supplies. If the power

source and the intermediate circuits are included in the definition of a power supply, and since

generally power supplies in a computer system connect to the same power sources, then power

supplies must necessarily share at least some of the same circuitry.

## XIX.    AUXILIARY POWER SUPPLY, SAID AUXILIARY POWER SUPPLY IS COUPLED TO SAID RING DETECT CIRCUIT FOR SUPPLYING POWER TO SAID RING DETECT CIRCUIT WHEN THE COMPUTER SYSTEM IS IN SAID POWER CONSERVATION MODE OF OPERATION

85.    The final element of claim 1 of the '054 patent reads as follows:

> wherein said auxiliary power supply is coupled to said ring detect
> circuit for supplying power to said ring detect circuit when the
> computer system is in said power conservation mode of operation,
> whereby said ring detect circuit is maintained in an active state
> even during said power conservation mode of operation of the
> computer system. ('054 patent, col. 4 ll. 36-42).

The auxiliary power supply is defined to be part of the power conservation system in the

computer system, but it is not until the final claim element that its connection with other

-42-

components and purpose become clear. The auxiliary power supply is described in the specification as a power supply that supplies power to the ring detect circuit of the modem at least when the computer system is in power conservation mode of operation. ('054 patent col. 3 ll. 59-65) This is consistent with the use of the auxiliary power supply as described in claim 1, where the function of the auxiliary power supply is to supply power to the ring detect circuit when the computer system is in the power conservation mode of operation. Therefore, to one of ordinary skill in the art, the auxiliary power supply is a power supply that supplies power to the ring detect circuit during a power conservation mode of operation. Furthermore, it is clear from a plain reading of the patent claim to one of ordinary skill in the art that when claim 1 says "said auxiliary power supply is coupled to said ring detect circuit for supplying power to said ring detect circuit when the computer system is in said power conservation mode of operation" that the auxiliary power supply supplies power to the ring detect circuit during a power conservation mode to maintain the ring detect circuit in an active state during the power conservation mode of operation.

86.    It should be noted that there is nothing in claim 1 that restricts the primary power supply from sharing circuitry with the auxiliary power supply. As discussed above, depending on how one defines "power supply," a power supply may necessarily share circuitry with another power supply. Moreover, one of ordinary skill in the art knows that power supplies are sometimes used in the design of other power supplies. Therefore, it is possible that the primary power supply and the auxiliary power supply could share circuitry.

## XX.    BATTERY POWER SOURCE

87.    Claim 11 reads as follows:

The system as set forth in claim 1, wherein said auxiliary power

-43-

supply comprises a battery power source. ('054 patent, Col. 5 ll. 19-20).

As previously discussed, a power supply is a circuit designed to provide electric current at a predetermined voltage for supplying power to devices or circuits. A power source supplies power that can be used to provide raw power to a power supply. A battery can provide a power source from which a power supply can derive its power. Claim 11 calls for the auxiliary power supply to include a battery power source. The specification indicates through an example that a battery may be included in the auxiliary power supply. ('054 patent, col. 1 ll. 35-36). Therefore, one of ordinary skill in the art would interpret a battery power source to be a power source that includes a battery. A power source is a raw source of power with unregulated output such that differing demands on the power source may cause a change in output voltage. Claim 11 requires that the battery power source be part of the auxiliary power supply, therefore the battery power source may supply the power used in at least part of the circuitry that makes up the auxiliary power supply.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed on this 11th of October 2002 at Cupertino, California.

DR. ROBERT G. WEDIG

-44-