EXHIBIT 7



# ORIGINAL

FILED

FEB 25 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>QUANTA COMPUTER, INC., QUANTA COMPUTER USA, INC., and COMPAL ELECTRONICS, INC.,<br><br>Defendants. | CASE NO. C 00-04524 VRW<br><br>**DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS CO., LTD.'S CLAIM CONSTRUCTION BRIEF**<br><br>Date: May 6, 2005<br>Time: 9:30 a.m.<br>Courtroom: 3<br>Judge: Honorable Vaughn R. Walker |
| SAMSUNG ELECTRONICS CO., LTD.,<br><br>Plaintiff,<br><br>v.<br><br>TWINHEAD CORPORATION and TWINHEAD INTERNATIONAL CORPORATION,<br><br>Defendants. | CASE NO: C 01-02424 VRW |



I, DR. ROBERT G. WEDIG, declare as follows:

1.      I am a citizen of the United States and reside at 1516 Cormorant Ct., Sunnyvale, CA 94087. I am the owner of Wedig Consulting, in Cupertino, California. Wedig Consulting is an independent consulting firm specializing in analysis of computer hardware and software

-1-

1   design issues. I have been retained by Plaintiff Samsung Electronics Co., Ltd. to provide it with

2   technical advice in this action.

3       2.      In this declaration, after describing my expertise and the materials I reviewed, I

4   will first describe some aspects of computer operation that will assist in understanding the

5   invention described in the patents in suit. Next, I will review computer technology pertinent to

6   United States Patent No. 5,333,273. Finally, I will review claims 1 and 4-5 of U.S. Patent No.

7   5,333,273 and identify various terms and phrases used in the claims and provide an explanation of

8   how one of ordinary skill in the art of computers, computer systems and architecture would have

9   understood the various claim terms and phrases in these claims at the time of invention.

10  **I.      EXPERTISE**

11      3.      I received a Bachelors of Electrical Engineering degree from the University of

12  Dayton in 1977. I received a Master of Science degree in electrical engineering from the

13  University of Southern California in 1979. I received a Ph.D. in electrical engineering from

14  Stanford University in 1982. From 1977 through 1979, I worked as a processor design engineer

15  at Hughes Aircraft Company in Fullerton, California. In this capacity, I designed computer

16  systems that included connections to computer keyboards. From 1979 through June 1982, I was a

17  Research Assistant, Instructor, and Teaching Assistant in the Computer Systems Laboratory at

18  Stanford University. During this time, I took classes and did research on computer systems which

19  connect to input devices such as keyboards. From 1982 through December 1985, I was an

20  Assistant Professor of Electrical and Computer Engineering at Carnegie-Mellon University where

21  I taught courses in computer architecture and VLSI design that included interfacing techniques to

22  a variety of input/output devices including keyboards. Since January 1986, I have worked as an

23  independent consultant, doing business as Wedig Consulting. My *curriculum vitae,* including a

24  list of all my publications, is attached as Exhibit A. I make this declaration in support of Plaintiff

25  Samsung Electronics Co., Ltd.'s proposed claim construction in this action. I make this

26  declaration of my own personal knowledge, and if called as a witness, I could and would testify

27  competently to the facts in this declaration.

28      4.      I am an expert in computers, computer systems and computer architecture that

-2-

EM\7182668.1
1190860-904400

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524 VRW & C 00-01-02424 VRW

1  involve microcomputers, namely computers and systems that employ microprocessors as the

2  central processing unit.  I understand that the field of invention of U.S. Patent 5,333,273 is

3  concerned with the field of microprocessor-based computer systems, and more particularly,

4  computer systems based on the Industry Standard Architecture (ISA) utilizing the Intel 80x86

5  microprocessors and their equivalents.  (US Patent 5,333,273, col. 1 ll. 11-16).  In particular, the

6  invention relates to an improved system for implementing a computer keyboard. In addition to

7  having taught courses on computer design which included connecting to computer keyboards, I

8  have designed computer systems and digital computer logic that connects to keyboards.

9  **II.    MATERIALS REVIEWED**

10       5.    I have read United States Patent No. 5,333,273, issued July 26, 1994, naming

11  Charles F. Raasch and Michael K. Goodman as inventors and entitled "Protected Hot Key

12  Function for Microprocessor-Based Computer System."  I will refer to that patent in this

13  declaration as the "'273 Patent."  I have also reviewed the United States patent application Serial

14  No. 939,583, filed September 3, 1992, the application from which the '273 Patent issued, and the

15  prosecution history of that application before the United States Patent and Trademark Office.  I

16  have also reviewed United States patent application Serial No. 611,292, filed November 9, 1990,

17  and the history of the prosecution of that application by the United States Patent and Trademark

18  Office.  I have also reviewed the United States patents and the other publications identified on the

19  first page of the '273 Patent as "References Cited".   I understand those patents and publications

20  to be the patents and publications that the United States Patent and Trademark Office considered

21  during the prosecution of the applications.  I have also reviewed the definitions of certain terms as

22  found in the general and technical dictionaries and other books cited by the parties.

23       6.    I have reviewed the definitions for the terms defined by Samsung Electronics and

24  defendants Quanta Computer, Inc. and Compal Electronics, Inc. in Exhibits B-3, C-3 and D-3,

25  respectively, to the Joint Claim Construction Statement, dated June 6, 2002, which was filed in

26  the action pending in the United States District Court for the Northern District of California, Case

27  No. C00-04524 VRW.  I have also reviewed the letter sent from John W. Schlicher to Terry D.

28

EM\7182668.1
1190860-904400

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524  VRW & C 00-01-02424 VRW

1  Garnett, William L. Anthony and Ned Isokawa on August 2, 2002 revising some of Samsung's

2  claim constructions for the '273 patent. I have also reviewed the letter sent from Matthew J. Hult

3  to John W. Schlicher on August 30, 2002 modifying some of Compal's claim constructions for

4  the '273 patent. I have also reviewed the letter sent from Sang N. Dang to John W. Schlicher on

5  August 30, 2002 modifying some of Quanta's claim constructions for the '273 patent. I have also

6  reviewed the letter sent from Keith A. Rutherford to Alan Albright on August 30, 2002 modifying

7  Inventec's claim constructions for the '273 patent. I have also reviewed the letter sent from Dan

8  C. Hu to Alan Albright on September 3, 2002 modifying Arima's claim constructions for the '273

9  patent. I have also reviewed the letter sent from John W. Schlicher to Terry D. Garnett, William

10  L. Anthony and Ned Isokawa on August 30, 2002 revising some of Samsung's claim

11  constructions for the '273 patent. I have also reviewed the letter sent from Alan Albright to Lee

12  Kaplan, Trang Q. Tran, Philip T. Burns and Keith Rutherford on August 30, 2002 revising some

13  of Samsung's claim constructions for the '273 patent. I have also reviewed the definitions for the

14  terms defined by defendant Twinhead Corporation in Exhibit C1 to the Joint Claim Construction

15  Statement, which was filed in the action pending in the United States District Court for the

16  Northern District of California, Case No. C01-02424 VRW. I have also reviewed the Samsung

17  October 9, 2002 Claim Construction Charts. I have also reviewed the Inventec October 9, 2002

18  Claim Construction Charts. I have also reviewed the Arima October 10, 2002 Claim Construction

19  Charts. I also attended the deposition of Dr. George Ligler held on September 18-19, 2002 and

20  the deposition of Dr. Ray Mercer held on September 24-25, 2002. I testified at the Markman

21  Hearing conducted by Magistrate Judge Nancy Johnson on November 12-15. At this hearing, I

22  also observed testimony provided by Dr. Mercer and Dr. Ligler. I have reviewed the definitions

23  for the terms defined by Samsung Electronics and defendants Quanta Computer, Inc., Compal

24  Electronics, Inc. and Twinhead Corporation, in Exhibits B, C, D and E, respectively, to the Joint

25  Claim Construction Statement, dated February 11, 2005, which filed in Cases Nos. C00-

26  04524 VRW and C01-02424 VRW.

27  **III.    LEVEL OF SKILL IN THE ART**

28       7.    Based on my reading of the patent specification and claims, I believe that one of

-4-

EM\7182668.1
1190860-904400

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524 VRW & C 00-01-02424 VRW

1   ordinary skill in the art at time of the invention of the '273 patent would have had a Bachelors of

2   Science in Electrical Engineering or Computer Science and at least 2 years of work experience in

3   the field of computer hardware and software design.

4   **IV.     TECHNICAL BACKGROUND PERTINENT TO THE '273 PATENT**

5           8.      In order to help provide a technical background sufficient to understand the

6   technology of the '273 patent, I will first provide a high level discussion of the basic operation of

7   a computer by illustrating a computer system as three basic interacting components: a central

8   processing unit, a memory and an input/output system.  I will then explain how a computer

9   program is performed in a computer system to execute computer programs.  Finally, I will explain

10  how the keyboard works, how the computer determines that a key has been pressed and which

11  key was pressed.

12          9.      Although the intricacies of computers are vast, it becomes easier to gain an

13  understanding of computers by conceptualizing them at a high level and then working down to

14  more detailed levels of complexity as required to understand specific aspects of their design.  One

15  such high level view is shown in Exhibit B to this declaration.  Exhibit B illustrates that a

16  computer can be thought of as being composed of a central processing unit ("CPU"), a memory,

17  and an input/output or "I/O" unit.  These three basic components are connected together by a

18  common set of wires called a "bus."  The CPU is in charge of the entire computer system and it

19  controls and directs its operation.  The memory contains computer programs composed of sets of

20  instructions for the CPU to execute and computer data for the CPU to manipulate.  The I/O unit

21  allows the CPU to communicate with the Input/Output devices, such as the keyboard, printer and

22  computer monitor.  The instructions and data that are transferred between the CPU and the

23  memory are transferred via a "processor bus."

24          10.     A computer operates by executing computer programs made up of a large number

25  of computer instructions.  In particular, the CPU reads the program's instructions from the

26  memory and performs the commands specified by the instructions.  The CPU does this

27  sequentially by requesting one instruction at a time from a specific location in the memory.

28

EM\7182668.1
1190860-904400

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524  VRW & C 00-01-02424 VRW

1    These requests are made over the bus. The memory locates the instruction at the specified

2    location and returns it back over the bus to the CPU. The CPU then examines the instruction and

3    performs the desired operation. After completing the instruction, the CPU will then read the next

4    instruction in memory and start to execute it. The CPU continues this process until all the

5    instructions in the program have been executed.

6          11.      Exhibit C shows an exemplary illustration of a seven instruction program residing

7    in memory that deducts the amount of checks written from a checking account and notifies the

8    user if the checking account balance goes below zero. The CPU reads each instruction from this

9    program sequentially, one after the other starting at the first instruction, unless the CPU performs

10    an instruction that commands it to change the order of reading. For example, in Exhibit C, the

11    first instruction commands the CPU to read the current checking account balance from memory.

12    The CPU does this and then sequentially reads the next instruction that says to determine if there

13    are any more checks to be processed. If there are checks, the CPU continues to read and execute

14    the third instruction. If there are no more checks to process, the CPU then redirects its attention

15    to start reading instructions starting at instruction 7. Instruction 7 indicates that the program has

16    completed so the computer can begin to work on another program.

17          12.      Although it may seem as though a computer can execute many programs

18    simultaneously, it can only actually execute one instruction at a time. Therefore, if the user is

19    downloading a file from the Internet while at the same time editing a file using a word processing

20    program, the computer must have a means for quickly jumping back and forth between the two

21    different programs. Because the program doing the downloading is not aware of the text editing

22    program and vice versa, "interrupts" are used to allow one program to interrupt or temporarily

23    halt the execution of another program. An interrupt is a digital signal input to the CPU that

24    instructs the CPU to stop reading instructions from one program and to start reading instructions

25    from another program. An interrupt is generated due to an event such as the receipt of data by a

26    modem, a key being typed at the keyboard, or possibly the failure of a component of the computer

27    system.

28          13.      As illustrated in Exhibit D, when the CPU receives an interrupt, it immediately

-6-

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524  VRW & C 00-01-02424 VRW

1  halts what it is doing and starts executing a special program called an interrupt routine designed

2  to respond to the interrupting condition called an interrupt routine.  In the example shown in

3  Exhibit D, the checking account balancing program is interrupted after it executes the third

4  instruction.  In this case, the user has typed a key on the keyboard.  The CPU then begins to

5  execute the interrupt routine by reading the data code for the key that was typed and saving it in a

6  queue of typed keys for later.  It then returns control back to the checking account program.  Once

7  the checking account program resumes execution, it continues on as though nothing has happened

8  and it does not realize that it has ever been interrupted.  At some later time, a program will

9  examine the queue of typed keys and begin to process them.  Each time a key is pressed, an

10  interrupt is generated causing an interrupt routine to be executed.  This happens at such great

11  speed that the user is never aware that interrupts are occurring and that one program is being

12  delayed because an interrupt routine is periodically taking small increments of the CPU's time.

13      14.  Further interaction that affects the behavior of a computer comes from the

14  Input/Output (I/O) system.  There are many types of I/O devices.  For example, the keyboard

15  controller provides communication with the computer's keyboard.  The keyboard I/O is germane

16  to the litigation at hand, so details of its operation will now be presented in more depth.

17      15.  In addition to the actual, plastic housing and the plastic keys, a computer keyboard

18  is comprised of a keyboard matrix and microprocessor circuitry such as that shown in Exhibit E,

19  which is Figure 7 of the '273 patent.  In order to determine exactly which key has been pressed,

20  the keyboard microprocessor circuitry sends signals to the keyboard matrix and then receives

21  back a response dependent on which key, if any, has been depressed.

22      16.  The keyboard matrix is composed of a matrix of switches such as that shown in

23  Exhibit F.  There is one electrical switch per key such that when a key is depressed, the switch is

24  connected and when the key is released the switch is disconnected.  Exhibit F illustrates that one

25  wire per row and column is connected to a keyboard microprocessor to perform the detection

26  process.  The keyboard microprocessor sets the column lines and then reads back the row lines.

27      17.  The process for detecting a key is to scan each column line and determine if a key

28  in a selected column has been pressed by reading out the row lines.  Exhibit G illustrates how this

-7-

EM\7182668.1
1190860-904400

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524  VRW & C 00-01-02424 VRW

1   process works.  In this example, a key at row 1, column 1 is being pressed.  In step 1, the

2   microprocessor sets the column 0 wire to logic "1" and all other column wires to logic "0."  The

3   keyboard microprocessor then reads the row wires.  When there is no connection between the

4   active column line and a row line, the row line will read out as a "0."  In step 1, none of the keys

5   in column 0 are pressed; therefore all the row lines remain at logic "0."  When the keyboard

6   microprocessor reads the row lines and sees that they are all at logic "0", it determines that no

7   keys are being pressed in this column and then proceeds to the next step.

8        18.     In step 2, the microprocessor changes the values of the column wires such that

9   only column 1 has a logic "1" value and all the other columns have a logic "0" value.  Then, the

10  keyboard microprocessor again reads out the row lines and detects that the value associated with

11  row 1 is found to be set to logic "1."  The keyboard microprocessor now determines that the

12  switch at row 1, column 1 is closed, indicating that a user is pressing the key associated with this

13  switch.  The keyboard microprocessor then sends a code to the CPU to indicate that a key has

14  been pressed.  After it has done this, it will continue to scan the keyboard by performing step 3,

15  which sets the column 2 line to "1" and all other lines to "0."  It then reads the row lines to see

16  that no switches in column 2 are pressed.  In step 4, the keyboard microprocessor then performs

17  the same function on column 3 and also sees that no switches are pressed.  The keyboard

18  microprocessor then repeats the process starting again at column 0 looking for the user to release

19  the current key and press a new key.

20       19.     The process that the keyboard microprocessor is performing is to scan each

21  column successively looking for closed switches and reporting their value back to the CPU when

22  one is found.  Because the keyboard microprocessor performs a scan of each column to find

23  which key or keys have been pressed, the values that correspond to the pressed keys are called

24  "scan codes."  Once one or more pressed keys have been detected and one or more scan codes

25  generated, the keyboard microprocessor will then activate an interrupt line to notify the CPU that

26  a key has been pressed.  The CPU will then execute an interrupt routine, which will request the

27  scan codes.  The scan codes are transferred to the CPU, which places them in a queue of recently

28  typed characters that are eventually passed on to the application program.

-8-

EM\7182668.1
1190860-904400

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524  VRW & C 00-01-02424 VRW

## V.    BACKGROUND PERTINENT TO THE '273 PATENT

20.    As previously discussed, when a user presses a key on the keyboard, the keyboard microprocessor detects it and interrupts the main computer to indicate that a key has been pressed.  A problem that the computer must face is to determine which one of the multiple running programs should be notified of the key press so the key can be correctly handled.  Normally this is easily decided by passing the data code associated with the pressed key or key combination to the program that the user is currently using.  However, modern computer systems allow the user to send keyboard commands to programs that may not be active at the time of the command.  For example, on an IBM computer system, if the user types a TAB key while holding down the ALT key, the operating system, the controlling program for the computer, will produce a window offering the user to switch to another active program.  This key combination is sent to the operating system program even though the user is interacting with another program.

21.    A single key or a multiple key combination that substitutes for a more complex set of keystrokes or mouse commands is called a "hot key."  Some hot keys are used in multiple programs, with one program using it for one purpose, and another using it for another purpose.  It sometimes can occur that a user may type a hot key intended for one program, but it is erroneously detected and acted on by another program that recognizes the same hot key but performs a different function upon detecting it.

22.    The inventors of the '273 patent recognized that such a situation was possible and developed an innovative solution to the problem.  Their invention involved adding a key to the standard IBM PC keyboard that would be used only by new programs that want to use a hot key combination.  This key is now commonly found on many modern personal computer systems and it is usually labeled as "Fn."  The Fn key operates such that when it is pressed along with a conventional key on the keyboard, a unique interrupt is generated different from the interrupt normally used to indicate a key has been pressed.  This interrupt is sent to the computer system.  This unique interrupt causes the computer to start to execute a unique interrupt handling routine to deal with the hot key.  This interrupt handling routine examines which conventional key was

-9-

EM\7182668.1
1190860-904400

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524  VRW & C 00-01-02424 VRW

1  pressed along with the Fn key and performs the function associated with the selected hot key.

2          23.      This invention works with all existing programs and any new programs without

3  interference. All new programs that are aware of the Fn key plus conventional key hot key

4  combination can use it without interfering with programs previously written to use older hot key

5  combinations. The interrupt generated by the combination of the Fn key and a conventional key

6  is different from the normal key press interrupt, so it will not be detected by older programs.

7  Programs designed before the development of the Fn key will therefore not know that the new

8  key combination was pressed, so new programs that use the Fn key cannot interfere with older

9  programs.

10  **VI.      AN OVERVIEW OF CLAIM 1 OF THE '273 PATENT**

11          24.      Claim 1 covers a system that provides additional functionality in an ISA-

12  compatible computer. This functionality is provided when certain key combinations are pressed.

13  Although I understand the language of the claim itself determines the bounds of invention, I will

14  use Exhibits H through L, and Figures 5, 6 and 7 from the '273 patent, to illustrate the basic

15  principals of claim 1. These exhibits illustrate one way to implement the invention described in

16  claim 1 and it is not meant to limit the interpretation of claim 1 to be only what is shown in these

17  exhibits.

18          25.      As illustrated in Exhibit H, which shows Figure 5 of the '273 patent, the first

19  limitation of claim 1 describes a keyboard having alphanumeric and function keys. In addition,

20  this keyboard has the previously discussed additional function key "Fn."

21          26.      As illustrated in Exhibit I, which shows Figure 7 of the '273 patent, Claim 1 also

22  claims a keyboard controller connected to the keyboard that monitors when a key is pressed.

23  Claim 1 discloses that the keyboard controller provides two interrupt signal lines that connect to

24  the ISA-compatible computer. Exhibit I highlights in this exemplary illustration the keyboard

25  controller and two interrupt lines labeled IRQ1 and IRQ15 provided from the keyboard controller.

26  The claim does not limit the interrupts to be exactly the specific interrupt signal lines shown in

27  Exhibit I. A personal computer system has many interrupt signal lines used for a variety of

28

-10-

1    purposes. One of ordinary skill in the art would understand that any two interrupt signal lines

2    produced by the keyboard controller would satisfy the two interrupt line requirement of claim 1.

3          27.    In claim 1, the keyboard controller must be responsive to any of the conventional

4    keys to activate a first interrupt signal to the ISA-compatible computer on the first interrupt signal

5    line. In addition, the keyboard controller must be responsive to an activation of the additional

6    function key along with one of the conventional alphanumeric keys to generate a second interrupt

7    signal to the ISA-compatible computer on the second interrupt signal line.   These requirements

8    are illustrated in Exhibit J, which is a modified version of Figure 7 of the '273 patent that includes

9    additional details of the keyboard and keyboard controller that are described in the patent

10   specification but which are not included in Figure 7. ('273 patent, col. 7, ll. 32-40).

11         28.    As illustrated in Exhibit J and discussed in the patent, the keyboard controller is

12   responsive to an activation of at least one of the conventional keys, such as the A key, to activate

13   a first interrupt signal, shown as the IRQ1 signal. The keyboard controller also is responsive to

14   an activation of the additional function key in combination with at least one of the conventional

15   alphanumeric keys, such as the Fn key in combination with the R key, to activate a second

16   interrupt signal, such as the IRQ15 signal. ('273 patent, col. 7, l. 51 – col. 8, l. 8).

17         29.    Due to the activation of the first interrupt signal, claim 1 specifies that a

18   conventional interrupt handling routine be executed to read the scan code from the keyboard.

19   Using Figure 6 of the '273 patent, Exhibit K highlights the keyboard interrupt service routine

20   executed by the CPU and the transfer of the scan code to the CPU that, in this embodiment,

21   comes from the keyboard controller.

22         30.    Exhibit L illustrates the final element of claim 1. Due to the activation of the

23   second interrupt signal, claim 1 specifies that a second non-conventional interrupt handling

24   routine is to be executed to identify which activated alphanumeric key was pressed along with the

25   additional function key and to then perform a predetermined function based on the identified

26   alphanumeric function key. In Exhibit L, the second interrupt line is IRQ15. However, claim 1

27   does not specify the interrupt line to use and one of ordinary skill in the art would know that it is

28   not required that IRQ15 be used as the second interrupt line.

EM\7182668.1
1190860-904400

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524 VRW & C 00-01-02424 VRW

31.    There are a number of terms and phrases at issue that need to be defined in more detail to come to a thorough understanding of claim 1. These terms and phrases are:

(1) ISA-Compatible Computer

(2) Keyboard controller

(3) Activation of said additional function key in combination with at least one of said conventional alphanumeric keys to generate a second interrupt signal

(4) Data scan code

32.    Each of these terms and phrases is discussed in light of the preamble and individual claim elements of claim 1.

## VII.    ISA-COMPATIBLE COMPUTER

33.    The term "ISA-compatible computer" is used in the preamble of claim 1 to specify the type of computer in which the present invention is to reside. It is therefore relevant to determine what one of ordinary skill in the art would understand to be an ISA-compatible computer.

34.    I understand that the parties have agreed that an "ISA-compatible Computer" is a computer that can handle ISA standard defined interrupts. One of ordinary skill in the art understands that while an ISA-compatible computer can handle ISA standard defined interrupts, not all ISA standard defined interrupts signals need to be actually used in a particular ISA compatible computer.

## VIII.    KEYBOARD CONTROLLER, ACTIVATION OF SAID ADDITIONAL FUNCTION KEY IN COMBINATION WITH AT LEAST ONE OF SAID CONVENTIONAL ALPHANUMERIC KEYS TO GENERATE A SECOND INTERRUPT SIGNAL

35.    The second element of claim 1 reads as follows:

a keyboard controller connected to said keyboard to monitor said conventional keys and said additional function key to detect when at least one of said keys is activated, said keyboard controller having first and second interrupt signal lines connected to said ISA-compatible computer; said keyboard controller responsive to an activation of at least one of said conventional keys to activate a first interrupt signal to said ISA-compatible computer on said first interrupt signal line, said keyboard controller responsive to an

-12-

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524  VRW & C 00-01-02424 VRW

activation of said additional function key in combination with at
least one of said conventional alphanumeric keys to generate a
second interrupt signal to said ISA-compatible computer on said
second interrupt signal line; ('273 patent, col. 13 ll. 43-57).

The function of the keyboard controller is clearly stated in the claim: "to monitor said

conventional keys and said additional function key to detect when at least one of said keys is

activated." This is the normal function of keyboard controllers and this function is supported by

the specification. ('273 patent, col. 2: 49-68; col. 4 ll. 6-11, 24-38; col. 6 ll. 35-68; col. 7 l. 32 –

col. 8 l. 46; col. 8 l. 65 – col. 9 l. 21; Figures 1-3: 128; Figure 4:220; Figure 6:220; Figure 7;

Figure 8). Therefore, one of ordinary skill in the art understands that the keyboard controller is an

electrical component that monitors and detects the activation of keys on the keyboard. As recited

in the claim element, the keyboard controller also performs the function of generating a first and a

second interrupt signal to the ISA-compatible computer when certain key combinations are

pressed. I understand that the parties have agreed that the keyboard controller is at least a

component that "activates interrupt signals in response to receipt of data scan codes from the

keyboard and upon request, transmits the data scan codes to the computer." One or ordinary skill

in the art understands this to be true.

36.    I also understand that the parties disagree as to whether the keyboard controller is

a component "separate from the keyboard." Claim 1 does not specify that the keyboard controller

must be separate from and receive scan codes from the keyboard. In support of this, the

specification discusses one embodiment in which the keyboard microprocessor and the keyboard

controller are combined in a single unit for computer systems such as laptop computers. ('273

patent, col. 7 ll. 35-37, 58-63). In this embodiment, when the combined unit detects that a key

has been pressed, it generates the scan code and sends the scan code to the host computer directly.

In this situation, one might consider that the keyboard controller described in this embodiment

does not receive scan codes from the keyboard since the keyboard controller and the keyboard

microprocessor are combined in the same unit. Therefore, since the claim does not specify that

the keyboard controller needs to receive scan codes from the keyboard, and at least one

embodiment of the keyboard controller in the specification does not support this interpretation,

-13-

1   one of ordinary skill in the art would understand that the keyboard controller is not required to be

2   separate from the keyboard and it is not required to receive scan codes from the keyboard.

3       37.    In a traditional desktop computer, the keyboard is in a separate unit from the main

4   unit that holds the CPU, memory and other components of the computer system.  The keyboard

5   contains a microprocessor that monitors and detects the activation of keys.  The keyboard

6   controller, located in the main unit, contains a second microprocessor that interrupts the computer

7   upon key activation.

8       38.    In a laptop or notebook computer, the keyboard and the keyboard controller are

9   typically combined together, such as what is depicted in Figure 7 of the '273 patent.  The two are

10  combined through their common use of a single microprocessor, rather than each using its own

11  separate microprocessor.  As described in the specification, the common microprocessor is

12  physically located within and is one part of the keyboard controller.  At the time the application

13  for the '273 patent was filed, one of ordinary skill in the art understood that such a combination

14  was possible and, in fact, such combinations were common in laptop computers at the time.

15      39.    Claim 1 calls for "a keyboard controller connected to said keyboard to monitor

16  said conventional keys and said additional function key to detect when at least one of said keys is

17  activated."  Claim 5 calls for "a keyboard controller coupled to said keyboard."  Columns 7 thru 8

18  and Figure 7 of the '273 patent disclose preferred embodiments in which the keyboard and the

19  keyboard controller are combined as a single unit.  One skilled in the art in reading the above

20  mentioned portions of the '273 patent understands that the words "connected" and "coupled" are

21  broad words and encompass these preferred embodiments.

22      40.    The second claim element indicates the conditions for generating the second

23  interrupt signal when it says:

24      "activation of said additional function key in combination with at least one
    of said conventional alphanumeric keys to generate a second interrupt signal."
25  ('273 patent, col. 13 ll. 53-56).

26      One of ordinary skill in the art would understand that this means that the second interrupt

27  signal is generated by the keyboard controller in response to the activation of the Fn key in

28  combination with at least one of the conventional alphanumeric keys for interrupting the

-14-

EM\7182668.1
1190860-904400

DECLARATION OF DR. ROBERT G. WEDIG IN SUPPORT OF PLAINTIFF SAMSUNG ELECTRONICS
CO., LTD.'S PROPOSED CLAIM CONSTRUCTION/CASE NOS. C 00-04524 VRW & C 00-01-02424 VRW

1   computer.  There is no restriction placed in the claim element on what signal may be used to

2   provide the second interrupt signal.  The term "interrupt signal" is a generic engineering term that

3   long pre-dates the filing of the application that led to the '273 patent.  In one embodiment of the

4   '273 patent, the signal IRQ15 is used as one example, but one of ordinary skill in the art would

5   not be so restricted to use only that signal or any other IRQ signal.  The second interrupt signal

6   can be any interrupt signal, which can be generated as described in the claim element.  One of

7   ordinary skill in the art at the time of the patent would have understood that other such interrupts

8   that could be used as the second interrupt signal would have included IRQ2-IRQ14, SMI and

9   NMI.  Moreover, because the term "interrupt signal" is a generic engineering term that describes

10  a type of signal, and because of continuing advances in technology, one of ordinary skill in the art

11  at the time of the patent would have understood that new interrupt signals could be developed in

12  the future that also could be used as the second interrupt signal.  One such interrupt is SCI.

13      41.     The second claim element of claim 1 indicates that the additional function key

14  must be pressed "in combination with at least one of said conventional alphanumeric keys."  This

15  does not imply, and one of ordinary skill in the art would not understand, that this means that

16  there must be some ordered sequence of pressing the additional function key and one or more

17  conventional alphanumeric keys.  The claim does not require that the Fn key must be pressed first

18  and a conventional alphanumeric key must be pressed second or a conventional alphanumeric key

19  must be pressed first and the Fn key must be pressed second.  The specification teaches that the

20  Fn key should be pressed "in conjunction" with at least one of the alphanumeric keys.  ('273

21  patent, col. 7 ll. 1-7).  One of ordinary skill in the art would not understand this to imply any type

22  of ordered sequence.

23  **IX.     DATA SCAN CODE**

24      42.     The third element of claim 1 reads as follows:

25

26          a first conventional interrupt handling routine within said ISA-
            compatible computer responsive to said first interrupt signal from
            said keyboard controller to input data scan codes from said
27          keyboard; and ('273 patent, col. 13 l. 58-61).

28      One of ordinary skill in the art would understand that this claim element specifies that

-15-

1   when the ISA-compatible computer receives the first interrupt signal, it must stop executing the

2   program that it was working on and start to execute the first conventional interrupt handling

3   routine.  Furthermore, the claim indicates and the specification describes that the first

4   conventional interrupt handling routine is a first interrupt handling routine that responds to the

5   first interrupt signal from the keyboard controller by inputting data scan codes originating at the

6   keyboard. ('273 patent, col. 2 ll. 59-63; col. 5 ll. 10-31; Figures 2, 3 and 6).

7         43.      Each time a key or combination of keys is pressed or released on an ISA-

8   compatible computer keyboard, a value, called a scan code, is generated.  One of ordinary skill in

9   the art would understand from the specification that a data scan code is a code that corresponds to

10  a particular key or a particular key combination on the keyboard.  ('273 patent, col. 2 ll. 59-63;

11  col. 4 ll. 12-30; col. 5 ll. 21-31; col. 7 l. 51 – col. 8 l. 46; Figures 2-3, 6-9).  The scan code

12  appears in different forms as the code travels though the computer system but it always

13  corresponds to a key or key combination.  When a keyboard row and column matrix is scanned

14  and the keyboard microprocessor determines that one or more keys are pressed, the value of the

15  row lines and column lines uniquely identify which key or key combination was pressed.  This

16  value is one form of scan code.  The information of the row and column lines identifying the

17  pressed key or keys is used to generate another form of scan code.  Before the scan code is read

18  by the first interrupt routine, the value obtained from the row and column scan may be converted

19  into another value that is commonly understood by software programs.  This converted value is

20  another form of the scan code since it also uniquely identifies which key or key combination has

21  been pressed.

22  **X.**      **FIRST MEMORY LOCATION POINTER, SECOND MEMORY LOCATION**

23           **POINTER**

24        44.      Claim 4 of the '273 patent reads as follows:

25        The system for providing a built-in function as defined in claim 1,
      further comprising a central processing unit that indexes a first

26        memory location pointer in response to said first interrupt signal,
      said central processing unit further indexing a second memory

27        location pointer in response to said second interrupt signal. ('273
      patent, col. 14 ll. 16 – 21).

28

-16-

1    Claim 4 teaches that the system described in claim 1 has a central processing unit that,

2    upon receiving the first interrupt signal, indexes a first memory location pointer. To one of

3    ordinary skill in the art, a memory location pointer is a value that indicates the location of a

4    specific memory item such as data or a routine. A memory location pointer may reside in

5    memory or it may reside in a temporary location outside the memory such as in the CPU. In

6    claim 4, the first memory location pointer is an identifier that corresponds to the start of the first

7    conventional interrupt handling routine. The claim does not specify the location of the first

8    memory location. It only specifies that the CPU must index a first memory location pointer. To

9    one of ordinary skill in the art, indexing the first memory location pointer, as it is used in the

10    claim, means to locate the first memory location pointer. The means for locating the first

11    memory pointer is not specified in the claim.

12    45.    An exemplary embodiment in the specification describes one way of indexing the

13    first memory location pointer. Exhibit M illustrates that when the CPU receives an interrupt

14    indicating that a conventional key has been pressed, the CPU will then access a memory pointer

15    that indicates where the interrupt service routine is located. ('273 patent, col. 5 ll. 1-16).

16    However, this illustration is one example of how to index to the first memory location pointer and

17    one of ordinary skill in the art would not limit the claim to covering only this method of indexing.

18    For example, the first memory location pointer may be a fixed location in memory or a temporary

19    storage location in the CPU. One of ordinary skill in the art would understand that indexing or

20    locating the first memory location pointer in a fixed location or a temporary storage in the CPU

21    would also be covered by the claim element.

22    46.    Like the first memory location pointer, the second memory location pointer is an

23    identifier that corresponds to the start of the second non-conventional interrupt handling routine.

24    Exhibit N illustrates one embodiment that shows that when the CPU receives a second interrupt

25    signal, it will then access a memory pointer that indicates where the Fn interrupt service routine is

26    located. ('273 patent, col. 6 ll. 52-60). The claim does not say how the indexing or accessing is to

27    be carried out. In particular, it specifically does not indicate that it is necessary to utilize an

28    interrupt vector to perform the indexing. Although such a vector is utilized in one embodiment,

-17-

there is no such limitation called for in the claim and limiting the claim interpretation to require the use of an interrupt vector would be incorrect. For example, an interrupt vector does not need to be used at all. The second memory location pointer may be a fixed location in memory or a temporary storage location in the CPU. One of ordinary skill in the art would understand that indexing or locating the second memory location pointer in a fixed location or a temporary storage in the CPU would also be covered by the claim element.

## XI. SECOND INTERRUPT SIGNAL ON SAID SECOND INTERRUPT SIGNAL LINE UPON RECEIPT OF A SCAN CODE CORRESPONDING TO SAID NON-CONVENTIONAL KEY

47. Claim 5 reads as follows:

> A system for servicing keyboard interrupts in an ISA-compatible computer, comprising:
>
> a keyboard having a plurality of keys including conventional alphanumeric keys, conventional symbol keys, conventional function keys and conventional cursor control keys, said keyboard further including at least one non-conventional function key, said keyboard generating a scan code in response to an activation of at least one of said keys, said scan code varying depending upon which of said keys is activated; and
>
> a keyboard controller coupled to said keyboard, said keyboard controller further coupled to said ISA-compatible computer by first and second interrupt signal lines, said keyboard controller generating a first interrupt signal on said first interrupt signal line upon receipt of a scan code corresponding to one of said conventional keys, said ISA-compatible computer programmed to execute a program to input said scan code in response to said first interrupt signal, said keyboard controller generating a second interrupt signal on said second interrupt signal line upon receipt of a scan code corresponding to said non-conventional function key, said ISA-compatible computer programmed to execute at least one special routine upon receipt of said second interrupt signal. ('273 patent, col. 14 ll. 22-48).

48. Portions of claim 5 are the same as claim 1 and to the extent that the same terms are used in the same way, I understand that it should be interpreted the same way. One difference is that the keyboard controller must generate a second interrupt signal upon receipt of a scan code corresponding to the non-conventional function key. Claim 1 does not require receipt of such a scan code. It does however require the keyboard controller to recognize the activation of the additional function key in combination with a conventional alphanumeric key. Claim 5 requires

1   only the receipt of the scan code corresponding to the non-conventional function key.  Therefore,

2   one of ordinary skill in the art would interpret "second interrupt signal on said second interrupt

3   signal line upon receipt of a scan code corresponding to said non-conventional function key" to

4   mean a signal generated by the keyboard controller upon receipt of a scan code corresponding to

5   the non-conventional function key.

6       49.    Claim 5 does not say that the second interrupt signal can only be generated by the

7   keyboard controller when the keyboard controller receives the scan code corresponding to the

8   non-conventional function key alone.  It also does not require that as soon as the keyboard

9   controller receives the scan code for the non-conventional function key, it must issue the second

10  interrupt signal without waiting for an additional key to be pressed.  The specification teaches that

11  the invention is pressing the non-conventional function key along with a conventional key. ('273

12  patent, col. 2 ll. 17-21, 55-59; col. 7 l. 65 – col. 8 l. 46; Figure 8).  The specification also teaches

13  that the preferred embodiment is to use the non-conventional function key along with a

14  conventional key. Therefore, it is not the preferred embodiment to respond to the activation of the

15  non-conventional function key alone and to immediately issue the second interrupt signal without

16  waiting for an additional key to be pressed.

17      50.    One of ordinary skill in the art understands that the F1-F12 function keys operate

18  by generating a first interrupt signal when a function key, F1-F12, is pressed alone.  The

19  specification makes clear that it is not the preferred embodiment to respond to the non-

20  conventional function key alone in a manner similar to the function keys F1 – F12.   ('273 patent,

21  col. 7 ll. 1-19).

22      I declare under the penalty of perjury under the laws of the United States of America that

23  the foregoing is true and correct.  This declaration is executed on this 25 of February, 2005, at

24  Cupertino, California.

25

26                                  DR. ROBERT G. WEDIG

27

28

-19-