1    MARK D. FOWLER, Bar No. 124235
     mark.fowler@dlapiper.com
2    ELIZABETH DAY, Bar No. 177125
     elizabeth.day@dlapiper.com
3    TIMOTHY LOHSE, Bar No. 177230
     timothy.lohse@dlapiper.com
4    SAL LIM, Bar No. 211836
     sal.lim@dlapiper.com
5    GREGORY J. LUNDELL, Bar No. 234941
     greg.lundell@dlapiper.com
6
     DLA PIPER US LLP
7    2000 University Avenue
     East Palo Alto, CA  94303-2214
8    Tel:  650.833.2000
     Fax:  650.833.2001
9
     Attorneys for Defendant and Counter-Plaintiff
10   SAMSUNG ELECTRONICS CO., LTD.

11

12                  UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                   SAN FRANCISCO DIVISION

15   WISTRON CORPORATION, a Taiwan          CASE NO.  C-07-4748 VRW
     corporation,
16                                          **SAMSUNG ELECTRONIC CO., LTD.'S
                                            REPLY CLAIM CONSTRUCTION BRIEF**
17               Plaintiff and Counter-
                 Defendant,                 Claim Construction Hearing:
18                                          Date:        September 17, 2008
           v.                               Time:        10:00 a.m.
19                                          Courtroom: 6, 17th Floor
     SAMSUNG ELECTRONICS CO., LTD., a       Judge:       Hon. Vaughn R. Walker
20   Republic of Korea corporation,

                 Defendant and Counter-
21               Plaintiff.

22
     SAMSUNG ELECTRONICS CO., LTD.,
23
                 Counterclaim-Plaintiff,
24
           v.
25
     WISTRON CORPORATION, and
26   WISTRON INFOCOMM (TEXAS)
     CORPORATION,
27
                 Counterclaim-Defendants.
28

DLA PIPER US LLP    WEST\21458962.1        SAMSUNG ELECTRONICS CO., LTD.'S REPLY CLAIM CONSTRUCTION BRIEF
                                                                        CASE NO. C 07-04748 VRW

1

## **TABLE OF CONTENTS**

2

**Page**

3   I.      INTRODUCTION ............................................................................................................ 1

4   II.     U.S. PATENT NO. 5,333,273 (the "'273 patent") .......................................................... 1

        A.      Data Scan Code/Scan Code.................................................................................. 1

5       B.      First Interrupt Signal ........................................................................................... 3

6       C.      Second Interrupt Signal ....................................................................................... 4

7       D.      Second Interrupt Signal Line ............................................................................... 4

8       E.      Non-Conventional Function Key/Additional Function Key ................................. 6

        F.      Combination......................................................................................................... 6

9       G.      Program ............................................................................................................... 7

        H.      Special Routine .................................................................................................... 7

10      I.      "Indexing" Claim Limitations.............................................................................. 9

11  III.    U.S. PATENT NO. 5,625,275 (the "'275 patent") .......................................................... 9

12      A.      Block ................................................................................................................... 9

        B.      Variable ............................................................................................................... 9

13      C.      First Inactive State ............................................................................................. 10

14  IV.     U.S. PATENT NO. 6,523,100 (the "'100 patent") ........................................................ 10

15      A.      Memory Controller Unit .................................................................................... 10

16      B.      Configured To Receive ...................................................................................... 12

        C.      To Provide ......................................................................................................... 12

17      D.      Indication Of Access Speed ............................................................................... 12

18      E.      Access Timing.................................................................................................... 13

        F.      Commensurate (with)......................................................................................... 14

19  V.      CONCLUSION ............................................................................................................. 15

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**CASES**                                                                      **Page**

3
*Abtox, Inc. v. Exitron Corp.*,
    131 F.3d 1009 (Fed. Cir. 1997) ............................................................................... 11
4

*Athletic Alternatives, Inc. v. Prince Mfg, Inc.*,
5
    73 F.3d 1573 (Fed. Cir. 1996) ................................................................................. 9

6
*Decisioning.com v. Federate Dept. Stores, Inc.*,
    527 F.3d 1300 (Fed. Cir. 2008) ............................................................................... 11
7

*Kao Corp. v. Unilever United States, Inc.*,
8
    441 F.3d 963 (Fed. Cir. 2006) ................................................................................. 11

9
*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................................................ 9, 11
10

*Signtech USA, Ltd. v. Vutek, Inc.*,
11
    174 F.3d 1352 (Fed. Cir. 1999) ............................................................................... 13

12
*Teleflex, Inc. v. Ficosa North America Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ............................................................................ 1, 11
13

*The Saunders Group, Inc. v. Comfortrac, Inc.*,
14
    492 F.3d 1326 (Fed. Cir. 2007) ............................................................................... 11

15
*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................................ 14, 15

16

17

18

19

20

21

22

23

24

25

26

27

28

DLA PIPER US LLP    WEST\21458962.1    SAMSUNG ELECTRONICS CO., LTD.'S REPLY CLAIM CONSTRUCTION BRIEF
CASE NO. C 07-04748 VRW

1    **I.    INTRODUCTION**

2        Samsung Electronics Co., Ltd. respectfully requests the Court adopt its proposed claim

3    constructions for the reasons established in its opening brief and this reply brief.

4    **II.    U.S. PATENT NO. 5,333,273 (the "'273 patent")**

5        **A.    Data Scan Code/Scan Code.**

6

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| A code number that the keyboard generates whenever a key is depressed or released, said code number created by converting a pairing of a row signal and a column signal in the keyboard matrix. | A code number that the keyboard generates whenever a key is depressed or released, said scan code number created by converting a pairing of a row signal and a column signal in the keyboard matrix. Each key on the keyboard has a unique scan code. |

10

11        Wistron asks the Court to add the following sentence to the Court's prior construction of

12    this claim term:  "Each key on the keyboard has a unique scan code."  However, this added

13    limitation is not supported by any of the little intrinsic evidence cited by Wistron.  '273 patent,

14    col. 4:12-21, col. 7:51-55, col. 8:35-46, Fig. 8.  Indeed, Wistron cites no claim language to

15    support its construction, and ***no part*** of the specification cited by Wistron mentions "a" "unique"

16    scan code for each key.  As discussed in Samsung's opening brief, the only specification passage

17    using the word "unique" does not refer to scan codes, but instead refers to the operation of row

18    and column signals (which the Court concluded were not scan codes).  '273 patent, col. 7:51-55;

19    Lim Decl., Ex. B, pp. 11-16 (May 12, 2005, Claim Construction Order).  Simply stated, the

20    intrinsic evidence does not support Wistron's conclusion, much less define a limitation in such

21    unequivocal terms that it must be read into the claims.  *Teleflex, Inc. v. Ficosa North America*

22    *Corp.*, 299 F.3d 1313, 1325-1326 (Fed. Cir. 2002) (limitations cannot be read into the claims

23    from the specification absent an express intention to do so).

24        Samsung's opening brief noted "Wistron has not articulated a substantive reason for its

25    proposed additional limitation, and it is unclear what added meaning or requirement this

26    additional language imposes."  Samsung Op. Br., at 5.  While Wistron initially responds that this

27    added language is "needed in this case" (Wistron Resp. Br., at 5.), Wistron fails and refuses to

28    identify why the language is needed in this case, and fails and refuses to explain what this added

1    language means in the context of the patent. *Id.*

2        Samsung's opening brief identified two possible meanings Wistron may be ascribing to its

3    proposed "unique scan code" language, *i.e.,* two added claim limitations Wistron may be seeking

4    to impose through this language. Samsung's brief also explained why such added limitations are

5    incorrect. Samsung Op. Br., at 5; Wedig Decl., ¶¶ 35-41, Exs. N-P. Wistron does not challenge

6    Samsung's showing that both limitations are incorrect. Thus, Wistron presents proposed

7    language to the Court (1) to which Wistron ascribes no meaning, nor offers any explanation as to

8    its impact on claim scope, and (2) that Samsung demonstrated, without rebuttal from Wistron,

9    would import improper limitations into the claims.

10       Wistron asserts Samsung is asking Wistron to identify its non-infringement arguments.

11   This is incorrect. Rather, Wistron has failed to explain what its proposed language means and its

12   impact on claim scope. This failure does nothing to advance the purposes of claim construction

13   and, if Wistron's construction were adopted, only would postpone a determination by the Court of

14   the meaning of Wistron's proposed language.

15       Wistron incorrectly suggests Dr. Wedig agrees with Wistron's position. However, Dr.

16   Wedig testified to the contrary: "[T]he statement each key on a keyboard has a unique scan code

17   is not true." Davis Decl., Ex. 4, at 122:25-124:6. Wistron also distorts Dr. Wedig's opinion

18   beyond recognition by selectively quoting partial sentences from his declaration, repeatedly

19   replacing important testimony with ellipses. Dr. Wedig's complete testimony, including the

20   evidence cited by him, is contrary to Wistron's position. Wedig Decl., ¶¶ 34-41, Exs. N-P.[1]

21       None of the other evidence cited by Wistron is any more compelling. The testimony of

22   Wistron's expert, Mr. Clark, simply consists of several brief, wholly unsubstantiated assertions.

23   Clark Decl., ¶¶ 36-37. Indeed, the "factual" assertions made by Mr. Clark – such as each key

24

25   [1] Wistron's citation in footnote 6 of its brief to Dr. Wedig's prior testimony also is not faithful to Dr.
     Wedig's opinions. For example, regarding the Microsoft Dictionary definition of scan code, Dr. Wedig
26   testified: "Q. Are you telling me that it's wrong because it's incomplete? A. Yes." Davis Decl., Ex. 5, at
     64:20-65:22. Nor do either of Dr. Wedig's prior declarations stand for the proposition Wistron now
27   advocates, *i.e.*, that "scan code" in the '273 patent should bear the added limitation that each key on the
     keyboard has "a" "unique" scan code. In fact, Dr. Wedig's declaration testimony is to the contrary. Davis
28   Decl., Ex. 6, ¶¶ 50-53, Ex. 7, ¶¶ 42-43.

-2-

1    only has "a" "unique" scan code – are demonstrably false, as demonstrated by Dr. Wedig.  Wedig

2    Decl., ¶¶ 35-41, Exs. N-P.

3        Wistron also points to extrinsic evidence in the form of the Microsoft Dictionary.  Davis

4    Decl., Ex. 3, p. 464.  Wistron asserts it "simply" is adding the second sentence of the dictionary's

5    definition to the Court's construction.  As established above, however, Wistron does not explain

6    how inclusion of this second sentence is supported or mandated by the intrinsic evidence.  (Nor

7    does it explain, for that matter, why, out of the last four sentences of the dictionary's definition,

8    only the second sentence bears on the meaning of the term "scan code" in the '273 patent.)

9        Finally, Wistron cites Judge Rainey's ruling in the prior *Inventec* and *Arima* litigation.

10    However, the cited portion of Judge Rainey's opinion held that row and column signals may be a

11    form of scan code.  Davis Decl., Ex. 2, at 6-7.  This Court reached a contrary conclusion.  Lim

12    Decl., Ex. B, at 15-16.

13    **B.    First Interrupt Signal.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| IRQ1. | The ISA Standard IRQ1 interrupt signal. |

16        Nowhere do the claims, specification or prosecution history require the IRQ1 signal be an

17    "ISA standard IRQ1" signal, or even mention a "standard IRQ1" signal.  Not surprisingly then,

18    Wistron's brief fails to cite any intrinsic evidence in support of its construction. On the other

19    hand, as demonstrated by Samsung's opening brief, Samsung's proposed construction is

20    consistent with the teaching of the specification, as well as with the Court's prior rulings

21    concerning whether the "ISA standard" can be read into individual claim limitations.  Samsung

22    Op. Br., at 6.  Wistron fails to address the substance of either of these points.

23        Wistron's stated rationale for its construction is a computer maker might "arbitrarily" or

24    "randomly" identify the signal it uses in its computers as an "IRQ1" signal.  Wistron Resp. Br., at

25    5-6.  However, Wistron identifies no actual instance of any such "absurd" behavior.

26        Wistron also again resorts to asserting Dr. Wedig said something he did not.  Wistron's

27    counsel asked Dr. Wedig a hypothetical question that included, as an express assumption, that the

28

-3-

1   computer in question was not ISA-compatible (contrary to the claims' express requirement that

2   the computer be "ISA-compatible").  Dr. Wedig correctly responded that there would be no

3   infringement, even if someone had "arbitrarily" called a signal "IRQ1," because the computer

4   failed to meet the ISA-compatible limitation.  Davis Decl., Ex. 4, at 124:23-126:21.

5         **C.**     **Second Interrupt Signal.**

6

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Any interrupt other than IRQ1. | Any interrupt signal other than IRQ1 interrupt signal. |

8

9        Samsung's proposed construction is identical to the Court's prior construction.  Wistron

10  does not contend the Court's construction is incorrect, and Samsung disagrees with Wistron's

11  unsupported assertion that the construction may confuse the jury.

12        **D.**     **Second Interrupt Signal Line.**

13

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| A second, separate signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the second interrupt signal. | A second, <u>dedicated</u> separate signal line from the keyboard controller connected to the ISA-compatible computer for transmitting the second interrupt signal.  (Emphasis added.) |

16

17       There is no basis whatsoever for Wistron's contention that the second interrupt signal line

18  must be "dedicated" to a single purpose.  None of the intrinsic evidence cited by Wistron

19  supports, much less requires, the imposition of such an added limitation.

20       The claims and the specification *never* say the second interrupt line is or should be

21  dedicated to sending only the second interrupt signal.  In purported support of its position,

22  Wistron quotes a portion of column 4 of the specification and italicizes, underlines and bolds the

23  word "dedicated," suggesting the word somehow refers to the second interrupt signal line.

24  Wistron Resp. Br., at 8; '273 patent, col. 4:24-43.  However, the cited passage discusses Figure 2

25  of the patent, which describes the prior art without the claimed invention.  '273 patent, Fig. 2

26  (note the absence of a second interrupt signal line, as compared with Figure 6, which illustrates

27  IRQ15 as an embodiment of the second interrupt signal line).  Moreover, the "dedicated signal

28  lines" cited by Wistron "form part of the processor bus 114."  *Id.*, col. 4:37-43.  As demonstrated

-4-

1    by both Figures 1 and 4 of the patent, the "processor bus 114" is a bus that is different from, and

2    does not include, either IRQ1 (identified in both figures) or IRQ 15 (identified in Figure 4).

3    Thus, this part of the specification is not describing the first or second interrupt signal lines

4    claimed in the patent.  Furthermore, even as to the "dedicated lines" on the processor bus, the

5    specification is teaching that certain lines are dedicated to sending interrupt signals (as opposed to

6    sending other signals and data), and never states or suggests that any one line is dedicated to

7    sending just one specific interrupt signal.  *Id.*

8            Wistron also quotes a lengthy part of column 12 of the specification, again placing the

9    word "dedicated" in emphasis.  Wistron Resp. Br., at 8; '273 patent, col. 12:21-13:27.  Once

10    again, Wistron mischaracterizes the quoted passage.  As is evident from the face of the passage, it

11    is "the interrupt service routine [that is] *dedicated* to handling IRQ15." '273 patent, col. 13:14-15

12    (emphasis added).  It is undisputed claim 1 requires a second interrupt handling routine to handle

13    the second interrupt signal.  *Id.*, col. 14:1-7.  This is one of the inventive features of the patent,

14    and it is this that is being described in the quoted passage, not dedicating a signal line for the

15    exclusive purpose of sending the second interrupt signal.  Moreover, contrary to Wistron's

16    unsupported assertion, nowhere does the cited passage state the second interrupt signal line is

17    used solely to transmit IRQ15 and may not also transmit other signals.

18            Wistron also cites portions of the specification that describe using separate signal lines for

19    IRQ1 and the second interrupt signal line, respectively, in order to avoid the interference found in

20    the prior art.  Wistron Resp. Br., at 7-8.  Samsung completely agrees the specification describes

21    using separate lines for IRQ1 and the second interrupt signal, and, in fact, the claims require such

22    separate lines.  '273 patent, col. 13:46-47, col. 14:35-36.  Indeed, recognizing that using different

23    signal lines for IRQ1 and the second interrupt signal is part of the invention, the parties' proposed

24    constructions each state the first and second interrupt signal lines must be "separate."  However,

25    the fact that the first and second interrupt lines must be separate does not mean the second

26    interrupt signal line cannot itself be used to transmit different signals at different times (as long as

27    it is not being used to transmit IRQ1).

28            Wistron twice cites the part of the specification indicating IRQ15 can be used as the

-5-

1  second interrupt signal line because it typically is not used. '273 patent, col. 6:42-45. Again,

2  however, stating the IRQ15 signal line can be used as the second interrupt signal line does not

3  mean that line also cannot be used to transmit other signals (other than IRQ1). Nor does the

4  specification ever suggest, much less purport to impose, such a limitation. This is not surprising,

5  as one of skill in the art knows signal lines can be used for multiple functions. Wedig Decl., ¶ 45.

6       Wistron cites the prosecution history twice. Wistron Resp. Br., pp. 7-8; Davis Decl., Ex.

7  8, WIS0111309-10. However, neither cited page states or suggests the second interrupt signal

8  line must be dedicated to a single use. Rather, the cited statements only stand for the proposition,

9  reflected in the claims themselves, that the first and second interrupt signal lines must be separate

10  lines in order to avoid interference between IRQ1 and the second interrupt signal. *Id.*

11       Finally, Wistron turns to its expert, who asserts, in a merely conclusory fashion, that a

12  dedicated signal line is "necessary" to accomplish "the goal" of the invention because using a

13  shared signal line would "invite" interference. Clark Decl., ¶ 41. However, Mr. Clark cites no

14  evidence to support his bald assertion. Moreover, Mr. Clark's testimony is entirely beside the

15  point because the *only* interference addressed in the '273 patent is that which is avoided by

16  separating IRQ1 and from the interrupt signal generated by hotkeys. '273 patent, col. 13:43-col.

17  14:7, col. 14:33-48. The patent does not address any other hypothetical interference potentially

18  resulting from using the second interrupt signal line to transmit different signals at different times.

19      **E.**    **Non-Conventional Function Key/Additional Function Key.**

20

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Plain meaning (no construction is required). | An additional function key other than a conventional function key. |

21

22

23       Samsung disagrees with Wistron's unsupported assertion that there is a danger of jury

24  confusion, and agrees with the Court's prior conclusion that these terms require no construction.

25      **F.**    **Combination.**

26

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Plain meaning (no construction is required). | Simultaneously. |

27

28       Claim 1 recites the "activation" of the additional function key in "combination" with an

-6-

1  alphanumeric key.  '273 patent, col. 13:52-55.  As established in Samsung's opening brief, the

2  specification establishes the "activation" of the two keys is not "simultaneous."  Samsung Op.

3  Br., at 8-9; '273 patent, col. 7:65-68, Fig. 8.  Wistron's construction must therefore be rejected.

4  Furthermore, contrary to Wistron's claims of purported "admissions," Dr. Wedig explained why

5  Wistron's construction is incorrect both in his declaration and during his deposition.  Wedig

6  Decl., ¶ 51; Davis Decl., Ex. 4, 169:22-172:11.

7  **G.    Program.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| A handling routine that causes the computer to receive keyboard scan codes from the keyboard controller. | To perform a series of instructions to input the scan code. |

11     The specification explains that a handling routine performs the program's claimed

12  function: "As part of ***the keyboard interrupt service routine***, the microprocessor 110 is caused to

13  enable the keyboard controller 128 . . . to communicate the keyboard scan codes from the

14  keyboard controller to the microprocessor 110."  '273 patent, col. 5:21-25 (emphasis added).  On

15  the other hand, the specification does not recite or describe "performing a series of instructions."

16  As Samsung's proposed construction is consistent with the intrinsic evidence, Samsung requests

17  the Court adopt its proposed construction.

18  **H.    Special Routine.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| A routine that is executed upon receipt of the second interrupt signal. | A routine that is <u>only</u> executed upon receipt of the second interrupt signal and the <u>scan code corresponding to one of the conventional keys</u>.  (Emphasis added.) |

23     Wistron's sole justification for its requirement that the "special routine" be executed

24  "only" upon receipt of the second interrupt signal is its assertion that Samsung's construction

25  permits the "special routine" to be triggered by the first interrupt signal and, therefore (according

26  to Wistron), the claimed "program" and claimed "special routine" may be the same thing.  This

27  "straw man" argument is without merit.  First, as the patent is clear on this point, Samsung does

28

1    not contend the claimed "first interrupt signal" may trigger the "special routine" – and Samsung

2    has no objection to the Court stating this in its claim construction order.  Second, as the patent

3    also is clear on this point, Samsung does not contend the claimed "program" and the claimed

4    "special routine" can be the same thing – again, Samsung has no objection to the Court stating

5    this in its order.  These two points obviate the purported need for Wistron's construction.

6         Moreover, as established in Samsung's opening brief, nothing in the intrinsic or extrinsic

7    evidence precludes the "special routine" from being triggered by events other than receipt of the

8    second interrupt signal (other than, as Wistron correctly points out, the receipt of the claimed

9    "first interrupt signal").  Samsung Op. Br., at 10.  Therefore, there is no basis in the intrinsic

10   evidence for Wistron's narrowing construction.

11        Wistron's second assertion, that the special routine is executed upon receipt of the scan

12   code corresponding to "one of the conventional keys," is plainly incorrect.  First, claim 5 does not

13   say this.  Second, claim 5 is clear the special routine is executed upon receipt of the second

14   interrupt signal, which is generated upon receipt of a scan code corresponding to the "non-

15   conventional function key," not to a scan code corresponding to "one of the conventional keys":

16        said keyboard controller generating a second interrupt signal on said second
          interrupt signal line upon receipt of **a scan code corresponding to said non-**
17        **conventional function key**, said ISA-compatible computer programmed to
          execute at least one special routine upon receipt of said second interrupt signal.
18

19   '273 patent, col. 14:42-48 (emphasis added).

20        Wistron's proposed construction literally changes the claim by replacing the phrase "said

21   non-conventional function key" with the phrase "one of the conventional keys."  Accordingly, not

22   only is Wistron's proposed construction unsupported by the claim language, it is inconsistent with

23   the claim language.  Wistron's proposed construction must therefore be rejected.

24        The cases cited by Wistron at pages 12 and 13 of its brief are inapposite.  Each of the cited

25   cases, even as described by Wistron, concern claim language which on its face could be construed

26   broadly according to its ordinary meaning, but which the Federal Circuit concluded could not be

27   so construed in light of the content of the intrinsic record.  Each of these cases involved a

28   situation "[w]here there is an equal choice between a broader and a narrower reading of the

-8-

DLA PIPER US LLP    WEST\21458962.2    SAMSUNG ELECTRONICS CO., LTD.'S REPLY CLAIM CONSTRUCTION BRIEF;
C-07-4748-VRW

1  claim." *Athletic Alternatives, Inc. v. Prince Mfg, Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996). This

2  is not such a case of equal choices. Here, Wistron seeks to modify the clear, express claim

3  language to comport with an embodiment in the specification. None of the cases cited by Wistron

4  permits such a result.[2]

5  **I.     "Indexing" Claim Limitations.**

6  Wistron's arguments concerning the construction of these claim terms are incorrect for the

7  reasons set forth in Samsung's opening brief at pages 11 and 12.

8  **III.    U.S. PATENT NO. 5,625,275 (the "'275 patent")**

9  **A.    Block.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| The transistor is biased off. | Stop the flow of charging current. |

12  Wistron's construction is incorrect because it reads dependent claim 5 out of the patent *if*,

13  as it appears from Wistron's brief, Wistron contends "blocking" does not at least encompass

14  "biasing the transistor off." Samsung Op. Br., p. 15. Wistron's brief does not deny this.

15  Samsung's construction, on the other hand, is supported not only by the express language

16  of claims 5 and 8, but also by the last six parts of the specification that teach blocking as biasing

17  the transistor on and off. Samsung Op. Br., at 15-16. *Phillips,* 415 F.3d at 1315 (the specification

18  is the single best guide to the meaning of the claim term).

19  Finally, Wistron quibbles with Samsung's construction because it uses the language of the

20  specification, rather than being phrased in verb tense. If this is a concern, the Court could revise

21  Samsung's construction to read "bias the transistor off."

22  **B.    Variable.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| Plain meaning (no construction is needed). | Adaptable. |

25

26  [2] Wistron asserts in passing that Samsung's construction is not enabled by the specification. However, Wistron's expert, Mr. Clark, does not so opine. In any event, Samsung disagrees with Wistron's invalidity

27  contention, which contention cannot alter the construction required by the clear claim language. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005) (existence of explicit claim language precludes

28  construing claim in light of alleged invalidity argument).

-9-

1    Wistron's brief fails to articulate any legitimate reason, rooted in the intrinsic evidence,

2    for replacing the clear word "variable" with the word "adaptable."  Indeed, in attempting to

3    shoehorn "adaptable" into "variable," Wistron is forced to use the word "vary" to explain its

4    position.  Wistron Resp. Br., at 16 (lines 21 and 24) and 17 (line 3).

5    Wistron also ignores the context of "variable" in the claims.  Claim 1 refers to "current at

6    a variable level" and "said variable changing current level."  '275 patent, col. 9:33, 36.  Thus,

7    "variable" refers to the current level.  However, the current does not itself "adapt" to anything.

8    Rather, if anything "adapts," it is the claimed power supply adapting to the circumstances

9    described in the patent.  This adapting is accomplished by the specific means recited in claim

10   limitations.  Thus, not only does "adaptable" not fit into "variable," it would be inappropriate to

11   short-hand many specific claim limitations through Wistron's construction.

12   **C.    First Inactive State.**

13

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| The state in which the transistor is biased off. | The signal state that represents no charging current is flowing. |

14

15   The parties agree the "first inactive state" of the control signal results in the same

16   condition as when the charging current is "blocked" in claim 1.  The parties also agree that their

17   arguments regarding "blocking" also apply here.

18   **IV.    U.S. PATENT NO. 6,523,100 (the "'100 patent")**

19   **A.    Memory Controller Unit.**

20

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Chip circuitry, other than a memory access requestor, that provides the access timing. | A controller that receives an indication of access speed on each access. |

21

22

23   Wistron's entire argument boils down to its contention that an indication of access speed

24   "on each access" limitation should be imported into the claims. This contention is unfounded.

25   While Wistron asserts such a limitation "is supported . . . by the claim language," Wistron

26   never cites any supporting claim language – because no such language exists.  Wistron Op. Br., at

27   18. Indeed, the claims of the '100 patent stand in stark contrast to the claims of the "parent" of

28   the '100 patent, United States Patent No. 6,021,477 (the "'477 patent").  In this regard, as the

-10-

1    "parent" of the '100 patent, the '477 is relevant evidence to be considered in construing the '100

2    patent. *See Abtox, Inc. v. Exitron Corp.*, 131 F.3d 1009, 1010 (Fed. Cir. 1997).

3        Unlike the '100 patent, the '477 patent claims include an "on each access" limitation. *See*

4    Declaration of Mark Fowler In Support Of Samsung Electronic Co., Ltd.'s Reply Claim

5    Construction Brief ("Fowler Decl."), Ex. A, '477 patent, col. 12:3 (claim 1 – "on an access-by-

6    access basis").  This distinction between the claims of the '100 patent and the '477 patent

7    establishes that the applicant, by not including an "on each access" limitation in the claims of the

8    '100 patent, made a choice that should be honored to not impose such a limitation in the '100

9    patent. *See Kao Corp. v. Unilever United States, Inc.*, 441 F.3d 963, 973 n5 (Fed. Cir. 2006)

10    (Federal Circuit noted that differences in claim language between parent and child must be

11    recognized otherwise "the subsequent patent application would have been superfluous.").

12        Nor do the specification or prosecution history purport to require such a limitation, much

13    less clearly express an intent to impose such a requirement. *Teleflex*, 299 F.2d at 1313.  Imposing

14    such a requirement would result in limiting the claims to one exemplary embodiment where there

15    is nothing in the claims or the specification to compel such a result. *Decisioning.com v. Federate*

16    *Dept. Stores, Inc.*, 527 F.3d 1300, 1309 (Fed. Cir. 2008) (refusing to limit claims to preferred

17    embodiment); *The Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir.

18    2007) (refusing to limit claims to sole embodiment described in specification); *Phillips*, 415 F.3d

19    at 1323 ("we have expressly rejected the contention that if a patent describes only a single

20    embodiment, the claims of the patent must be construed as being limited to that embodiment").

21        In particular, while Wistron's brief points to the patent's teaching of a "state machine" –

22    which is cited by the specification only as an "example" ('100 patent, col. 4:8-9) – there is no

23    teaching in the patent that in such a state machine an indication of access speed is received on

24    each access.  '100 patent, col. 4:9-63.  Nor does Wistron's expert so opine.  Nor does the excerpt

25    from the prosecution history cited by Wistron mention (much less impose) an "on each access"

26    limitation.  Davis Decl., Ex. 13, at WIS0111797, 814-16.

27        Finally, relying only on a one-line statement by Mr. Clark, Wistron asserts that "during

28    each access is the novel aspect of the system of the '100 patent."  Wistron Resp. Br., at 18.

-11-

1    However, this assertion is wrong as demonstrated by Dr. Wedig's testimony. *See* Wedig Decl.,

2    ¶¶ 54-56.

3        **B.    Configured To Receive.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| Plain meaning, which is "designed to receive." | Set up to receive during each access. |

6        Wistron's attempt to re-write the claims to include an "each access" limitation must be

7    rejected for the reasons discussed immediately above. Samsung Op. Br., at 20-21; *see also*

8    Fowler Decl., Ex. B, Wedig Depo., at 184:18-186:23.

9        **C.    To Provide.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| Plain meaning (no construction is needed). | Supply during each access. |

11       The "each access" issue presented by Wistron with respect to the "to provide" claim term

12   is different than the "each access" issue presented by Wistron in connection with "memory

13   controller unit" and "configured to receive" limitations. In particular, the "memory controller

14   unit" and "configured to receive" claim limitations each pertain to the <u>receipt</u> of "<u>an indication of</u>

15   <u>access speed</u>," whereas the "to provide" claim limitation pertains to <u>providing</u> "<u>an appropriate</u>

16   <u>access timing</u>." '100 patent, col. 11:47-51, col. 12:17-25.

17       As established above, there is no basis for importing an "each access" limitation into the

18   of "memory controller unit" or "configured to receive" limitations. As to "to provide," these

19   words are clear and no construction is required. However, even if the Court concludes, based

20   upon the evidence cited by Wistron, that an "each access" construction is appropriate for this

21   claim term, it still would be improper to import an "each access" limitation into the "memory

22   controller unit" and "configured to receive" limitations for the reasons established above.

23       **D.    Indication Of Access Speed.**

| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| Data that identifies the read/write speed of the memory module. | State of a signal line connecting between a memory unit (MU) and the memory control unit (MCU) that represents memory clock rate information. |

1    The claims do not require the "indication" take any particular form or be received from

2    any particular source – only that there be "an indication." '100 patent, col. 11:48-49, col. 12:21-

3    22. One of skill in the art understands the "indication" only must be a type of data provided to the

4    MCU indicating access speed, and that multiple types of data can provide such information.

5    Wedig Decl., ¶ 74. The inventor's careful choice of this broad "indication" claim language

6    should be honored. *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1358 (Fed. Cir. 1999).

7    Wistron replaces the claim term "indication" with a narrow construction consisting of the

8    state of a particular signal line between two particular components – one of only many specific

9    ways the claimed "indication" could be received. Wedig Decl., ¶ 74. Wistron thus once again

10   seeks to improperly read a single narrow embodiment from the specification into a broad claim.

11   Wistron also asserts "Samsung's proposed construction improperly changes this 'status

12   signal' to a broad and vague 'data.'" Wistron Resp. Br., at 20. However, the claim term is

13   "indication," not "status signal," and contrary to Wistron's contention, the "data" in Samsung's

14   construction is specifically limited to that identifying "the read/write speed of the memory

15   modules," with which language Wistron identifies no error.

16   Wistron's argument regarding the prosecution history is without merit. As Samsung itself

17   emphasized in its opening brief (at pages 19-20), the applicant made clear during examination

18   that the claimed memory controller is not the memory requestor (such as a CPU) – the same point

19   now made by Wistron. However, this disclaimer has no bearing on Wistron's assertion that the

20   indication of access speed must be received only "directly" rather than "indirectly." The

21   prosecution history does not address this issue, nor does Wistron (or its expert) offer any

22   explanation as to how these two points are related. Moreover, the claims do not specify the

23   component from which the MCU must physically receive the indication, nor do they specify a

24   path by which such indication must travel. Accordingly, there is no basis to limit the source of

25   the indication to a particular component, or to limit receipt of the indication to a particular path.

26   **E.    Access Timing.**

| Samsung's proposed construction | Wistron's proposed construction |
|---|---|
| Timing of a signal used to control the read/write access of the memory module. | A period of time used to access memory. Access timing is different from access speed. |

-13-

1    The only germane difference between the parties' constructions is Samsung correctly

2    identifies "access timing" as the "timing of a signal," whereas Wistron incorrectly identifies it as

3    a "period of time" used to access memory.

4    Samsung's opening brief cited extensive intrinsic evidence – including both the claims

5    and the specification – establishing "access timing" is the timing of a signal, such as RAS*, used

6    to control the read/write access of the memory module, which is Samsung's construction.

7    Samsung Op. Br., at 23-24; s*ee* also Wedig Decl., ¶ 80. Wistron's brief and expert completely

8    ***ignore all of this intrinsic evidence*** and, instead, simply (and incorrectly) assert the meaning of

9    "access timing" cannot be derived from the intrinsic evidence.

10    Having incorrectly declared that the meaning of "access timing" cannot be derived from

11    the intrinsic evidence, Wistron turns directly to dictionary definitions of "access time" and

12    "timing." However, the claim term is "access timing," not "access time." As established by the

13    intrinsic evidence, "access timing" in the '100 patent is the timing of a signal, not a period of

14    time. In this regard, extrinsic evidence (such as dictionaries) cannot be used to contradict the

15    clear meaning provided in the intrinsic record. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

16    1576, 1584 (Fed. Cir. 1996).

17    Wistron once again incorrectly suggests Dr. Wedig somehow agrees with its position.

18    However, just the opposite is true – Dr. Wedig disagreed and explained why Wistron's position is

19    wrong. Davis Decl., Ex. 4, at 194:6-197:8.

20    **F.    Commensurate (with).**

21    
| Samsung's proposed construction | Wistron's proposed construction |
| --- | --- |
| To accommodate the timing requirements of the memory module. | Corresponding in size. |

23    Amazingly, Wistron asserts that Samsung's construction is "not supported by <u>any</u> intrinsic

24    or extrinsic evidence whatsoever." Wistron Resp. Br., at 22. However, as established in

25    Samsung's opening brief, Samsung's construction is a near verbatim quote from the specification:

26    "AHCMATCH* is a status signal to the MCU 14 which indicates that the MU is adding one half

27    of a MEMCLK cycle to the memory access ***to accommodate the timing requirements of the***

28    ***DRAMs***." '100 patent, col. 8:26-31 (emphasis added). The Abstract similarly recites a "memory

-14-

WEST\21458962.2         SAMSUNG ELECTRONICS CO., LTD.'S REPLY CLAIM CONSTRUCTION BRIEF;
C-07-4748-VRW

1   access cycle ***compatible with*** the indicated access speed." Abstract (Certificate) (emphasis

2   added). Thus, the intrinsic evidence directly aligns with Samsung's proposed construction. Not

3   surprisingly, then, Samsung's proposed construction also is consistent with the intrinsic evidence

4   as understood by one of ordinary skill in the art. Samsung Op. Br., at 24.

5         Wistron's construction – "corresponding in size" – obviously is incorrect because "size" is

6   not being measured or used in any way in the claims. Wistron never answers the question, the

7   size of what? Wistron's construction also is incorrect because (as explained by Wistron) it

8   attempts to impose a one-to-one correspondence between the access timing and the access speed

9   (*i.e.*, any given access speed can have only one corresponding access timing). However, as

10  established in Samsung's opening brief, the claims impose no such restriction, and the

11  specification expressly provides the access timing only needs "to accommodate" or be

12  "compatible with" the access speed. Samsung Op. Br., at 24-25. Thus, any access timing is

13  acceptable as long as it can operate with the access speed.

14        Wistron cites the definition of "commensurate" in a general purpose dictionary. However,

15  in addition to the fact that the definition ("corresponding in size or degree") does not relate to the

16  use of the word "commensurate" in the claims, a dictionary definition cannot be used to

17  contradict clear meaning provided in the intrinsic record. *Vitronics*, 90 F.3d at 1584.

18        Finally, Wistron's brief once again mischaracterizes Dr. Wedig's testimony – claiming

19  "admissions" where in fact none were made. *See* Davis Decl., Ex. 4, at 197:9-200:19.

20  **V.    CONCLUSION**

21        For the above reasons, Samsung requests the Court adopt its proposed constructions.

22  Dated: July 10, 2008                    DLA PIPER US LLP

23

24                                          By  /s/ Mark Fowler
                                                Mark Fowler
25                                              Attorneys for Defendant and Counterclaim Plaintiff
                                                SAMSUNG ELECTRONICS CO., LTD.
26

27

28

-15-
SAMSUNG ELECTRONICS CO., LTD.'S REPLY CLAIM CONSTRUCTION BRIEF;
C-07-4748-VRW